**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA,<br><br>*Petitioner*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>*Respondents*. | ) | Case No. ____________________ |

**PETITION FOR REVIEW**

Pursuant to 47 U.S.C. §402(a) and Federal Rule of Appellate Procedure 15(a), the Broadband Communications Association of Pennsylvania (BCAP) respectfully petitions this Court for review of the Federal Communications Commission's October 1, 2026 order styled *In the Matter of Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318. The order was published in the Federal Register on November 12, 2026. A copy of the order is attached as Exhibit A, and the Federal Register entry is attached as Exhibit B. As relevant here, the order repeals the national audience reach limitation appearing at 47 C.F.R. §73.3555(e), Ex.A.11, which Congress previously directed FCC to set at "39 percent," Consolidated Appropriations Act of 2004, Pub.L.108-199, §629, 118 Stat. 99-100.

This Court has jurisdiction under 28 U.S.C. §2342(1). Venue is proper in this Court under 28 U.S.C. §2343 because BCAP's principal office is in Harrisburg, Pennsylvania. BCAP requests that this Court hold unlawful, vacate, enjoin, and set aside the October 1 order as arbitrary, capricious, in excess of statutory authority, and otherwise not in accordance with law. BCAP further requests that this Court provide such additional relief as may be appropriate.

Respectfully submitted,

s/Paul D. Clement

PAUL D. CLEMENT
JAMES Y. XI
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

JONATHAN A. FRIEDMAN
MICHAEL D. HURWITZ
SAMUEL H. ECKLAND
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006

*Counsel for Petitioner*

November 13, 2026

## CERTIFICATE OF SERVICE

I electronically filed this petition with the Clerk of the Court for the United States Court of Appeals for the Third Circuit on November 13, 2026 using the CM/ECF system. I also sent two copies to the Clerk of Court by overnight Federal Express for service on Respondents pursuant to Federal Rule of Appellate Procedure 15(c)(3) at the following addresses:

Todd Blanche
Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Adam Candeub
General Counsel
Federal Communications Commission
45 L Street NW
Washington, DC 20554

Consistent with 47 C.F.R. §1.13(a), I will also serve an as-filed, date-stamped copy by email to LitigationNotice@fcc.gov. There are no parties admitted to participate in the agency proceedings other than Respondents for purposes of Federal Rule of Appellate Procedure 15(c)(1).

s/Paul D. Clement
Paul D. Clement

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule | ) | MB Docket No. 17-318 |
| | ) | |

**REPORT AND ORDER**

**Adopted: August 6, 2026** **Released: October 1, 2026**

By the Commission: Chairman Carr and Commissioner Trusty issuing separate statements; Commissioner Gomez dissenting and issuing a statement:

**TABLE OF CONTENTS**

Heading Paragraph #

I. INTRODUCTION .... 1
II. BACKGROUND .... 9
III. DISCUSSION .... 20
A. The National Television Multiple Ownership Rule is Not Necessary .... 25
1. The rule is not necessary to promote viewpoint diversity or competition .... 25
2. The rule is not necessary to promote localism .... 30
B. Case-by-Case Review is a Better Way to Promote the Commission's Goals .... 43
1. Potential transaction-specific benefits .... 47
a. Increase in local programming .... 47
b. Increase in innovation .... 59
2. Potential transaction-specific harms .... 60
a. Decrease in local programming .... 60
b. Increase in retransmission consent fees .... 67
c. Loss of journalists and other communications workers .... 80
C. The Commission Has Authority to Repeal the Rule .... 84
IV. PROCEDURAL MATTERS .... 102
V. ORDERING CLAUSES .... 106
APPENDIX A – Final Rule
APPENDIX B – Final Regulatory Flexibility Act Analysis

## I. INTRODUCTION

1. The Commission has been working to empower local broadcast television stations to operate in the public interest, and the agency has been doing so mindful of the modern media marketplace. This includes taking steps that can help ensure broadcasters continue serving the needs of their local communities in today's communications environment. The Commission takes another step in that

direction here by updating its approach to the agency's national television multiple ownership rule for the first time in over 20 years.[1]

2. Dating back to its creation, the Commission has taken actions to regulate the ownership structure of the communications industry that it regulates. Early on, the Commission focused in many cases on blanket prohibitions and *ex ante* regulations. For instance, the Commission once had a blanket prohibition that prevented any one entity from owning both a daily print newspaper and a full-power broadcast station if the station's service contour encompassed the newspaper's community of publication.[2] That prohibition operated to prevent the Commission from even considering whether to allow common ownership regardless of whether the facts pertinent to any particular combination would promote the public interest or not. In 2017, the Commission decided to modify its approach—ultimately allowing for case-by-case reviews of broadcast license transfers to newspaper owners.[3]

3. Likewise, the Commission once had a blanket prohibition generally limiting commercial radio ownership on a nationwide basis to no more than 20 AM stations and no more than 20 FM stations.[4] In 1996, Congress directed the Commission to eliminate this national restriction on radio station ownership.[5] With the elimination of this national *ex ante* restriction, the Commission now reviews applications for radio license transfers and assignments on a case-by-case basis, consistent with applicable standards of the local radio ownership rule.[6] The agency's experience with this regulatory approach has been positive.

4. With successive orders and statutes, the Commission and Congress have been in a decades-long review of the national television multiple ownership cap, but over the years one principle has remained clear—the Commission has always retained authority to modify the rule governing the national cap. Statutory directives, including those in the Consolidated Appropriations Act of 2004, instructed the Commission only to "modify its rules."[7] And the power to modify its rules includes the power to later

---

[1] *See* 47 CFR § 73.3555(e). The Commission invited comment on the national cap in December 2017, and the Media Bureau invited interested parties to refresh the record in June 2025. *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, Notice of Proposed Rulemaking, 32 FCC Rcd 10785 (2017) (*NPRM*); *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, MB Docket No. 17-318, Public Notice, 40 FCC Rcd 4159 (MB 2025) (*Refresh Public Notice*).

[2] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, MB Docket No. 14-50 et al., Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802, 9806, para. 8 (2017) (*2014 Quadrennial Review Order on Reconsideration*).

[3] *Id.* at 9806-08, paras. 8-10. The U.S. Court of Appeals for the Third Circuit (Third Circuit) vacated and remanded the Commission's decision. *Prometheus Radio Project v. FCC*, 939 F.3d 567, 587-88 (3rd Cir. 2019). The U.S. Supreme Court subsequently reversed the Third Circuit's decision. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427-28 (2021). The Media Bureau then reinstated the changes adopted in the Commission's 2017 reconsideration order, including its elimination of the newspaper/broadcast cross-ownership rule. *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al.*, MB Docket No. 14-50 et al., Order, 36 FCC Rcd 9354-55, para. 1 (MB 2021).

[4] An entity was permitted to have an attributable but noncontrolling interest in an additional three AM and three FM stations that were small business-controlled or minority-controlled. *See Implementation of Sections 202(a) and 202(b)(1) of the Telecommunications Act of 1996 (Broadcast Radio Ownership)*, Order, 11 FCC Rcd 12368, 12368-69, para. 2 (1996).

[5] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(a), 110 Stat. 56, 110 (1996) (1996 Act).

[6] 47 CFR § 73.3555(a).

[7] 1996 Act § 202(c)(1)(b); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (CAA).

change them. This principle is highlighted in *Fox Television Stations, Inc. v. FCC* (*Fox I*), where the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) stated that "the choice of 35%"—the then-congressionally specified national audience reach limit—"rather than any other number determined only the starting point from which the Commission was to assess the need for further change."[8]

5. Today, the Commission exercises its authority to modify the rule once again to meet current market realities. In its current formulation, the national cap generally has operated as a blanket prohibition on transactions that would result in the merged entity achieving a national audience reach greater than 39% of television households in the United States. As applied, the rule generally has presumed that it would not be in the public interest to allow a particular deal in excess of this bright line limit. Particularly in light of changes in the media marketplace since the Commission implemented the current *ex ante* restriction, the agency acts today to update its approach.

6. As we explain, the Commission shifts today from a blanket prohibition to a case-by-case approach that will give the Commission the flexibility to approve deals that are in the public interest while continuing to deny any transaction that fails to serve the public interest. Under a case-by-case approach, the Commission's interests in localism, viewpoint diversity, and competition (to the extent they are implicated) can be fully analyzed and vindicated in the context of a specific transaction. There may be transactions that would have exceeded the limits of the 39% national cap that do not promote the public interest and that will be denied. On the other hand, there may be transactions that would have exceeded the 39% national cap that do promote the public interest and could gain Commission approval. We find that shifting from a relatively inflexible, *ex ante* regulation to an individualized, case-by-case assessment will help ensure that the Commission carries out its statutory mandates in an appropriate manner without having to show special circumstances that would justify a waiver of a rule that no longer serves the public interest.

7. Given this finding, we repeal the Commission's national television multiple ownership rule. We conclude that replacing that regulation with a case-by-case approach to applications for television license transfers and assignments is the best way to promote the Commission's media ownership goals of localism, viewpoint diversity, and competition. Therefore, any proposed transactions that would have been barred under a strict application of the current rule will be subject to the Commission's regular review process to determine whether approval would serve the public interest, consistent with the local television multiple ownership rule.[9]

8. It is fully within the Commission's statutory authority to repeal the rule. The Commission retains authority to change the national cap if the public interest requires. While Congress has at times directed us to change our rules, it has never withdrawn our authority under the Communication Act's public interest standard to regulate or change ownership limits. For the reasons below, we conclude that the public interest requires us to eliminate the national television multiple ownership rule in favor of a case-by-case approach.

## II. BACKGROUND

9. The Commission's rules prohibit a commercial television licensee from having a cognizable interest in television stations that have an aggregate national audience reach above 39%, or up to a maximum of 78% using the UHF discount, which attributes to a UHF television station only 50% of the television households in the station's Nielsen Designated Market Area (DMA).[10] As an original matter,

---

[8] *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1043, *modified on reh'g*, 293 F.3d 537 (*Fox II*) (D.C. Cir. 2002).

[9] 47 CFR § 73.3555(b).

[10] 47 CFR § 73.3555(e). Section 73.3555(e)(1) states that "[n]o license for a commercial television broadcast station shall be granted, transferred or assigned to any party (including all parties under common control) if the grant, transfer or assignment of such license would result in such party or any of its stockholders, partners, members,

(continued….)

the Communications Act of 1934 (Communications Act) itself does not set any limit on broadcast ownership; rather, the Commission created the cap in 1941 as a rule under the statute's public interest standard.[11] Since it was promulgated originally, the limit on national television ownership has become less restrictive as television licensees have required greater flexibility to respond to the marketplace changes confronting the broadcast industry. During the earliest days of television, the Commission's first, and most restrictive, ownership limits prohibited an entity from owning, operating, or controlling more than three television stations nationwide.[12] The Commission stated that it would be inconsistent with the public interest, convenience, and necessity to allow a greater concentration of television ownership.[13] Three years later, it relaxed the limit to five television stations.[14] In 1954, under its rulemaking authority, the Commission concluded that the limit should be raised further to seven television stations, provided that at least two of the seven stations were UHF stations.[15] In finding that the increase was warranted in order to promote the development of the UHF band, the Commission explained that its diversification policy was not the only relevant consideration in setting television ownership limits.[16]

10. In 1984, again utilizing its rulemaking authority, the Commission reexamined its television and radio ownership limits in light of the increase in the number of broadcast stations and the expanding reach of cable service.[17] Citing, among other things, the tremendous increase in the number of media outlets, the Commission concluded that the ownership limits could be repealed without harming either viewpoint diversity or competition.[18] The Commission stated that new evidence showed that, in fact, group ownership can boost viewpoint diversity.[19] Nonetheless, to avoid a disruptive restructuring of the

(Continued from previous page)
officers or directors having a cognizable interest in television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent." Section 73.3555(e)(2) defines national audience reach as "the total number of television households in the Nielsen Designated Market Areas (DMAs) in which the relevant stations are located divided by the total national television households as measured by DMA data at the time of a grant, transfer, or assignment of a license" and provides that "[f]or purposes of making this calculation, UHF television stations shall be attributed with 50 percent of the television households in their DMA."

[11] *Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, MB Docket No. 25-331, Memorandum Opinion and Order, DA 26-267, at 12, para. 25 (MB Mar. 19, 2026) (*Nexstar-TEGNA Order*); Letter from Joel L. Thayer, President and Board Member, Digital Progress Institute, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 2 (filed Jan. 8, 2026) (DPI *Ex Parte*).

[12] *Broadcast Services Other Than Standard Broadcast*, 6 Fed. Reg. 2282, 2284-85 (May 6, 1941).

[13] *Id.*

[14] *Rules Governing Broadcast Services Other Than Standard Broadcast*, 9 Fed. Reg. 5442 (May 23, 1944).

[15] *Amendment of Section 3.636 of the Commission's Rules and Regulations Relating to Multiple Ownership of Television Broadcast Stations*, Docket No. 10822, Report and Order, 43 F.C.C. 2797, 2797-99, 2801, paras. 3, 8, 13 (1954) (allowing a single individual or entity to hold a cognizable ownership interest in seven AM, seven FM, and seven television stations (of which no more than five could be VHF stations), which became known as the Seven Station Rule). The Commission adopted these amendments under authority contained in, among others, sections 4(i) and 303(r) of the Communications Act of 1934. *Id.* at 2802, para. 16.

[16] *Id.* at 2801, paras. 13-14.

[17] *Amendment of Section 73.3555 [formerly Sections 73.35, 73.240, and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations,* GN Docket No. 83-1009, Report and Order, 100 F.C.C.2d 17, 18, para. 4 (1984) (*1984 Multiple Ownership Order*), *recon. granted in part*, Memorandum Opinion and Order, 100 F.C.C.2d 74 (1985) (*1985 UHF Discount Order*), *recon. dismissed*, 5 FCC Rcd 5338 (MMB 1990). The Commission cited sections "4(i) and (j), and 301, 303, 308 and 309" of the Communications Act of 1934 as authority for adopting the rule changes. *1984 Multiple Ownership Order*, 100 F.C.C.2d at 56, para. 113.

[18] *1984 Multiple Ownership Order*, 100 F.C.C.2d at 18-20, 24-46, 54-55, paras. 5-10, 24-86, 108.

[19] *Id.* at 20, 31-36, paras. 9, 44-56.

broadcast industry that an immediate repeal might cause, the Commission adopted a transitional approach that included raising the television ownership limit from seven stations to twelve stations, which was intended to sunset after six years.[20]

11. In 1985, on reconsideration of its decision to raise the limit to twelve stations, the Commission affirmed its earlier conclusion that eliminating the seven station limit would not have contravened the Commission's viewpoint diversity and competition goals.[21] Nevertheless, the Commission decided that an even more cautious approach was needed to minimize the potentially disruptive effects of permitting additional concentration.[22] First, the Commission retained the 12 station numerical limit to guard against a rapid restructuring of small markets that might ensue from eliminating the numerical limit.[23] Additionally, it layered onto the rule an audience reach limit of 25% of the nation's television households to prevent a group owner from substantially increasing its audience base by focusing its expansion efforts on the most populous markets.[24] However, to reflect the fact that, in the analog television broadcasting era, UHF signals reached a smaller audience in comparison with VHF signals, the Commission adopted a 50% UHF discount, whereby UHF stations are attributed with only half of the television households in their DMAs for purposes of determining compliance with the national audience reach cap.[25] Consistent with its decision to proceed more cautiously, the Commission eliminated the sunset provision.[26]

12. In the 1996 Act, Congress directed the Commission to amend its rules to increase the national audience reach cap from 25% to 35% and to eliminate restrictions on the number of television stations an entity may own nationwide.[27] The Commission revised its rules accordingly, and, in doing so, it retained the 50% UHF discount, which the 1996 Act had not addressed.[28] Pursuant to Congress's directive in the 1996 Act to review the media ownership rules biennially,[29] the Commission examined the national cap in 1998, and considered revising it, notwithstanding Congress's instruction to the Commission in the 1996

[20] *Id.* at 18, 54-57, paras. 5, 108-12 (allowing a single individual or entity to hold a cognizable ownership interest in 12 AM, 12 FM, and 12 television stations). No distinction was made between VHF and UHF stations.

[21] *1985 UHF Discount Order*, 100 F.C.C.2d at 80-88, 97, paras. 17-29, 30, 32, 50.

[22] *Id.* at 89-90, paras. 36-37.

[23] *Id.* at 89-90, paras. 37-38.

[24] *Id.* at 89-92, paras. 36, 39-40.

[25] *Id.* at 92-94, paras. 42-44 (finding that the "inherent physical limitations" of analog UHF broadcasting should be reflected in the national television ownership rules); *see also* 47 CFR § 73.3555(e)(2)(i). On June 13, 2009, the Commission completed the transition from analog to digital television broadcasting for full-power stations, and the Commission has stated that its experience since completion of the transition confirms that UHF channels are technically equal, if not superior, to VHF channels for the transmission of digital television signals. *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Order on Reconsideration, 32 FCC Rcd 3390, 3393, para. 8 (2017) (*UHF Discount Order on Reconsideration*).

[26] *1985 UHF Discount Order*, 100 F.C.C.2d at 96-97, para. 49.

[27] 1996 Act § 202(c)(1).

[28] *Implementation of Sections 202(c)(1) and 202(e) of the Telecommunications Act of 1996 (National Broadcast Television Ownership and Dual Network Operations)*, Order, 11 FCC Rcd 12374, 12374-75, paras. 2-4 (1996).

[29] 1996 Act § 202(h).

Act to set the cap at a specific level in the Commission's rules.[30] Upon completion of its review, the Commission opted for a wait-and-see approach and retained the 35% limit.[31]

13. The D.C. Circuit remanded that decision in 2002, finding that the Commission had failed to demonstrate that retaining the 35% cap advanced localism, diversity, or competition.[32] Perhaps even more significant, the court also rejected the argument that the 1996 Act required the Commission to draw the line at 35%. The court reasoned instead that Congress's instruction to the Commission to set the cap at 35% in its rules did not require deference because "the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change."[33] Upon rehearing, the court again rejected the Commission's argument that the agency should defer to Congress, explaining that if Congress wished to take away the Commission's power to alter the cap, "it need only have enshrined the 35% cap in the statute itself."[34]

14. In its *2002 Biennial Review Order*, the Commission again reviewed the national television multiple ownership rule and found that, while a national ownership cap was no longer needed to protect diversity or competition, a cap remained necessary to promote localism given the nature of station ownership in the television industry.[35] The Commission observed that, by limiting the national audience reach that a broadcast network could achieve through the ownership of local television stations, the national cap limits how many stations the network itself can own and operate for the purpose of distributing its programming.[36] By contrast, in those markets not covered by a network-owned station, the network's programming is aired by local television stations that are affiliated with the network but that are owned and operated by another entity.[37] The owner of the network and the owner of a station affiliated with the network periodically negotiate the terms and conditions of their affiliation agreement, including the affiliate's rights and responsibilities regarding the airing of the network's programming.[38] In the *2002 Biennial Review Order*, the Commission reasoned that, by preserving a balance of negotiating power between networks and its affiliates, a national cap enables affiliates to maintain their bargaining power to select programming responsive to the interests of their local communities.[39] The Commission decided, however, to raise the cap from 35% to 45% to promote free, over-the-air programming by allowing networks to achieve greater economies of scale by purchasing more stations in order to compete

---

[30] *1998 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MM Docket No. 98-35, Biennial Review Report, 15 FCC Rcd 11058, 11072-75, paras. 25-30 (2000) (*1998 Biennial Review Order*).

[31] *Id.*

[32] *See Fox I*, 280 F.3d at 1040-49.

[33] *Id.* at 1042-43.

[34] *Fox II*, 293 F.3d at 540.

[35] *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 02-277 et al., Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13815, 13842, paras. 501, 578 (2003) (*2002 Biennial Review Order*).

[36] *Id*. at 13815, para. 501 (finding that "a national cap is necessary to limit the percentage of television households that a broadcast network may reach through the stations it owns").

[37] *See id*. at 13828-45, paras. 538-84.

[38] *See id*.

[39] *Id*. at 13815, 13842, paras. 501, 578.

more effectively with cable and satellite operators, while at the same time ensuring that a network could not reach a larger national audience than its affiliates could reach collectively.[40]

15. Following the adoption of the *2002 Biennial Review Order*, and while an appeal of that Commission decision was pending, Congress in 2004 partially rolled back the Commission's cap increase by including a provision in the CAA directing the Commission to modify its rules to set the national cap at 39% of national television households.[41] The CAA also amended section 202(h) of the 1996 Act to require the Commission to review its media ownership rules quadrennially rather than biennially.[42] In doing so, however, Congress excluded consideration of "any rules relating to the 39 percent national audience reach limitation" from the quadrennial review requirement.[43] Prior to the enactment of the CAA, several parties had appealed the Commission's *2002 Biennial Review Order* to the Third Circuit. In June 2004, the Third Circuit found that the challenges to the Commission's actions with respect to the national audience reach cap and the UHF discount were moot as a result of the CAA provisions.[44] The court further stated that Congress's decision to remove "any rules relating to the 39 percent national audience reach limitation" from mandatory periodic review under section 202(h) would include removing the UHF discount from that review, given that any change made with respect to the discount would effectively change the national cap.[45] Moreover, the court clarified that, although the UHF discount would be insulated from the specific 202(h) review process going forward, the court did not intend its decision to "foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h)" and that the Commission remained free to "decide, in the first instance, the scope of its authority to modify or eliminate the UHF discount outside the context of 202(h)."[46]

16. In August 2016, as part of a proceeding unaffiliated with the Commission's quadrennial review under section 202(h), the Commission eliminated the UHF discount, finding that UHF stations were no longer technically inferior to VHF stations following the digital television transition and that the competitive disparity between UHF and VHF stations had disappeared.[47] In doing so, the Commission concluded that it had the authority to revise not only the UHF discount but also the national cap.[48] The Commission characterized the CAA as simply directing the Commission to revise its rules while eliminating the requirement for periodic review.[49] The Commission found that no statute barred "the

[40] *Id.* at 13815, 13843-44, paras. 501, 581-83. In both the *1998* and *2002 Biennial Review Orders*, the Commission retained the UHF discount.

[41] CAA § 629. The CAA amended section 202(c)(1)(B) of the 1996 Act "by striking '35 percent' and inserting '39 percent,'" but it otherwise left in place the language that Congress used in 1996 when it directed the Commission to modify its rules to set a 35% national cap. *Id.* § 629(1). In accordance with Congress's directive, the Commission revised its rules to set the national cap at 39%. *Implementation of Section 629 of the Consolidated Appropriations Act, 2004 (National Broadcast Television Ownership)*, Order, 22 FCC Rcd 4245, 4245-46, paras. 1-3 (2006) (*Order Implementing the CAA*).

[42] CAA § 629(3).

[43] *Id.*

[44] *Prometheus Radio Project v. FCC*, 373 F.3d 372, 395-97 (3d Cir. 2004) (*Prometheus I*).

[45] *Id.* at 396-97.

[46] *Id.* at 397.

[47] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Report and Order, 31 FCC Rcd 10213, 10224-33, paras. 25-40 (2016) (*UHF Discount Elimination Order*) (Commissioners Pai and O'Rielly dissenting).

[48] *Id.* at 10222-23, para. 21.

[49] *Id.*

Commission from revisiting the cap or the UHF discount contained therein in a rulemaking proceeding so long as such a review is conducted separately from a quadrennial review of the broadcast ownership rules pursuant to Section 202(h) of the 1996 Act."[50] Moreover, the Commission concluded that it retained authority under the Communications Act, and had an affirmative obligation over time, to revisit and, where appropriate, revise or eliminate its rules, which could include "any aspect of the national audience reach cap."[51] Eliminating the UHF discount effectively tightened the national cap by reducing the maximum allowable audience reach of an owner of UHF stations from 78% to 39%. After networks owning and/or affiliated with UHF stations asked the Commission to reconsider its decision,[52] the Commission decided in April 2017 to reinstate the UHF discount.[53] The Commission concluded that because the discount is used to determine licensees' compliance with the national cap, the two are inextricably linked and the discount cannot be eliminated without also considering whether the cap remains in the public interest.[54] The Commission's reinstatement of the discount was challenged in the D.C. Circuit, but the court found that the petitioners lacked standing and dismissed the lawsuit in an unpublished decision in 2018.[55] There have been no further modifications to the rule, and so both the 39% national audience reach cap and the 50% UHF discount remain in effect.

17. In reinstating the UHF discount, the Commission committed to undertake a comprehensive rulemaking proceeding to determine whether to modify or eliminate the national ownership limit, including the UHF discount.[56] Accordingly, the Commission adopted the *NPRM* in 2017 to initiate that proceeding to seek comment on whether the Commission is authorized to make changes to the cap and/or the UHF discount.[57] The *NPRM* also asked whether the current 39% cap should be modified or eliminated and, if a cap is retained, how to calculate compliance, including whether to modify or eliminate the UHF discount.[58] Among other things, the *NPRM* also sought comment on whether the cap continues to promote localism given the current media marketplace and on whether it has other potential benefits, or costs, that the Commission should consider.[59] Specifically, the *NPRM* asked whether changes in the marketplace have affected the network/affiliate relationship in ways that warrant revision of the Commission's previous assumptions underlying the rule's justifications.[60] In response, a number of parties, including broadcasters, MVPDs, and public interest organizations, filed comments on March 19,

---

[50] *Id.*

[51] *Id.* (citing 47 U.S.C. §§ 154(i) and 303(r); *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 767 (6th Cir. 1995); *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 816 (1992); *Geller v. FCC*, 610 F.2d 973, 979 (D.C. Cir. 1979).

[52] *See* Petition for Reconsideration of ION Media Networks (ION) and Trinity Christian Center of Santa Ana, Inc., MB Docket No. 13-236 (filed Nov. 23, 2016).

[53] *UHF Discount Order on Reconsideration*, 32 FCC Rcd at 3390-91, 3394-96, paras. 1, 10-15.

[54] *Id.*

[55] *Free Press, et al. v. FCC*, No. 17-1129, 735 Fed.Appx. 731, 46 Media L. Rep. 2049 (D.C. Cir. July 25, 2018).

[56] *UHF Discount Order on Reconsideration*, 32 FCC Rcd at 3390-91, 3394, 3397-98, paras. 1, 10, 17.

[57] *NPRM*, 32 FCC Rcd at 10788-90, paras. 7-9.

[58] *Id.* at 10788-96, paras. 6-26. The Commission also asked whether it should grandfather ownership combinations that would no longer be in compliance with the rule as the result of any adopted changes. *Id.* at 10796-97, paras. 27-28.

[59] *Id.* at 10790-94, 10795, paras. 10-18, 23-25. The Commission noted a number of marketplace changes, including the growth in video programming options (including online alternatives to traditional video distribution), reverse compensation fees paid by affiliates to broadcast networks, common ownership of broadcast and cable networks, consolidation among non-network-owned station groups, consolidation among multichannel video programming distributors (MVPDs), and MVPD video subscriber losses. *Id.* at 10790, para. 11.

[60] *Id.* at 10791-92, para. 14.

2018, and reply comments on April 18, 2018. Multiple *ex parte* filings addressing the rule have been submitted in the years since then.

18. Although the public has had ample opportunity to comment on the issues raised in the *NPRM*, the Media Bureau issued a Public Notice (*Refresh Public Notice*) on June 18, 2025, that invited interested parties to refresh the record given the passage of time since the *NPRM*'s adoption.[61] The *Refresh Public Notice* sought comment on: (1) materials filed since the comment period for the *NPRM* ended in April 2018; (2) pertinent new or additional information regarding the television and video programming marketplace; (3) relevant trends within the television and video programming industry or in related markets, including whether and how the national cap has affected broadcast television's market position in relation to other video distributors, such as online video providers; and (4) other legal or economic developments that the Commission should consider.[62] Comments were due on August 4, 2025, and reply comments were due on August 22, 2025.[63]

19. In comments responsive to the *Refresh Public Notice*, broadcasters urge the Commission to eliminate the national television multiple ownership rule in its entirety, which they view as an obsolete and artificial constraint on their ability to compete in a vastly changed media marketplace. Supporters of the rule, including public interest organizations and MVPDs, assert that the Commission lacks statutory authority to modify or eliminate the rule. They also argue that, among other things, the rule is necessary to promote localism and to prevent higher retransmission consent fees that would lead to higher MVPD subscription prices.

## III. DISCUSSION

20. We find that a bright line, *ex ante* limitation, as opposed to a transaction-specific review, is not necessary in today's media marketplace. A rigid cap is no longer needed to serve the "public interest, convenience, and necessity," which is the review standard used in our evaluation of individual applications and licenses, because, as discussed below, the Commission can review proposed transactions on a case-by-case basis to assess whether approval would promote the Commission's media ownership goals of diversity, competition, and localism.[64] As mentioned above, the Commission determined in 2003 that a national cap was not necessary to promote either diversity or competition,[65] and we find that there is even more support today for those conclusions given the availability and accessibility of a myriad of sources of video programming, including cable networks, online services, and social media platforms.

---

[61] *Refresh Public Notice*, 40 FCC Rcd at 4159.

[62] *Id.* at 4160-61.

[63] National Television Multiple Ownership Rule, 90 Fed. Reg. 30032 (July 8, 2025).

[64] 47 U.S.C. §§ 309(a) (providing that "the Commission shall determine, in the case of each application . . . whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application"), 310(d) (instructing that "[n]o . . . station license, or any rights thereunder, shall be transferred, assigned, . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby"); *see also* 47 U.S.C. § 303(r) (stating that "the Commission from time to time, as public convenience, interest, or necessity requires, shall" "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter"). We apply this "public interest, convenience, and necessity" review standard because Congress instructed in the CAA that the national cap would no longer be governed by section 202(h) of the 1996 Act. CAA § 629(3) (adding to the end of section 202(h) of the 1996 Act that "[t]his subsection does not apply to any rules relating to the 39 percent national audience reach limitation"). Section 202(h) directs the Commission to determine whether its media ownership rules "are necessary in the public interest as a result of competition." 1996 Act § 202(h).

[65] *2002 Biennial Review Order*, 18 FCC Rcd at 13818-28, paras. 508-37.

The reason for the Commission's continued imposition of a limit in 2003 was to promote localism by maintaining the balance of power between the networks and their affiliates.[66] At that time, limiting the percentage of households that networks could reach through their owned and operated stations ensured networks' reliance on affiliated television stations for the distribution of network programming. However, now networks can reach viewers by placing their programming on streaming platforms. After reviewing the extensive record in this proceeding, we find that a bright line rule is no longer necessary to serve the public interest because we can review cases on an individual basis.

21. The rule's repeal will not lead to automatic approval of transactions currently barred under the national cap because the Commission will review any proposed transaction that the national cap would have barred. In addition, it will have no effect on the public interest obligations of broadcast licensees.[67] Instead, removal of the cap will serve the public interest because it will allow the Commission to analyze all proposed transactions on the basis of their individual merits, taking into account all pertinent factors, instead of automatically excluding transactions that do not satisfy a singular metric that may or may not be relevant to the circumstances of a particular case.[68] National audience reach is not necessarily a meaningful measure of a station group's relative negotiating leverage, market power, financial strength, or public interest record.[69] Thus, a blunt tool like the national cap may be precluding station acquisitions that would be in the public interest, without providing the Commission the opportunity, outside of a waiver process, to take into consideration factors favoring approval of a transaction. Conversely, station acquisitions that would result in a national audience reach below the cap are not given automatic approval on that basis. Rather, the Commission is required to review such transactions to ensure that they serve the public interest, as it always has.[70]

22. In light of changing market conditions, it is no longer valid to presume that virtually any transaction that breaches the cap would disserve the public interest. Removing the cap will allow the Commission to consider additional proposed transactions instead of those currently brought by applicants because they happen to comply with an outdated cap. Eliminating the cap also will be a more efficient and sensible approach than retaining the cap and granting waivers for transactions that serve the public

---

[66] *Id.* at 13828-34, paras. 538-52. As stated above, the Commission raised the national cap in 2003 to 45%, which Congress rolled back to 39% in 2004. *Id.* at 13842-45, paras. 578-84; CAA § 629(1).

[67] *See* 47 U.S.C. § 309(k) (requiring as a condition for license renewal that a broadcast station "has served the public interest, convenience, and necessity").

[68] *See* National Association of Broadcasters (NAB) 2025 Comments at 4 (noting that eliminating the national cap will not obviate the Commission's role in ensuring that proposed transactions serve the public interest).

[69] NAB argues that audience reach was never a good measure of a station's competitive position because attributing all the households in a DMA to a VHF station, or even half the households to a UHF station, vastly overstates the actual viewership of broadcast stations. *See, e.g.*, NAB 2025 Comments at 11-12, n.39 (stating that, even during prime time hours, the percentage of Americans viewing broadcast stations during any given minute in 2024 was in the single digits); NAB 2018 Comments at 25-29 (asserting that audience reach as defined by the national cap greatly exaggerates broadcasters' actual audience share, which has been in decline for years); NAB 2018 Reply at 1-2 (claiming that "no TV stations are viewed by 100 percent of the households in their markets"); *see also* Ryan Sweeney (Sweeney) 2018 Reply at 4-5 (noting that "reaching 39% of the national audience is not the same as controlling 39% of the market" and that "each expansion of a broadcaster's national audience reach should be reviewed on its individual merits"); Entravision Communications Corporation (Entravision) 2018 Reply at 8 (asserting that national audience reach "does not provide anything like an empirical snapshot of stations' true viewership"); Sinclair Broadcast Group, Inc. (Sinclair) Delete, Delete, Delete Comments at 10-11 (arguing that the national cap "is based on the faulty premise that a broadcaster at the top of the cap has a 39% market share of the national audience").

[70] *See* 47 U.S.C. § 310(d) (stipulating that no broadcast station license can be transferred or assigned "except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby").

interest,[71] like the recent merger between Nexstar Media Inc. (Nexstar) and TEGNA Inc. (TEGNA).[72] For the reasons discussed below, we conclude that a blanket rule that automatically prohibits television mergers exceeding an inflexible numerical bar absent a waiver no longer makes sense in today's complex media marketplace, given the numerous forces affecting the broadcast industry.

23. Therefore, we repeal the national television multiple ownership rule.[73] Given that the UHF discount already allows television licensees to reach a potential 78% of the nation's households, we believe that repeal will provide needed relief to station owners without constituting a radical departure from the current ceiling. As discussed below, to the extent that market forces do not ameliorate or constrain any resulting public interest harms that some commenters in this proceeding predict, such as an imbalance in the network/affiliate relationship, a decrease in local programming, an increase in retransmission consent fees, or a loss of journalists and other communications workers, the Commission can consider addressing those concerns directly in more targeted ways, including as part of the Commission's transaction review process, rather than relying on an outdated rule that is no longer serving, and may be undermining, its intended purpose.[74]

24. Furthermore, we conclude that the Commission has the statutory authority to modify or eliminate the national television multiple ownership rule. The best reading of the CAA is that Congress did not prohibit the Commission from reviewing or further modifying the rule. Under this authority, we now review the rule and conclude that it should be replaced with a case-by-case review.

## A. The National Television Multiple Ownership Rule is Not Necessary

### 1. The rule is not necessary to promote viewpoint diversity or competition

25. For more than 40 years, the Commission's position has been that a national ownership limit on television licensees is not necessary to promote competition or viewpoint diversity, most notably

---

[71] Granting relief through a waiver assumes that the general rule has validity. *Zimmer Radio of Mid-Missouri, Inc. v. FCC*, 145 F.4th 828, 856 (8th Cir. 2025) (citing *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988)) (*Zimmer*). Courts have long held that a waiver cannot save an otherwise irrational rule. *Id.* Therefore repeal of the national cap is appropriate despite the availability of relief through a waiver because, as explained in this section, a bright line limit based on national audience reach is no longer valid.

[72] *See Nexstar-TEGNA Order* at 19-20, 28-35, paras. 43-45, 65-89 (assessing whether specific benefits would stem from the merger and making a particularized determination that those benefits, along with Nexstar's commitments to ameliorate potential harms, warranted a waiver of the national cap). The D.C. Circuit has denied motions for a stay of the *Nexstar-TEGNA Order* pending appeal. *Broadband Communications Association of Pennsylvania, et al. v. FCC,* No. 26-1062 (D.C. Cir. July 9, 2026) (denying the stay motions under the All Writs Act because the court determined that appellants had not demonstrated that they would suffer irreparable harm without a stay). The D.C. Circuit found that that the harms alleged by appellants were "either not irreparable or not certain, particularly in light of the preliminary injunction" entered by the U.S. District Court for the Eastern District of California blocking the transaction itself. *Id.* at 1-2 (citing *In re Nexstar-TEGNA Merger Litigation,* Order, No. 2:26-cv-00976-TLN-CKD (E.D. Cal. Apr. 17, 2026), 2026 WL 1049295 (*Nexstar-TEGNA Preliminary Injunction*)). The D.C. Circuit also denied the appellants' mandamus petitions after concluding that the Commission's inaction in addressing the application for review of the *Nexstar-TEGNA Order* three months after such an application was filed does not "justify the extraordinary grant of mandamus relief to compel agency action." *Id.* at 2. Finally, the D.C. Circuit dismissed the appeals of the *Nexstar-TEGNA Order* after finding that the court lacked jurisdiction over appellants' challenges because the Commission had not yet acted on the application for review. *Id.* at 2-3.

[73] *See* 47 CFR § 73.3555(e).

[74] In a separate proceeding, the Media Bureau recently released a Public Notice seeking comment on the issue of whether the relative bargaining positions of networks and their affiliates are impeding the ability of affiliated stations to exert independence in their programming and operational decisions in order to meet their public interest obligations. *Empowering Local Broadcast TV Stations to Meet Their Public Interest Obligations: Exploring Market Dynamics Between National Programmers and Their Affiliates*, MB Docket No. 25-322, Public Notice, DA 25-961 (MB Nov. 19, 2025) (*Empowering Local Broadcast TV Stations Public Notice*).

because the national scale of a broadcaster has no impact on the number of viewpoints or the concentration of competitors in the local television markets it serves. In 1984, the Commission reached that conclusion after observing the "explosive growth and change" that had led to an abundance of outlets in the mass media market, including the fact that the number of television stations had increased to 1,169; the number of radio stations had reached almost 9,500; cable passed 64% of the nation's television households; satellite service was expected to launch soon; and over 8.3 million video cassette recorders were in American homes.[75] Moreover, the Commission concluded that national broadcast ownership limits are not pertinent to preserving viewpoint diversity and competition because the relevant market to consider for promoting those goals is local.[76] The Commission reasoned that the viewpoint diversity to which an individual is exposed is not affected by whether those viewpoints also are disseminated in other local broadcast markets.[77] The Commission also determined that "the fact that local competitors may share common ownership with stations in other markets is unimportant in terms of competitive harm."[78] In addition, the Commission concluded that "[g]roup owners may be able to devote more resources to newsgathering and other activities which improve the quality of programming presented."[79] Nevertheless, the Commission retained a modified national cap on a transitional basis to minimize potential disruptive effects to the broadcast industry.[80] A year later, the Commission affirmed its position that repeal of the rule would not contravene its policy goals of promoting diversity and preventing undue concentration.[81]

26. In 2003, the Commission again found that the national cap was not necessary to promote its diversity and competition goals.[82] It affirmed its 1984 conclusion that the market for viewpoint diversity is local, not national, and that, regardless, "the proliferation of media outlets nationwide" rendered the cap unnecessary even if the national market were the relevant area to consider.[83] The Commission added that the cap also was not necessary to promote program diversity, which it concluded that the marketplace can and should address.[84] The Commission expanded its competition analysis from its 1984 review of the national television advertising market to include a review of the national program acquisition market.[85] An in-depth analysis of both these markets confirmed the Commission's earlier conclusion that a national cap is not necessary to promote competition.[86] The Commission's description of the U.S. media marketplace at the time was based on data showing that in 2000 there were more than 12,615 radio

---

[75] *1984 Multiple Ownership Order*, 100 F.C.C.2d at 18, 27-29, 37, 38, 41-42, 54-55, paras. 4, 34-35, 60, 63, 73, 108.

[76] *Id.* at 37, 41-42, paras. 60, 73.

[77] *Id.* at 37, para. 60.

[78] *Id.* at 41-42, para. 73.

[79] *Id.* at 38, para. 62.

[80] The Commission raised the television ownership limit to 12 stations and adopted a sunset provision of six years. *Id.* at 55-56, paras. 109-12.

[81] *1985 UHF Discount Order*, 100 F.C.C.2d at 97, para. 50. The Commission nonetheless eliminated the sunset provision and added to the rule a 25% national audience cap and the UHF discount. *Id.* at 89-92, 96-97, paras. 36-40, 49. The Commission was concerned that the sunset provision could "create the danger of an abrupt and disruptive restructure of the national broadcasting industry." *Id.* at 97, para. 52. As an additional check on a disruptive restructuring, the Commission adopted the 25% cap to curb an owner's ability to use the relaxed limit to increase its audience base substantially by acquiring stations in the most populous areas. *Id.* at 89, para. 36.

[82] *2002 Biennial Review Order*, 18 FCC Rcd at 13818-28, paras. 508-37.

[83] *Id.* at 13827, para. 535.

[84] *Id.* at 13828, para. 537.

[85] *Id.* at 13818, para. 508.

[86] *Id.* at 13818-26, paras. 508-32.

stations; 1,616 television stations; 68.5 million cable subscribers; approximately 14.8 million direct broadcast satellite systems (DBS) subscribers; and 281 nationally-distributed non-broadcast networks.[87] Approximately 42.5 million U.S. households subscribed to an Internet access provider, and the Internet offered roughly 30 million websites.[88] Thus, the total number of voices and competitors in the country had increased substantially since the Commission's 1984 observation that the media marketplace had undergone explosive growth.

27. We find no reason to depart from the Commission's earlier conclusions that a national cap is not needed to promote diversity or competition. Indeed, those findings are even more incontrovertible today, and we disagree with the commenters that claim otherwise.[89] First, we affirm our previous view that it is the local market that is relevant for assessing those policy goals with respect to broadcast television.[90] The national cap is not a constraint on local ownership because it is not focused on audience reach in any given local market but rather is concerned with how many stations a broadcaster owns on the national level. Therefore, eliminating the national cap will not permit any more or less consolidation within a local market and so will not affect the number of voices in that local market or the number of

---

[87] *Id.* at 13662-63, para. 120.

[88] *Id.* at 13661-63, paras. 117, 120.

[89] A number of commenters assert that elimination of the national cap will harm competition and viewpoint diversity. *See, e.g.*, Free Press 2018 Comments at 13-14; Herndon-Reston Indivisible 2018 Comments at 3; Office of Communication, Inc. of the United Church of Christ, Common Cause, National Hispanic Media Coalition, and Public Knowledge (UCC et al.) 2018 Comments at 6-8; Free Press 2025 Comments at 21-31 (discussing the influence of local television news on public opinion and proclaiming the inadequacy of the market and of antitrust protections to protect competition among local broadcasters); Newsmax Media Inc. (Newsmax) 2025 Comments at 2-3, 6-9, 13-17; Asian Americans Advancing Justice (AAJC) 2025 Comments at 1; National Hispanic Media Coalition (NHMC) 2025 Comments at 2; Hispanic Technology & Telecommunications Partnerships (HTTP) 2025 Reply at 1-3. Newsmax seems to conflate source diversity with viewpoint diversity. *See* Newsmax 2025 Comments at 3-4, 16-20 (forecasting a loss of viewpoints but describing it as a loss of "source diversity"); *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13627, 13633, paras. 18, 42 (explaining that "viewpoint diversity" refers to "the availability of media content reflecting a variety of perspectives" whereas "source diversity" refers to "the availability of media content from a variety of content producers"). Regardless, to the extent that Newsmax discusses source diversity as a separate policy goal, we note that the Commission concluded in 2003 that source diversity should not be a policy goal of its broadcast ownership rules. *2002 Biennial Review Order*, 18 FCC Rcd at 13633-34, paras. 42-45 (stating that "[g]iven the explosion of programming channels now available in the vast majority of homes today, and in the absence of evidence to the contrary, we cannot conclude that source diversity should be a policy goal of our broadcast ownership rules"). Newsmax provides no basis upon which to revisit that conclusion, and we decline to do so.

[90] The Commission sought comment in the *NPRM* on the "interplay between the national audience reach rule and other Commission ownership rules affecting television broadcasters." *NPRM*, 32 FCC Rcd at 10796, para. 26. Several commenters express concern that the Commission's revisions to its local television ownership rule make the retention of a 39% national cap all the more critical. *See* DISH Network L.L.C. (DISH) 2018 Comments at 11-12 (asserting that "elimination of these [local television ownership rule] protections facilitates broadcaster consolidation, leading to larger broadcast groups and increasing . . . harms to competition, localism, and consumers that come from such consolidation" and that the national cap "serves to somewhat blunt these harms by ensuring a broadcaster can only get so big"); UCC et al. 2018 Comments at 5-6 (stating that relaxing or raising the national cap would "allow large station owners to expand their national reach because once a company owns one television station in a market, it can acquire a second station, and even operate multiple stations, without increasing its national reach" and asserting that "it is likely that large station owners will swap stations with one another to maximize both their national reach and their local influence"). In *Zimmer*, the U.S. Court of Appeals for the Eighth Circuit vacated and remanded the top four prohibition of the local television ownership rule, which restricted ownership of two of the top four rated stations in a DMA. *Zimmer*, 145 F.4th at 839-40. Although the top four prohibition is no longer in place, to the extent commenters raise concerns about the effects of consolidation within a local market, which the national cap does not address, we note that the local television ownership rule continues to prohibit a combination of more than two stations in a given market. *See* 47 CFR § 73.3555(b).

local stations competing in that local market.[91] As the Joint Broadcasters argue, allowing a station owner to purchase an existing station in another local market that it does not already serve will not harm viewpoint diversity because one viewpoint in the market will be exchanged for another, and the overall number of viewpoints in that market will not be reduced.[92] Similarly, concentration within a local market will not be affected by the substitution of a station owner that is new to the local market for a station owner that had been serving the market, and in some instances, the new owner may inject new ideas or more vigorous competition into the market. In addition, while a broadcaster's acquisition of a second station in a local market could reduce the number of independent voices or independent competitors, repeal of the national cap has no bearing on the likelihood of such an outcome because, for purposes of the rule, a broadcaster's audience reach in that local market is the same regardless of the number of stations it owns in the market given that the television households in that market are counted only once and are not multiplied by the number of the broadcaster's stations in that market.

28. Second, the proliferation in recent years of video programming providers available on the Internet and through streaming services only reinforces the Commission's 1984 and 2003 diversity and competition findings. We agree with NAB that "[i]f a national TV rule was not necessary to preserve viewpoint diversity or competition before the expansion of cable TV channels; the launch of satellite TV and radio; the development and exponential growth of the [I]nternet, myriad online content providers, and social media . . . , then that rule is not necessary now."[93] As compared with 1984 and 2003, recent data show that there are 15,686 radio stations; 1,777 television stations;[94] 35.3 million cable subscribers; 13.7 million DBS subscribers; 5.1 million telephone company video subscribers;[95] at least 193 nationally-distributed non-broadcast networks;[96] and roughly 2.3 million U.S. podcast shows.[97] Approximately 121

---

[91] Because viewpoint diversity is measured by the number of voices in a local market, and not by any particular mix or composition of viewpoints, we reject the argument that the national cap is needed to preserve the diversity of voices provided by independent stations. *See, e.g.*, One Ministries, Inc. (One Ministries) 2025 Comments at 1-2 (expressing concern that the relaxation of the television ownership rules would lead to a decrease in diversity of station ownership among religious organizations, minorities, and women and would reduce those voices); Letter from Keith J. Leitch, President, One Ministries, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed July 29, 2026).

[92] National Association of Broadcasters, ABC Owned Television Stations, ABC Television Affiliates Association, CBS News and Stations, CBS Television Network Affiliates Association, Entravision, E.W. Scripps Co., FBC Television Affiliates Association, Fox Television Stations, LLC, NBC Television Affiliates, Nexstar Media Inc., Sinclair Inc., and Trinity Broadcasting Network (Joint Broadcasters) 2025 Reply at 48-53.

[93] NAB 2025 Comments at 3; *see also* NAB 2018 Comments at 14-19 (recounting the numerous video programming options made available to consumers since 2003); Nexstar 2018 Comments at 12-21 (asserting that it would be "plainly illogical" for the Commission to reverse course on its earlier conclusions regarding diversity and competition); Sweeney 2018 Reply at 4-7 (arguing that competition and viewpoint diversity goals cannot justify the national cap); Entravision 2018 Reply at 4-6 (observing that "non-broadcast video providers have only proliferated" since the Commission in 1984 and 2003 "dropped competition and diversity as plausible rationales for the National Cap"); Univision Communications Inc. (Univision) 2018 Reply at 1-2 (arguing that the Commission's 2003 conclusions that the cap was unnecessary to promote diversity or competition are even more persuasive today); Joint Broadcasters 2025 Reply at 48-62 (asserting that the cap does not promote diversity or competition); Digital First Project 2025 Reply at 1-2 (contending that the national cap was "designed for a bygone era of limited outlets" that is now "out of sync" with today's media marketplace, which has been "upended by the rise of digital platforms, national cable networks, streaming services, and social media").

[94] *Broadcast Station Totals as of December 31, 2025*, Public Notice, DA 26-49 (Jan. 13, 2026), https://docs.fcc.gov/public/attachments/DA-26-49A1.pdf.

[95] *2024 Communications Marketplace Report*, GN Docket No. 24-119, Report, 39 FCC Rcd 14116, 14256, para. 204, Fig. II.E.1 (2024) (*2024 CMR*).

[96] *See* S&P Global, *Economics of Basic Cable Networks, Ownership, 2025* (Dec. 9, 2025) (listing 193 cable networks).

million U.S. households subscribe to an Internet access provider,[98] and the Internet offers approximately 200 million active websites, with 252,000 new websites created daily.[99] Although traditional MVPD subscribership has been in decline since 2012, when it reached 101.6 million subscribers,[100] 83% of U.S. adults now access video programming through streaming services.[101] Subscribership is robust for online video distributors (OVDs), which distribute video programming to consumers over the Internet and include services such as Netflix, Amazon Prime Video, Disney+, and Paramount+, among many others.[102] In addition, NAB points to a report finding that 1,189 free, ad-supported streaming television (FAST) channels are available over the Internet.[103] As the Media Bureau observed in the *Nexstar-TEGNA Order*, "today, broadcasters are competing in a much larger, broader, and competitive environment" with digital advertisers and various technology platforms, including streaming services and podcasters.[104] A national cap on broadcasters to protect viewpoint diversity and competition makes no sense in a media marketplace with so many ways for video content to reach consumers today.[105] Indeed, allowing

(Continued from previous page)
[97] Beamly, *Podcast Statistics & Trends in 2026* (Jan. 1, 2026), https://beamly.com/podcast-statistics/.

[98] *See 2024 CMR*, 39 FCC Rcd at 14132-33, para. 25, Fig. II.A.11.

[99] As of October 2025, the total number of websites, including inactive sites, was over 1.2 billion. Katherine Haan, *Top Website Statistics for 2025*, Forbes (Feb. 2, 2026), https://www.forbes.com/advisor/business/software/website-statistics/.

[100] *2024 CMR*, 39 FCC Rcd at 14256, para. 204.

[101] Eugenie Park and Colleen McClain, *83% of U.S. Adults Use Streaming Services, Far Fewer Subscribe to Cable or Satellite TV*, Pew Research Center (July 1, 2025), https://www.pewresearch.org/short-reads/2025/07/01/83-of-us-adults-use-streaming-services-far-fewer-subscribe-to-cable-or-satellite-tv/.

[102] *2024 CMR*, 39 FCC Rcd at 14266-68, paras. 225-28.

[103] Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, and Jerianne Timmerman, Senior Vice President and Senior Deputy General Counsel, Legal and Regulatory Affairs, NAB, to Maureen H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 8 (filed Apr. 2, 2025) (NAB Apr. 2, 2025 *Ex Parte*) (citing Gracenote, *Beyond nostalgia: Tracking FAST channel evolution and the opportunities for platforms and advertisers*, at 2 (Mar. 2025)).

[104] *Nexstar-TEGNA Order* at 30, para. 76.

[105] Noting low levels of station ownership among minorities and women, some commenters point to consolidation and suggest that the national cap remains important to prevent further declines in ownership diversity. *See, e.g.*, Free Press 2018 Comments at 14-15; Herndon-Reston Indivisible 2018 Comments at 3; The Leadership Conference on Civil and Human Rights 2018 Comments (Leadership Conference) at 2-3; National Urban League 2018 Reply at 2-5; AAJC 2025 Comments at 1-3; Asian Americans Advancing Justice, Filipina Women's Network, OCA–Asian Pacific American Advocates, and Sikh American Legal Defense and Education Fund 2025 Comments at 1-2; American Conservative Union Foundation's Center for Regulatory Freedom (CPAC) 2025 Comments at 5-7; NHMC 2025 Comments at 1-3; One Ministries 2025 Comments at 1; HTTP 2025 Reply at 3; Multicultural Media, Telecom and Internet Council, LGBT Tech, National Association of Black Owned Broadcasters, OCA – Asian Pacific American Advocates, Consumer Action, Multicultural Media Correspondents Association, and National Consumers League (MMTC et al.) 2025 Reply at 4-5; National Action Network 2025 Reply at 2-3; One Ministries 2025 Reply at 1; United Church of Christ Media Justice Ministry, Asian Americans Advancing Justice, Hispanic Federation, Japanese American Citizens League, The Leadership Conference on Civil and Human Rights, National Consumer Law Center, National Hispanic Media Coalition (UCC et al.) 2025 Reply at 1-2. The purpose of the rule was to promote localism. *2002 Biennial Review Order*, 18 FCC Rcd at 13828, para. 539 (retaining a national cap to promote the Commission's localism goal). Its purpose was not to promote ownership opportunities for minorities and women, and, regardless, record evidence does not show that it has done so. The Leadership Conference and CPAC argue that the Commission is legally obligated to study the effect of the rule on ownership by minorities and women before repealing the rule. *See* Leadership Conference 2018 Comments at 3; CPAC 2025 Comments at 5-7. The record, however, does not establish an evidentiary connection between the rule and ownership by minorities, women, or any other group; nor does it demonstrate that removal of the cap would raise barriers to entry in a local

(continued….)

broadcasters to achieve greater scale in such a media environment is unlikely to have an adverse impact on viewpoint diversity or competition.

29. In any event, any relevant concerns about viewpoint diversity or competition can be raised and, if appropriate, adjudicated by the Commission in the context of its review of any broadcast transaction.

### 2. The rule is not necessary to promote localism

30. Notwithstanding its conclusion that a national cap is not necessary to promote its diversity and competition goals, the Commission decided to retain a cap in 2003 to promote its localism goal.[106] We now find that the *ex ante* 39% cap is no longer necessary to serve this one remaining purpose. Rather, concerns regarding localism can be addressed by the Commission in the context of specific transactions.[107]

31. As the Commission has explained before, to maximize their national audience, the Big Four networks (i.e., ABC, CBS, FOX, and NBC) traditionally have acquired their own local broadcast stations (typically in the largest television markets) and entered into affiliation agreements with station owners throughout the rest of the country.[108] Through this affiliation model, the Big Four networks benefit by obtaining wide-scale delivery of their programming, and affiliates benefit by obtaining access to network programming.[109] By contrast, many local affiliates historically have aired local programming, including local news, in time slots not occupied by national network programming. Television viewers benefit from localism to the extent that their affiliated stations have the latitude and resources to produce and air local programming, as well as the incentive and ability to preempt national network programming in favor of local news or other programming that is potentially of greater value or importance to their local audiences and better serves local needs and interests.[110] This network/affiliate model has long sought to balance two competing interests: that of broadcast networks, which are economically motivated to ensure that their programming appeals to a nationwide audience and is carried broadly by affiliates; and that of local affiliates, which are economically motivated to attract viewers and advertising dollars by tailoring their

(Continued from previous page)

market for any group. *See also FCC v. Prometheus Radio Project*, 592 U.S. at 427 (finding that "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies").

[106] *2002 Biennial Review Order*, 18 FCC Rcd at 13828-45, para. 538-84 (retaining a national cap but raising it from 35% to 45%).

[107] With respect to its goal of promoting localism, the Commission has observed that:

> as temporary trustees of the public's airwaves, broadcasters are obligated to operate their stations to serve the public interest—specifically, to air programming responsive to the needs and issues of the people in their communities of license. . . . [O]ur broadcast regulatory framework is designed to foster a system of local stations that respond to the unique concerns and interests of the audiences within the stations' respective service areas.

*Broadcast Localism*, MB Docket No. 04-233, Report on Broadcast Localism and Notice of Proposed Rulemaking, 23 FCC Rcd 1324, 1327, para. 6 (2008) (footnotes omitted); *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13643, paras. 73-74 ("Localism is rooted in Congressional directives to this Commission and has been affirmed as a valid regulatory objective many times by the courts. . . .Federal regulation of broadcasting has historically placed significant emphasis on ensuring that local television and radio stations are responsive to the needs and interests of their local communities." (footnotes omitted)).

[108] *See, e.g.*, *2022 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 22-459, Notice of Proposed Rulemaking, FCC 25-64, para. 41 (Sept. 30, 2025).

[109] *Id.*

[110] *Id.*

programming to the tastes of their local audiences and by inducing networks to air programming that is responsive to their communities' needs and interests.[111]

32. The central factor in the Commission's 2003 decision to retain the national cap was its consideration of the ability of affiliated television stations to promote localism by: (1) influencing through collective negotiation the programming that networks provide and (2) preempting network programming in favor of programming that appeals more to the needs and interests of their local communities.[112] The Commission acknowledged that it had not taken this factor into account in its determination in 1984 that the rule should sunset after a transition period.[113] It noted that in 1984, the Commission had looked, however, at whether group station owners provided less or lower quality local news and public affairs programming than single station owners and had found no evidence that such was the case.[114] In fact, the Commission found the opposite to be true.[115] Similarly, the Commission concluded in 2003 that the national cap is not necessary to promote a higher quality or quantity of local news programming.[116]

33. Nevertheless, after analyzing preemption rates, the Commission in 2003 found that affiliated stations act on their economic incentive to serve their local audiences by preempting network programming at greater rates than network-owned stations do, which is not surprising given networks' interest in the widest distribution of their programming in order to maximize their advertising and syndication revenues.[117] The Commission pointed to data showing that affiliated stations preempted an average of 9.5 hours of prime time programming in 2001, as compared to an average of 6.8 hours preempted that year by network-owned stations.[118] The Commission listed numerous specific examples of affiliates protecting local viewing interests by raising concerns with networks about certain programs and/or by preempting those programs.[119] The Commission concluded that affiliates' ability to affect program selection is a benefit to viewers and that eliminating the cap would shift the balance of power toward the networks in a way that would disserve the Commission's localism policy.[120] The Commission noted its finding in the *1998 Biennial Review Order* that "affiliates 'play a valuable counterbalancing role' to network programming decisions by exercising their independent programming discretion regarding what programs best serve the needs and interests of their local communities."[121] The Commission concluded that preventing a network from achieving a greater national audience reach than its affiliates have collectively serves the Commission's localism goal by keeping in check the network's power over its affiliates.[122]

34. However, in today's media marketplace, the Commission determines that restricting the national audience reach of station owners through an *ex ante* 39% cap is no longer the best way for the

---

[111] *Id.*

[112] *2002 Biennial Review Order*, 18 FCC Rcd at 13828, 13832-33, 13844-45, paras. 538-39, 546, 584.

[113] *Id.* at 13828, 13844-45, paras. 538-39, 584.

[114] *Id.* at 13837-38, para. 564.

[115] *1984 Multiple Ownership Order*, 100 F.C.C.2d at 31-34, paras. 44-51 (citing evidence that "group-owned stations" had higher ratings, had larger news staffs, produced more news programming, were less dependent on wire services and networks for news, and aired more public service programming than "non-group-owned stations").

[116] *2002 Biennial Review Order*, 18 FCC Rcd at 13842, para. 577.

[117] *Id.* at 13829-34, paras. 541-52.

[118] *Id.* at 13833, para. 548.

[119] *Id.* at 13829-31, para. 543.

[120] *Id.* at 13834, para. 552.

[121] *Id.* at 13828, para. 538 (citing *1998 Biennial Review Order*, 15 FCC Rcd at 11074-75, para. 30).

[122] *See id.* at 13843-44, para. 582.

agency to maintain the balance of power between networks and their affiliated stations. Rather, the Commission can examine the dynamics between networks and affiliates in the context of specific transactions. In making this change, we note that networks do not depend on affiliates for programming distribution to the same extent as they did in the past.[123] As described in the *Nexstar-TEGNA Order*, "[w]e have entered a new streaming age."[124] Now networks can reach viewers directly by placing their programming on their associated streaming platforms, such as Peacock, Disney+, Paramount+, and FOX One.[125] The streaming services owned by the parent companies of the Big Four networks reach tens of millions of viewers.[126] Thus, there is less incentive for networks to acquire local stations as a means of controlling the distribution of their programming such that an *ex ante* 39% cap is no longer the best approach.

35. Notably, the national cap currently affords the networks plenty of headroom to acquire more local television stations, and yet all four of the major networks remain well below the 39% limit. With the UHF discount, the Big Four network owners currently reach through their owned stations the following percentages of the national television audience: ABC owns stations reaching 20.7% of the national audience; CBS owns stations reaching 21.8% of the national audience; FOX owns stations reaching 24.2% of the national audience; and NBC owns stations reaching 19.4% of the national audience.[127] Moreover, all Big Four networks are owned by large conglomerates engaged in multiple enterprises and therefore derive substantial revenue from other lines of business besides their network-owned stations.[128] Indeed, the total number of stations owned by the Big Four networks has decreased since the *2002 Biennial Review Order*.[129] For these reasons, we do not share Newsmax's concern that

---

[123] Although arguing that the national cap is necessary because it claims that consolidation is a threat to localism, Free Press acknowledges that the balance of power rationale for the national cap no longer makes sense given that networks are shifting away from linear programming (except for sports and news programming) in favor of reaching viewers directly through their streaming platforms. Free Press 2025 Comments at 33-37.

[124] *Nexstar-TEGNA Order* at 30, para. 73.

[125] *See, e.g.*, Affiliates 2025 Comments at 3-4, 7-13 (stating that whereas affiliates used to be the "exclusive local conduit for [ne]twork programming," now they compete directly with the programming that networks carry on their direct-to-consumer streaming platforms); E.W. Scripps Company (Scripps) 2025 Comments at 4-6 (stating that networks' streaming services "allow them to partially cut out their local affiliates"); Sinclair 2025 Comments at 8-9 (stating that "Big Media continues to seek to funnel viewers into their siloed proprietary streaming services").

[126] *See 2024 CMR*, 39 FCC Rcd at 14277-78, para. 249, Fig. II.E.11. For instance, by the fourth quarter of 2025, Peacock Premium had an estimated 44.3 million U.S. subscribers; Disney+ had 53.6 million; and Paramount+ had 44.9 million. John Fletcher and Seth Shafer, S&P Global, *Leading U.S. Video Provider Rankings, Q4 2025* (Mar. 20, 2026). FOX One launched in August 2025 and currently has more than two million subscribers. Antenna, *State of Subscriptions Preview: Sports Officially Enters Its Streaming Era*, https://www.antenna.live/insights/state-of-subscriptions-preview-sports-officially-enters-its-streaming-era (last visited Feb. 11, 2026).

[127] Justin Nielson, S&P Global, *Top 50 U.S. TV Station Groups 2025 Update* (Oct. 30, 2025).

[128] *See, e.g.*, Sinclair 2018 Comments at 8-9; Affiliates 2025 Comments at 8, 12-13.

[129] Between 2003 and 2024, ABC's total ownership decreased from 10 to 8 stations, CBS's total ownership decreased from 39 to 28 stations, and FOX's total ownership decreased from 37 to 30 stations. NBC was the only Big 4 network that increased its total ownership during that time period, gaining three stations for an increase from 29 to 32 stations. Nielson, *Top 50 U.S. TV Station Groups 2025 Update*; *2002 Biennial Review Order*, 18 FCC Rcd at 13844, para. 583 n.1207 (citing *The Top 25 TV Station Groups*, B'casting and Cable (Apr. 7, 2003) at 32-34). In addition, when considering only stations owned by the Big Four networks that carry their own network programming (as opposed to all stations they own), between 2003 and 2025, ABC decreased from 10 stations to 8; CBS from 16 to 15; FOX from 25 to 18; and NBC from 12 to 11. These additional figures for ABC, CBS, FOX, and NBC owned-and-operated stations do not include stations they own but are independent or carry the programming of non-Big Four networks (e.g., Telemundo, the CW, or MyNetworkTV stations). This count also does not include those stations operated as satellite stations of larger television stations. The Walt Disney Company, Securities and Exchange Commission Annual Report (Form 10-K) at 2 (reporting information for the fiscal year

(continued….)

repealing the cap will lead to a higher concentration of network station ownership and further erode the network/affiliate balance of power.[130] Regardless, the networks comprise only a small subset of potential station buyers, and any such concerns about their ownership concentration, where identified as the product of a specific transaction, can be considered as part of the Commission's transaction review process. Given that the networks' power over their affiliates has become less contingent upon station ownership, the bright line 39% national cap is not the best way for the agency to limit networks' negotiating leverage with affiliated stations.[131] Further indication that the 39% national cap is not serving its purpose is the fact that the affiliates no longer seek a two-tiered cap as they did in 2018, when they proposed that network-owned stations be subject to a 39% cap with no UHF discount but that the rule be relaxed for non-network-owned stations.[132] It is telling that the affiliates in their 2025 comments do not object to the rule being repealed for network-owned stations despite their claim of increasing network power.[133]

36. This is not to say that there are no relevant differences between affiliates owning more television stations compared to networks owning more television stations. The Commission continues to have concerns regarding the balance of power between these two types of station owners. But any differences between affiliate or network television station ownership can be taken into account in the context of a specific transaction.

(Continued from previous page)
ending Sept. 30, 2003); Viacom Inc., Securities and Exchange Commission Annual Report (Form 10-K) at I-15, I-16 (reporting information for the fiscal year ending Dec. 31, 2003); The News Corporation Ltd., Securities and Exchange Commission Annual Report (Form 10-K) at 10 (reporting information for the fiscal year ending June 30, 2003); *The Top 25 TV Station Groups*, B'casting and Cable (Apr. 7, 2003) at 32-34; *ABC Owned Television Stations*, https://www.disneyadvertising.com/mediakit/abc-owned-television-stations/ (last visited Feb. 11, 2026); *CBS TV Stations and Affiliates*, https://www.cbsnews.com/news/cbs-tv-stations-affiliates/ (last visited Feb. 11, 2026); Fox Corporation, Securities and Exchange Commission Annual Report (Form 10-K) at 8-10 (reporting information for the fiscal year ending June 30, 2025); *NBC Owned Television Stations*, https://together.nbcuni.com/network/nbc-owned-television-stations/ (last visited Feb. 11, 2026).

[130] Newsmax 2025 Comments at 3, 16-17 (arguing that the network/affiliate balance of power would erode further if networks were permitted to acquire a high-enough concentration of stations so as to reduce their accountability to affiliates); *see also* MMTC et al. 2025 Reply at 2-3 (asserting that the national cap continues to maintain a competitive balance between networks and affiliates).

[131] *See, e.g.*, Scripps 2025 Comments at 4-5 (positing that "[t]o the extent the national cap was justified in 2003 as balancing the bargaining power of national networks and their affiliates, it does not accomplish that goal now").

[132] Affiliates 2018 Comments at 4-10 (arguing that a two-tiered national cap is needed to maintain a healthy balance of power between networks and affiliates). The affiliates initially asked the Commission to tighten the 39% cap for network-owned stations by removing the UHF discount for them but to relax the cap for non-network-owned stations by providing them a 50% discount for both VHF and UHF stations. *Id.* at 39-40. By contrast, other commenters counter that applying disparate treatment, based solely on the identity of a station's owner, to similarly-situated entities would be bad policy, arbitrary and capricious, and unconstitutional. Networks 2018 Reply at 1-3; Univision 2018 Reply at 5-6; NBCUniversal Media, LLC 2025 Reply at 1-4; NCTA–The Internet & Television Association (NCTA) 2025 Comments at 3; Fox Television Stations (Fox) 2025 Comments at 5-7; American Television Alliance (ATVA) 2025 Reply at 23; NCTA 2025 Reply at 2. Although we conclude that the record does not support the imposition of a two-tiered cap (or any cap for that matter), ownership of a major broadcast network by a licensee's parent company could be considered as part of the individualized review of a license transfer to the extent it is relevant to an alleged transaction-specific harm.

[133] *See* Affiliates 2025 Comments at 10-13. Trinity Broadcasting Network (Trinity), a group owner of unaffiliated stations that broadcast faith-based programming, also supports elimination of the cap. Trinity 2025 Comments at 1-4, 6-8; Letter from Matthew W. Crouch, President, Trinity, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1-2 (filed Feb. 3, 2026) (*Trinity Ex Parte*).

37. Not only is the national cap no longer necessary to maintain the balance of power in the network/affiliate relationship, but neither has it been effective in doing so.[134] The market capitalizations of the Big Four networks are multiples of those of station groups owning affiliated stations.[135] The affiliates point out that the networks, despite previously paying their affiliates for distributing their programming, now demand reverse compensation fees from the stations in exchange for their affiliation.[136] These fees, which typically are tied to the retransmission consent payments stations receive from MVPDs, now total approximately one-half of the retransmission consent fee revenues that a local station receives on average.[137] And by some accounts, certain networks are now charging fixed reverse compensation fees that are in excess of the station's retransmission consent revenues.[138] In addition, the affiliates contend that networks control not only the negotiations with online video providers for the right to stream a station's local signal but also that they demand a share of the negotiated licensing revenues of the station's online streaming rights.[139]

38. The affiliates further claim that networks exert their negotiating power by imposing unreasonable terms and conditions in affiliation agreements, such as limitations on preemption rights.[140] The ability to preempt network programming remains an important means through which local stations can reflect the tastes and needs of the communities they serve. When the Commission last reviewed the national cap as part of the *2002 Biennial Review Order*, affiliates, at that time, described how increased network leverage had led, over time, to networks' rising resistance to affiliate preemptions and to affiliates' declining use of preemptions.[141] In the current proceeding, affiliates maintain that preemption

---

[134] *See* Affiliates 2018 Comments at 7 (claiming that "[t]he balance of power between the networks and affiliates continues to shift in favor of the networks"); Affiliates 2025 Comments at 10-11 (contending that "the imbalance has continued to tilt against local stations"); Scripps 2025 Comments at 4-5 (asserting that the networks' bargaining power only has strengthened since the *2002 Biennial Review Order*).

[135] As of the stock market's close on February 3, 2026, the approximate market capitalizations of the corporate owners of the Big Four networks were: The Walt Disney Company, $185 billion; Comcast Corporation, $117 billion; Fox Corporation, $30 billion; and Paramount Skydance Corporation, $12 billion. In contrast, the approximate market capitalizations of the largest station group owners were: Nexstar Media Group, Inc., $6 billion; TEGNA Inc., $3 billion; Sinclair, Inc., $954 million; Gray Media, Inc. (Gray), $498 million; and Scripps, $304 million. Yahoo Finance, https://finance.yahoo.com/ (last visited Feb. 3, 2026). Thus, the collective market capitalization of the network owners was $344 billion, as compared to the $11 billion collective market capitalization of those station groups. Note that a company's market capitalization, which is the total dollar value of its outstanding shares of stock, fluctuates with the company's share price. Fidelity Viewpoints, *What is Market Cap?* (Jan. 6, 2026), https://www.fidelity.com/learning-center/trading-investing/market-cap.

[136] *See, e.g.*, Affiliates 2025 Comments at 10-11 (asserting that the fees affiliates pay to networks continue to increase even as affiliates' distribution rights erode); Scripps 2025 Comments at 4-5 (arguing that unlike in 2003, networks now demand "enormous" fees from affiliates for the right to broadcast network programming); Sinclair 2025 Comments at 8-9 (claiming that Big Media uses affiliation fees extracted from local broadcasters "to subsidize their efforts to make local broadcasting extinct").

[137] *2024 CMR*, 39 FCC Rcd at 14284, para. 263.

[138] *See* Jon Lafayette, *Affiliates Seek to Change How They Pay Networks for Programming* (Mar. 1, 2024), https://www.nexttv.com/news/affiliates-seek-to-change-how-they-pay-networks-for-programming; Hank Price, *Will Stations Revolt Over Network Payments?* (Sept. 23, 2024), https://tvnewscheck.com/business/article/will-stations-revolt-over-network-payments/; Emily Barr, *Network TV is Dead. Long Live Local TV* (Mar. 25, 2025), https://tvnewscheck.com/business/article/network-tv-is-dead-long-live-local-tv/.

[139] *See, e.g.*, Affiliates 2018 Comments at 7, 30-34; Affiliates 2025 Comments at 12; Sinclair 2025 Comments at 8-9; Scripps 2025 Comments at 4-6 (stating that networks negotiate for online distribution not only of network content, but often their affiliates' local content as well).

[140] *See, e.g.*, Affiliates 2018 Comments at 34-36 & Exh. 4.

[141] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13834, 13835-36, paras. 554, 557.

allowances "in network affiliation agreements, where they exist, remain increasingly crabbed and financial penalties for unauthorized preemptions high, and loss of affiliation remains the ultimate penalty."[142] As evidence, they submit numerous examples of preemption provisions that the CBS, FOX, and NBC networks have imposed in their affiliation agreements.[143] Nonetheless, they state that "[e]ven in the face of these restrictions and possibly severe penalties, affiliates do still preempt network programming" given that "[a]ffiliates have a countervailing and independent duty, as broadcast licensees, to serve the public interest," which they claim to fulfill "by making independent programming decisions to serve their individual local communities—by producing their own local news, sports, weather, and public affairs programming and by making ultimate decisions about which programs, including network programs, best serve their local audiences."[144] They describe various occasions when affiliated stations have preempted network programming, including to provide local coverage of the shooting at Marjory Stoneman Douglas High School, Hurricane Irma, tornado warnings, local parades, local telethons, and sporting events of local interest.[145] They posit that affiliated stations would preempt network programming more often "if the network grip were not so tight."[146]

39. The national cap has not prevented this growing imbalance in the network/affiliate relationship, and eliminating the cap will not worsen it given not only networks' decreasing incentive to acquire local television stations as a means of controlling the distribution of their programming, but importantly and more fundamentally the Commission's determination here that any such issues can be addressed and mitigated as appropriate in the context of any particular transaction.[147]

40. Furthermore, if warranted, network power over affiliates likely could be curbed more effectively through more direct mechanisms than a blanket rule like the national cap.[148] For example, section 73.658 of the Commission's rules affords affiliates various protections in their negotiations with networks, including with respect to program preemption, territorial exclusivity, and station rates for the sale of broadcast time.[149] Among its options, the Commission could enforce these existing rules more

---

[142] Affiliates 2018 Comments at 34.

[143] *Id.* at Exh. 4.

[144] *Id.* at 5, 35. The United Church of Christ Media Justice Ministry counters that large station groups do not tailor preemption decisions to the particular interests of the local communities they serve. Cheryl A. Leanza, United Church of Christ Media Justice Ministry, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed July 30, 2026) (United Church of Christ Media Justice Ministry *Ex Parte*). Given the numerous counterexamples in the record, the fact that a station group owner may make nationwide decisions for its stations does not establish that it is unresponsive to the needs and interests of the local communities its stations serve.

[145] Affiliates 2018 Comments at 11-15.

[146] *Id.* at 35.

[147] *But see* National Association of Broadcast Employees and Technicians – Communications Workers of America (NABET-CWA) 2025 Comments at 11-12 (arguing that the national cap is needed to protect affiliates' leverage with networks, which "is crumbling with every passing day" as networks increase their demands for portions of the affiliates' retransmission consent fees, while simultaneously diminishing the level of exclusivity of the content they license to their affiliates).

[148] *See, e.g.*, Nexstar 2018 Comments at 22 (arguing that any concerns regarding the balance of power in network/affiliate relationships "are better addressed directly, rather than indirectly through the obliquely-connected and overly-restrictive mechanism of a national audience reach cap"); Entravision 2018 Reply at 6 & n.19 (asserting that "broad-brush rules, such as the [n]ational [c]ap," are not effective in serving the Commission's localism goals).

[149] *See* 47 CFR § 73.658 (imposing various restrictions on the contractual agreements between networks and their affiliates to ensure that licensees retain control over their stations sufficient to fulfill their public interest obligations); *see also Network Affiliated Stations Alliance (NASA) Petition for Inquiry Into Network Practices and Motion for Declaratory Ruling*, Declaratory Ruling, 23 FCC Rcd 13610 (2008) (providing guidance regarding

(continued….)

rigorously, consider adopting new rules that might be warranted, or ensure that affiliate concerns are addressed when reviewing proposed station acquisitions.[150] Indeed, a closer look at the network/affiliate relationship is already underway at the Commission in order to gather information regarding what, if any, more targeted measures should be taken to ensure affiliated stations have the leverage they need to meet their public interest obligations.[151]

41. The networks' ability to migrate their programming to streaming platforms not only has lessened their incentive to purchase their own local television stations, but it also has weakened affiliates' bargaining power by reducing networks' reliance on affiliated stations for programming distribution. Despite this shift, affiliated stations remain an important distribution channel for network programming, and station groups therefore could boost their bargaining strength by increasing their ownership of affiliated stations. The more stations affiliated with a particular network that a station group owns, the more leverage it has with that network in negotiations regarding reverse compensation fees, preemption rights, access to network programming, and so forth.[152] Additional leverage would help preserve affiliated stations' ability to influence network programming through collective negotiation and to preempt network programming in favor of programming that better serves the local community—the bases for which the Commission retained the national cap in 2003.[153] As Scripps explains, "[f]or broadcast affiliate owners to have a stronger hand in negotiations with their networks, those affiliate owners need to be able to achieve greater scale, putting them on more even footing with their networks, which now have their own non-broadcast national distribution channels."[154] By limiting national audience reach, the national cap constrains a station group's ability to purchase more affiliated stations as a way to maintain its leverage vis-à-vis networks' increasing bargaining power. According to Scripps, "[w]ithout the ability to obtain greater scale, owners of local network affiliates remain at a massive disadvantage in negotiating with networks, threatening the ability of local broadcasters to survive and

(Continued from previous page)
protections from network interference that are afforded to affiliates under the Communications Act and the Commission's rules); Affiliates 2018 Comments at Exh. 1, A History of the Statutory and Regulatory Framework for Regulation of the Television Network-Affiliate Relationship.

[150] *See* NAB 2025 Comments at 4 (noting the Commission's authority to review all proposed broadcast license assignments and transfers to ensure they do not raise public interest concerns).

[151] *Empowering Local Broadcast TV Stations Public Notice* at 1-6.

[152] Although not a basis for our action today, to the extent that pressure from networks for higher reverse compensation fees is driving stations to seek higher retransmission consent fees from MVPDs, it follows that additional leverage to negotiate lower reverse compensation fees could put downward pressure on the retransmission consent fees that MVPDs pay to owners of affiliated stations. *See, e.g.,* NTCA–The Rural Broadband Association (NTCA) 2025 Comments at 4-5 (asserting that networks' demands for increasing reverse compensation fees create "a compounding effect where rural MVPDs face escalating costs driven not by local programming needs, but by financial arrangements between national networks and station groups"); *but see* Letter from Todd Eachus, President, Broadband Communications Association of Pennsylvania; David Ducharme, Executive Director, Broadband Communications Association of Washington; Jeff Weist, Executive Director, Colorado Cable Telecommunications Association; Charles Dudley, General Counsel, Florida Internet and Television Association; Joseph Dant, Executive Director, Indiana Cable and Broadband Association; Nathan Kark, Executive Director, Michigan Cable Telecommunications Association; Melissa Wolf, Executive Director, Minnesota Cable Communications Association; Lindsey Simmons, Executive Director, Mississippi Internet and Television; Tim Wilkerson, President, New England Connectivity and Telecommunications Association; and Ray LaMura, President, VCTA – Broadband Association of Virginia, to Marlene H. Dortch, Secretary, FCC, MB Docket 17-318, at 7 (filed July 29, 2026) (arguing that there is no evidence "in fact or economic theory" to support the possibility of that potential effect) (State Cable Associations *Ex Parte*).

[153] *2002 Biennial Review Order*, 18 FCC Rcd at 13829-34, paras. 543-52.

[154] Scripps 2025 Comments at 6; *see also* Center for American Rights (CAR) 2025 Reply at 1 (arguing that "economies of scale allow station ownership groups additional leverage vis-à-vis the networks").

deliver essential local news and other locally-focused programming."[155] Thus, we find that the national cap has become an ineffectual tool for promoting localism because, rather than preserving a balance of power, it may be exacerbating an imbalance of power. For these reasons, we find that it is no longer the case that eliminating the cap would "shift the balance of power with respect to programming decisions toward the national broadcast networks in a way that would disserve our localism policy."[156] In fact, allowing station groups to achieve greater scale may promote our localism goal depending on the facts of any particular case.

42. For the reasons discussed above, we conclude that the national television multiple ownership rule is no longer serving its intended purpose to promote localism; nor is it necessary to promote the Commission's other media policy goals of viewpoint diversity and competition.[157] On this basis, we therefore find that the rule is not serving the public interest, convenience, or necessity, and we repeal section 73.3555(e) of the Commission's rules.[158]

**B. Case-by-Case Review is a Better Way to Promote the Commission's Goals**

43. As discussed above, the Commission must review all applications for television license transfers and assignments to evaluate whether approval would serve the public interest. Elimination of the rule does not eliminate the Commission's obligation to weigh the potential benefits and harms specific to a proposed transaction. Rather, it ensures that proposed transactions that otherwise would have been presumed not to be in the public interest under the national cap are reviewed on their individual merits. On the one hand, opponents of the national cap argue that, as a general matter, further consolidation will produce public interest benefits, namely furtherance of the Commission's localism goal and advancement of innovative technologies, such as ATSC 3.0.[159] On the other hand, proponents of the national cap warn that further consolidation will result in public interest harms, such as a decrease in localism, an increase in retransmission consent fees, and a loss of journalists and other communications workers. We respond to

[155] Scripps 2025 Comments at 4-6 (discussing the networks' demands for reverse compensation fees, the placement of their programming on streaming platforms, and their direct negotiations with online video providers for the distribution of network and local content); *but see* Free Press 2025 Comments at 32-38 (arguing that the balance of power rationale for the national cap is no longer applicable because the largest station groups now have the same incentive as the networks to distribute their programming as widely as possible, to the detriment of localism). We agree with Free Press that the balance of power rationale (in the sense of keeping networks in check) is no longer an applicable justification for retaining the national cap, and we explain herein how our action today is consistent with safeguarding localism.

[156] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13834, para. 552.

[157] We reject Newsmax's comparison with consolidation in the radio industry following the 1996 Act. Newsmax calls that consolidation "a cautionary tale" given the amount of debt that some radio owners incurred as a result of rapid expansion. Newsmax 2025 Comments at 5-6, 22-25 (arguing that the largest television station groups already are saddled with debt and should not be encouraged to take on more); Newsmax 2025 Reply at 2; *see also* Common Frequency, Inc. (Common Frequency) 2025 Comments at 6-11; NewsGuild-CWA, Free Press, Open Markets Institute, NABET-CWA, Writers Guild of America East, Writers Guild of America West (WGAW), Reporters Without Borders – USA, Society to Professional Journalists, National Coalition Against Censorship, Mickey Huff, Fairness and Accuracy in Reporting, Tully Center for Free Speech, Whistleblower and Source Protection Program at ExposeFacts, Local Independent Online News Publishers (NewsGuild-CWA et al.) 2025 Comments at 1-3; Media and Democracy Project and the Media Action Center 2025 Reply at 4, 7. Vague and speculative warnings about additional debt that some television station groups may or may not incur do not serve to justify the retention of an industry-wide ownership limit on all television station owners.

[158] *See* 47 CFR § 73.3555(e).

[159] ATSC 3.0 is the "Next Generation" broadcast television transmission standard that merges the capabilities of over-the-air broadcasting with the broadband viewing and information delivery methods of the Internet. *See, e.g.*, *Authorizing Permissive Use of the "Next Generation" Broadcast Television Standard*, GN Docket No. 16-142, Notice of Proposed Rulemaking, 32 FCC Rcd 1670, 1671, para. 1 (2017).

commenters' arguments below. We note, however, that to the extent that commenters forecast harms as a result of the rule's repeal, those harms would occur, if at all, as a result of specific transactions. This action to repeal the rule will neither create harms nor affect our ability to assess and address any particular concerns about the potential effect of a proposed transaction.

44. Moreover, our decision to eliminate an outdated and overly restrictive bright line limit, in favor of a more flexible approach, is consistent with the approach the Commission has taken with respect to other ownership restrictions, including in other spectrum bands and services. It is undisputed, and abundantly evident in the record of this proceeding, that the communications industry (broadcast television included) has undergone seismic changes over the course of several decades. Seeing this transformation on the horizon, Congress, in the 1996 Telecommunications Act, set out to "promote competition and reduce regulation."[160] Consistent with those objectives, and in recognition of dramatic changes in the marketplace, the Commission's rules have evolved over time such that many *ex ante* restrictions have given way to case-by-case review. For instance, the 1996 Telecommunications Act led to the removal of restrictions on the nationwide ownership of broadcast radio stations[161] and the cross-ownership of cable systems and broadcast television stations.[162] Similarly, the Commission no longer restricts MVPD ownership via horizontal or vertical restrictions.[163] More recently, the Commission also eliminated restrictions on the cross-ownership of newspapers and broadcast stations as well as cross-ownership of radio and television stations.[164]

45. In addition to its actions with respect to media ownership limits, the direction the Commission has taken over the past twenty plus years in the mobile wireless sector also proves instructive. In that context, the Commission once maintained spectrum aggregation limits that strictly limited the total megahertz of spectrum across certain spectrum bands that a licensee could hold in a geographic area.[165] In 2001, the Commission decided to eliminate this so-called spectrum cap, with the final sunset of the cap occurring in 2003.[166] The Commission found, at the time, that with the evolution of competition in the market, the rule was no longer necessary in the public interest to serve its intended purpose and it was, therefore, "no longer appropriate to impose overbroad, *a priori* limits on spectrum aggregation that may prevent transactions that are in the public interest."[167] In the absence of a rigid spectrum cap, the Commission, for more than two decades, has employed a case-by-case approach, guided by the use of a "spectrum screen" that has evolved over time, through both transaction and rulemaking decisions, to keep pace with developments in the wireless industry.

---

[160] 1996 Act, 110 Stat. at 56.

[161] *See* 1996 Act § 202(a), 110 Stat. at 110; *In the Matter of Implementation of Sections 202(a) and 202(b)(1) of the Telecommunications Act of 1996 (Broadcast Radio Ownership*), *47 C.F.R. Section 73.3555*, Order, 11 FCC Rcd 12368 (1996).

[162] *See* 1996 Act § 202(i), 110 Stat. at 112; *1998 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MM Docket No. 98-35, Order, 18 FCC Rcd 3002 (2003).

[163] *See Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009) (vacating rule that capped at 30% of all subscribers nationwide the market share that any single cable television operator was permitted to serve); *Time Warner Entertainment Co. v. FCC*, 240 F.3d 1126 (D.C. Cir. 2001) (reversing limits on the number of channels on a cable system that could be occupied by a video programmer in which a cable operator had an attributable interest).

[164] *See 2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9806, 9824, paras. 8, 49.

[165] *See Policies Regarding Mobile Spectrum Holdings*, WT Docket No. 12-269, Report and Order, 29 FCC Rcd 6133, 6137-40, paras. 7-12 (2014).

[166] *Id.* at 6139-40, para. 12.

[167] *2000 Biennial Regulatory Review—Spectrum Aggregation Limits for Commercial Mobile Radio Services*, WT Docket No. 01-14, Report and Order, 16 FCC Rcd 22668, 22694, para. 50 (2001).

46. In keeping with that approach, the end of a strict cap on national broadcast television ownership by no means represents the end of Commission oversight regarding the transfer of ownership of broadcast television stations. Rather, the overall shift away from rigid limits, and toward a more nuanced approach (which our current action also reflects) has proven nimble and provided the Commission with much needed flexibility in a rapidly changing environment, allowing it to consider, and reach determinations regarding, which transactions would, or would not, serve the public interest. Under this case-by-case approach, and consistent with the Commission's statutory public interest review, it has long been true—and it will remain so—that some transactions receive approval, while others do not. Ultimately, approval of any given transaction will continue to depend on the Commission's analysis of the transaction's potential benefits and harms and the likelihood that any potential harms can be mitigated by the imposition of merger conditions. In the discussion below, we address arguments that a case-by-case approach allows for more subjective decision-making than bright line rules do.[168] We provide some initial guidance regarding the kind of information that would inform our review of any non-local effects of a television merger, particularly with respect to allegations of potential harm from such effects. We anticipate that such transactions processed under a case-by-case approach will help to refine and further develop these guideposts and criteria.

### 1. Potential transaction-specific benefits

#### a. Increase in local programming

47. As suggested above, instead of promoting localism, the national cap may be undermining it by preventing the Commission from approving specific transactions that promote localism (e.g., transactions that would improve the ability of local television stations to access additional capital and advertising revenue needed to invest in local programming). Repealing the rule will provide the Commission the opportunity to analyze whether a particular transaction would result in increased investment in local news coverage and other programming of local interest.

48. There is considerable debate in the record over whether the national cap prevents station groups from competing effectively with national and global technology and media conglomerates, which some commenters refer to as Big Tech and Big Media,[169] for the revenues that local broadcasters need to serve their communities. The broadcast industry argues that station groups need economies of scale in order to compete for viewers and advertisers with Big Tech and Big Media, which enjoy unrestricted

---

[168] *See* United Church of Christ Media Justice Ministry *Ex Parte* at 2 (asserting that a shift to a case-by-case approach "with no guideposts or criteria to guide decision-making is arbitrary and inconsistent with previous decisions"); Letter from Andrew Jay Schwartzman to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed July 27, 2026) (Schwartzman *Ex Parte*) (rejecting any suggestion that a case-by-case approach will be "some sort of new safeguard against adverse consequences of granting a particular application"); Letter from Claire Lochbaum to Commissioners, FCC, MB Docket No. 17-318, at 1-2 (filed July 20, 2026) (contending that a "bright-line ownership limit provides a structural safeguard" against decision-making influenced by "the priorities, political preferences, or personality of any particular chairperson or administration"); Letter from Justin Wyatt to Commission and Staff, FCC, MB Docket No. 17-318, at 3-4 (filed July 16, 2026) (arguing that a case-by-case approach should not be implemented without certain "concrete, enforceable metrics").

[169] *See, e.g.*, Sinclair 2025 Comments at 2-8, 11-13; Affiliates 2025 Comments at 2-4, n.10, 6-14; NAB 2025 Comments at 18, 20; CAR 2025 Comments at 1, 4; Entravision 2025 Comments at 2-4; Free Press 2025 Comments at 58-64; Free State Foundation 2025 Comments at 2, 4-5, 7; NABET-CWA 2025 Comments at 1-2, 8-11; Nexstar 2025 Comments at 1, 6, 25; Newsmax 2025 Comments at 20-22; Trinity 2025 Comments at 2-3, 6; Univision 2025 Comments at 2,3; Joint Broadcasters 2025 Reply at 3, 34, 56, 58, 59. Examples of Big Tech companies that some of these commenters identify include Alphabet, Apple, Amazon, and Meta. Commenters generally employ the term Big Media to refer to the owners of the four major broadcast networks, namely Disney, Comcast, Paramount, and Fox. Netflix and TikTok frequently are mentioned in commenters' discussions regarding Big Tech and Big Media.

reach.[170] Several commenters cast the threat to the broadcast industry as existential.[171] As depicted by Sinclair, they argue that "[t]he remedy is unshackling local broadcasters by eliminating the national ownership cap, which will allow broadcasters to achieve greater scale and synergies and challenge Big Tech and Big Media gatekeepers."[172] NAB contends that the Commission's delay in repealing the newspaper/broadcast cross-ownership rule, while the newspaper industry struggled, serves as a cautionary example in light of the threat now facing local television stations and the viability of their newsrooms.[173]

49. Proponents of retaining the national cap are not persuaded. They assert that station groups are not as vulnerable as they claim, as evidenced by their statements to investors touting their company's profit performance and favorable business outlook.[174] For example, the State Cable Associations quote Nexstar's Chief Executive Officer stating that "[Nexstar's] record-breaking top line financial performance . . . [and] record-breaking distribution revenue further validates the power and sustainability of [its] highly profitable business model."[175] Free Press provides financial data purporting to show that Nexstar,

---

[170] *See* NAB 2018 Comments at 11-13; Sinclair 2018 Comments at 6-9; Entravision 2018 Reply at 1-2, 4-6, 8; NAB 2018 Reply at 15; Letter from Hearst Television, Inc., Scripps Media, Inc., Raycom Media, Inc., Gray Television, Inc., Graham Media, Inc., Quincy Media, Inc., Dispatch Broadcast Group, and Morgan Murphy Media, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 3 (filed May 16, 2018) (Hearst et al. *Ex Parte*); Letter from Elizabeth Ryder, Executive Vice President & General Counsel, Nexstar, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1-2 (filed June 18, 2018); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1-2 (filed Feb. 26, 2025) (NAB Feb. 26, 2025 *Ex Parte*); Affiliates 2025 Comments at 2-5, 8-9; NAB 2025 Comments at 1-3, 6-13; Entravision 2025 Comments at 1-4; Fox 2025 Comments at 2-3; Nexstar 2025 Comments at 5-9; Scripps 2025 Comments at 4, 6-9; Trinity 2025 Comments at 3, 6-7; Univision 2025 Comments at 1-4; Sinclair 2025 Comments at 2-9; Joint Broadcasters 2025 Reply at 31-34; Digital First Project 2025 Reply at 2; Heritage Action for America, Americans for Tax Reform, Digital First Project, Digital Progress Institute, Citizens for Renewing America, Center for American Rights, Taxpayers Protection Alliance, Americans For Prosperity, Competitive Enterprise Institute, Consumer Choice Center, The Bull Moose Project, National Taxpayers Union, Digital Liberty, American Center for Law and Justice Action, Consumer Action for a Strong Economy, National Security Institute, American Consumer Institute Center for Citizen Research, Center for Individual Freedom, James Madison Institute, Nick Solheim, Kristian Stout, and Evan Swarztrauber (Heritage Action et al.) 2025 Reply at 1; Sinclair Delete, Delete, Delete Comments at 1-8, 10-13.

[171] Affiliates 2025 Comments at 5; Entravision 2025 Comments at 1-4; Nexstar 2025 Comments at 1-2; Sinclair 2025 Comments at 2, 9; Trinity 2025 Comments at 3-4; Heritage Action et al. 2025 Reply at 1; *see also* NAB 2025 Comments at 5-6.

[172] Sinclair 2025 Comments at 8-9.

[173] NAB 2025 Comments at 15. In spite of evidence of the economic challenges broadcasters face, the dissent points to other proposed changes to statutes and rules for which broadcasters are advocating (e.g., application of consent obligations to virtual MVPDs, changes to the Sports Broadcasting Act, adoption of a cutover date for the next generation television standard, and involvement of the Commission in network/affiliation negotiations) as having the potential to impact favorably the economics of local television for broadcasters. These proposals, however, are beyond the scope of this proceeding, and there is no guarantee that any of them will materialize. Moreover, the broadcasters' advocacy for these proposals only further underscores their struggles, which have led them to seek relief on a number of fronts.

[174] *See, e.g.*, UCC et al. 2018 Reply at 6; Free Press 2025 Comments at 52-58, 62-64, 77-90; ATVA 2025 Comments at 9-10; NABET-CWA 2025 Comments at 10-11; NTCA 2025 Comments at 5; ATVA 2025 Reply at 16-19; Cincinnati Bell Extended Territories LLC (altafiber) 2025 Reply at 1-4; NTCA 2025 Reply at 5-6; NABET-CWA 2025 Reply at 4-6; *but see* Joint Broadcasters 2025 Reply at 43-48 (stating that "many individual stations struggle financially with very thin margins (or are unprofitable) and cannot properly support independent local news operations").

[175] Broadband Communications Association of Pennsylvania, Broadband Communications Association of Washington, Colorado Cable Telecommunications Association, Florida Internet and Television Association, Indiana Cable & Broadband Association, Louisiana Internet & Television – The Broadband Association, Michigan Cable

(continued….)

Sinclair, Scripps, Gray, and TEGNA generally experienced healthy growth from 2016 to 2024 in terms of operating revenue, advertising revenue, and political advertising revenue.[176]

50. Proponents of retaining the national cap further argue that comparing local broadcast licensees, which have unique public interest obligations and regulatory protections, to Big Tech and Big Media is an apples to oranges comparison because Big Tech and Big Media do not provide local news and other locally produced content.[177] NABET-CWA, for example, contends that "[w]hile there have indeed been market and technological changes, broadcasters misrepresent the reality of how these changes have affected broadcasting's profitability and local broadcasting's continued unique role relative to streaming services and Big Tech."[178] These commenters argue that, even if they were direct competitors, eliminating the national cap would not let station groups achieve equal footing with massive conglomerates such as Google, Apple, Amazon, Netflix, DIRECTV, Verizon, Comcast, Disney, Paramount, and Fox.[179]

51. It is not necessary for us to resolve this debate in order to recognize that the broadcast industry as a whole has been experiencing declines in both viewership and advertising revenue for decades.[180] A recent Nielsen study reported that viewership of streaming services has surpassed that of broadcast and cable combined.[181] NAB, for example, provides data showing that "the ratings of the top-rated scripted program on broadcast TV has fallen 72.1 percent since 2004 . . . ; by 78.3 percent since

(Continued from previous page)
Telecommunications Association, Minnesota Cable Communications Association, New England Connectivity and Telecommunications Association, and VCTA – Broadband Association of Virginia (State Cable Associations) 2025 Reply at 30 (quoting Perry Sook and citing Transcript of Nexstar Media Group, Inc. Q3 2024 Earnings Call (Nov. 7, 2024)); *see also id.* at 29-31. State Cable Associations note that broadcasters have been warning for eight years in this proceeding that their survival depends on relief from the national cap. *Id.* at 29.

[176] Free Press 2025 Comments at 77-79; *see also id.* at 80-87 (drawing favorable comparisons between profitability metrics of those station groups, plus Entravision, and those of Big Tech and Big Media companies).

[177] *See, e.g.*, UCC et al. 2018 Reply at 2-6 (contending that Big Tech and Big Media companies do not compete with broadcasters in providing local news and other locally produced programming); Free Press 2025 Comments at 58-68 (claiming that local television broadcasters are not in the same relevant product market as online tech giants or OVDs); NABET-CWA 2025 Comments at 8-11 (asserting that "Big Tech is not a source of local news" and "[t]he suggestion that a flood of 'content creators' online is a technological change which requires that local news producers consolidate without limit or face extinction is a red herring").

[178] NABET-CWA 2025 Comments at 11.

[179] *See, e.g.*, UCC et al. 2018 Reply at 5-6 (positing that raising the cap would not permit station groups "to compete against much larger firms with holdings in a variety of different markets and industries"); Free Press 2025 Comments at 61-62 (questioning how local television consolidation would enable station groups to compete against firms like Google and Meta); Common Frequency 2025 Comments at 1-3 (arguing that because "video streaming content sources are now essentially infinite," broadcasters need to explain how owning more local stations would allow them ever to compete head-to-head with streaming); *but see* Joint Broadcasters 2025 Reply at 55-62 (arguing that the fact that Big Tech does not face sufficient competition from broadcast television in its market does not mean that television stations do not face competition from Big Tech).

[180] *See* Entravision 2018 Reply at 5-6; NAB 2018 Reply at 16-17; Affiliates 2025 Comments at 7-10; NAB 2025 Comments at 6-11, 13-19; Fox 2025 Comments at 2-3; Nexstar 2025 Comments at 4, 5-9; Scripps 2025 Comments at 7-8; Sinclair 2025 Comments at 3-5; Trinity 2025 Comments at 4-6; Suzanne Vranica & Nate Rattner, *The TV Ad Market Is Being Taken Over by Streaming Platforms*, Wall St. J. (May 12, 2026), https://www.wsj.com/business/media/streaming-platforms-are-swallowing-the-tv-ad-market-333aacfb.

[181] In June 2025, streaming services accounted for 46% of television viewership, cable garnered a 23.4% share, and broadcast's share was only 18.5%. Nielsen, *Netflix Leads Streaming Growth in June on the Strength of Multiple Big Titles in Nielsen's 50th Report of The Gauge* (July 2025), https://www.nielsen.com/news-center/2025/netflix-leads-streaming-growth-in-june-on-the-strength-of-multiple-big-titles-in-nielsens-50th-report-of-the-gauge/.

passage of the 1996 Telecommunications Act; and by 86.4 percent since the mid-1980s."[182] NAB further reports that BIA data show that total advertising revenue (over-the-air plus digital) for television stations fell 42.9% from 2000 to 2024 on an inflation-adjusted basis.[183] In addition, according to the Affiliates, local broadcasters now control only 28.7% of the local advertising-supported viewing market, while 42.4% of that market goes to streaming services.[184] As the Media Bureau noted in the *Nexstar-TEGNA Order*, both streaming services and cable providers offer "targeted and DMA-wide advertising options" that are "real and competitive substitutes in any market for local spot advertising."[185]

52. Station groups argue that expansion through the elimination of the national cap will improve their ability to provide programming that promotes the Commission's localism goal.[186] Broadcasters describe the high cost of gathering and producing local news content.[187] They also decry the rising expense of securing distribution rights to live sports programming of interest to their local communities given increasing migration of live sports programming to non-broadcast channels and streaming platforms.[188] They claim that allowing station groups to reach more viewers will enable them to attract additional advertising and investment capital needed to improve local service.[189] NAB argues that the national cap creates "a vicious circle" by restricting broadcasters' audiences and advertising revenues, which hinders their ability to produce and/or acquire quality programming and to obtain investment capital, which in turn further impairs their ability to attract viewers and advertising dollars, and thus their ability to invest in local journalism.[190]

53. We share station groups' concern that, with the increase in network bargaining power over their affiliates that has resulted from the rise of online video distribution and other secular changes in the media landscape, the returns on local programming investments by affiliates have been reduced due to the networks now capturing a larger share of the profits from those investments. With the rising leverage of the networks over their affiliates, the returns on local programming investments, and therefore the total dollars invested in local programming, would be reduced primarily for three reasons. First, as networks

---

[182] NAB 2025 Comments at 11.

[183] *Id.* at 15-16.

[184] Affiliates 2025 Comments at 9-10 (citing Nielsen, *Nielsen Launches the Ad Supported Gauge, a New Look at the Ad-Supported TV Landscape*, Nielsen.com (May 1, 2025), https://www.nielsen.com/news-center/2025/nielsen-launches-the-ad-supported-gauge-a-new-look-at-the-ad-supported-tv-landscape/).

[185] *Nexstar-TEGNA Order* at 29, para. 70.

[186] Nexstar 2018 Comments at 22-25; Entravision 2018 Reply at 6-9; NAB 2018 Reply at 21-23; Univision 2018 Reply at 2-6; NAB Feb. 26, 2025 *Ex Parte* at 1-2; NAB 2025 Comments at 3-4, 22; Entravision 2025 Comments at 1-4; Fox 2025 Comments at 3-5; Trinity 2025 Comments at 6-7; Univision 2025 Comments at 2-4; Sinclair 2025 Comments at 8-9; Joint Broadcasters 2025 Reply at 31-43; Digital First Project 2025 Reply at 2-3; Sinclair Delete, Delete, Delete Comments at 11-12; Letter from Daniel Kirkpatrick, Baker & Hostetler LLP, Counsel for Scripps, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318 et al., at Attach. at 1-3 (filed Sept. 10, 2025) (Scripps Sept. 10, 2025 *Ex Parte*); *see also* Hearst et al. *Ex Parte* at 2, 4-5.

[187] *See* NAB 2025 Comments at 20-22; Nexstar 2025 Comments at 10-11, 16; Hearst et al. *Ex Parte* at 4.

[188] Affiliates 2025 Comments at 9-10; Scripps 2025 Comments at 8-9; NAB 2025 Comments at 23-24; *see also* Sinclair 2018 Comments at 12-14; Scripps Sept. 10, 2025 *Ex Parte* at Attach. at 2-3.

[189] *See, e.g.*, Sinclair 2018 Comments at 15; Nexstar 2025 Comments at 5, 16; NAB 2025 Comments at 4, 19-20, 24-25; Scripps 2025 Comments at 9; Sinclair Delete, Delete, Delete Comments at 11-12; Scripps Sept. 10, 2025 *Ex Parte* at Attach. at 3.

[190] NAB 2025 Comments at 4, 19-20, 24-25; *see also* Sinclair Delete, Delete, Delete Comments at 11-12 (arguing that national reach would increase a station group's ability to attract more advertising dollars, which enables increased investment in high-quality content, which attracts more viewers, which leads to more advertising, which enables more investment in local journalism).

extract an increasing share of the retransmission consent fees that MVPDs pay to carry the local network affiliate, the returns on local programming investments decline because the affiliate retains a lower share of the returns on such investments. Second, networks negotiating the online distribution rights and retaining a share of these revenues similarly would directly reduce the return on local programming investments. Third, network-imposed limitations on preemption directly limit the amount of local programming that an affiliate can produce and air. Furthermore, the imbalance of power between networks and affiliates that now exists is exacerbated by our artificial cap on station ownership because it does not allow station owners to sufficiently consolidate and restore their bargaining position vis-à-vis the networks.

54. We believe that eliminating the national cap will serve to allow affiliates to restore their leverage in negotiations with networks, which will promote the public interest by providing affiliates with the ability to use their greater returns to invest in local programming. To the extent that the national cap is preventing station groups from increasing investment in local news and other content of local interest, we agree with broadcasters that the cap is not only unnecessary to promote our localism goal but that, in fact, it likely is undermining it.[191] That possibility, although not a basis for our decision to repeal the rule, lends support to our conclusion that the rule is no longer serving the public interest. We will evaluate proposed transactions on a case-by-case basis to determine, among other things, whether approval would result in a higher quality and quantity of local programming on the applicants' television stations.

55. Several broadcasters claim that expanding their audience reach across other local markets already has enabled them to produce a higher quality and quantity of local content.[192] NAB provides data showing that during a period of consolidation between November 2011 and November 2023 when the number of different television station groups fell from 140 to 62, the number of local news telecasts increased by 41.7% and the hours of local news increased by 49.7%.[193] According to Scripps, when it acquired the licenses in 2021 of television stations KUPX in the Salt Lake City market and KMCC in the Las Vegas market, neither station aired any local news.[194] Scripps states that, under its ownership, KUPX now airs 25 hours per week of local news and KMCC now airs 21.5 hours per week of local news.[195] Among other examples it provides, Scripps touts its addition of 15.5 hours per week of local news to KCDO's schedule after it purchased the station in 2020 and combined it with station KMGH in the

---

[191] *See* Nexstar 2018 Comments at 21-25; Entravision 2018 Reply at 1-2; Univision 2018 Reply at 2-3, 6; Fox 2025 Comments at 5; NAB 2025 Comments at 19, 24-25; Sinclair 2025 Comments at 8-9; Trinity 2025 Comments at 6; Scripps Sept. 10, 2025 *Ex Parte* at Attach. at 1-3.

[192] Univision 2018 Reply at 2-6 (providing examples of the numerous awards its stations have won for their local newscasts); Nexstar 2025 Comments at 11-16 (attributing its stations' increases in local news coverage and hundreds of journalism awards to efficiencies and resources gained through scale); Univision 2025 Comments at 2-3 (claiming that the national cap "limits broadcasters from achieving the requisite scale necessary to bear the significant costs to produce high-quality local news and programming that is responsive to the needs and interests of local viewers"); Joint Broadcasters 2025 Reply at 32-34 (arguing that "[b]y preventing broadcasters from achieving scale, the rule impedes their ability to acquire and produce quality programming of all types and to earn the advertising revenues needed to support locally oriented programming"); Scripps Sept. 10, 2025 *Ex Parte* at Attach. at 1-2 (contending that increased scale has enabled it to deliver increased local news coverage); *see also* Century Egg Credit 2025 Comments at 2 (arguing that "consolidation is the lever than can make [localism] real").

[193] NAB Apr. 2, 2025 *Ex Parte* at 30 (stating that in November 2011, 939 stations controlled by 140 different television station groups aired 113,772 individual local news telecasts totaling 76,328 hours, and in November 2023, 1,139 stations controlled by 62 different groups aired 161,238 local news telecasts totaling 114,089 hours); *see also* NAB 2025 Comments at 22; Nexstar 2025 Comments at 13.

[194] Scripps Sept. 10, 2025 *Ex Parte* at Attach. at 1.

[195] *Id.*

Denver, Colorado market.[196] Further, Scripps credits its ability to leverage the resources obtained through its increased scale for its addition of hundreds of hours of local sports to various stations it owns and for the acquisition of its broadcast rights to a number of women's sporting events and games.[197]

56. Likewise, Nexstar claims that "[its] own experience demonstrates that the efficiencies and resources available to larger station groups lead to expanded news and other local coverage."[198] It states that between its 2019 acquisition of Tribune Media Company (Tribune) and 2024, its stations increased their total local news coverage by more than 28,000 hours and won hundreds of journalism awards annually.[199] It further states that, during that period, its stations added a total of more than 9,000 hours of local lifestyle programming and almost 800 hours of local political programming.[200] Nexstar contends that its reach and the resources made possible by scale enabled it to host 74 political debates or forums leading up to the 2024 election.[201] In addition, it describes how resource sharing among its stations allows it to provide continuing weather and safety information to communities affected by hurricanes and other natural disasters.[202]

57. These examples demonstrate that allowing station groups to grow and expand their audience reach can promote the Commission's localism goal. This point is particularly salient in the case of a station that is without the resources to produce local news or is likely to go dark without some form of relief.[203] As the Joint Broadcasters argue, "[t]o the extent individual stations are financially struggling, repealing the national cap would allow station groups with healthier balance sheets to expand into new markets, acquire those stations, and provide those communities with more robust locally-oriented programming."[204]

58. In reviewing proposed transactions, we will consider all arguments supporting or opposing a finding that approval of the transaction would promote localism. Thus, rather than presume that any deal that exceeds the cap would not be in the public interest, by repealing the rule, we will consider and potentially approve specific transactions based on their individual merit.

#### b. Increase in innovation

59. Another potential benefit of allowing broadcasters to achieve greater scale via transactions approved through the Commission's case-by-case approach could be their improved ability to invest in innovative technologies and services, such as ATSC 3.0, to the benefit of consumers. That is, the rule's

---

[196] *Id.* at Attach. at 1-2 (arguing that its acquisitions in these markets have enabled it "to use the combined resources of its local stations, as well as the resources it has gained through its increased national scale to deliver increased local news coverage, furthering localism in each market").

[197] *Id.* at Attach. at 2-3 (stating, for example, that it added 630 hours of local sports per year on KMCC, 570 hours of local sports per year on KUPX, and 377 hours of local sports per year on WHDT in West Palm Beach, and that it has entered into distribution agreements with the WNBA, the National Women's Soccer League, 2025's inaugural Sports Illustrated Women's Games, and the Fort Myers Tip Off women's college basketball tournament).

[198] Nexstar 2025 Comments at 13.

[199] *Id.*

[200] *Id.*

[201] *Id.* at 14.

[202] *Id.* at 14-16; *see also* Fox 2025 Comments at 4-5 (describing how Fox sister stations assist in coverage of natural disasters, such as during the recent Texas floods and Los Angeles wildfires).

[203] *See* Joint Broadcasters 2025 Reply at 40-41, 46-48, 50-51.

[204] *Id*. at 50; *see also* Media and Democracy Project and the Media Action Center 2025 Reply at 5 (acknowledging that "consolidated newsrooms . . . may be an appropriate choice" for small markets that "may be grateful to get any local TV news at all").

repeal will mean that the Commission will evaluate each proposed transaction on its individual merit, including whether grant would enable the merged entity to devote additional resources to the deployment of ATSC 3.0, among other innovations, without first needing to show that special circumstances warrant a waiver.[205] In the *2002 Biennial Review Order*, the Commission posited that the national cap encouraged innovation in the television industry because different station groups were likely to develop different types of services and offerings, which the Commission concluded would be particularly beneficial in facilitating the impending transition to digital television.[206] With the rollout of ATSC 3.0, the television industry is again on the cusp of a technological transition. However, given the changes to the media marketplace in the more than 20 years since the Commission's conclusion that the national cap would promote innovation in the transition to digital television, we now find that the national cap may be hindering, rather than promoting, investment in innovative developments by limiting broadcasters' ability to expand their operations and achieve economies of scale in the deployment of new technologies. With respect to innovation, once again, a principal advantage of removing an *ex ante* barrier in the national cap is that the Commission will consider transactions on their individual merit, rather than presume that deals in excess of the bright line limit would not be in the public interest even if they otherwise would promote innovation.

### 2. Potential transaction-specific harms

#### a. Decrease in local programming

60. Numerous commenters contest the argument that further consolidation among station groups will promote localism.[207] They argue that consolidation leads to a homogenization of news content, fewer resources devoted to local journalism, cuts to local newsroom staffs, and corporate takeover of editorial decision-making.[208] DISH asserts that empirical research shows that "the larger broadcast conglomerates

---

[205] *See* Sinclair 2018 Comments at 15-17 (arguing that allowing broadcasters a greater national audience reach would accelerate the rollout of ATSC 3.0); Nexstar 2018 Comments at 24 (contending that the cap hinders broadcasters' ability to invest in new programs and services through use of the ATSC 3.0 standard); Univision 2018 Reply at 4-5 (attributing its ability to invest in ATSC 3.0 to its broad national audience reach); Trinity 2025 Comments at 7 (arguing that allowing broadcasters to own more stations would accelerate ATSC 3.0 deployment by enabling broadcasters to spread infrastructure costs across larger networks); NAB Apr. 2, 2025 *Ex Parte* at 35 n.130 (asserting that greater scale would permit greater investment in new ATSC 3.0 services); Joint Broadcasters 2025 Reply at 32-33 (arguing that eliminating the cap "will allow broadcasters to gain sufficient scale to fully support the infrastructure investment necessary to fully deploy ATSC 3.0"); *but see* Free Press 2025 Comments at 91-92 (casting doubt on broadcasters' claims that they need access to additional revenue streams given that new technologies and services, like ATSC 3.0, will generate "billions" in revenue for them); altafiber 2025 Reply at 5-6 (noting that broadcasters argue that the national cap must be eliminated so that they can compete with streaming services, without acknowledging that ATSC 3.0 will allow broadcast stations to be received off-air on mobile devices); Newsmax 2025 Comments at 22 (questioning broadcasters' commitment to local news investment given their focus on ATSC 3.0 datacasting). Concerns regarding the potential effects of ATSC 3.0 deployment on the likelihood of local news investment can be addressed within the context of specific transactions.

[206] *2002 Biennial Review Order*, 18 FCC Rcd at 13825-26, paras. 531-32.

[207] *See, e.g.*, DISH 2018 Comments at 11-12; Free Press 2018 Comments at 11-12; Herndon-Reston Indivisible 2018 Comments at 2-4; Newsmax 2018 Comments at 5-7; WGAW 2018 Comments at 7-10; Free Press 2018 Reply at 10-11; DISH 2018 Reply at 5; UCC et al. 2018 Reply at 2-4; WGAW 2018 Reply at 2-4; Free Press 2025 Comments at 32-52; NewsGuild-CWA et al. 2025 Comments at 1-3; Newsmax 2025 Comments at 9-13; ATVA 2025 Reply at 19-23; HTTP 2025 Reply at 2; UCC et al. 2025 Reply at 3-4; National Action Network 2025 Reply at 2, Appx; NABET-CWA 2025 Reply at 7-10; Newsmax 2025 Reply at 2-3.

[208] *See, e.g.*, Herndon-Reston Indivisible 2018 Comments at 2-4 (warning that, as station groups expand, "the more likely economics and ideology will combine to mandate nationally produced, cookie cutter programming"); Newsmax 2018 Comments at 5-7 (arguing that allowing the centralization and homogenization of local news would be dangerous for democracy); WGAW 2018 Comments at 7-10 (providing various examples, including Sinclair's requirement that its stations run segments produced by its national headquarters and Nexstar's staff cuts after

(continued….)

*do not* invest freed resources into local content and coverage."[209] UCC et al. posits that economies of scale and scope are not achieved unless local news and local programming are replaced with centrally-produced programming.[210] Similarly, Free Press points to a study finding a prevalence of duplicated news content when stations are under common ownership or control, which the study's authors call "a direct and unambiguous form of the achievement of economies of scale."[211] Several commenters criticize Sinclair's use of "must-run" news segments, where local news anchors across Sinclair's stations are required to read from the same script or to air a news story that was produced at Sinclair's national headquarters.[212] Free Press predicts that "[i]nstead of competing for the approval of viewers by investing in news and other local programming, broadcasting conglomerates would likely take any relaxation of the national ownership cap as encouragement to compete for scale alone—pursuing mergers that swallow up the last semblance of diverse voices in the broadcasting marketplace, and pocketing the savings for shareholders rather than spending them on viewers."[213]

61. In addition, both UCC et al. and WGAW submitted a 2018 study by Gregory J. Martin and Josh McCrain, political scientists then with Emory University, that compared stations acquired by Sinclair from Bonten Media Group Holdings to other stations operating in the same markets.[214] The study found that Sinclair's station acquisitions led to "substantial increases in coverage of national politics at the expense of local politics."[215] However, another study in 2024 by these same authors and Nicola Mastrorocco and Arianna Ornaghi widened the analysis of local news coverage to include stations acquired by Nexstar and Gray, as well as Sinclair.[216] Consistent with their earlier research, they found

(Continued from previous page)
consolidating the operations of four stations it controlled in the Little Rock, Arkansas market); DISH 2018 Reply at 5 (disputing Nexstar's claim that a broadcaster's reach does not affect how it serves viewers in a local market and arguing that "consolidation by large broadcast groups leads to the slashing of local news staffs, consolidation of regional news production, and shifting of news production to corporate headquarters"); Free Press 2018 Reply at 11 (alleging that Sinclair "has regularly used its tremendous reach to shutter and consolidate local newsrooms"); Free Press 2025 Comments at 37 (criticizing both Sinclair and Nexstar for shuttering and consolidating local newsrooms); HTTP 2025 Reply at 2 (arguing that consolidation leads to homogenized news coverage and fewer editorial voices); NABET-CWA 2025 Reply at 9 (contending that Nexstar's "record profits have not translated into support for local newsrooms"); Letter from Clayton Weimers, Executive Director, Reporters Without Borders, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed July 28, 2026) (arguing that further consolidation will crowd smaller broadcasters out of the media ecosystem and threaten the viability of local news programming) (Reporters Without Borders *Ex Parte*).

[209] DISH 2018 Comments at 11-12, n.21 (emphasis in original) (citing various journal articles).

[210] UCC et al. 2018 Reply at 2-4; *see also* WGAW 2018 Reply at 3-4.

[211] Free Press 2025 Comments at 43-46 (quoting Danilo Yanich & Benjamin E. Bagozzi, *Reusing the News: Duplicating Local TV Content*, University of Delaware, at 66 (Aug. 2025), https://udspace.udel.edu/server/api/core/bitstreams/414834a9-fa05-4be0-a5cd-9b317fdbe02b/content); *see also* Newsmax 2025 Comments at 11 (citing a study finding that the stations owned by the largest station groups reported the most frequent reliance on outside sources for news content).

[212] Newsmax 2025 Comments at 14-15; DISH 2018 Comments at 11; Herndon-Reston Indivisible 2018 Comments at 2; WGAW 2018 Comments at 8-9; National Action Network 2025 Reply at Appx.; Newsmax 2025 Reply at 3.

[213] Free Press 2018 Comments at 11-12.

[214] UCC et al. 2018 Reply at 3-4, Attach.; WGAW 2018 Reply at 3-4, Attach; *see also* Free Press 2025 Comments at 41 n.115. *See* Gregory J. Martin & Joshua McCrain, *Local News and National Politics*, 113 Am. Pol. Sci. Rev. 372 (2019) (Martin/McCrain 2018 Study).

[215] Martin/McCrain 2018 Study at 372.

[216] Gregory J. Martin, Nicola Mastrorocco, Joshua McCrain, & Arianna Ornaghi, *Media Consolidation*, Stanford Graduate School of Business (Sept. 9, 2024), https://www.gsb.stanford.edu/gsb-box/route-download/626153 (Martin et al. 2024 Study).

that news coverage of local events and local politics dropped by about 10% on the Sinclair stations.[217] However, their data showed an increase in local news coverage by about that same amount on the stations acquired by Nexstar.[218] The data showed no real change on the stations acquired by Gray.[219] Therefore, the study shows that the effect of consolidation on local news coverage varies by merger, with some mergers leading to decreases in local coverage, some leading to increases, and others having no effect.[220] Furthermore, viewers in local markets have an interest in national and regional political issues, and many of the larger broadcast groups are able to invest in such reporting that otherwise would be unavailable in the market or provided solely by national news networks.

62. We acknowledge that there are arguments on both sides of the question regarding the effects of consolidation on investment in locally oriented programming. However, given that repealing the rule could help restore the balance of bargaining power in the network/affiliate relationship, which ultimately should have a salutary effect on station revenues, we believe that the better course is to remove the national cap and replace it with a case-by-case approach. We reiterate that removal of the cap will not itself lead to any direct or inevitable harm given the Commission's obligation to review all proposed transactions. Moreover, review of applications for transfers and assignments, license renewal applications, and complaints filed against a station offer the Commission a more targeted means of ensuring that local stations are meeting their public interest obligations, based on the record in a particular proceeding, rather than a rigid bar proscribing certain transactions that may be in the public interest.

63. We believe that, regardless, the need for Commission action likely will be mitigated by market forces. Numerous commenters maintain that television local news remains one of the most relied upon and trusted sources of news among consumers.[221] They further argue that local news, live sports, weather and traffic reports, and emergency information are the types of offerings that differentiate local broadcasters from other video programming providers.[222] As expressed by Entravision, "relaxation of the National Cap will not change the enduring incentive of broadcasters to produce quality local content, because quality local service is simply sound business."[223] Nexstar adds that "[l]ocal programming and local community service are key to allowing television broadcasters to differentiate themselves in the sea of voices that have invaded the contemporary video programming marketplace."[224] We therefore reject Newsmax's suggestion that retention of the national cap is justified given TEGNA's plan to expand its

---

[217] *Id.* at 3-4, 18-21.

[218] *Id.* at 4, 18-21.

[219] *Id.*

[220] *Id.* at 18-19.

[221] *See, e.g.*, Free Press 2018 Comments at 10-11; Herndon-Reston Indivisible 2018 Comments at 4; Leadership Conference 2018 Comments at 3-4; UCC et al. 2018 Comments at 3-5; Free Press 2018 Reply at 5; Letter from Amy Hinojosa, President & Chief Executive Officer, MANA – A National Latina Organization et al., to Chairman Carr and Commissioners Starks, Simington, and Gomez, MB Docket No. 17-318, at 1-2 (filed Apr. 28, 2025); Sinclair Delete, Delete, Delete Comments at 12-13; Affiliates 2025 Comments at 5; AAJC 2025 Comments at 2; CAR 2025 Comments at 1; Free Press 2025 Comments at 22-24; NHMC 2025 Comments at 2; Nexstar 2025 Comments at 11-16; Scripps 2025 Comments at 10; Hispanic Federation 2025 Reply at 3-4; National Action Network 2025 Reply at Appx.; UCC et al. 2025 Reply at 2-4.

[222] *See, e.g.*, Affiliates 2018 Comments at 11-17; Nexstar 2018 Comments at 23-25; Entravision 2018 Reply at 7, 9; Affiliates 2025 Comments at 5-7; Fox 2025 Comments at 3-5; Nexstar 2025 Comments at 11-16; Scripps 2025 Comments at 10; Joint Broadcasters 2025 Reply at 33-34, 35, 45, 60-61.

[223] Entravision 2018 Reply at 7.

[224] Nexstar 2025 Comments at 15; *see also* Joint Broadcasters 2025 Reply at 45 (claiming that television stations invest in local news because it is critical to their service and that "as for-profit entities, they offer high-quality local news because it is a competitive differentiator that sets apart one station from other stations and also sets broadcast stations apart from pay TV, social media, technology platforms, and streaming services").

local news operations despite being subject to the cap.[225] If anything, Newsmax's claims regarding TEGNA support the argument that removing the cap will not reduce broadcasters' incentive to invest in local news coverage, such as by expanding news staffs, adding news anchors, and devoting more time to local news stories. To the extent that stations are incentivized to invest in local programming as a means of differentiation, the market will serve as a check against station owners reducing investment in local journalism and other local content.[226] Nevertheless, in reviewing a proposed transaction, we will take into consideration any and all concerns that market forces would be insufficient to negate the transaction's potential harms.

64. In light of our new approach replacing the national cap with case-by-case review, we provide initial guidance on our anticipated approach to case-by-case review of the potential transaction-specific harms premised on national reach identified in this Order should they be alleged in a particular transaction in the future. In doing so, we do not seek to comprehensively identify every consideration that could be relevant in the future, but we simply highlight certain implications particularly relevant in light of our analysis in this Order.

65. With respect to concerns about decreases in local programming, and local news in particular, alleged to result from the post-transaction national reach of a broadcast group, a threshold consideration will be the transaction-specific nature of any alleged harms. The record reveals the financial challenges posed by producing high-quality local news and the fact that not all local television stations broadcast local news.[227] Thus, we will expect oppositions to a transaction based on local news concerns to draw any comparisons to the likely marketplace *status quo* and likely trajectory absent the transaction, rather than some hypothetical ideal marketplace not grounded in practical realities.

66. As to the merits of any alleged transaction-specific concern about local news, given the record evidence that local programming, including local news, is a competitive advantage for local broadcasters, we will expect oppositions to a transaction based on local news concerns to explain why that incentive is unlikely to exist or why the broadcaster is unlikely to act on that incentive in a given transaction.[228] In conducting such an analysis, historical experience involving the parties at issue is likely to be relevant. This includes the practical experience of viewers in communities where the potential acquiror expanded into new markets in the past. Such history is not in itself dispositive insofar as that history is distinguishable or where such issues are mooted by commitments by the merging parties. But giving due consideration to the practical experience of viewers is a critical way to ensuring our case-by-case approach truly best protects the public interest in the markets at issue, consistent with our expectations.[229]

**b. Increase in retransmission consent fees**

67. Any concerns regarding the effect a particular transaction may have on retransmission consent negotiations can be addressed within the context of the Commission's review of that transaction. Therefore, we disagree with those commenters that argue that the Commission should retain a national ownership cap to preserve a balance of power between broadcasters and MVPDs, including small MVPDs, in retransmission consent negotiations. We note, at the outset, that the national cap—a

---

[225] *See* Newsmax 2025 Comments at 13; Newsmax 2025 Reply at 3-4.

[226] Calling Newsmax "an outspoken opponent of updating the cap for its own business reasons," Trinity notes that it has delivered faith-based programming for more than 50 years over its stations. Trinity *Ex Parte* at 2. Its contention that repealing the cap would strengthen Christian broadcasting supports the argument that repeal will not alter broadcasters' incentive to invest in programming deemed to be of local interest. *Id*.

[227] *See, e.g.*, *supra* paras. 52, 54-55, 57.

[228] *See, e.g.*, *supra* paras. 55-57.

[229] *See, e.g.*, *supra* paras. 46, 62 (discussing the benefits of case-by-case reviewing in advancing the public interest).

structural ownership rule that applies nationwide—historically has not been intended as a vehicle for addressing concerns about leverage in retransmission consent negotiations. Instead, retransmission consent negotiations are governed by a specific set of behavioral rules, including a good faith negotiation standard that applies to both broadcasters and MVPDs.[230]

68. Moreover, the Commission previously has found that, in general, the public is well served when marketplace mechanisms can be left to govern such negotiations as much as possible.[231] Over the years, Congress and the Commission have reviewed, and in some cases modified (or declined to modify), the retransmission consent rules as warranted in light of evolving marketplace behavior (e.g., prohibiting joint negotiations for two stations in a given geographic market where the two stations are not commonly owned).[232] We note that, in addition to advocacy in this proceeding, parties are free to seek further clarification or modification of the Commission's retransmission consent rules, including the good faith standard, to address areas where they have specific concerns.[233] Given that the Commission has separate

---

[230] *See* 47 U.S.C. § 325(b); 47 CFR §§ 76.64-76.66. The good faith standard includes a list of objective standards as well as a "totality of the circumstances" test for behavior that may not constitute a *per se* violation of any of the defined objective standards. 47 CFR § 76.65(b); *see also* Nexstar 2018 Reply at 9-10. We note too that the Commission has found that there are limits to its statutory authority to act in this area. *See Amendment of the Commission's Rules Related to Retransmission Consent*, MB Docket No. 10-71, Notice of Proposed Rulemaking, 26 FCC Rcd 2718, 2727-29, paras. 18-19 (2011).

[231] *See, e.g.*, *Implementation of the Satellite Home Viewer Improvement Act of 1999, Retransmission Consent Issues: Good Faith Negotiation and Exclusivity*, CS Docket No. 99-363, First Report and Order, 15 FCC Rcd 5445, 5462, para. 39 (2000) (*2000 Good Faith Order*) (stating that "the substance of [retransmission consent] agreements generally should be left to the market"); *Implementation of the Cable Television Consumer Protection and Competition Act of 1992, Broadcast Signal Carriage Issues*, MM Docket No. 92-259 et al., Report and Order, 8 FCC Rcd 2965, 3006, para. 178 (1993) (noting that the retransmission consent regime established by Congress was not intended to "dictate the outcome of the ensuing marketplace negotiations").

[232] *See, e.g.*, STELA Reauthorization Act of 2014, Pub. L. No. 113-200, § 103(a), 128 Stat. 2059 (2014) (prohibiting joint negotiation between two stations in a market that are not under common *de jure* control); Satellite Home Viewer Extension and Reauthorization Act of 2004 (SHVERA), Pub. L. No. 108-447, § 207, 118 Stat. 2809 (2004) (making the good faith negotiation obligation reciprocal between broadcasters and MVPDs); Satellite Home Viewer Improvement Act of 1999 (SHVIA), Pub. L. No. 106-113, 113 Stat. 1501 (1999) (requiring television stations to negotiate in good faith with MVPDs); Tom Wheeler, FCC Blog, *An Update on Our Review of the Good Faith Retransmission Consent Negotiation Rules* (July 14, 2016), https://www.fcc.gov/news-events/blog/2016/07/14/update-our-review-good-faith-retransmission-consent-negotiation-rules (declining to modify the "totality of the circumstances" test for good faith); *Amendment of the Commission's Rules Related to Retransmission Consent*, MB Docket No. 10-71, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 3351, 3352, para. 1 (2014) (*2014 Joint Retransmission Consent Negotiations Order*) (finding that joint negotiation by top-four stations that are not commonly owned constitutes a violation of the good faith obligation); *Implementation of Section 207 of the Satellite Home Viewer Extension and Reauthorization Act of 2004, Reciprocal Bargaining Obligation*, MB Docket No. 05-89, Report and Order, 20 FCC Rcd 10339, 10339, para. 1 (2005) (implementing the reciprocal good faith obligation from SHVERA); *2000 Good Faith Order*, 15 FCC Rcd at 5446, paras. 1-2 (implementing the good faith requirements of SHVIA).

[233] Multiple commenters made proposals to reform the retransmission consent rules that are beyond the scope of this proceeding but could be separately proposed through a petition for rulemaking or in another proceeding. As a result, we do not consider them at this time. *See* Affiliates 2018 Comments at 30-33 (calling for reform of the retransmission consent rules that would allow stations to negotiate directly with virtual MVPDs); altafiber 2025 Comments at 9-15 (proposing to reform the retransmission consent rules to allow waivers of the national cap in exchange for following prescribed conditions, including a reduction of retransmission consent fees); ATVA 2025 Comments at 25-27 (calling for the Commission to place multiple new prohibitions on broadcasters' behavior should it remove the cap in order to "adopt an approach that ameliorates the corresponding harms"); Free State Foundation 2025 Comments at 1-5 (stating that removing the national cap would "further skew retransmission consent negotiations" in broadcasters' favor and should not be done without corresponding relief for MVPDs); NCTA 2025 Reply at 3-4 (proposing a prohibition on station groups conducting joint retransmission consent

(continued….)

rules that directly govern the retransmission consent process—something the national cap has never been intended to do—general issues related to retransmission consent are best addressed in a rulemaking proceeding focused on those rules.[234]

69. It should also be noted that the Commission has not previously identified or defined a non-local (e.g., national or regional) market for retransmission consent.[235] Instead, the Commission has focused on the individual local markets in which the licensing of broadcast television stations occurs.[236] Indeed, if the national cap is removed, the Commission must still review all applications for the transfer of control and assignment of licenses and authorizations to ensure that the public interest would be served by approving the applications. We recognize that retransmission consent issues associated with national consolidation may continue to come up in the context of the Commission's individualized broadcast television transaction review. Commenters in those transaction proceedings will continue to be able to raise transaction-specific issues in the context of a specific combination of broadcast assets and a defined set of facts.[237] Given the state of the video marketplace today, we believe that approach is far more

(Continued from previous page)
negotiations with out-of-market stations they do not own as well as a prohibition on "behaviors that frustrate the ban on joint retransmission consent negotiations, such as sharing non-public information regarding retransmission consent negotiations or engaging common legal counsel or other agents in connection with retransmission consent negotiations"); Letter from Michael Nilsson and Annick Banoun, HWG, Counsel to DIRECTV, LLC, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 6-7 (filed Sept. 19, 2025) (DIRECTV Sept. 19, 2025 *Ex Parte*) (proposing remedial measures if the cap is eliminated including: prohibiting retransmission consent price increases beyond inflation for five years if the broadcaster surpasses the current cap; placing restrictions on a broadcaster's bundling of programming if it surpasses the current cap; allowing joint negotiation by distributors for retransmission consent; and prohibiting geographic-exclusivity agreements between networks and affiliates).

[234] *See, e.g.*, *Nexstar-TEGNA Order* at 32, para. 80.

[235] *See, e.g.*, *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc. to Nexstar Media Group, Inc.*, MB Docket No. 16-57, Memorandum Opinion and Order, 32 FCC Rcd 183, 196-97, para. 35 (MB/WTB 2017) (*Nexstar-Media General Order*); *Applications of Tribune Media Company for Transfer of Control to Nexstar Media Group, Inc.*, MB Docket No. 19-30, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8450-51, para. 28 (2019) (*Nexstar-Tribune Order*); *Applications for Consent to Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. to Gray Television, Inc.*, MB Docket No. 18-230, Memorandum Opinion and Order, 33 FCC Rcd 12349, 12357, para. 16 (MB 2018) (*Gray-Raycom Order*). By contrast, the Commission has recognized retransmission consent harms, including fee increases, that may result from concentration within a local geographic market. *See Nexstar-Media General* Order, 32 FCC Rcd at 196-97, para. 35; *2014 Joint Retransmission Consent Negotiations Order*, 29 FCC Rcd at 3357-58, 3363-64, paras. 10, 17; *see also* American Cable Association (ACA) 2018 Comments at 3-4. However, the Commission previously has identified a national market for national cable network programming. *See, e.g.*, *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Docket No. 15-149, Memorandum Opinion and Order, 31 FCC Rcd 6327, 6404, para. 164 (2016) (*Charter-Time Warner Cable Order*).

[236] *Nexstar-Tribune Order*, 34 FCC Rcd at 8450-51, para. 28; *Gray-Raycom Order*, 33 FCC Rcd at 12357, para. 16; *Nexstar-Media General Order*, 32 FCC Rcd at 196-97, para. 35. We note that, in granting its preliminary injunction, the U.S. District Court for the Eastern District of California also focused on retransmission consent agreements for Big Four broadcasting stations in local DMAs as the relevant product and geographic markets, respectively, in its antitrust analysis. *See Nexstar-TEGNA Preliminary Injunction* at 14-24, 27-36 (reviewing arguments regarding potential anticompetitive effects as the result of consolidation within local markets).

[237] State Cable Associations and ATVA find that this option offers "cold comfort" given that the Media Bureau has declined to address retransmission consent issues in transaction reviews and stated that such issues are best handled in rulemakings of industry-wide effect. State Cable Associations *Ex Parte* at 7-8; Michael Nilsson, HWG LLP, Counsel for ATVA, to Marlene H. Dortch, Secretary, FCC, MB 17-318, at 2-3 (filed July 27, 2026). Regardless, we agree with NAB that "this proceeding is not the appropriate rulemaking for addressing broad issues relating to retransmission consent, given its focus on a single broadcast-only rule rather than the retransmission consent regime established by Congress in [s]ection 325 of the Act." Letter from Jerianne Timmerman, Senior Vice President and

(continued….)

suitable than clinging to a bright line limit that no longer serves its intended purpose and was never intended to address retransmission consent issues.

70. Despite these rules and safeguards currently in place, some commenters argue that the national cap should remain because there is a correlation between station group size and increased retransmission consent fees and that allowing station groups to grow in size would harm MVPD subscribers who will be forced to pay higher bills due to higher programming costs.[238] They contend that increasing or abolishing the 39% national cap would increase the bargaining leverage for a station group by allowing it to threaten blacking out programming across a greater percentage of an MVPD's footprint, thereby enabling the station group to extract a higher retransmission consent fee from the MVPD.[239] These commenters argue that retransmission fees paid by MVPDs have grown exponentially in recent years and that broadcasters will use this increased bargaining leverage to continue raising retransmission consent fees, resulting in more contentious negotiations that will, in turn, lead to more programming blackouts and higher prices for MVPD subscribers.[240] NCTA points out that "[r]etransmission consent

(Continued from previous page)
Deputy General Counsel, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 3 (filed July 30, 2026).

[238] DISH 2018 Comments at 7-10 (citing study that purports to show correlation between station group size and retransmission consent fees); Letter from Mary C. Lovejoy, Vice President of Regulatory Affairs, ACA Connects – America's Communications Association, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318 et al., at 7-9 (filed Mar. 25, 2019) (ACA Connects Mar. 25, 2019 *Ex Parte*) (asserting that there is a correlation between group size and increased fees); ATVA 2025 Comments at 3-5 (citing DISH study and asserting MVPDs pay more for stations owned by larger broadcast groups than for those owned by small groups); DIRECTV Sept. 19, 2025 *Ex Parte* at 1-6 (presenting study finding relationship between broadcaster size and retransmission consent fees). In particular, small MVPD commenters note the difficulty of negotiating with larger station groups. *See* NTCA 2018 Comments at 2-3; ACA Connects Mar. 25, 2019 *Ex Parte* at 2.

[239] ACA 2018 Comments at 2-10 (asserting that modification or elimination of the cap will result in broadcast consolidation that gives broadcasters greater leverage with MVPDs in retransmission consent negotiations, which leads to higher MVPD subscriber prices and other unfavorable terms); Consumers Union 2018 Comments at 3-4, 6-9 (arguing that the cap should be retained to prevent broadcasters from gaining further leverage in retransmission consent negotiations and causing MVPD subscriber prices to rise); DISH 2018 Comments at 3-10 (contending that negotiating imbalances between broadcasters and distributors because of rapid broadcast consolidation have led to huge increases in retransmission consent fees, which get passed on to MVPD subscribers); Free Press 2018 Comments at 11-13 (asserting that "[b]roadcast conglomerates have reaped great financial rewards from consolidation, owing to explosive growth in retransmission consent fees . . ."); NTCA 2018 Comments at 2-4 (stating that raising the cap would harm small and rural MVPDs because they would lose bargaining power in retransmission consent negotiations); DISH 2018 Reply at 4-6 (asserting that large broadcast groups have even greater bargaining power than small ones and that further broadcast group consolidation would exacerbate that asymmetry and lead to higher prices for consumers); UCC et al. 2018 Reply at 10-11 (noting that further concentration will result in higher retransmission consent fees, which will result in higher MVPD subscriber fees); altafiber 2025 Comments at 9 (stating that any suggestion that retransmission consent negotiations are balanced would be inaccurate, and that since 2005, broadcast stations, with Nexstar leading the charge, have demanded rapidly increasing amounts of cash consideration in exchange for retransmission consent); ATVA 2025 Comments at 2-7 (contending that elimination or modification of the national cap will result in higher retransmission consent fees, which MVPDs will pass on as higher fees to consumers); Free Press 2025 Comments at 68 (asserting that consolidation will increase broadcaster market power and will lead to increased retransmission consent fees); Free State Foundation 2025 Comments at 1-4 (asserting that lifting the cap would further skew retransmission consent negotiations in broadcasters' favor); NCTA 2025 Comments at 3-4 (asserting that removal of the cap would lead to higher retransmission consent fees, which would harm consumers and MVPDs); DIRECTV Sept. 19, 2025 *Ex Parte* at 4-5 (contending that consolidation leads to higher retransmission consent prices even when markets do not overlap).

[240] ACA 2018 Comments at 4-5 (asserting that broadcast consolidation also leads to higher prices even where geographic markets do not overlap); Consumers Union 2018 Comments at 8 (stating that the national cap prevents greater market power to further raise retransmission consent fees paid by MVPDs, which are passed to consumers);

(continued….)

revenue increased by 31% from 2019 to 2023 ($11.5 billion to $15.1 billion) and more than *135%* when compared to 2015 levels ($6.4 billion)—despite MVPDs' decline in subscribership."[241] By contrast, broadcast commenters claim the fees are set by the market, they are appropriately priced for the programming's value, they are more affordable than cable programming, and they are slowing in growth.[242] Moreover, the record shows that increases in retransmission consent fees charged by network-affiliated local stations to MVPDs have coincided with increasing reverse compensation fees charged by the networks to their affiliates based on network bargaining power.[243] As commenters note, these

(Continued from previous page)
DISH 2018 Comments at 4 (arguing that the asymmetry of bargaining power between a network station and distributor in each local DMA is the reason for increased fees); DISH 2018 Reply at 5-6 (asserting that retransmission consent rates for MVPDs are already exorbitant because of the asymmetry of bargaining power between a network station and distributor in each local DMA); UCC et al. 2018 Reply at 10-11 (asserting that further concentration will lead to higher retransmission consent fees, which will result in higher MVPD subscriber fees); State Cable Associations 2025 Reply at 20-33 (asserting that industry consolidation has been a key driver of rising retransmission consent costs and further consolidation would lead to immediate price increases); NTCA 2018 Comments at 2-3 (arguing that small, rural MVPDs are already hindered in their ability to negotiate retransmission agreements, and a relaxed cap would cause further negative impacts); altafiber 2025 Comments at 3-7 (stating that consolidation will lead to increased retransmission consent fees, which are counter to the public interest); ATVA 2025 Comments at 2-9 (contending that broadcast consolidation will lead to increased retransmission consent fees); Free Press 2025 Comments at 68 (stating that exponential increases in retransmission consent fees have enriched broadcasters); NCTA 2025 Comments at 3-4 (arguing that increased bargaining power for broadcasters will lead to increased retransmission consent fees due to MVPDs' desire to end blackouts); NCTA 2025 Reply at 2-3 (contending that increasing broadcast station group leverage in retransmission consent negotiations will likely immediately increase the retransmission consent fees paid by MVPDs and that retransmission consent fees will increase immediately after broadcast transactions due to after-acquired station clauses); NTCA 2025 Reply at 1-2 (asserting that lifting the cap will result in higher retransmission consent fees); ATVA 2025 Reply at 13-15 (contending that broadcast station groups have outsized leverage in negotiations and that retransmission consent fees will increase as the result of after-acquired station clauses); altafiber 2025 Reply at 5 (citing June 2025 Nexstar presentation for the argument that Nexstar will increase retransmission consent fees); MMTC et al. 2025 Comments at 3-5 (arguing that consolidation would disproportionately harm smaller broadcasters and thwart new entrants, as well as increase retransmission consent fees and the threat of blackouts).

[241] NCTA 2025 Comments at 4 (emphasis in original) (citing *2024 CMR*, 39 FCC Rcd at 14284, para. 263; *2020 Communications Marketplace Report*, GN Docket No. 20-60, Report, 36 FCC Rcd 2945, 3076, para. 216, Fig. II.D.17 (2020)).

[242] NAB 2018 Reply at 29-30 (asserting that market forces set the price for programming); Sinclair 2018 Reply at 5 (asserting that retransmission consent fees started from an "artificially low baseline" and are now fairly priced); Nexstar 2025 Comments at 16-18 (asserting that broadcaster viewership percentage exceeds percentage cost of MVPDs' total cable affiliation and retransmission fees and is undervalued); Joint Broadcasters 2025 Reply at 67-68 (stating that the retransmission consent fee growth rate has significantly declined in recent years). Broadcast commenters also dispute the claims that retransmission consent is driving MVPD prices or that the retransmission consent marketplace has failed. *See* Sinclair 2018 Reply at 3-4; NAB 2018 Reply at 25-28. NAB also argues that retransmission consent revenue is crucial for keeping stations viable and promotes the public interest goals of competition and localism. *See* NAB 2018 Comments at 36-37.

[243] *See* NTCA 2025 Comments at 4-5 (asserting that networks' demands for more reverse compensation from station groups result in hikes in retransmission consent fees); Affiliates 2018 Comments at 29 (asserting that the increase in reverse compensation fees has diverted money away from local programming); *see also 2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 18-349, Report and Order, 38 FCC Rcd 12782, 12854, para. 135 (2023) (finding that "increases in affiliation fees paid by the local affiliates to the Big Four broadcast networks in recent years are evidence of the considerable leverage the Big Four broadcast networks already hold in their negotiations with affiliates"); Gray Media, Inc., Gray Television, Inc. Investor Presentation, at 7 (Feb. 2023), https://graymedia.com/documents/presentations/Gray_Television_Presentation_February_2023.pdf (showing the reverse compensation payouts for the company growing between 2018 and 2022 and representing a larger percentage of net retransmission consent revenue over time).

payments to national networks are resources that do not go toward additional local news coverage or other local programming.[244] Outside of retransmission consent fees themselves, some commenters also warn against the influence a large station group may have in retransmission consent negotiations, which they claim may enable such groups to induce MVPDs to carry additional programming or to dictate an MVPD's carriage terms in a way that disfavors a competing independent programmer.[245]

71. With regard to concerns about station group leverage in retransmission consent negotiations, two studies introduced into the record reach conflicting conclusions regarding the relationship between station group size and increased retransmission consent fees. In an *ex parte* letter, DIRECTV introduced a statistical study performed by Dr. Allan Shampine.[246] The study examines the relationship between station group size and retransmission consent fees and concludes that larger station group owners charge higher retransmission consent fees to DIRECTV than smaller station group owners.[247] The study purports to replicate a 2017 study by DISH that was introduced in the docket of the Sinclair-Tribune proceeding (MB Docket No. 17-179).[248] The 2017 study was submitted by DISH in that docket to support allegations that the specific, proposed combination of Sinclair and Tribune would lead to higher retransmission consent fees for the combined company's stations.[249] In his study, Dr. Shampine reviewed DIRECTV's confidential monthly retransmission consent data from January 2023 to December 2024 and found that retransmission consent fees for stations affiliated with the Big Four broadcast networks were higher for affiliates owned by larger groups with the impact of size on fees being "very economically significant."[250]

72. In response, NAB submitted its own analysis from Dr. Jay Ezrielev that refutes DIRECTV's submission and contends that the analysis does not demonstrate a causal relationship between station group size and retransmission consent fees.[251] Dr. Ezrielev argues that Dr. Shampine's analysis does not take into account key variables, such as DMA size and the greater per-household costs of serving small

[244] NABET-CWA 2025 Comments at 12-13 (arguing that while there is an abundance of national programming, there is limited local programming and that stations should be using their revenues to create programming that meets local and regional needs); Affiliates 2025 Comments at 12 (asserting that local television revenue should be used to maintain strong local news and information programming but is instead sent to national networks).

[245] Newsmax 2025 Comments at 17-20; CPAC 2025 Comments at 15. Broadcasters respond that elimination of the national cap will not result in a reduction of viewpoints in a local market and that there is no "basis to disturb the FCC's longstanding judgment that retransmission consent negotiations that involve compensation in the form of carriage of other broadcast signals, programming streams, or affiliated nonbroadcast networks (i.e., in-kind compensation) is presumptively consistent with the FCC's good faith negotiation rules." Joint Broadcasters 2025 Reply at 48-53, 75-76 (citing *2000 Good Faith Order*, 15 FCC Rcd at 5462, 5469, paras. 39, 56). The Commission's stated purpose of the national ownership cap is to protect localism, not to address national source diversity or viewpoint diversity in the MVPD industry, or alleged discriminatory treatment of independent cable programmers. To the extent commenters are concerned about the behavior of a specific broadcaster, or with respect to specific programming, such concerns would be more appropriately addressed outside the scope of this proceeding (e.g., through a complaint proceeding alleging a lack of good faith during a particular retransmission consent negotiation), rather than through retention of a bright line, industrywide structural ownership limit.

[246] DIRECTV Sept. 19, 2025 *Ex Parte* at Exh. A.

[247] *Id.* at 4-5.

[248] *Id.* at 1, 4-5.

[249] *See* DISH Petition to Dismiss or Deny, MB Docket No. 17-179 (filed Aug. 7, 2017); *see also* ACA 2018 Comments at 3-7; DISH 2018 Comments at 7-8.

[250] DIRECTV Sept. 19, 2025 *Ex Parte* at 4-6.

[251] Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, Attach. at 2-6 (filed Nov. 24, 2025) (NAB Nov. 24, 2025 *Ex Parte*).

versus large markets.[252] Dr. Ezrielev also asserts that Dr. Shampine's analysis is overly skewed toward small station groups with which DIRECTV can negotiate a below market rate for retransmission consent and does not properly take into account DIRECTV's natural loss of market power when negotiating with a larger station group.[253] NAB further contends that even if DIRECTV pays more to larger broadcast groups than to smaller groups for retransmission consent, that fact does not establish that the rates are anticompetitive or overpriced.[254]

73. Given the conflicting evidence in the record regarding whether, and the extent to which, permitting some level of greater audience reach would affect retransmission consent fees in all, or even most, cases, we do not believe the record justifies retaining a bright line prohibition on all acquisitions that would exceed 39%. To start, even if there may be some evidence that purports to show a correlation between station group size and retransmission consent fees, we do not believe it is reasonable to conclude that larger group owner reach automatically results in retransmission consent fee increases across all broadcasters, such that a 39% cap remains necessary to limit broadcaster leverage. For instance, not all broadcasters obtain, or even seek, retransmission consent compensation in exchange for carriage. In lieu of retransmission consent compensation, broadcast stations are permitted to choose mandatory carriage of their signal (also known as "must carry").[255] As a result, when viewed through the lens of retransmission consent, the rule is likely overbroad because it restricts the growth of all station groups regardless of whether, or the extent to which, they actually seek or intend to seek retransmission consent fees for their stations.[256] With respect to price increases that MVPDs allege would be passed through to consumers, or

---

[252] *Id.* Attach. at 4-6.

[253] *Id.* Attach. at 6-8.

[254] *Id.* at 1. DIRECTV filed a response by Dr. Shampine addressing Dr. Ezrielev's criticisms. Letter from Michael Nilsson, Counsel to DIRECTV, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed Jan. 21, 2026). Dr. Shampine argues that Dr. Ezrielev's findings are not supported by the facts and do not alter Dr. Shampine's conclusions on the relationship between increased retransmission consent rates and station group size. *Id.* Dr. Shampine disagrees with the assertion that retransmission consent rate changes of a small dollar amount are insignificant because a small dollar amount can have a large effect on a large subscriber base. *Id.* Exh. A at 1. Dr. Shampine also disputes Dr. Ezrielev's contention that he erred by not considering DMA size in his analysis and counters by arguing that Dr. Ezrielev provided no empirical evidence showing that the inclusion of DMA size would materially impact his study's findings. *Id.* Exh. A at 2-4. In further support of his findings, Dr. Shampine submits a case study on the retransmission consent rates paid by DIRECTV after the Nexstar/Tribune merger. *Id.* Exh. A at 4-7.

[255] *See* 47 U.S.C. § 534(a) ("Each cable operator shall carry, on the cable system of that operator, the signals of local commercial television stations and qualified low power stations as provided by this section."). In addition, we note that the composition of a particular group owner's holdings could also be a critical part of understanding its retransmission consent leverage. Take, for example, two hypothetical group owners with equivalent nationwide coverage: one owns two stations in each market rather than one; one has a top-ranked station in each market rather than a lower-ranked station; one holds a Big Four network affiliate in each market rather than an unaffiliated station; one owns stations that produce local newscasts versus a group whose stations do not; one offers popular programming via multicast streams versus one that does not; one holds stations in the largest geographic markets versus one that holds stations in small markets; or one owns broadcast stations as well as various cable networks, all of which it can threaten to black out, versus one that owns only broadcast stations and therefore can black out only broadcast stations in a market. Despite being able to reach the same number of viewers nationwide, one might argue the first group owner would have significantly more leverage in retransmission consent negotiations than the second.

[256] Notable examples of large station groups that have elected must carry status include Trinity and ION. *See NPRM*, 32 FCC Rcd at 10797, para. 27 & n.81 (explaining that when, in 2016, the Commission acted to eliminate the UHF discount, Trinity, ION, and Univision all sought grandfathering of their existing station groups, which would have exceeded the 39% cap at the time); KBTN-TV Public Inspection File, Trinity Broadcasting Network, Mandatory Carriage Election for January 1, 2024 through December 31, 2026 (electing mandatory carriage for Trinity stations); File No. BTCCDT-20201013AAO (filed Oct. 13, 2020), Comprehensive Exhibit at 4 (stating that "ION elects cable must-carry for its stations to ensure the broadest possible distribution of its programming"). In

(continued….)

other direct harms (e.g., increased signal blackouts) that MVPDs allege would follow from broadcasters increasing their audience reach, we note that, ultimately, it is MVPDs that set the prices for their subscribers and that the video marketplace today offers consumers various alternatives beyond a traditional MVPD subscription to access broadcast programming.[257]

74. Moreover, if size equates to influence on pricing, the maxim may hold true on the MVPD side of the negotiation as well, where MVPDs are not bound by bright line limits on their geographic reach. That is, larger MVPDs, many of which have broad geographic reach, may have the ability to drive down prices for retransmission consent.[258] Indeed, gaining scale in order to reduce the amount spent on video programming was a key aspect of several mergers involving MVPDs.[259] Additionally, while smaller MVPDs, in general, may likely pay more for programming than larger MVPDs,[260] they are also permitted by law to designate a qualified MVPD buying group to negotiate on their behalf in retransmission consent negotiations with large station groups to help level the playing field.[261]

(Continued from previous page)
addition, we note that Univision, which has the third largest coverage among station group owners, is estimated to obtain significantly lower retransmission consent fees than groups with less coverage. *See* Justin Nielson, S&P Global, *Top 50 U.S. TV Station Groups 2025 Update* (Oct. 30, 2025); Justin Nielson, S&P Global, *Retransmission-Per-Subscriber Rates Continue to Climb in Q4 2025* (Apr. 30, 2026). These three examples highlight the blunt nature of the current bright-line national cap and the folly of trying to repurpose it to address a concern—rising retransmission consent fees—that it was never intended to address.

[257] *See Nexstar-TEGNA Order* at 29-30, paras. 71-75 (making the following observations: broadcast programming, even when blacked out on an MVPD, remains available "free over the air" to consumers; MVPD subscribers are not "locked into a traditional MVPD" and have the option to switch to a streaming service or other source if prices rise or blackouts increase; and MVPDs control the prices they charge to their own subscribers for service).

[258] *See, e.g.*, *Charter-Time Warner Cable Order*, 31 FCC Rcd at 6480, para. 321 (finding that "there likely would be some reduction in programming cost as a result of the transaction"); *Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Docket No. 14-90, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9242, para. 287 (2015) (*AT&T-DIRECTV Order*) (finding that "AT&T's programming payments may be reduced as a result of the proposed transaction"); DISH Petition to Deny, MB Docket 15-149, at 65 (filed Oct. 13, 2015) (arguing that a larger MVPD would "likely be able to extract concessions from large, third-party programmers"); Sinclair Petition to Deny, MB Docket No. 14-57, at 4 (filed Aug. 25, 2014) (arguing against a merger of Comcast and Time Warner Cable because "post-transaction the combined company could have sufficient size and scale to exercise significant leverage over competitors in the programming industry, including local broadcast television"); *see also* NAB Nov. 24, 2025 *Ex Parte* at Attach. at 6-8 (citing analysis of Dr. Ezrielev, who found that DIRECTV could negotiate a below market rate for retransmission consent with smaller station groups).

[259] *See, e.g.*, *Charter-Time Warner Cable Order*, 31 FCC Rcd at 6489, para. 346. Additionally, the Commission has not found that reductions in programming payments, whether or not the product of increased negotiating leverage, constitute public interest harms (e.g., it has not found that these cost reductions would result in higher prices for other MVPDs or reductions in programmer investment in the quality or quantity of programming). *See id.* at 6489, para. 345; *AT&T-DIRECTV Order*, 30 FCC Rcd at 9243, para. 291.

[260] *See* NTCA 2025 Comments at 1-2 (stating that from 2023 to 2024, rural MVPDs incurred average fee increases of 33%, and the fees were, on average, 37% of their total operating expenses in 2024, compared to 27.9% in 2023); s*ee also 2024 CMR*, Appx. E (2024 Report on Cable Industry Prices), 39 FCC Rcd at 14539-40, paras. 31-32, Fig. 11.

[261] *See* Television Viewer Protection Act of 2019, Pub. L. No. 116-94, 133 Stat. 2534, § 1003 (2019); s*ee also* 47 U.S.C. § 325(b)(3)(C)(vi); *Implementation of Section 1003 of the Television Viewer Protection Act of 2019*, MB Docket No. 20-31, Notice of Proposed Rulemaking, 35 FCC Rcd 644, 647, para. 7 (2020) (citing H.R. Rep. No. 116-329, at 4, and observing that "a key purpose of the new good faith negotiation provisions is to level the playing field by 'allow[ing] smaller MVPDs to collectively negotiate as a buying group [with large station groups] for retransmission consent'").

75. Furthermore, the Commission, consistent with the direction of Congress, has not found it to be a failure of good faith bargaining where a broadcaster, regardless of its size, enters into different terms and conditions, including different price terms, with MVPDs so long as the different terms and conditions are based on competitive marketplace conditions.[262] The Commission also has not found that increasing a station's national reach leads to a public interest harm in retransmission consent negotiations.[263] Similarly, the Commission has held that an increase in compensation, by itself, is not necessarily a public interest harm,[264] and rather, the Commission found that such harm exists where an increase is not the product of "competitive marketplace considerations."[265] In addition, to the extent greater audience reach permits some stations to increase their retransmission consent fees, additional revenue could serve to strengthen the viability of the station and contribute greater resources to the mission of serving its local community. For the foregoing reasons, we find that concerns about retransmission consent negotiations raised in the record of this proceeding are insufficient to justify retaining a broad structural limit on station ownership that no longer serves its intended purpose. Finally, as noted previously, all station acquisitions will be subject to the Commission's transaction review process, where the Commission will have the opportunity to evaluate any alleged transaction-specific harms and to make a determination as to whether the proposed transaction serves the public interest.

76. Consistent with the analysis above, we provide certain guidance about our anticipated approach to allegations of retransmission consent-related harms premised on an increase in broadcaster negotiating leverage due to increased national reach. A threshold consideration will be the transaction-specific nature of any alleged harms, particularly because the Commission historically has not identified a non-local market for retransmission consent.[266] Oppositions to a transaction premised on cost increases in future retransmission negotiations arising from increased national reach could seek to justify a non-local market definition or would need to support another theory why the increased national reach at issue in a given transaction would cause the alleged harms.

77. Further, the Communications Act circumscribes the Commission's authority with respect to retransmission consent.[267] As a result, we will expect allegations of transaction-specific retransmission consent harms to explain why the alleged concerns should be cognizable in the Commission's review.

---

[262] *See* 47 U.S.C. § 325(b)(3)(C)(ii) (providing that "it shall not be a failure to negotiate in good faith if the television broadcast station enters into retransmission consent agreements containing different terms and conditions, including price terms, with different multichannel video programming distributors if such different terms and conditions are based on competitive marketplace considerations"); *see also 2000 Good Faith Order*, 15 FCC Rcd at 5469-70, paras. 56-57 (finding that bargaining proposals presumptively consistent with the good faith standard include "[p]roposals for compensation above that agreed to with other MVPDs in the same market" and "[p]roposals for carriage conditioned on carriage of any other programming").

[263] *Nexstar-Tribune Order*, 34 FCC Rcd at 8450-51, para. 28; *Gray-Raycom Order*, 33 FCC Rcd at 12357, para. 16; *Nexstar-Media General Order*, 32 FCC Rcd at 196-97, para. 35.

[264] *See 2000 Good Faith Order*, 15 FCC Rcd at 5469, para. 56 (finding that proposals for compensation above that agreed to with other MVPDs or other broadcasters in the same market are presumptively "consistent with competitive marketplace considerations and the good faith negotiation requirement"); *see also AT&T-DIRECTV Order*, 30 FCC Rcd at 9243, para. 291 (finding that a change in video programming costs, rather than affecting consumer welfare, constituted merely a "transfer of surplus between video programmers and video distributors").

[265] *Nexstar-Tribune Order*, 34 FCC Rcd at 8451-52, para. 29; *see also 2000 Good Faith Order*, 15 FCC Rcd at 5469-70, paras. 56-58 (finding that "[c]onsiderations that are designed to frustrate the functioning of a competitive market" and "[c]onduct that is violative of national policies favoring competition" are not "competitive marketplace considerations").

[266] *See, e.g.*, *supra* para. 69.

[267] *See, e.g.*, *supra* paras. 68, 75.

78. In the case of alleged harms in future retransmission consent negotiations premised on expanded national reach, we further will expect oppositions to identify why the relative negotiating leverage of the broadcast group would be contrary to the public interest. As discussed above, many MVPDs are themselves large, and small MVPDs have the statutory right to designate a qualified buying group to negotiate on their behalf when dealing with large station groups.[268] For example, evidence or arguments alleging concerns about future retransmission consent negotiations should address whether a broadcast group's increased national reach leads to a material net change in the stakes for the two sides and, if so, whether the change unfairly advantages the broadcasters in negotiations or simply enables the broadcast group to begin to approach comparable negotiating leverage to the MVPD.[269]

79. Finally, the ultimate question in our public interest review remains the overall effect on the viewing public. We recognize that this commonly has been the intended focus of retransmission consent-related arguments raised in transactions in the past, but we take this opportunity to confirm our approach in that regard.[270]

**c. Loss of journalists and other communications workers**

80. Some commenters argue that eliminating the national cap will harm workers in the broadcast industry.[271] They contend that removing the national cap would allow for greater consolidation in the broadcast industry and that consolidation historically has caused harm to journalists and newsroom staffs when newly consolidated stations centralize their operations in an attempt to increase scale and revenue. They argue that the harms caused by consolidation include lowered employee wages and reduced benefits, a decrease in the total number of jobs, and weakened job security.[272] In addition, they contend that further consolidation will follow this trend and lead to less journalism being produced, which in turn

[268] *See, e.g.*, *supra* para. 74.

[269] We recognize that this could turn on a number of specific factors or considerations and we do not seek to catalog them all here.

[270] The dissent's arguments on retransmission consent overlook both key aspects of the record and the underlying purpose for the rule change. The dissent argues that eliminating the national ownership cap could result in increased retransmission consent fees that might be paid by consumers, but it fails to acknowledge that the record here is mixed on that issue. As observed above, (i) there is conflicting evidence in the record as to whether and to what extent eliminating the cap would affect retransmission consent fees (past history and record evidence show that larger MVPDs may have the ability to drive down such prices and Commission rules provide a means for smaller operators to bargain as a group); (ii) ultimately, MVPDs set the prices for their subscribers; and (iii) it is not clear whether an increase in retransmission consent fees—which the dissent concedes are "an important and significant source of support for free over the air programming"—is necessarily a public interest harm. In addition, while the dissent points to past Bureau decisions not to consider retransmission consent arguments in the context of particular transactions, it fails to acknowledge the guidance our decision today provides that the Bureau is to consider retransmission consent issues in future cases where there are credible allegations of potential transaction-specific harm and our guidance supports such an inquiry. Most importantly, the dissent overlooks our determination that the national cap rule no longer serves its purpose, which is *not* to address concerns about leverage between broadcasters and MVPDs in retransmission consent negotiations, but rather to promote broadcast localism by maintaining the balance of power between networks and their affiliated stations.

[271] WGAW 2018 Comments at 8-10; Free Press 2025 Comments at 46-52; NewsGuild-CWA et al. 2025 Comments at 1-3; NABET-CWA 2025 Comments at 1-4; NABET-CWA 2025 Reply at 3-4, 9; National Action Network 2025 Reply at 2-3; UCC et al. 2025 Reply at 3-4; Reporters Without Borders *Ex Parte* at 1; *see also* Documentary Producers Alliance 2025 Comments at 1-2; Future Film Coalition 2025 Comments at 1-6.

[272] *See* WGAW 2018 Comments at 8-10; Free Press 2025 Comments at 46-52; NewsGuild-CWA et al. 2025 Comments at 1-3; NABET-CWA 2025 Comments at 1-4; NABET-CWA 2025 Reply at 3-4, 9; National Action Network 2025 Reply at 2-3; UCC et al. 2025 Reply at 3-4; Reporters Without Borders *Ex Parte* at 1; *see also* Documentary Producers Alliance 2025 Comments at 1-2; Future Film Coalition 2025 Comments at 1-6.

would undermine and harm the Commission's public interest goal of localism.[273] For the reasons below, we find that these labor-related concerns do not justify preserving a bright line limit on station ownership.

81. While commenters raise a valid concern that industry consolidation could result in employment reductions, we also recognize that questions about the viability of broadcast stations include risks to the long-term employment of its workers. As a result, we find that allowing broadcasters to increase their scale could improve long-term employment prospects for workers, particularly in instances where a financially stronger company acquires a station. In addition, we note that the synergies to be gained by transactions currently subject to the national cap are different from the synergies that would be gained from combining ownership of stations within a local market. As we have noted, removing the national cap does nothing to permit greater consolidation within a local market and therefore does not carry the same risk of elimination of overlapping or redundant operations that would result from the acquisition of an additional station in the market. Rather, repealing the national cap could allow a station group to expand its reach to a new market where it is currently not present, and the acquired station, under new ownership, would continue to compete with the other stations in the market for audience share, advertising revenue, and broadcast employees.

82. Regardless, elimination of the national cap rule would not foreclose the Commission's consideration of such issues in a case-by-case public interest review of individual acquisitions. Therefore, although labor issues historically have been handled and enforced by federal agencies other than the Commission,[274] commenters still will be able to raise transaction-specific labor issues that may be involved in a particular matter.[275]

83. When seeking to raise such concerns, we will expect oppositions to be premised on a proper baseline to ensure the alleged employment-related harms are transaction-specific. In particular, financial challenges in the broadcast television industry make it important to compare alleged post-merger harms against the pre-transaction *status quo* and trajectory that actually was likely absent the transaction.[276] We also will expect oppositions to explain why the alleged transaction-specific labor issues are cognizable by the Commission under its public interest authority under the Communications Act.[277] Finally, we once again will be focused on the ultimate effects on viewers through the broadcasters' continued ability to operate consistent with their public interest duties under the Communications Act and Commission rules.

---

[273] *See* WGAW 2018 Comments at 8-10; Free Press 2025 Comments at 46-52; NewsGuild-CWA et al. 2025 Comments at 1-3; NABET-CWA 2025 Comments at 1-4; NABET-CWA 2025 Reply at 3-4, 9; National Action Network 2025 Reply at 2-3; UCC et al. 2025 Reply at 3-4; Reporters Without Borders *Ex Parte* at 1; *see also* Documentary Producers Alliance 2025 Comments at 1-2; Future Film Coalition 2025 Comments at 1-6.

[274] *See, e.g.*, *Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees*, MB Docket No. 10-56, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4329-30, paras. 223-24 (2011) (declining to impose employment conditions that the Commission found were not related to the transaction and that are enforced by agencies other than the Commission); *see also Applications of Univision Holdings, Inc.*, Memorandum Opinion and Order, 7 FCC Rcd 6672, 6683, para. 48 n.45 (1992) (noting that the Commission "[has] never suggested that a reduction in a station's staff is contrary to the public interest, if conducted in a nondiscriminatory manner").

[275] *See Applications for Consent to the Transfer of Control of Paramount Global*, MB Docket No. 24-275, Memorandum Opinion and Order, 40 FCC Rcd 5689, 5711-12, paras. 50-51 (2025).

[276] *See supra* para. 65 (similarly discussing the need to identify the proper baseline for comparison in light of marketplace realities absent the transaction).

[277] *See supra* note 269.

### C. The Commission Has Authority to Repeal the Rule

84. Congress has authorized the Commission to adopt, modify, or eliminate broadcast ownership rules, including the national cap, under sections 154(i) and 303(r) of the Communications Act.[278] The Commission promulgated and modified broadcast ownership limits pursuant to this authority throughout the decades following the Act's passage in 1934.[279] The Commission adopted a national cap after determining such a rule was necessary to serve the public interest.[280] As with any Commission rule, the agency has the authority and obligation to reexamine the national cap rule in response to changing circumstances and to modify or repeal it if it no longer serves the public interest.[281] Indeed, the Commission has modified its limits on the number of television stations an entity can own several times, raising the limit each time to account for developments in the television industry.[282]

85. Although Congress also has reset the level of the national cap as the video marketplace evolved, Congress has uniformly done so by directing the Commission to modify its rules rather than by enacting a fixed cap into law.[283] In the 1996 Act, Congress instructed the Commission to set its

---

[278] 47 U.S.C. § 154(i) (empowering the Commission to "make such rules and regulations . . . as may be necessary in the execution of its functions"); *id.* § 303(r) ("[T]he Commission from time to time, as public convenience, interest, or necessity requires, shall . . . [m]ake such rules and regulations . . . as may be necessary to carry out the provisions of this [Act]"); *see FCC v. Nat'l Citizens Comm. for Broad. (NCCB)*, 436 U.S. 775, 790, 794 (1978) (upholding the Commission's authority to adopt broadcast ownership rules under sections 154(i) and 303(r)); *see also Nat'l Broad. Co. v. U.S.*, 319 U.S. 190, 214-20, 224-26 (1943).

[279] *See, e.g.*, *Nat'l Broad Co*., 319 U.S. at 209-27 (Chain Broadcasting Rules); *U.S. v. Storer Broad*., 351 U.S. 192, 203-07 (1956) (limits on common ownership of FM stations); *NCCB*, 436 U.S. at 793-96 (newspaper-broadcast cross-ownership ban).

[280] *See Amendment of Section 73.3555 of the Commission's Rules*, 100 FCC 2d 74, 90-92, paras. 38-40 (1985).

[281] *See, e.g.*, *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) ("[C]hanges in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so. In the rulemaking context, for example, it is settled law that an agency may be forced to reexamine its approach 'if a significant factual predicate of a prior decision . . . has been removed.'" (quoting *WWHT, Inc. v. FCC*, 656 F.2d 807, 819 (D.C. Cir. 1981))); *Geller v. FCC*, 610 F.2d 973, 979 (D.C. Cir. 1979) (per curiam) ("[An] agency cannot sidestep a reexamination of particular regulations when abnormal circumstances make that course imperative."); *see also Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 767-68 (6th Cir. 1995) (directing the Commission to reexamine fourteen-year-old structural-separation requirement imposed on the Bell Companies, which had come to place them at a disadvantage relative to new competitors in the "ever-evolving wireless communications marketplace").

[282] *Rules Governing Broadcast Services Other Than Standard Broadcast*, 9 Fed. Reg. 5442 (May 23, 1944); *Amendment of Section 3.636 of the Commission's Rules and Regulations Relating to Multiple Ownership of Television Broadcast Stations*, Docket No. 10822, Report and Order, 43 F.C.C. 2797, 2797-99, 2801, paras. 3, 8, 13 (1954); *1984 Multiple Ownership Order*, 100 F.C.C.2d at 18, para. 4; *1985 UHF Discount Order*, 100 F.C.C.2d at 89-92, paras. 36-40.

[283] Joint Broadcasters 2025 Reply at 9-10; Letter from Thomas M. Johnson, Jr., Partner, Wiley Rein LLP, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 3 (filed Dec. 15, 2025) (Johnson *Ex Parte*). The cases cited by attorneys general of several states, in which Congress used language that clearly supplanted agency authority, are not relevant to the meaning of the provisions at issue here since none of those cases involved a congressional direction for an agency to modify its rules. *Compare* Attorneys General of the States of Illinois, California, Iowa, Maine, Massachusetts, Pennsylvania, Rhode Island, and Virginia (State Attorneys General) 2018 Comments at 5 n.13 *with* Nexstar 2018 Reply at 5-6 n.20. Similarly, ATVA's reliance on *Util. Air Reg. Grp. v. EPA* is misplaced because that case was about a numerical threshold set within a statutorily defined term, rather than a statutory direction that an agency amends its rules. *Compare* ATVA 2025 Comments at 15, 21 (citing *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014)) *with* Joint Broadcasters 2025 Reply at 15 n.37. *Michigan v. DeVos* is not "factually analogous," as ATVA claims, for this same reason because that case involved a formula established as a statute whereas the mechanisms of the national cap are rules-based. *See* ATVA 2025 Reply at 5-6 (citing *Michigan v. DeVos*, 481 F. Supp. 3d 984 (N.D. Cal. 2020)).

previously modified national cap at a specific numerical percentage.[284] Specifically, section 202(c)(1)(b) of the 1996 Act directed the Commission to "*modify its rules* . . . by increasing the national audience reach limitation for television stations to 35 percent."[285] Section 202 similarly instructed the Commission to "modify" or "revise" other media ownership rules and directed the Commission to "review its rules adopted pursuant to this section and all of its ownership rules" on a periodic basis.[286] The use of the term "modify" indicates that Congress was prescribing a point to which the Commission would set the national cap, using the Commission's preexisting authority to modify the national cap, and from which the Commission periodically would reexamine the prescribed figures, again under its preexisting authority.[287]

86. Notably, there are other instances where Congress provided the specific figures the Commission was to use in modifying its rules but similarly declined to enact those limits in statute. For instance, the 1996 Act specified the precise market size tiers and numerical limits that the Commission was to use in its revisions for the local radio ownership rule.[288] The 1996 Act also specified the numerical limits and definition for networks that the Commission was to use in its revisions for the dual network rule.[289] In each of those cases, even though Congress provided the specific language and figures to be used in the rule revisions, the Commission retained authority to modify or eliminate the rule in question, and at Congress's direction, has periodically reviewed those rules ever since.[290] Furthermore, as described above, the Commission promulgated and revised the national television ownership limits many times before the adoption of the 1996 Act, exercising its authority under sections 154(i) and 303(r) of the Communications Act to promulgate and review its media ownership rules.[291] The 1996 Act did not

---

[284] 1996 Act § 202(c)(1)(b).

[285] *Id.* (emphasis added).

[286] *Id.* § 202(b)(1), (c)(2), (e), (h).

[287] *Nexstar-TEGNA Order* at 16, para. 34; Johnson *Ex Parte* at 3. Section 202(h) of the 1996 Act could not have been the sole statutory authority granted to the Commission for reviewing the media ownership rules because the Commission, having modified the national cap on multiple occasions prior to 1996, plainly had authority to promulgate or review its media ownership rules prior to adoption of the 1996 Act. One *ex parte* submission takes the position that the 1996 Act "took away the Commission's plenary authority over television ownership." Letter from Brian T. Fitzpatrick, Milton R. Underwood Chair in Free Enterprise and Professor of Law, Vanderbilt Law School, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed Nov. 3, 2025) (Fitzpatrick *Ex Parte*). This argument again ignores the fact that Congress chose to have the Commission revise its rules rather than enact statutory provisions and that the 1996 Act directs the Commission to conduct a rulemaking proceeding on local television ownership limits. 1996 Act § 202(c). Therefore, the 1996 Act cannot be read credibly as having rescinded the Commission's rulemaking authority over television ownership.

[288] 1996 Act § 202(b).

[289] *Id.* § 202(e).

[290] *Id.* § 202(h). Although to date the Commission has not changed either the dual network rule or the radio station ownership tiers specified by Congress, it has modified the definition of the radio station markets subject to the local radio ownership limits. *See Prometheus*, 373 F.3d at 423-425 (upholding the Commission's decision to replace contour-overlap methodology with Arbitron Metro markets).

[291] *See* DPI *Ex Parte* at 2 (noting that the Commission created broadcast ownership limits under the Communications Act's public interest standard since the statute itself does not set any broadcast ownership limits). ATVA argues, however, that section 303(r) only permits the Commission to take action that is "not inconsistent with law" and that any action by the Commission to modify the national cap would thus exceed the scope of the Commission's section 303(r) authority because the 39% cap is prescribed by statute. ATVA 2025 Comments at 22; *see also* State Cable Associations 2025 Reply at 17-18; Fitzpatrick *Ex Parte* at 3. As discussed below, the statute sets the cap through the Commission's rulemaking authority, meaning the prescribed percentage remains a component of the Commission's rules, not statutory law.

change that. It simply directed the Commission to make revisions under the Commission's preexisting rulemaking authority and review them periodically.[292]

87. In this regard, we find particularly significant the D.C. Circuit's rulings in the *Fox* litigation, which remanded the Commission's 1998 decision to defer any revision of the national cap when the agency examined it two years after the 1996 Act's instruction to increase the cap from 25% to 35%.[293] In doing so, the court rejected the Commission's argument that by setting the line at 35%, Congress had thereby removed the Commission's power to revisit that line should the public interest require.[294] The court explained that the Commission's decision to leave Congress's initial number untouched was improper: "the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change."[295] On rehearing, the court again rejected the Commission's argument that Congress set an unchangeable limit, explaining that had Congress wished to take away the Commission's ability to alter the cap, "it need only have enshrined the 35% cap in the statute itself," which it had not done.[296]

88. Eight years after the 1996 Act and two years after the *Fox* rulings, Congress again set the national cap at a specific numerical percentage in the Consolidated Appropriations Act of 2004 (CAA). Critically, Congress chose to use the same language as in the 1996 Act. The CAA amends section 202(c)(1)(B) to instruct the Commission to "modify its rules . . . by increasing the national audience reach limitation for television stations to 39 percent."[297] In accordance with that instruction, the Commission amended its rules to revise the national cap to 39%—the level at which it stands today.[298] Echoing the

[292] ATVA argues that a general grant of rulemaking authority does not allow the Commission to contravene specific congressional direction. ATVA 2025 Reply at 5-7. The cases cited by ATVA in support of this proposition all involve instances where courts curtail an agency's novel expansion of its rulemaking power or discretion and are distinguishable from the national cap because the Commission, having modified the national cap in the past, is not exercising authority or discretion it never previously had. *Cf. AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 383-385 (1999) (concluding that the 1996 Act's provisions giving state commissions the power to establish rates were "not enough to displace" the Commission's general rulemaking authority and that the Commission retained authority to promulgate other related rules).

[293] 1996 Act § 202(c)(1).

[294] *Fox I*, 280 F.3d at 1042-43.

[295] *Id*.

[296] *Fox II*, 293 F.3d 540.

[297] CAA § 629(1), 118 Stat. at 99 (amending 1996 Act § 202(c)(1)(B) "by striking '35 percent' and inserting '39 percent'"); Joint Broadcasters 2025 Reply at 8-9; DPI *Ex Parte* at 2; *Nexstar-TEGNA Order* at 16-17, para. 35 (citing *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 233-34 (2020)) (noting that Congress's choice to use the same language again in 2004 shows that it "intended the phras[ing]" to preserve the Commission's authority). The State Cable Associations argue that a "specifically authorized waiver of a strict numerical limit," like that contained in Section 310(b)(4) of the Communications Act, must be included if Congress had intended for the Commission to retain discretion. State Cable Associations *Ex Parte* at 3; *see also* Schwartzman *Ex Parte* at 2 (noting that the CAA contains no indication that the Commission has authority to modify the cap). On the contrary, the CAA's instruction to the Commission to "modify its rules," rather than simply mandate a specific national cap, shows an intent on the part of Congress to preserve the Commission's traditional statutory authority to alter or eliminate the cap in a future rulemaking, just as it has the authority to do with respect to any of its rules. The ex parte filers merely gloss over this significant instruction in the statutory text. *See* State Cable Associations *Ex Parte* at 3, n.12; Schwartzman *Ex Parte* at 2. The dissent emphasizes that the national cap was adopted pursuant to section 202(c)(1)(B) of the CAA and the 1996 Act but also repeatedly refers to the national cap as a rule, seemingly conceding that even though the national cap was adopted pursuant to statutes, the cap itself is a rule and not a statute.

[298] *See Order Implementing the CAA*, 22 FCC Rcd at 4245-46, paras. 1-3. Mirroring arguments raised by various commenters in the record—arguments addressed and refuted elsewhere herein (*see, infra,* paras. 94-99)—the dissent glosses over the significance of Congress's choice to retain the phrase "modify its rules" when directing the Commission to act in 2004. Through this phrase, the CAA charged the Commission to exercise its general

(continued….)

1996 Act, Congress included no language in the CAA taking away the Commission's rulemaking authority with regard to the cap, even though Congress, as made clear by the D.C. Circuit, easily could have "enshrined" the 39% level "in the statute itself."[299] Nonetheless, there is no language in the CAA requiring the Commission to maintain the national cap at 39% indefinitely or for any period of time.[300] That omission is especially significant because Congress was acting against the backdrop of the ruling in *Fox I* and in direct response to the Commission's attempt to increase the national cap in the *2002 Biennial Review Order*, both of which read the language used in the 1996 Act—which Congress incorporated into the CAA—to preserve the Commission's authority to further revise or eliminate the national cap in the future.[301] By using the same formulation as the 1996 Act, Congress did not suggest that it was eliminating the agency's authority to amend its national cap rule.[302] As the Supreme Court has explained, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."[303] Notably, as pointed out in the *Nexstar-TEGNA Order*, the same Congress that enacted the CAA considered alternative bills that would have enacted a fixed statutory cap as part of the Communications Act, displacing the rules created and maintained by the Commission, but it declined to enact those proposals.[304]

(Continued from previous page)
rulemaking power to "modify" the cap, thereby preserving its authority to modify or eliminate the cap in the future, if the public interest so warrants. The dissent fails to acknowledge that there is no language in the CAA removing the Commission's rulemaking authority with regard to the cap. To get around the plain text, the dissent instead bases such claimed limitation on other parts of the statute and policy reasons, none of which compels the dissent's preferred reading.

[299] *See Nexstar-TEGNA Order* at 16-17, para. 35; *Fox II*, 293 F.3d at 540; *UHF Discount Elimination Order*, 31 FCC Rcd at 10224, para. 23 (stating that Congress "could have foreclosed the Commission from ever revisiting the national audience reach cap or the UHF discount by making the national cap and the UHF discount a statutory restriction or by otherwise withdrawing Commission authority to modify the cap," but "[i]t did not do so"); *cf.* NAB 2018 Comments at 7 ("One very simple statutory provision would have sufficed[:] 'The Commission shall not grant any application or construction permit for a full-power commercial TV station license to any entity if doing so would result in that entity owning or controlling TV stations that, in the aggregate, reach more than 39 percent of U.S. TV households nationwide.'"); Joint Broadcasters 2025 Reply at 9-10. Commenters point out that Congress elsewhere in the Communications Act has expressly prohibited the Commission from taking various actions but apparently chose not to do so with respect to the national cap in the CAA. *See* NAB 2018 Reply at 8-9 & n.21; Nexstar 2018 Comments at 10 n.34; Nexstar 2025 Comments at 21-22 & n.88; Johnson *Ex Parte* at 5; DPI *Ex Parte* at 2.

[300] Johnson *Ex Parte* at 4.

[301] *Nexstar-TEGNA Order* at 16-17, para. 35; *Fox I*, 280 F.3d at 1042-43; *2002 Biennial Review Order*, 18 FCC Rcd at 13842-44, paras. 578-83; *see also 1998 Biennial Review Order*, 15 FCC Rcd at 11072, para. 25 (declaring that the Commission might alter the national cap if market conditions changed).

[302] Some commenters suggest that Congress need not retract rulemaking authority from agencies in express statutory language. Free Press 2025 Comments at 15-16; ATVA 2025 Reply at 6. Even if that were so, the circumstances here (namely of the Commission having so recently concluded it retains authority in the wake of Congress legislating on the matter and the court decision affirming the Commission's conclusion) make it very unlikely that Congress would refrain from making some express statement.

[303] *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721-22 (2018) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)); *accord, e.g.*, *Hall v. United States*, 566 U.S. 506, 516 (2012) ("'We assume that Congress is aware of existing law when it passes legislation.'"); *see also Nexstar-TEGNA Order* at 16-17, para. 35. In fact, a report by the Senate Committee on Commerce, Science, and Transportation demonstrates that Congress was specifically aware of both the *Fox* decisions and the Commission's assertion of authority to increase the national cap in the *2002 Biennial Review Order*. *See* S. Rep. No. 141, 108th Cong., 1st Sess., 3-4 (2003).

[304] *See* S. 1046, 108th Cong., 1st Sess. § 3 (2003) (proposing to codify a fixed statutory cap of 35% as a new section 340 of the Communications Act); H.R. 2052, 108th Cong., 1st Sess. § 3 (2003) (same); *Nexstar-TEGNA Order* at 16-17, para. 35; Johnson *Ex Parte* at 4 & n.34. *But see* State Cable Associations *Ex Parte* at 2-3, n.9 (citing
(continued….)

89. The fact that express prohibitory language can be found elsewhere in the Communications Act further illustrates that Congress could have included such language in the CAA, but chose not to do so.[305] The Radio Broadcasting Preservation Act of 2000, which also contains an express removal of the Commission's authority, similarly contrasts with the CAA and the 1996 Act.[306] Along with directing the Commission to modify its low-power FM radio rules, Congress included language that the Commission "may not . . . eliminate or reduce" its prescribed rule modifications except "as expressly authorized by an Act of Congress enacted after the date of the enactment of this Act."[307] Language rescinding the Commission's ability to modify or eliminate the national cap is not present anywhere in the CAA or the 1996 Act.[308] As another example, DPI points to an instance where Congress codified an existing Commission broadcast ownership rule via section 613 of the Cable Communications Policy Act of 1984.[309] By enshrining that rule into statutory law, Congress ensured that the Commission could not modify or eliminate it. Tellingly, Congress did no such thing with respect to the national cap.

90. For all these reasons, we believe that the Commission's interpretation of its statutory authority to modify or repeal the national audience reach cap is the best reading of the CAA and the 1996 Act.[310] As the Supreme Court has held, "a legislature says in a statute what it means and means in a statute what it says there."[311] Statutory language then must be interpreted to "mean[] what it says and no more."[312] Nor can a statute be interpreted beyond its text based "on the view that . . . Congress 'must

(Continued from previous page)
precedent for the notion that failed legislation and congressional inaction are not persuasive factors of statutory interpretation).

305 Nexstar 2025 Comments at 21-22 & n.88. Nexstar cites several such provisions of the Communications Act, including section 152(b), which prohibits the Commission from regulating intrastate telecommunications service; section 271(d)(4), which states that "[t]he Commission may not, by rule or otherwise, limit or extend the terms used;" section 543(a)(1), which provides that "[n]o Federal agency, State, or franchising authority may regulate the rates" of certain cable systems; and section 544a(b)(2), which states that "the Commission shall not limit the use of scrambling or encryption technology" in certain circumstances. *Id.* at 21-22 n.88; *see* 47 U.S.C. §§ 152(b), 271(d)(4), 543(a)(1), 544a(b)(2).

306 Johnson *Ex Parte* at 5 (contrasting the CAA with the Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553, 114 Stat. 2762, § 632(a)(2) (2000), which included an express rescission of agency discretion over its rules).

307 *Id.* (quoting Radio Broadcasting Preservation Act of 2002 § 632(a)(2)).

308 As discussed below, commenters arguing that the CAA enacted a permanent cap assert that such a recission of the Commission's authority may be inferred from various provisions of the CAA. None of those provisions contains language comparable to that of the provision in the Radio Broadcasting Preservation Act of 2000. *Compare* Radio Broadcasting Preservation Act of 2002 § 632(a)(2) *with* CAA § 629(2)-(3). The State Cable Associations argue that the fact that Congress used different language in the RBPA to remove the Commission's discretion does not render the CAA's language "any less effective" in doing so because "in contrast to the RBPA, where Congress restrained the Commission by creating a new statutory framework out of whole cloth, a statutory framework already existed for periodic review of the broadcast ownership rule." State Cable Associations *Ex Parte* at 4. We do not find this argument persuasive because it fails to explain why recission language was not included in the CAA, which Congress could have included if it intended to restrict the Commission in this manner, as evidenced by the RBPA.

309 *See* DPI *Ex Parte* at 2 (stating that "when Congress intended to cap ownership of a particular medium without allowing later FCC modification, it has done so explicitly (as it did with cable ownership restrictions in the 1984 Cable Act)"). *See* Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779, § 613 (1984).

310 *See Nexstar-TEGNA Order* at 16-17, para. 35; NAB Apr. 2, 2025 *Ex Parte* at 50; Nexstar 2025 Comments at 23-25.

311 Johnson *Ex Parte* at 2 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

312 *Id.* (quoting *United States v. M.H. Pulaski Co.*, 243 U.S. 97, 107 (1917)).

have intended' something broader" than it enacted.[313] In short, the plain text of the 1996 Act and the CAA shows that the Commission has authority to modify or eliminate the national cap.[314]

91. Furthermore, the Supreme Court has indicated that agency interpretations "issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."[315] Our interpretation here meets these conditions. First, the Commission's interpretation was issued contemporaneously with the relevant statutes. After the 1996 Act was enacted, the Commission considered changing the national audience reach cap under the interpretation that, in directing the Commission to set the national cap at a specific level, the 1996 Act did not curtail the Commission's authority to revise the cap further if deemed necessary in the public interest.[316]

92. Second, the Commission has consistently maintained that it retains authority to repeal or revise both the national cap and the UHF discount since then.[317] In 2013, the Commission, with bipartisan support, tentatively concluded that the CAA did not preclude it from revisiting the national cap or the UHF discount in a proceeding separate from the quadrennial review proceeding.[318] In 2016, the Commission, again with bipartisan support, concluded that it had authority to revise the national cap, including the UHF discount, and characterized the CAA as simply directing the Commission to revise the cap while eliminating the need for periodic review.[319]

93. After undertaking a comprehensive review of the relevant statutory and regulatory provisions, we find no reason to depart from the Commission's longstanding bipartisan position that the Commission retains authority to modify or eliminate the rule establishing the national cap upon a determination that

---

313 *Id.* (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014)).

314 *Id.* at 1-2, 3, 4.

315 *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024) (citing *U.S. v. American Trucking Ass'ns.*, 310 U.S. 534, 549 (1940) (finding that an agency's statutory interpretation made three times—the first of which was within half a year of the statute being enacted—was entitled to great weight)).

316 *1998 Biennial Review Order*, 15 FCC Rcd at 11072, para. 25 (making an affirmative decision not to change the national cap at that time subject to further observation of industry trends).

317 *See* NAB Apr. 2, 2025 *Ex Parte* at 47-50. The State Cable Associations argue that "when the Commission codified the 39 percent Cap into its rules, it dispensed with notice-and-comment procedures because it viewed adoption of the 39 percent Cap and divestiture procedures as a 'nondiscretionary ministerial action' 'mandated by' the 2004 CAA." State Cable Associations *Ex Parte* at 6. The Commission's characterization in that instance, however, related to its discretion to implement Congress's instruction to modify the rule to 39% in the first instance, not the Commission's discretion to later re-evaluate the rule. *Order Implementing the CAA*, 22 FCC Rcd at 4245-46, paras. 1-3.

318 *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 13-236, Notice of Proposed Rulemaking, 28 FCC Rcd 14324, 14329-30, paras. 13-15 (2013) (*UHF Discount Elimination NPRM*); NAB Apr. 2, 2025 *Ex Parte* at 47-48. Although Commissioner Pai dissented from the *UHF Discount Elimination NPRM*, his reasons were not based on the issue of the Commission's authority. *UHF Discount Elimination NPRM*, 28 FCC Rcd at 14343-45.

319 *UHF Discount Elimination Order*, 31 FCC Rcd at 10222-23, para. 21; NAB Apr. 2, 2025 *Ex Parte* at 48-49. Commissioner Pai again dissented, but his dissent was not because of the Commission's conclusion on its legal authority to revise the national cap. *UHF Discount Elimination Order*, 31 FCC Rcd at 10247-50. Commissioner O'Rielly also dissented and made statements that align with the notion of congressional staff intending the CAA to preclude the Commission from making further changes to the national cap. *Id.* at 10251. The Commission has never adopted such a position. Similarly, dissenting statements made during the adoption of the *NPRM* also take the position that the Commission lacks authority to change the national cap. *NPRM*, 32 FCC Rcd at 10805-07, 10811. However, as noted by then-Commissioner Carr and then-Chairman Pai, the Commission never held such a position in rendering past actions involving the national cap or UHF discount. *Id.* at 10804, 10810.

the rule no longer serves the public interest, convenience, and necessity.[320] To properly examine the issue, the *NPRM* in this proceeding sought further comment on whether the Commission has authority to modify or eliminate the national cap and the UHF discount used for measuring compliance with the cap.[321] The *Refresh Public Notice* also sought comment on whether any legal developments have affected the Commission's past conclusions about its authority to implement changes to the national cap and the UHF discount.[322] We conclude that the Commission continues to have the authority to modify or repeal the national cap based on the record of this proceeding and prior determinations.

94. Some commenters argue that the Commission lacks authority to modify the national audience reach because the CAA excluded the cap from the quadrennial review mandated by section 202(h) of the 1996 Act.[323] We are unpersuaded. Section 202(h) requires the Commission to "review . . . all of its ownership rules quadrennially" to "determine whether any of such rules are necessary in the public interest as the result of competition," and to "repeal or modify any regulation it determines to be no longer in the public interest."[324] The CAA added language stating that the periodic review mandated by section 202(h) "does not apply to any rules relating to" the national audience reach cap.[325] As the Third Circuit recognized in *Prometheus I*, that language does not purport to forbid the Commission from accounting for changing market conditions by reexamining rules relating to the national cap *outside of* the quadrennial review process; it simply separates the Commission's decisions to review the national cap from the statutorily mandated review of other media ownership rules that are to occur every four years.[326]

[320] *See* Joint Broadcasters 2025 Reply at 7 n.8 (noting that the Commission consistently has concluded in decisions under Acting Chairwoman Mignon Clyburn, Chairman Tom Wheeler, and Chairman Ajit Pai that it possesses authority to modify or remove the national cap); NAB Apr. 2, 2025 *Ex Parte* at 47-49; DPI *Ex Parte* at 3.

[321] *NPRM*, 32 FCC Rcd at 10788-90, paras. 7-9. The State Cable Associations suggest that the *NPRM*'s invitation of comments regarding the statutory authority question indicates the Commission's inconsistency on the issue. State Cable Associations *Ex Parte* at 6. To the contrary, the *NPRM* explicitly states that the Commission has concluded it retains authority to modify or eliminate the national cap and that it seeks comment because of questions regarding the Commission's authority from parties opposing its actions. *NPRM*, 32 FCC Rcd at 10788-90, paras. 7-9.

[322] *Refresh Public Notice*, 40 FCC Rcd at 4161.

[323] *See, e.g.*, State Attorneys General 2018 Comments at 5-6; Free Press 2018 Comments at 5; DISH 2018 Comments at 12-13; Newsmax 2018 Comments at 3; UCC et al. 2018 Comments at 1-2; CPAC 2025 Comments at 4; Free State Foundation 2025 Comments at 5-6; AAJC 2025 Comments at 1; NewsGuild-CWA et al. 2025 Comments at 3; NHMC 2025 Comments at 1; NCTA 2025 Comments at 2-3; NABET-CWA 2025 Comments at 14-15; Newsmax 2025 Comments at 25-27; ATVA 2025 Comments at 14-22; Free Press 2025 Comments at 16-19; UCC et al. 2025 Reply at 4-5; State Cable Associations 2025 Reply at 10-11; ATVA 2025 Reply at 6-7; State Cable Associations *Ex Parte* at 4; Schwartzman *Ex Parte* at 2; Letter from Clayton Weimers, Executive Director, Reporters Without Borders, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed July 28, 2026).

[324] 1996 Act § 202(h), 110 Stat. at 111-12, *as amended*.

[325] CAA § 629(3), 118 Stat. at 100. Consistent with the Commission's position, here the CAA expressly refers to any provisions relating to the national cap as "rules." *Id.* Section 629(3) of the CAA is also notable because, had Congress established the 39% cap as a statute, there would have been no need for a separate provision exempting the national cap from quadrennial review because the Commission would have no authority—under section 202(h) or otherwise—to review a cap enshrined in statute. NAB 2018 Comments at 9. The express exclusion of the national cap from the quadrennial review thus reinforces our conclusion that the 39% national cap is a rule and that the Commission retains authority to review it outside of the quadrennial cycle mandated by 202(h). *Id.*

[326] *Prometheus I*, 373 F.3d at 397 ("Although we find that the UHF discount is insulated from this and future periodic review requirements, we do not intend our decision to foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h)."); *id.* at 445 n.101 (Scirica, C.J., concurring in part and dissenting in part) ("I also agree the Commission is not estopped from revisiting the UHF discount in rulemaking outside the § 202(h) context."). For its position, the dissent emphasizes the CAA's removal of the national audience reach cap from section 202(h)'s periodic review, but that action merely

(continued….)

Nor can the CAA be read to implement an implied repeal of the Commission's general authority to modify its rules, including the national cap rule, since no such intent is "clear and manifest" in the text and the law as written is not "irreconcilable" with that authority.[327]

95. Other commenters argue that the Commission's interpretation would lead to an absurd result if the Commission could have waived the cap or changed the cap back immediately afterwards from what Congress had just set.[328] But under general administrative law principles, the Commission would have had to have shown that the public interest would have been served by such an immediate waiver or revision of the rule.[329] Administrative procedure constraints would also have required the Commission to seek public comment on whether the existing cap continues to serve the public interest before revising it. As a practical matter, some period of time would have had to elapse to provide an opportunity for debate on the advisability of any possible rule change. In all events, whether the Commission could have justified a change to the national cap shortly after Congress prescribed the figure in 2004, over two decades have elapsed since then, and such concerns can hardly apply to the Commission's decision here to revisit the cap now.

96. The CAA's exclusion of the national cap from the Commission's forbearance authority under section 10 of the Communications Act[330] does not preclude the Commission from altering the cap itself.[331] For one thing, as the Commission has noted, "the meaning of this provision is unclear given that forbearance authority does not apply to the regulation of broadcasters under Title III of the

(Continued from previous page)
removed the national cap from periodic review without affecting the Commission's existing authority to modify or eliminate it in response to changing circumstances.

[327] Nexstar 2025 Comments at 21; Joint Broadcasters 2025 Reply at 13-14; *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 189-90 (1978). Furthermore, Congress's decision to remove the requirement that the national cap be subject to statutorily mandated periodic review can be read to serve other purposes that make more sense than implicitly removing the cap from Commission review altogether. Congress's elimination of a rigid review cycle for the national cap effectively gave the Commission additional flexibility and time to evaluate the national television market and determine whether modifying or repealing the cap would serve the public interest. Had Congress not removed the national cap from section 202(h)'s periodic review mandate, the Commission would have been tasked as part of the 2006 quadrennial review with revisiting that particular rule a mere *two years* after Congress had directed the Commission to change it to 39%. Congress's decision to remove the national cap—set at 39% in 2004—from further review in 2006 thus can be seen, at least in part, as informed by practical considerations that the fixed periodic timetable likely would not have given the Commission sufficient time to assess the marketplace and consider possible changes to the new rule. In the *1998 Biennial Review Order* following the adoption of the 1996 Act's biennial review requirement, the Commission opted to retain the 35% cap. *1998 Biennial Review Order*, 15 FCC Rcd at 11066-80, paras. 14-38. That decision was challenged by several parties, and its litigation was not resolved until 2002, by which time the Commission was required to undertake the 2002 biennial review. *Fox I*, 280 F.3d at 1040-49. The Commission's decision to raise the national audience reach cap from 35% to 45% in the *2002 Biennial Review Order* was also challenged in court, and review of the decision was pending when Congress enacted the CAA. *See 2002 Biennial Review Order*, 18 FCC Rcd at 13814-47, paras. 500-591; *Prometheus Radio Project v. FCC*, No. 03-3388, 2003 WL 22052896 (3d Cir. Sept. 3, 2003); *see also Prometheus I*, 373 F.3d at 382, 389 (noting previous stay order).

[328] *See* State Attorneys General 2018 Comments at 6-7; ATVA 2025 Comments at 19; Free Press 2025 Comments at 18-19; NCTA 2025 Reply at 1-2; State Cable Associations *Ex Parte* at 3 n.10.

[329] Joint Broadcasters 2025 Reply at 18 n.44.

[330] *See* CAA § 629(2), 118 Stat. at 100 (amending section 202(c)(4) of the 1996 Act to state that "Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations").

[331] *See UHF Discount Elimination Order*, 31 FCC Rcd at 10222-23, para. 21 n.77; Joint Broadcasters 2025 Reply at 11 n.23; Johnson *Ex Parte* at 7-8.

Communications Act."[332] Whatever the import of the provision, as the Media Bureau explained in the *Nexstar-TEGNA Order*, the Commission's ability to forbear from enforcement of its rules is distinct from its power to alter or eliminate those rules.[333]

97. The CAA also provides that any person or entity that exceeds the 39% national cap through a transaction "shall have not more than 2 years after exceeding such limitation to come into compliance."[334] This provision simply sets a specific time period for coming into compliance with the rule as it exists.[335] It is not reasonably read to restrict the Commission's discretion to alter the cap.[336] Indeed, the Commission routinely provides grace periods for acquiring parties to come into compliance with existing ownership rules via divestiture when granting applications for assignments or transfers of television station licenses.[337] The provision also states that "[t]his divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth."[338] This clarifying language merely restates Commission policy adopted when the national cap based on audience reach was first adopted in 1985 and cannot be read as indicating that population growth was the only congressionally-approved method of avoiding divestiture after exceeding the national cap.[339]

[332] *UHF Discount Elimination Order*, 31 FCC Rcd at 10222-23, para. 21 n.77; *see also Nexstar-TEGNA Order* at 17, para. 37. A couple of ex parte filings assert that canons of statutory construction require that the forbearance language nevertheless must be given some meaning. State Cable Associations *Ex Parte* at 4-5; Schwartzman *Ex Parte* at 2. Even if that were so, the language can only be read as guiding the Commission's enforcement of the rule since there is nothing in the language to suggest it pertains to the Commission's ability to modify or repeal a rule. *See* Johnson *Ex Parte* at 7-8.

[333] *Nexstar-TEGNA Order* at 17, para. 37; Joint Broadcasters 2025 Reply at 11 n.23 (noting that prohibiting one form of limited relief from a regulation does not preclude other types of relief, such as relaxation or repeal of the regulation itself); *see also* Johnson *Ex Parte* at 7-8.

[334] CAA § 629(2), 118 Stat. at 99.

[335] Joint Broadcasters 2025 Reply at 11 n.23; Johnson *Ex Parte* at 7.

[336] Joint Broadcasters 2025 Reply at 11 n.23; Johnson *Ex Parte* at 7. *But see* Schwartzman *Ex Parte* at 2 (characterizing the divestiture provision as "a powerful commandment not to modify the cap"). An examination of the plain text, however, shows there is no "command" in section 629(2) of the CAA not to modify the cap, let alone a powerful one.

[337] *Nexstar-TEGNA Order* at 17, para. 36; Joint Broadcasters 2025 Reply at 11 n.23. *See generally Consent to Transfer Control of Certain Subsidiaries of Univision Holdings, Inc. to Searchlight III Utd, L.P., Forgelight (United) Investors, LLC, and Grupo Televisa, S.A.B. Univision Holdings, Inc.*, MB Docket Nos. 20-123, 20-122, Memorandum Opinion and Order and Declaratory Ruling, 35 FCC Rcd 14835, 14842-43, para. 23 (MB 2020) (requiring divestiture to ensure that the transaction complies with the local television ownership rule).

[338] CAA § 629(2), 118 Stat. at 99. We note that this sentence does not include the reference, "in paragraph (1)(B)," which some might claim suggests the number is to be unchangeable statutory language. However, given the other references in the CAA to section (c)(1)(B), the second sentence is best understood as also referring to that section (which only directs the Commission to use its rulemaking authority) rather than creating a freestanding statutory cap. Joint Broadcasters 2025 Reply at 11 n.23. Furthermore, as noted earlier, the CAA refers to provisions relating to the national cap as "rules." CAA § 629(3), 118 Stat. at 100.

[339] Joint Broadcasters 2025 Reply at 11 n.23; *1985 UHF Discount Order*, 100 F.C.C.2d at 92 n.52. *See* CAR 2025 Reply at 4 (asserting that examining what Congress actually adopted is a better approach than "trying to assemble different bits of bills and rules and news reports about legislative history"); Joint Broadcasters 2025 Reply at 7-8 ("Those contending that Congress removed all of the FCC's authority over the national cap ignore, overread, or otherwise misconstrue the actual 'words on the page' and improperly rely on 'extratextual considerations' to assert unwarranted claims about congressional intentions and expectations." (quoting *Bostock v. Clayton County*, 590 U.S. 644, 653-54, 683 (2020))); Johnson *Ex Parte* at 1-2; DPI *Ex Parte* at 1-3.

98. Finally, we see no independent significance to the CAA's various other references to "the 39 percent national audience reach limitation for television stations in [section 202(c)](1)(B)." [340] This language simply reflects that, at the time Congress enacted the CAA, it had directed the Commission in section 202(c)(1)(B) to revise its rules to reset the national cap to that particular level.[341] While they refer to the then-existing cap, they do not freeze the cap at a particular level indefinitely.[342] The references to the 39% number are to its placement "in paragraph (1)(B)," which is the provision of the 1996 Act that directed the Commission to set the cap through its rulemaking authority, which necessarily preserves Commission discretion to adjust its rules as warranted by the public interest.[343]

99. We acknowledge that there are some statements by Members of Congress while the CAA was under consideration, as well as other contemporaneous accounts expressing a belief that the statute would preclude the Commission from making further changes to the national cap.[344] But these statements are belied by the terms of the legislation that was adopted.[345] In similar circumstances, the D.C. Circuit in *Fox I* refused to find a statement "by the ranking minority Member of the relevant subcommittee of the House" that the 1996 Act's specification of a 35% cap "should settle the issue for many years to come" to dispose of the statute's meaning.[346]

[340] CAA § 629(2), (3), 118 Stat. at 99-100 (amending 1996 Act § 202(c), (h), 110 Stat. at 111-12). *But see* State Cable Associations 2025 Reply at 12 (arguing that, if Congress intended the national cap to remain subject to Commission modification, Congress would not have referred to "the 39 percent national audience reach limitation" repeatedly throughout the statutory text); State Cable Associations *Ex Parte* at 2-3. As we have explained, such extrapolations are unwarranted and fall far short of the express recission of authority that Congress has utilized when it restricts agency discretion. *See* Joint Broadcasters 2025 Reply at 20 n.51 (noting that "three subsections all lacking any prohibitory language that effectively forestalls FCC action do not add up to a prohibition on the FCC's long-standing statutory authority to regulate ownership of broadcast stations"); *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991) (holding that if Congress was restricting an agency's rulemaking ability, it would not do so in such an indirect manner); Johnson *Ex Parte* at 8.

[341] *Nexstar-TEGNA Order* at 17-18, para. 38.

[342] *Id.*

[343] *Id.* ATVA seemingly suggests that the CAA's use of the phrase "in paragraph (1)(B)" indicates that the 39% cap resides in section 202(c)(1)(B) of the 1996 Act. ATVA 2025 Comments at 18 n.60. We find the phrase "[t]he Commission shall modify its rules for multiple ownership . . ." from the section that encompasses paragraph (1)(B) to be the definitive indication that the 39% cap is a rule over which the Commission has responsibility and not a statutory term. *See* 1996 Act § 202(c)(1).

[344] *See* State Attorneys General 2018 Comments at 6 nn.16-18 (collecting statements); UCC et al. 2018 Reply at 10; ATVA 2025 Comments at 16 n.49; Free Press 2025 Comments at 14; MMTC et al. 2025 Reply at 2; State Cable Associations 2025 Reply at 12-13. The dissent characterizes enactment of the CAA as a bipartisan consensus that our action today would be overturning. As discussed earlier, the same consensus incorporated language from the 1996 Act that unambiguously preserved the Commission's authority to revise or repeal the national cap. The same bipartisan consensus also rejected earlier bills that would have removed the national cap from the Commission's purview.

[345] As the Supreme Court has reiterated, "[L]egislative history is not the law. It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute we do not inquire what the legislature meant; we ask only what the statute means." *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (internal quotation marks and alteration omitted); *see also, e.g.*, *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306-07 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history" because "[w]hat Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators.").

[346] *Fox I*, 280 F.3d at 1043; *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) (stating that "[t]he remarks of a single legislator, even the sponsor, are not controlling" when interpreting a statute's meaning).

100. A few commenters assert that the Commission is prevented from repealing the national cap by the Major Questions Doctrine.[347] But that doctrine applies to instances in which an agency claims "extravagant statutory power over the national economy" in the absence of clear authority from Congress.[348] The Commission has held the power to modify or repeal broadcast ownership rules since the Communications Act was passed.[349] It is not regulating outside its area of expertise or invoking expansive power from a narrow statute.[350] And, as we have discussed, nothing in the CAA repeals the Commission's authority to review its rules, even where the "starting point" has been set by Congress.[351]

101. In sum, the best reading of the statute supports the Commission's longstanding position that the Commission retains authority to modify or eliminate the national television audience reach rule upon determining that the rule no longer serves the public interest, and for the reasons we have explained, we have determined that here. We therefore exercise our authority to modify our rules by repealing the national audience reach limitation for television stations in favor of a case-by-case analysis of specific transactions. This, in our judgment, far better serves the public interest in light of the significant changes to the position of television broadcasters in the modern media marketplace.

## IV. PROCEDURAL MATTERS

### A. Regulatory Flexibility Act Analysis

102. The Regulatory Flexibility Act of 1980, as amended (RFA),[352] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[353] Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule and policy changes contained in this Report and Order on small entities. The FRFA is set forth in Appendix B.

### B. Paperwork Reduction Act Analysis

103. This Report and Order does not contain proposed new or revised information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104-13 (44 U.S.C. §§ 3501-3520). In addition, this Report and Order therefore does not contain any new or modified "information burden for small business concerns with fewer than 25 employees" pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, 44 U.S.C. § 3506(c)(4).

### C. Congressional Review Act Analysis

104. The Office of Information and Regulatory Affairs of the Office of Management and Budget has found that this rule is major under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Report & Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

---

[347] Newsmax 2025 Comments at 27-29; Christopher Terry, Caitlin Ring Carlson, and J. Israel Balderas 2025 Comments at 4; Timothy J. Simeone et al., Counsel to DIRECTV, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 6-7 (filed Feb. 25, 2026); *see also* NABET-CWA 2025 Comments at 15.

[348] Joint Broadcasters 2025 Reply at 28 (citing *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)).

[349] *See supra* note 278 and accompanying text.

[350] Joint Broadcasters 2025 Reply at 29-30.

[351] *Fox I*, 280 F.3d at 1043.

[352] 5 U.S.C. §§ 601 et seq., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[353] 5 U.S.C. § 605(b).

### D. People with Disabilities

105. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

## V. ORDERING CLAUSES

106. Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303(r), 307, 309, and 310, the Report and Order **IS ADOPTED** effective sixty days after the date of publication in the Federal Register.[354]

107. **IT IS FURTHER ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303(r), 307, 309, and 310, Part 73 of the Commission's rules **IS AMENDED** as set forth in Appendix A, effective sixty days after the date of publication in the Federal Register.[355]

108. **IT IS FURTHER ORDERED** that the Commission's Office of the Secretary **SHALL SEND** a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy.

109. **IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Program Management, **SHALL SEND** a copy of this Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

110. **IT IS FURTHER ORDERED** that, should no petitions for reconsideration or petitions for judicial review be timely filed, MB Docket No. 17-318 **SHALL BE TERMINATED** and its docket **CLOSED**.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

[354] Pursuant to Executive Order 14215, 90 Fed. Reg. 10447 (Feb. 20, 2025), this regulatory action has been determined to be significant under Executive Order 12866, 58 Fed. Reg. 68708 (Dec. 28, 1993). This rule is considered an Executive Order 14192 deregulatory action.

[355] 5 U.S.C. § 801(a)(3)(A).

## APPENDIX A

## Final Rule

**PART 73 – RADIO BROADCAST SERVICES**

1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

**§ 73.3555 [Amended]**

2. Amend § 73.3555 by removing and reserving paragraph (e).

## APPENDIX B

## Final Regulatory Flexibility Act Analysis

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Federal Communications Commission (Commission) incorporated an Initial Regulatory Flexibility Analysis (IRFA) in *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking (*NPRM*), released on December 18, 2017.[2] The Media Bureau sought further written public comment in *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, Public Notice (*Refresh Public Notice*), including comment on the IFRA.[3] The comments received are addressed below. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA and it (or summaries thereof) will be published in the Federal Register.[4]

### A. Need for, and Objectives of, the Rules

2. In December 2017, the Commission adopted an *NPRM* to seek comment on whether to retain, modify, or eliminate its rule limiting entities from owning or controlling broadcast television stations that, in the aggregate, reach more than 39% of the television audience households in the United States.[5] The *NPRM* also sought comment on a component of the rule, which provides a 50% discount to UHF stations for purposes of calculating compliance with the 39% audience reach cap, often referred to as the "UHF discount."[6] In June 2025, the Media Bureau issued the *Refresh Public Notice* seeking to refresh the record in this proceeding. In light of the request to refresh the record, the *Refresh Public Notice* invited comment on any potential effect of proposals on small entities and the IRFA.[7] In the *Report & Order*, we repeal the national television multiple ownership rule, an important step towards modernizing our regulation of the media marketplace.

3. We find that the record demonstrates that eliminating the national television multiple ownership rule serves the public interest, as it is no longer necessary to promote competition, viewpoint diversity, and localism. The Commission has found since 2003 that the rule is not needed to promote competition and viewpoint diversity, which is only more true today in the modern, diverse media marketplace that includes the proliferation of online video streaming options for viewers. On localism, we agree that increased scale will open opportunities for broadcasters to attract additional capital and advertising revenue needed to produce local programming and to improve service to their local communities. We find that a case-by-case review of applications for the transfer and assignment of television licenses is a better way to ensure that the Commission's media ownership goals are being met. Accordingly, we eliminate the national television multiple ownership rule.

---

[1] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[2] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, Notice of Proposed Rulemaking, 32 FCC Rcd 10785, 10797-98, 10800-03, paras. 30-31, Appx. A (2017) (*NPRM*).

[3] *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, MB Docket No. 17-318, Public Notice, 40 FCC Rcd 4159 (MB 2025) (*Refresh Public Notice*).

[4] 5 U.S.C. § 604.

[5] *NPRM*, 32 FCC Rcd. at 10788-89, paras. 6-7.

[6] *Id.*

[7] *Refresh Public Notice*, 40 FCC Rcd at 4161.

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

4. While no commenter directly responded to the IRFA in this proceeding, one commenter references the RFA process. That commenter contends that the Commission's regulatory flexibility analysis under the RFA is insufficient because, in seeking to refresh the record, the Commission "fails to provide any meaningful analysis of how potential changes to the nationwide audience reach cap or UHF discount might affect small broadcast entities."[8] The commenter further states that "[t]o address this deficiency, the FCC should conduct a comprehensive RFA analysis before proceeding with any modifications to the national audience reach cap or UHF discount."[9] The arguments raised by the commenter fail to acknowledge that the 2017 *NPRM* in this proceeding included the requisite IRFA and that the *Refresh Public Notice* sought further comment on that IRFA. The Commission has reviewed the record in its entirety and has evaluated the impact of this final action on small broadcast entities, and now publishes this FRFA, consistent with the requirements of the RFA.

### C. Response to Comments by the Chief Counsel for the Small Business Administration Office of Advocacy

5. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA,[10] the Commission is required to respond to any comments filed by the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy, and also provide a detailed statement of any change made to the proposed rules as a result of those comments.[11] The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.[12]

### D. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

6. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the adopted rules.[13] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[14] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[15] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any

---

[8] CPAC 2025 Comments at 3, 11-14.

[9] *Id.* at 14 (stating that the Commission's RFA analysis "should include a detailed assessment of the potential economic impact on small broadcast entities and consideration of alternatives that might minimize adverse impacts while still achieving the Commission's regulatory objectives").

[10] Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010).

[11] 5 U.S.C. § 604(a)(3).

[12] We note that the SBA Office of Advocacy did file comments in another Commission proceeding (GN Docket No. 25-133) that discuss the national television multiple ownership rule, 47 CFR § 73.3555(e). *See* SBA Delete, Delete, Delete Comments at 5-6. The comments state that "[s]mall television station owners have expressed concern that [the 39% cap] is out of sync with the current state of media and request the FCC remove the national ownership cap." *Id.* The comments further state that small television station owners "observe that this national cap is not present for streaming companies and therefore creates an unnecessary and outdated constraint on their business." *Id.*

[13] 5 U.S.C. § 604.

[14] *Id.* § 601(6).

[15] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

additional criteria established by the SBA.[16] The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.[17]

7. Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions.[18] In general, a small business is an independent business having fewer than 500 employees.[19] These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses.[20] Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and are not dominant in their field.[21] While we do not have data regarding the number of non-profits that meet that criteria, over 99% of nonprofits have fewer than 500 employees.[22] Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[23] Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[24]

8. The rule changes adopted in the *Report and Order* will apply to small entities in the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS)[25] codes and corresponding SBA size standard.[26] Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the adopted rules will impact a substantial number of small entities. Where available, we also provide additional information regarding the number of potentially affected entities in the identified industries below.

---

[16] 15 U.S.C. § 632.

[17] 13 CFR § 121.903.

[18] 5 U.S.C. § 601(3)-(6).

[19] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business* (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

[20] *Id.*

[21] 5 U.S.C. § 601(4).

[22] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

[23] 5 U.S.C. § 601(5).

[24] *See* U.S. Census Bureau, 2022 Census of Governments–Organization Tables, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, Tables 1-11.

[25] The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. *See* www.census.gov/NAICS for further details regarding the NAICS codes identified in this chart.

[26] The size standards in this chart are set forth in 13 CFR § 121.201, by six-digit NAICS code.

**Table 1. 2022 U.S. Census Bureau Data by NAICS Code**

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms[27] | Total Small Firms[28] | % Small Firms |
|---|---|---|---|---|---|
| Television Broadcasting Stations | 516120 | $47 million | 413 | 316 | 76.51% |

**Table 2. Broadcast Entity Data**

| Broadcast Station Owners (as of August 8, 2025) | SBA Size Standard ($47 Million) | | |
|---|---|---|---|
| **Affected Entity** | **# Commercial Licensed[29] [30]** | **Small Firms** | **% Small Entities** |
| Television Stations | 171 | 142 | 83.04 |

### E. Description of Economic Impact and Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities

9. The RFA directs agencies to describe the economic impact of adopted rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.[31]

10. In this *Report and Order*, we repeal the national television multiple ownership rule. Accordingly, small and other entities that want to purchase or control broadcast television stations that, in the aggregate, reach more than 39% of the television audience households in the United States will no longer need to make a showing or otherwise calculate and demonstrate compliance with the rule. We find that there are no reporting, recordkeeping, or other compliance requirements for small entities. After reviewing the record in this proceeding, we received no concerns about these types of burdens on small entities. In addition, as the *Report and Order* explains, eliminating the national cap will not permit any more or less consolidation within a local market and so will not reduce the number of voices in the market or increase the concentration among stations for small broadcasters in a given market.[32]

---

[27] *U.S. Census Bureau*, "*Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2022*," Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVFIRM, 2025.

[28] *Id.*

[29] Data as of 2024, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on August 8, 2025.

[30] As of December 31, 2025, there were 1,389 licensed commercial television stations. There were also 397 Class A TV stations, 1,760 LPTV stations and 3,092 TV translator stations. *Broadcast Station Totals as of December 31, 2025*, Public Notice, DA 26-49 (Jan. 13, 2026), https://docs.fcc.gov/public/attachments/DA-26-49A1.pdf.

[31] 5 U.S.C. § 604(a)(5).

[32] *See Report & Order* at para. 27.

### F. Discussion of Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

11. The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[33]

12. The rule change, eliminating the national television multiple ownership rule,[34] is deregulatory in nature and does not impose or increase regulatory burdens on small entities. In the *Report & Order*, the Commission finds that a case-by-case approach to applications for television license transfers and assignments is the best way to promote the Commission's media ownership goals of localism, competition and viewpoint diversity.[35] Notably, in response to the latest request for comment in the *Refresh Public Notice*, broadcast commenters were unified in their advocacy for complete elimination of the rule.[36] As the *Report & Order* explains, elimination of the rule would not result in a loss of viewpoint diversity or competition in the local markets in which broadcast stations operate.[37] Further, the *Report & Order* finds that eliminating the national cap does not permit any more or less consolidation within a local market and therefore has no effect on the number of voices in the market.[38] Similarly, the *Report & Order* finds that competition within a local market will not be harmed by the substitution of one station owner for another,[39] and preservation of the rule is not needed to promote localism.

13. Some commenters believe an alternative approach of maintaining the national ownership cap will encourage competition and local programming. By contrast, the *Report & Order* makes clear that eliminating the rule will enable broadcasters to gain additional scale, which will allow broadcasters to generate additional revenues that can be used to provide broadcast service to the local community.[40] Creating this flexibility for broadcasters is important, as the *Report & Order* details the loss of viewership and revenue that the industry has endured since the time when the Commission last reviewed the need for this rule.[41] The *Report & Order* further finds that scale will give local broadcast affiliates additional leverage vis-à-vis the national networks with which they negotiate for affiliation, thereby improving the ability of broadcast affiliates to resist network demands with respect to compensation and programming decisions.[42] We considered alternative arguments that eliminating the national ownership cap would give broadcasters leverage over multichannel video programming distributors (MVPDs) in retransmission consent negotiations; however, any retransmission consent concerns may be addressed in the context of a specific transaction or in a separate rulemaking proceeding. The *Report & Order* also explains that, for individual stations that are financially struggling, repealing the national cap would give those stations

[33] 5 U.S.C. § 604(a)(6).

[34] 47 CFR § 73.3555(e).

[35] *See Report & Order* at para. 7.

[36] *See id.* at para. 19.

[37] *See id.* at para. 27.

[38] *See id.*

[39] *See id.*

[40] *See id.* at paras. 52-53.

[41] *See id.* at para. 51.

[42] *See id.* at para. 41.

additional options by permitting station groups with healthier balance sheets to expand into new markets, acquire those stations, and provide communities with more robust locally-oriented programming.[43]

### G. Report to Congress

14. The Commission will send a copy of the *Report & Order*, including this Final Regulatory Flexibility Analysis, in a report to Congress pursuant to the Congressional Review Act.[44] In addition, the Commission will send a copy of the *Report & Order*, including this Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the SBA and will publish a copy of the *Report & Order*, and this Final Regulatory Flexibility Analysis (or summaries thereof) in the Federal Register.[45]

[43] *See id.* at para. 57.

[44] 5 U.S.C. § 801(a)(1)(A).

[45] *Id.* § 604(b).

## STATEMENT OF CHAIRMAN BRENDAN CARR

Re: *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, Report and Order (August 6, 2026).

Last month, the editor of the New York Times, A.G. Sulzberger, wrote in an op-ed that "A healthy democracy depends on an informed public, which, in turn, depends on the flow of information and accountability provided by independent reporters." "This is true," he said, "not just at the national level, but in each of the communities — each town, each city, each county, each capital — that comprise these United States."

For those of us here at the FCC, we can probably hear echoes in his language of the agency's longstanding localism policy. For decades, our media regulations have focused on empowering broadcasters to air programming that responds to the specific needs, interests, and issues of their own communities.

Localism matters. In my view, it is vital as a country that our future include local reporters working in local newsrooms producing stories that matter to the communities those journalists live in. After all, Americans trust their local journalists a whole lot more than the national mass media personalities.

The very foundation of our broadcast industry is built on this idea—that local TV stations licensed to local communities air programming responsive to their needs. Congress never envisioned that local broadcast TV stations would become nothing more than undifferentiated passthroughs of national programming produced in Hollywood and New York. But if the FCC does not change course, this could become the reality in many towns and cities and counties.

We have seen this dynamic play out before. Just look at local newspapers. Years ago, the FCC adopted a rule that limited investment in local newspapers. The rule may have made sense in the 1970s—it might have even preserved some local newspapers given the market structure at the time. But while the industry changed quickly, the agency stood still. Newspapers started to see increased competition. Cable. The Internet. Craigslist. Social media. Digital advertising.

For decades, the FCC debated whether to change its rule—to allow increased investment in local newspapers. But it took no action. It then started to talk a lot about tough choices and tradeoffs and changing conditions—all while continuing to do nothing. In fact, Democrats on the FCC repeatedly assured the public that that newspapers would be just fine and that concern for the newspaper industry was overstated. Take the words of former FCC Commissioner Michael Copps: "We shed crocodile tears for the financial plight of newspapers—yet truth is that newspaper profits are about double the S&P 500 average." he said.[1] "Let's also be careful not [sic] get too carried away with the supposed premise for all this contortionism, namely the poor state of local newspapers. The death of the traditional news business is often greatly exaggerated." Newspapers are "moving to turn [the] threat [of the Internet] into opportunity," he assured us.

The market moved on—the agency's talking notwithstanding. Newspapers started to lay off reporters. They decreased the number of days in print. Then they started to close down all together. Printing presses removed. Offices emptied out. A few at first. Then by the dozen. Today, one closes every three days. Nearly 3,500 newspapers have shuttered over the past years alone.

[1] *2006 Quadrennial Regulatory Review — Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 06-121, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010 (2008) (Dissenting Statement of Commissioner Michael J. Copps).

When the FCC finally eliminated its outdated restriction on investment in local newspapers, a step it did not take until the first Trump Administration—the damage from agency inaction was all but complete. A daily local newspaper is hard to come by these days. The industry is largely dominated by a handful of effectively national papers. That is not an outcome consistent with localism. It does not promote a diversity of views. And there is far less competition between papers now, not more.

The lesson is clear. The FCC kept a rule on the books in the name of localism that contributed to the gutting of local newspapers. Maybe the FCC was slow to see the forest for the trees. Or maybe it just thought the politics were too fraught. It is always easier to say something must be done while doing nothing. The courts contributed too. Entertaining activist lawsuits to overturn FCC efforts at reform. But the outcome is the same either way.

I don't want local broadcast TV to go the way of local newspapers. And yet the risk is real. To be sure, big city stations will be fine—the way big city newspapers are fine today. But that will not be the case everywhere.

Sulzberger in his op-ed named the statistics. Over the last two decades, he said, "more than 80% of local journalism jobs have vanished." More than 80%. Gone. What is the FCC's policy response? To do nothing? To just hope? To take a wait and see approach just like we did with local newspapers?

In my view, if you care about trusted sources of local news and information, you have to care about the future of local TV stations. They are the economic engines that produce the paychecks for so many of the local journalists that remain in the business.

So how can the FCC maximize the odds that those institutions continue to survive and hopefully thrive into the future? To start, we should stop hamstringing this one segment of the broader market with outdated restrictions.

National programmers today are free to reach 100% of their relevant markets by distributing their programming direct to consumers or through deals they cut with virtual cable companies. Cable channels can reach 100% of the country. Social media sites can reach 100% too. Same with Netflix, podcasts, and all other forms of digital content. Even the old newspaper has no limit on marketing itself to 100% of households.

But not so with the owners of local broadcasters. The FCC has had a bright line rule that generally prevented the agency from even considering the merits of certain deals. Maybe a deal that exceeds the 39% cap is a good one. Maybe it is a bad one. Today's decision lets the parties make their case, allows all stakeholders to be heard, and ensures that the agency will then decide, consistent with our public interest review. We are replacing a blunt instrument with a much more granular, case-by-case approach.

The FCC's legal authority to modify the national cap is also clear. Indeed, the D.C. Circuit has already rejected the argument that Congress's decision to pass a statute directing the FCC to set the cap at a specific percentage prevents the FCC from later modifying the cap. The court stated that Congress's statutory instruction to the Commission to set the cap at a specific percentage determined "only the starting point from which the Commission was to assess the need for further change."

The D.C. Circuit is not alone in expressing this view. An unbroken line of FCC Chairs going back more than a dozen years all agreed that the FCC has the authority to modify the cap. Under President Obama's FCC Chair, the agency determined that "the Commission has the authority to modify the national audience reach cap[.]" Continuing, the agency found in that decision that "no statute bars the Commission from revisiting the cap." Congress did not, according to that FCC, "impose a statutory national audience reach cap or prohibit the Commission from evaluating the elements of this rule." President Biden's FCC Chair voted to approve of that same decision and those same conclusions. President Trump's first FCC Chair also took the same position. He wrote that the agency "rightly rejects" the argument that Congress took away the Commission's authority to modify the cap, writing "that the Commission has the authority to 'modify both the national audience reach restriction and the UHF

discount." I agree with President Biden's FCC Chair. I agree with President Trump's first FCC Chair. And I agree with President Obama's FCC Chair. At least on this issue. The FCC has the authority to modify the cap as we do today, and it is the right policy answer too if you care about the future of trusted, local news.

It is time to restore balance to the broadcast airwaves. Repealing the national cap will provide essential relief for local broadcasters by restoring a healthy counterbalance to the growing leverage of national programmers. Increased scale will enable broadcasters to attract the capital and advertising revenue needed to sustain and produce trusted and community-focused news and programming. We should learn from our mistakes with the local newspaper industry, and we should not let the same thing happen to the local broadcast TV industry. Trusted sources of local reporting, broadcast over the public airwaves, are worth protecting and worth fighting for.

This item has my full support and would not be possible without the tremendous work staff put into this item. I would like to thank Julie Salovaara, Chad Guo, Bill Durdach, Ty Bream, Lori Maarbjerg, Erin Boone, Susan Aaron, Jin Lee, David Konczal, Scott Bouboulis, Andrew Wise, Kim Makuch, and Joycelyn James.

**STATEMENT OF**
**COMMISSIONER ANNA M. GOMEZ**

Re: *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, Report and Order (August 6, 2026).

The Commission's decision to eliminate the 39 percent national audience reach cap is unlawful on its face and a profound departure from both statutory boundaries and longstanding broadcast policy. Congress set this cap in federal law, and only Congress can change it. I cannot support an action that so plainly exceeds the Commission's authority while simultaneously overlooking the real-world consequences for the public we serve.

The national cap matters and Congress, not this Commission, controls its fate. Today's action undermines our core public interest principles of localism, viewpoint diversity, and competition while failing to consider or address the interconnected rules, market realities, and economic pressures that define today's media ecosystem.

Broadcast television remains one of the nation's most vital civic institutions precisely because it is free, universally accessible, and rooted in the communities it serves. Unlike subscription-based or algorithm-driven digital platforms, broadcasting is a public-facing technology designed from the outset to deliver content that strengthens civic infrastructure and supports democratic engagement. At its best, broadcasting is a glue that holds communities together by providing local journalism, emergency information, cultural touchstones, and live events that speak to who we are and what we value.

Local journalism sits at the center of this civic mission. It is the backbone of localism, supplying coverage of public safety issues, local government, community concerns, school board decisions, and regional sports, matters that national outlets neither cover nor understand with the nuance they require. Many national stories begin at the local level, and communities rely on reporters who know their neighborhoods, understand their residents, and can contextualize national issues through a local lens. This service cannot be replicated at a national scale. That is why the law has long afforded local broadcasters special treatment: because communities depend on them.

Broadcasting is also indispensable in emergencies. Over-the-air alerts save lives, and broadcasters' ability to reach virtually every household, even when broadband is down or mobile networks are congested, is a public-safety asset unmatched by any technology company. When a hurricane is approaching, when wildfires threaten communities, when a chemical spill forces evacuations, when seconds matter, broadcasters provide immediate, authoritative information.

Culturally, broadcasting binds the country together through shared experiences. National sporting events such as the Super Bowl, the Olympics, and the World Cup are not merely entertainment, they are common, unifying moments that cross political, geographic, and demographic lines. Regional and local sports carry similar importance, reflecting the identities of states, towns, and schools. Congress recognized the civic and cultural significance of sports broadcasting when it enacted the Sports Broadcasting Act, underscoring the public value of ensuring these shared experiences remain broadly accessible.

These public-interest benefits flow from what broadcasters do uniquely well, delivering time-sensitive live content. News, emergency alerts, and sports, all core to the public interest, depend on real-time distribution, consistency, and universal reach. And while news and emergency services are public goods, sports content serves the public interest *and* helps sustain the economic model that makes those public goods possible. Recent events underscore this synergy: the World Cup's unifying impact and strong ratings, the Olympics' broad national resonance, and football's extraordinary audience reach. Ninety-two of the top one hundred broadcasts in 2025 were football games. These are not just ratings milestones, they are reminders of broadcasting's unique role in our cultural fabric.

But today, the financial model that underpins broadcast journalism and emergency communications is under strain. Global digital platforms, which include some of the largest and most powerful corporations in history, are aggressively moving into sports, siphoning away a cornerstone of broadcast revenue at a moment when advertising markets are already tightening. It is difficult to overstate the significance of this shift. As Big Tech competes for sports rights, the economic viability of the broadcast model becomes more precarious. Broadcasters are being squeezed from both sides. Digital giants compete for their most valuable programming and advertising, while consolidation pressures at the national level threaten the local reporting and public-safety functions on which communities rely. But eliminating the cap does not free local broadcasters from that strain. It just changes who is doing the squeezing. A handful of station-group giants do not represent the wishes of local broadcasters. They are large national companies that own local stations and increasingly dictate what airs on them without much local input. Trading a squeeze from Big Tech for a squeeze from Big Media does nothing to protect the communities this cap was designed to serve.

Eliminating the national audience reach cap would accelerate these pressures precisely when communities need strong, independent local journalism and robust emergency communications the most. The cap has long served as a guardrail preserving localism, viewpoint diversity, and competition. Removing it now, without regard for the public policy consequences, risks undermining the very features of broadcasting that distinguish it from nationalized, centralized digital media systems. At a time when shared civic experiences are increasingly rare, weakening an institution that still produces them is not just unwise policy; it is a step in the wrong direction for our country.

Most fundamentally, however, the Commission does not have the authority to raise or waive the 39 percent national audience reach limitation. Simply put, the 39 percent national audience reach limitation was established by a statute and only Congress has the authority to raise or eliminate it. The Consolidated Appropriations Act of 2004 (2004 CAA) directed the Commission to set the national audience reach limitation at 39 percent, removed this limitation from the congressionally created review process, established an ongoing divesture requirement for any entity that exceeds the 39 percent limitation, and not only failed to provide the Commission with authority to modify, waive, or raise the limitation, it affirmatively stated that the Commission was prohibited from forbearing from enforcing the statutory provision.[1] These steps were deliberate, explicit, and binding.

There are few, if any, issues with more history at the Federal Communications Commission than broadcast ownership limitations. The Commission has regulated broadcast ownership since 1941 to promote localism and competition, preserve diverse viewpoints, and avoid "concentration of control."[2] At the outset, ownership was limited to one television station within a given area and three "scattered" stations. The Commission later raised the ownership limitation to five stations in 1944 and seven in 1954. In 1984, the Commission increased the limitation to twelve stations and proposed phasing it out, but *in direct response to such Commission action* Congress quickly intervened to block the phase-out.[3] And in response to Congress stepping in and directing the Commission to reconsider its action, the Commission proceeded more cautiously by maintaining the twelve-station limitation, and, for the first time, also adopted a percentage-based limitation.[4] This limitation prohibited any single entity from acquiring

---

[1] Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004) (2004 CAA).

[2] Kannon Shanmugam and William Marks, The FCC Lacks Statutory Authority to Revise the Telecommunications Act's 39% National Ownership Cap for Television at 3 (2025), https://americantelevisionalliance.org/wp-content/uploads/2025/12/NationalOwnershipCapWhitePaper_12-15-25.pdf (quoting *Broadcast Services Other Than Standard Broadcast*, 6 Fed. Reg. 2282, 2282 (Apr. 30, 1941)).

[3] *See* Second Supplemental Appropriations Act, Pub. L. No. 98-396, § 304, 98 Stat. 1369, 1423 (1984) (*1984 SSAA*).

[4] In the Matter of Amendment of Section 73.3555 [formerly Sections 73.35, 73.240 and 73.636] of the Commission's Rules Relating to Multiple Ownership of AM, FM and Television Broadcast Stations, 100 F.C.C.2d 74 (1984).

ownership interests in stations reaching more than 25 percent of the national audience. These actions ultimately set the stage for Congress to revisit the Commission's ownership limitations in the Telecommunications Act of 1996 (1996 Act).

In the 1996 Act, Congress again asserted its authority over broadcast ownership limits when it created an initial national audience reach limitation of 35 percent and simultaneously created a biennial review process that required the Commission to consider whether this *congressionally created limitation*, along with additional rules "adopted pursuant to [the 1996 Act]" and all of the Commission's other existing ownership rules, continued to be "necessary in the public interest."[5] In June of 2003, the Commission raised the national audience reach limitation to 45 percent as part of such required review.[6] In *direct response to this Commission action*, in January of 2004, Congress stepped in yet again and in the 2004 CAA modified the relevant sections of the 1996 Act in several critical respects.[7]

Specifically, Congress directed the Commission to set the national audience reach limitation to 39 percent in the Commission's rules by modifying the language in section 202(c)(1)(B) of the 1996 Act.[8] It also changed the review process it had created by explicitly removing review of "the 39 percent national audience reach limitation in subsection (c)(1)(B)"[9] from the required, now quadrennial, review of the Commission's rules that were "*adopted pursuant to this section* and all of its ownership rules."[10] The 39 percent national audience reach limitation in subsection (c)(1)(B), and its precursor 35 percent rule originally adopted in 1996, are the original and subsequently congressionally modified version of a rule that was "adopted pursuant to this section."[11]

The changes to the text of the 1996 Act also prohibited the Commission from forbearing from the 39 percent national audience reach limitation.[12] Forbearance is a term used specifically in the Communications Act to provide the Commission with the authority to not enforce statutory provisions.[13] As used here, by stating forbearance authority "shall not apply" to the 39 percent national audience reach limitation, the language makes clear two things. First, that Congress believed the limitation was statutory. Forbearance only applies to statutory provisions, it is not necessary for rules established by the Commission and use of the word would make no sense if Congress believed otherwise. Second, that forbearing from it was prohibited makes clear Congress's intent that the limitation was not to be changed.

This interpretation of the meaning of the forbearance provision is consistent with the related actions in the 2004 CAA that demonstrate Congress's intent to establish a limitation that the Commission

---

[5] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151 et seq.) (1996 Act).

[6] 2002 Biennial Regulatory Review -- Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al., Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13814 para. 499 (June 3, 2003) (*2002 Biennial Review*).

[7] 2004 CAA § 629.

[8] *Id.*

[9] *Id.*

[10] *Id.*; 1996 Act § 202(h).

[11] *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002) *(Fox I); see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, *modified on reh'g*, 293 F.3d 537, 540 (D.C. Cir. 2002).] (*Fox II*)

[12] 2004 CAA § 629.

[13] 47 U.S.C. § 160. Congress provided the Commission with specific forbearance authority in the Telecommunications Act of 1996 in response to the Supreme Court reversing a Commission decision not to enforce a statutory tariffing requirement because the Commission lacked forbearance authority. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 114 S. Ct. 2223 (1994). *See also* Cary Adickman, Grin and Forbear It: Suffering Statutory Forbearance Under The Telecommunications Act Of 1996 at 5-8 (2013).

did not have the authority to change. Congress lowered the 39 percent national audience reach limitation in direct response to the Commission's decision to raise it.[14] Congress then removed the now modified national audience reach limitation from the congressionally established review process.[15] That review process specifically applied to "[The Commission's] rules adopted pursuant to this section."[16] The national audience reach limitation was adopted pursuant to the section of the 1996 Act in question. By taking the statutorily established rule out of the statutorily established review process,[17] Congress was removing the Commission's authority to modify the statutorily established rule.

Notably, Congress took further consistent actions. It also created a stand-alone ongoing divestiture obligation that made it crystal clear that the directed rule change removed the Commission's authority to change it.[18] Specifically, Congress established a statutory two-year timeline for entities that exceeded the limitation to come into compliance that was independent of the effective date of the 2004 CAA. The divestiture requirement is that any entity "that exceeds *the 39% national audience reach limitation* . . . through grant, transfer, or assignment of an additional license for commercial broadcast television station shall have not more than two years after exceeding *such limitation* to come into compliance with *such limitation*."[19] Importantly, this language refers specifically to a numerical limitation and then refers back to that specific limitation twice. It is not referencing the Commission's rule, it is speaking to the specific limitation that Congress had created with this action.

Conspicuously, the language the 2004 CAA inserts into the 1996 Act speaks in terms of the specifically enumerated "39 percent national audience reach limitation." Neither the exclusion of the limitation from quadrennial review, the divestiture requirement nor the prohibition against forbearance refer to the national audience reach limitation "in the Commission's rules." Instead in each instance the statutory language states explicitly "the 39 percent national audience reach limitation," demonstrating that Congress intended this specific limitation to be set absent further action by Congress.

Further, knowledgeable republicans with direct experience shaping, and later interpreting, the national audience reach cap agree that today's action is plainly foreclosed by law. Former FCC Commissioner Mike O'Rielly, who was personally involved in the negotiations that produced the 39 percent cap, has stated unequivocally that the Commission "does not have the authority to modify the national audience reach cap," explaining that Congress expressly codified the cap in statute, removed it from the Commission's periodic ownership review, and never revisited that limitation.[20] Former House Majority Leader Tom DeLay, who negotiated the final compromise with Senator Ted Stevens, has likewise emphasized that the 39 percent cap was deliberately enacted to prevent FCC revision absent a future act of Congress, underscoring that "regulatory agencies cannot defy or modify laws enacted by Congress" and reaffirming that the cap is "a statute, not a suggestion."[21] And while Senator Ted Cruz did not serve in Congress during those negotiations, his present role as Chair of the Senate Commerce

---

[14] *2002 Biennial Review* at 13814 para. 499 (2003); 2004 CAA § 629.

[15] 2004 CAA § 629 (amending 1996 Act § 202(h) "by striking ''biennially'' and inserting ''quadrennially'' and by adding the following new flush sentence at the end: ''This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).")

[16] *Fox I* at 1043; *see also Fox II* at 540.

[17] 2004 CAA § 629.

[18] *Id.*

[19] *Id*. (emphasis added).

[20] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, Notice of Proposed Rulemaking, 32 FCC Rcd 10785, 10808, para. 2 (2017).

[21] Tom Delay, *I Helped Create The FCC's Ownership Cap. Here's How We Did It* (Aug. 3, 2026) https://www.dailywire.com/news/tom-delay-i-helped-create-the-fccs-ownership-cap-heres-how-we-did-it.

Committee gives him direct oversight over this very issue. He has made clear that he is "skeptical a change can be made absent an act of Congress," signaling that Congress's intent remains unchanged today.[22] Taken together, these perspectives from the architects of the cap, the regulators who implemented it, and the congressional leaders who now oversee it underscore a bipartisan, durable, and deeply informed consensus that the law prohibits the Commission from eliminating the national audience reach cap. No amount of policy preference can substitute for statutory authority.

Today's order eliminating the 39 percent audience reach limitation ignores or summarily dismisses inconvenient facts and legal findings from its description of the relevant history. The Commission concludes that Congress's statutory action in the 2004 CAA changing the language in the 1996 Act directing the Commission to set the limitation at 39 percent was a mere temporary action in response to the Commission raising it too quickly. The Commission bases its analysis on the fact that the 2004 CAA did not change the language in the 1996 Act that directed the Commission to "modify its rules," the Commission's general rulemaking authority and language in appellate decisions predating the 2004 CAA.[23] Specifically, that "had the Congress wished to insulate the [national ownership reach limitation] from review under § 202(h), it need only have enshrined the 35% cap in the statute itself."[24] Upon close examination, the analysis falls apart. The order relies in large part on its analysis of the D.C. Circuit opinions in the *Fox* litigation.[25] The order is correct that the D.C. Circuit found that Congress had directed the Commission to review the national ownership reach limitation and that the Commission was required to revisit the 35 percent limitation because it was only a starting point.[26] The order fails to acknowledge, however, that the reason that the 35 percent limitation was only a starting point and the Commission was required to review it was that the statute required a biennial review of rules adopted pursuant to that section of the 1996 Act. The decision specifically noted that the rule in question, the national audience reach limitation, was a rule adopted pursuant to the 1996 Act.[27] When Congress removed the 39 percent national audience reach limitation from the required, now quadrennial, review, it removed the statutory requirement on which the court relied in making its determination.

The Commission's reliance on *Fox II* is equally unpersuasive. It relies on the court's statement that "had Congress wished to take away the Commission's ability to alter the cap, 'it need only have enshrined the 35% cap in the statute itself.'"[28] While it is an accurate recitation of the court's decision, it completely ignores that in the 2004 CAA Congress, in fact, took action to enshrine the 39 percent national audience reach limitation by statute. As explained above, Congress (1) directed the Commission's rules be changed to reflect the 39 percent national audience reach limitation, (2) directed the removal of the 39 percent national audience reach limitation from the review process for congressionally established broadcast ownership rules that served as the basis for the decision in *Fox I*, (3) directed that the Commission should not forbear from the 39 percent national audience reach limitation, and (4) established an ongoing two-year deadline by which any broadcasters that exceeded the 39 percent

[22] Monty Tayloe, Howard Buskirk, Matt Daneman and Jimm Phillips, *FCC to Vote on Eliminating National Cap at Aug. 6 Meeting* (July 16, 2026), https://communicationsdaily.com/article/view?search_id=82641&id=2789159.

[23] Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, MB Docket No 17-318, at 45-46, paras. 84-85 (August 6, 2026) (*National Television Multiple Ownership Rule*).

[24] *Fox II* at 540.

[25] *National Television Multiple Ownership Rule* at 47-48, paras. 87-88.

[26] *Fox I* at 1043.

[27] *Id.*

[28] *National Television Multiple Ownership Rule* at 47 para. 87 (citing *Fox II* at 570).

national audience reach limitation had to divest stations to come into compliance.[29] By its action today, the Commission is turning a willfully blind eye to the clear intent of Congress.

The Commission's assertion that national ownership limitations have always been rules set by the agency with longstanding Congressional deference is contrary to history. Congress legislated on national television broadcast ownership limitations three separate times over the course of 20 years in 1984, 1996, and 2004.[30] What is clear is that Congress kept the Commission on a very short leash with regard to these limitations.

The public-interest harms that will arise from this unauthorized rule change compound the statutory deficiency. This decision ignores the harms to the media ecosystem that will likely arise as a consequence of raising the national audience reach limitation. These harms include the negative impact on local journalism, consumers paying higher fees to their cable and satellite providers, known as Multichannel Video Program Distributors (MVPDs), and the MVPDs' loss of customers as increased costs result in more consumers cutting the cord. These are not speculative harms. When the Media Bureau waived the cap to clear the way for the Nexstar-TEGNA merger, a federal judge halted the transaction, finding that the states and DIRECTV are likely to succeed in proving it violates antitrust law. A court has already signaled that this kind of consolidation may harm competition and consumers, a signal that this Commission should take seriously before eliminating the cap altogether. Broadcasting does not need to look outside the world of journalism for a second warning. Over roughly the same period that the largest newspaper chains grew their share of the industry from one-third to 70 percent, the country lost more than 3,300 newspapers. Consolidation did not save that industry. It concentrated what remained of it while the industry itself collapsed.

I am cognizant of the economic challenges facing broadcasters today and I remain open to discussing solutions that address these challenges by taking actions that are within our authority and address the issues in a holistic manner. Local journalists do important work and local broadcasters are provided with valuable rights precisely because the public values local journalism. However, the Commission is not doing its job when it modifies its rules to protect the profit margins of corporate behemoths without ensuring that they will continue to provide claimed public interest benefits to consumers.

The Commission concludes that consolidation will allow economies of scale to support more local news and that the relevant market is the entire media ecosystem. The claim that media consolidation will lead to more local news is belied by history as submitted by DIRECTV.[31] In short, history shows that media consolidation leads to commonly owned stations sharing "common news website[s] and content, common news leadership, and common news talent."[32] These assertions are validated by academic research that studied how broadcaster consolidation impacts the rate of news duplication, where station pairs connected through a service agreement, duopoly, or common ownership with one content originating station and one non-originating member had at least 50 percent of the content of their transcripts matched exactly.[33]

[29] 2004 CAA § 629 (divesture requirement does not apply when the national audience reach limitation is exceeded through population growth). *See also* 47 CFR § 202(c)(3).

[30] 1984 SSAA § 304; 1996 Act § 202; 2004 CAA § 629.

[31] *See* DIRECTV Letter in MB Docket No. 17-318 at pp. 7-8, filed February 25, 2026; *see also* DIRECTV Reply to Opposition in MB Docket No. 25-331, at pp. 21-27, filed January 26, 2026.

[32] *Id.*

[33] Danilo Yanich and Benjamin E. Bagozzi, "Reusing the News: Duplication of Local Content," at 28-29, University of Delaware, (May 2025).

Further, the assertion that the relevant market is the entire media ecosystem because local broadcasters compete with national digital media platforms for advertisers and audience share is an oversimplification that ignores both the public interest and the complexity of the broadcast ecosystem. The complex and longstanding regulatory structure underlying broadcasting is designed, on the one hand, to ensure a diversity of viewpoints are represented by precluding one entity from dominating the voices available in a community and, on the other hand, to support a balance of negotiating power between large broadcasting networks that produce news and entertainment content targeting a national audience and locally licensed broadcasting stations that produce news and entertainment content that is targeted locally. Those advocating for lifting the national audience reach limitation assert it is necessary to preserve local broadcasting from the dominance of national networks. The assertion that the creation of large national ownership groups will result in more locally generated news content to serve local communities is both nonsensical and contrary to the evidence.

The structure is further complicated by the impact of consolidation on broadcasters' negotiations with MVPDs for retransmission consent payments for the distribution of the broadcasters' content. These payments are an important and significant source of support for free over-the-air programming. The MVPD community asserts that increasing or waiving the national audience reach limitation to allow consolidation into larger broadcast ownership groups will result in increased retransmission consent fees that will be paid by consumers. This assertion is supported by the public statements of Nexstar, the broadcast ownership group granted a waiver of this limitation by the Media Bureau earlier this year, which asserted such consolidation would cause Nexstar to achieve hundreds of millions of dollars in "economic synergies," which includes significantly increased retransmission consent fees.[34] This is further supported by Nexstar's actions after the transaction closed, where it asserted in court filings that it was required by its contracts to raise retransmission consent rates for acquired entities.[35]

The Commission's response in this decision to stakeholder concerns about increases in retransmission consent fees that are likely to result from eliminating the national reach limitation is jaw-dropping when considered together with its prior statements on the subject of retransmission consent fees. Specifically, in the order adopted today the Commission states that the impact of eliminating the 39 percent national audience reach limitation on retransmission consent fees is not appropriate for consideration in this proceeding and should instead be considered as part of the case-by-case reviews in individual transactions or in a separate rulemaking proceeding.[36]

There is nothing new about case-by-case reviews. They already happen in every license transfer and the treatment of these issues is instructive as to what stakeholders can expect from this Commission. What is notable about such reviews is the studied avoidance thus far of addressing the impact of the transaction at issue on retransmission consent fees on the merits every single time it is raised.[37] The Media Bureau routinely summarily dismisses such issues as outside the scope of what it should be considering. For example, in the Nexstar Tegna decision, despite evidence that the transaction would result in millions of dollars in increased fees on consumers, the Media Bureau determined that it was

---

[34] Press Release, Nexstar Media Group, Inc., Nexstar Media Group, Inc. Enters into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/.

[35] Todd Spangler, *Nexstar and Tegna Claim They Can't Fully Comply With Court Order Halting Merger Because Certain Actions 'Cannot Be Undone'* (Apr. 1, 2026) https://variety.com/2026/tv/news/nexstar-tegna-merger-tro-court-order-reply-1236704471/.

[36] *National Television Multiple Ownership Rule* at 34-36, paras. 67-68.

[37] Letter from Michael Nilsson, Counsel to the American Television Alliance, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318 (filed July 27, 2026) (citing the Media Bureau's declining to address restransmission consent issues in nine proceedings since Feb. 3, 2026, *see* DA 26-755; DA 26-612; DA 26-441; DA 26-427; DA 26-417; DA 26-304; DA 26-267; DA 26-177; and DA 26-108).

inappropriate to consider the issue in that "case-by-case" review because "allegations regarding retransmission consent do not raise a substantial and material question of fact as to whether grant of the Applications would serve the public interest"[38] and such questions should be considered in a rulemaking proceeding.[39] Clearly the Commission does not want to address the challenging questions retransmission consent raises, but passing the buck to another proceeding when the impact is significant, direct, and current can only go so far without becoming the very essence of arbitrary and capricious. The Commission has crossed that line here. This is indefensible.

The order further noticeably maintains willful ignorance of other proposed changes to statutes as well as Commission rules and requirements for which broadcasters are currently advocating that will potentially impact the economics of local broadcasting. These include proposals in Congress to apply retransmission consent obligations to virtual MVPDs (e.g., DIRECTV, Hulu+ Live, Sling TV and YouTube TV) and to make changes to the Sports Broadcasting Act in response to streaming carriage of NFL games, as well as proposals at the Commission to mandate a hard cutover date for transition to the next generation TV broadcast standard and insert the Commission into negotiations between networks and their affiliates. In each of these proceedings, broadcasters are asserting preferential economic treatment is justified by the public good that local broadcasters provide in the form of public safety, local journalism, and cultural touchstones.

The Commission's decision to eliminate the national audience reach cap is not only a departure from decades of statutory and regulatory precedent, but a profound threat to the public interest. Congress has repeatedly and unequivocally asserted its authority over broadcast ownership limits, calibrating the cap to preserve localism, diversity, and competition in the media landscape. By removing this structural safeguard, the Commission disregards clear legislative intent and undermines the foundational principles that ensure communities retain access to independent local journalism, emergency information, and culturally significant programming. This action risks accelerating media consolidation, diminishing the diversity of voices available to the public, and eroding the civic infrastructure that broadcasting uniquely sustains.

Moreover, the Commission's rationale rests on a misreading of statutory language and a willful blindness to the historical record. Congress's repeated interventions in 1984, 1996, and 2004 demonstrate a consistent commitment to limiting national broadcast ownership and preventing excessive concentration of control. The statutory framework, including the prohibition on forbearance and the stand-alone divestiture requirement, leaves no ambiguity: only Congress has the authority to change the cap, and the Commission is expressly prohibited from doing so. By disregarding these constraints and dismissing the interconnected rules and market realities that define today's media ecosystem, the Commission abdicates its responsibility to uphold both the law and the public interest. Eliminating a statutory cap without addressing these interconnected issues is a bad strategy and an improvisation that will hasten the collapse this Commission claims it wants to prevent. I respectfully dissent.

[38] *Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, MB Docket No. 25-331, Memorandum Opinion and Order, DA 26-267 at 31, para. 77 (Mar. 19, 2026) *(Nexstar Tegna Order*).

[39] *Nexstar Tegna Order* at 32, para. 80 (2026) (". . . Petitioners' and Opposing Commenters' allegations regarding Nexstar's incentive and ability, post Transaction, to black out (or threaten to black out) its stations go to the functioning of the retransmission consent marketplace, and the Commission has not previously entertained general concerns about the retransmission consent marketplace in the context of individual transactions. Instead, the Commission has, in the past, considered issues related to retransmission consent—including leverage in retransmission consent negotiations—in rulemaking proceedings, and we believe that it is appropriate to continue that practice here.")

**STATEMENT OF
COMMISSIONER OLIVIA TRUSTY**

Re: *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Docket No. 17-318, Report and Order (August 6, 2026).

Today's vote recognizes that the media marketplace has changed dramatically, while many of our rules have not.

When the national broadcast television ownership rule was last meaningfully updated, Netflix had not yet begun its streaming service, YouTube did not exist, and "appointment television" was still the norm, with many American families planning their evenings around linear broadcast schedules. Now, over two decades later, audiences have shifted from scheduled broadcasts to on-demand viewing, with millions opting for the convenience of near-endless streaming libraries. The data confirm these trends. Today, streaming viewership "surpasses 'the combined share of broadcast and cable,' and is more than double that of broadcast television alone."[1]

These changes have fundamentally altered the competitive landscape for local broadcasters. Consider the effect on advertising revenues that once sustained local television; these revenues now increasingly flow to digital platforms, with particularly significant consequences for stations serving medium-sized and smaller markets. At the same time, broadcasters face increased costs to obtain network programming, while receiving a smaller share of the revenues generated through streaming distribution arrangements negotiated by the national networks themselves.

These economic pressures ultimately affect viewers. Facing higher costs and diminished resources, local broadcasters have been forced to close newsrooms across the country increasing the number of local news deserts to record highs last year. For several communities, this means the elimination of "the first, and in many instances the only, source of free, factual, relevant, timely, and trusted local news."[2] The practical impact is less-informed decision making, reduced emergency awareness, and a decline in civic engagement and accountability.

This brings me to today's Commission action to eliminate the national television ownership cap. Although I do not view this proceeding as a silver bullet to reverse audience or marketplace trends entirely, I do believe that eliminating the cap removes a regulatory constraint that can unnecessarily stand in the way of strengthening broadcasters' ability to compete and serve their communities. Greater scale can improve financial sustainability. It can provide additional resources to invest in local journalism, emergency coverage, investigative reporting, and community programming.[3] It can improve broadcasters' bargaining position with national networks and enhance their ability to compete for

---

[1] Joint Comments of the Four Affiliates Associations, MB Docket No. 17-318, at 7 (Aug. 4, 2025) (Affiliate Associations 2025 Comments); *see also, e.g.*, Nielsen, *Netflix Leads Streaming Growth in June on the Strength of Multiple Big Titles in Nielsen's 50th Report of The Gauge* (July 2025), https://www.nielsen.com/news-center/2025/netflix-leads-streaming-growth-in-june-on-the-strength-of-multiple-big-titles-in-nielsens-50th-report-of-the-gauge/.

[2] Letter from Tim Nelson of Brooks Pierce, LLP on behalf of Graham Media Group, News-Press & Gazette Company, Morgan Murphy Media, Hearst Television Inc., Gray Media, Inc., TEGNA Inc., E.W. Scripps Company and Cox Media Group to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318 (Apr. 28, 2025); *see also, e.g.*, Affiliate Associations 2025 Comments at 14 ("The newspaper industry is a mere shell of its former self. Local broadcasters are trying to hold on so that they can continue to serve their local communities, but, already, there has been a '[m]ore than 75% drop in local journalists since 2002 on average,' resulting in 'more than 1,000 counties—one out of three—[lacking] the equivalent of even one full-time local journalist.' Local broadcasters cannot sustain their businesses on an inherently unfair and unlevel playing field for much longer." (footnote omitted)).

[3] *See, e.g.*, *2024 Communications Marketplace Report*, 39 FCC Rcd 14116, 14283, para. 261 (2024) ("Local news programming, and the advertising presented alongside it, are vital to broadcast stations.").

valuable programming such as live sports. Most importantly, it can help strengthen broadcasters in the current marketplace. And, stronger broadcasters are better positioned to continue fulfilling the public interest obligations that Congress has assigned to them. The Commission cannot expect broadcasters to advance localism, competition, and diverse viewpoints if the underlying business model is unsustainable.

Some may ask why the Commission should devote special attention to broadcasters when consumers enjoy more choices for video programming than ever before. The answer lies in the Communications Act.

Unlike streaming platforms or other digital competitors, broadcast licensees operate pursuant to public interest obligations established by Congress. Those obligations include providing local programming, emergency communications, and service to their communities. Because broadcasters shoulder responsibilities that many of their competitors do not, the Commission has a corresponding responsibility to ensure that our regulatory framework allows them a meaningful opportunity to fulfill those obligations.[4]

Under the law, Congress directed the Commission to "encourage the larger and more effective use of" broadcast spectrum,[5] to "provide a fair, efficient, and equitable distribution of" broadcast stations among states and communities,[6] and ultimately to ensure "'the best practicable service to the public.'"[7]

Today's decision advances those longstanding statutory objectives. Indeed, the Commission has long recognized that marketplace developments affecting the economic viability of broadcasters can directly influence their ability to serve the public interest.[8] Throughout the history of broadcast regulation, the FCC has evaluated the evolving relationship between networks and affiliates and has adjusted its regulatory approach as competitive conditions have changed.[9] That history reflects an enduring principle: when marketplace realities evolve, the Commission must ensure that its regulatory framework continues to serve the public interest Congress entrusted us to protect.

The Communications Act provides the Commission with multiple tools to accomplish that objective. We may establish generally applicable rules through rulemaking[10] and we also may evaluate individual transactions through our licensing authority.[11] As the Supreme Court has explained, where Congress provides agencies with both forms of authority, choosing between them "lies primarily in the informed discretion of the administrative agency."[12]

Here, a case-by-case licensing approach is particularly appropriate. Rather than relying on a rigid nationwide ownership cap, the Commission can evaluate each proposed transaction on its individual merits, considering specific competitive effects, local market conditions, and public interest benefits presented by the record. That approach is firmly grounded in longstanding Commission practice and well-established principles of administrative law. I appreciate that the item also will provide some initial

[4] "Finding the Angel of the Public Interest," Remarks of Commissioner Olivia Trusty, NAB Show, The Las Vegas Convention Center (Apr. 20, 2026), available at https://docs.fcc.gov/public/attachments/DOC-420897A1.pdf.

[5] 47 U.S.C. § 303(g).

[6] 47 U.S.C. § 307(b).

[7] *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 782 (1978).

[8] *See, e.g.*, *United States v. Sw. Cable Co.*, 392 U.S. 157 (1968).

[9] *See, e.g., Nat'l Broad. Co. v. United States*, 319 U.S. 190 (1943).

[10] *See, e.g.*, 47 U.S.C. § 303(r).

[11] *See, e.g.*, 47 U.S.C. §§ 301, 307-310.

[12] *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

guidance on how the FCC plans to approach that case-by-case review so we can confirm each transaction truly will ensure the best practicable service to the local communities involved.

Having determined that the existing ownership cap does not advance the public interest, we move forward today to fulfill our responsibilities under the Communications Act using the tools the Act provides for us.

Some have argued that Section 202 of the Telecommunications Act of 1996 prevents the Commission from carrying out its public interest duties despite the procedures the Communications Act places at our disposal. On balance, I ultimately am persuaded that Section 202 merely directed the Commission to modify a rule originally adopted under the Communications Act, but it did not permanently strip the Commission of the authority Congress otherwise granted to revise that rule when doing so serves the public interest.

But I recognize that reasonable minds can differ about the best statutory interpretation. Justice Scalia once described the 1996 Act as "a model of ambiguity or indeed even self-contradiction."[13] And the 2004 update to Section 202 continued to operate within that statutory framework rather than charting a new path and speaking to this issue clearly and directly with entirely new statutory language.

The passage of time also has not led to greater stakeholder consensus on this legal question either. And, given those continued disputes, I agree with the view that a final decision like the one we adopt here can enable legal clarity on this issue through court review. That being said, I commend the Chairman for his leadership and for his willingness to confront this issue – one that can help preserve a vital part of the nation's media ecosystem and give local broadcasters the opportunity to remain strong, competitive, and capable of serving their communities.

My sincere thanks to the Media Bureau for its hard work on this important item.

[13] *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999).

# EXHIBIT B

including the interference protection requirements. In support of its channel substitution request, the Licensee filed comments reaffirming its interest and stating that it commits to promptly take any and all steps that may be necessary to effectuate the channel substitution proposed in the petition. An individual commenter, Steven Quinn Singleton (Singleton), also filed comments, but did not explicitly object to the proposed channel change. For the reasons discussed in the *Report and Order* referenced below, the Bureau denied Singleton's comments.

**DATES:** Effective November 12, 2026.

**FOR FURTHER INFORMATION CONTACT:** Todd Carney, Video Division, Media Bureau, at *Todd.Carney@fcc.gov,* (202) 418–1618; Emily Harrison, Media Bureau, at *Emily.Harrison@fcc.gov,* (202) 418–1665; or Mark Colombo, Media Bureau, at *Mark.Colombo@fcc.gov,* (202) 418–7611.

**SUPPLEMENTARY INFORMATION:** This is a synopsis of the Commission's *Report and Order,* MB Docket No. 26–195; RM–12023; DA 26–1188, adopted November 3, 2026, and released November 3, 2026. The proposed rule was published at 91 FR 51656 on August 11, 2026. The full text of this document is available online at *https://www.fcc.gov/edocs.*

This document does not contain information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104–13. In addition, therefore, it does not contain any proposed information collection burden ''for small business concerns with fewer than 25 employees,'' pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, *see* 44 U.S.C. 3506(c)(4). Provisions of the Regulatory Flexibility Act of 1980, 5 U.S.C. 601–612, do not apply to this proceeding.

The Commission will send a copy of this *Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

### List of Subjects in 47 CFR Part 73

Television.

Federal Communications Commission.

**Thomas Horan,**

*Chief of Staff, Media Bureau.*

### Final Rule

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

■ 1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

■ 2. In § 73.622, in the table in paragraph (j), under Utah, revise the entry for ''St. George'' to read as follows:

**§ 73.622 Digital television table of allotments.**

* * * * *

(j) * * *

| Community | Channel No. |
|---|---|
| * * * * | * |
| **Utah** | |
| * * * * | * |
| St. George | 9, *18 |
| * * * * | * |

* * * * *

[FR Doc. 2026–23041 Filed 11–10–26; 8:45 am]

BILLING CODE 6712–01–P

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

**[MB Docket No. 17–318; FCC 26–53; FR ID 376834**

### National Television Multiple Ownership Rule

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) repeals the national television multiple ownership rule (national cap), which prohibits a commercial television licensee from having a cognizable interest in television stations that have an aggregate national audience reach above 39%. The Commission finds, given seismic changes in the modern media marketplace, that the rule's repeal will help empower local broadcast television stations to operate in the public interest and to better serve the needs and interests of their local communities. The Commission will review on a case-by-case basis proposed transactions that would have been prohibited under the national cap to determine whether a proposed transaction would serve the Commission's media ownership goals of localism, competition, and viewpoint diversity.

**DATES:** The repeal of 47 CFR 73.3555(e) is effective January 11, 2027.

**FOR FURTHER INFORMATION CONTACT:** For additional information on this proceeding, please contact Chad Guo of the Media Bureau, Industry Analysis Division, *Chad.Guo@fcc.gov,* (202) 418–0652.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Report and Order, in MB Docket No. 17–318, FCC 26–53, adopted on August 6, 2026, and released on October 1, 2026. The complete text of this document is available electronically via the search function on the FCC's website at *https://docs.fcc.gov/public/attachments/FCC-26-53A1.pdf.*

### Synopsis

### Introduction

1. The Commission has been working to empower local broadcast television stations to operate in the public interest, and the agency has been doing so mindful of the modern media marketplace. This includes taking steps that can help ensure broadcasters continue serving the needs of their local communities in today's communications environment. The Commission takes another step in that direction here by updating its approach to the agency's national television multiple ownership rule for the first time in over 20 years. See 47 CFR 73.3555(e).

2. Dating back to its creation, the Commission has taken actions to regulate the ownership structure of the communications industry that it regulates. Early on, the Commission focused in many cases on blanket prohibitions and *ex ante* regulations. For instance, the Commission once had a blanket prohibition that prevented any one entity from owning both a daily print newspaper and a full-power broadcast station if the station's service contour encompassed the newspaper's community of publication. That prohibition operated to prevent the Commission from even considering whether to allow common ownership regardless of whether the facts pertinent to any particular combination would promote the public interest or not. In 2017, the Commission decided to modify its approach—ultimately allowing for case-by-case reviews of broadcast license transfers to newspaper owners.

3. Likewise, the Commission once had a blanket prohibition generally limiting commercial radio ownership on a nationwide basis to no more than 20

a.m. stations and no more than 20 FM stations. In 1996, Congress directed the Commission to eliminate this national restriction on radio station ownership. With the elimination of this national *ex ante* restriction, the Commission now reviews applications for radio license transfers and assignments on a case-by-case basis, consistent with applicable standards of the local radio ownership rule. The agency's experience with this regulatory approach has been positive.

4. With successive orders and statutes, the Commission and Congress have been in a decades-long review of the national television multiple ownership cap, but over the years one principle has remained clear—the Commission has always retained authority to modify the rule governing the national cap. Statutory directives, including those in the Consolidated Appropriations Act of 2004 (CAA), instructed the Commission only to ''modify its rules.'' And the power to modify its rules includes the power to later change them. This principle is highlighted in *Fox Television Stations, Inc.* v. *FCC* (*Fox I*), where the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) stated that ''the choice of 35%''—the then-congressionally specified national audience reach limit—''rather than any other number determined only the starting point from which the Commission was to assess the need for further change.''

5. Today, the Commission exercises its authority to modify the rule once again to meet current market realities. In its current formulation, the national cap generally has operated as a blanket prohibition on transactions that would result in the merged entity achieving a national audience reach greater than 39% of television households in the United States. As applied, the rule generally has presumed that it would not be in the public interest to allow a particular deal in excess of this bright line limit. Particularly in light of changes in the media marketplace since the Commission implemented the current *ex ante* restriction, the agency acts today to update its approach.

6. As we explain, the Commission shifts today from a blanket prohibition to a case-by-case approach that will give the Commission the flexibility to approve deals that are in the public interest while continuing to deny any transaction that fails to serve the public interest. Under a case-by-case approach, the Commission's interests in localism, viewpoint diversity, and competition (to the extent they are implicated) can be fully analyzed and vindicated in the context of a specific transaction. There may be transactions that would have exceeded the limits of the 39% national cap that do not promote the public interest and that will be denied. On the other hand, there may be transactions that would have exceeded the 39% national cap that do promote the public interest and could gain Commission approval. We find that shifting from a relatively inflexible, *ex ante* regulation to an individualized, case-by-case assessment will help ensure that the Commission carries out its statutory mandates in an appropriate manner without having to show special circumstances that would justify a waiver of a rule that no longer serves the public interest.

7. Given this finding, we repeal the Commission's national television multiple ownership rule. We conclude that replacing that regulation with a case-by-case approach to applications for television license transfers and assignments is the best way to promote the Commission's media ownership goals of localism, viewpoint diversity, and competition. Therefore, any proposed transactions that would have been barred under a strict application of the current rule will be subject to the Commission's regular review process to determine whether approval would serve the public interest, consistent with the local television multiple ownership rule.

8. It is fully within the Commission's statutory authority to repeal the rule. The Commission retains authority to change the national cap if the public interest requires. While Congress has at times directed us to change our rules, it has never withdrawn our authority under the Communication Act's public interest standard to regulate or change ownership limits. For the reasons below, we conclude that the public interest requires us to eliminate the national television multiple ownership rule in favor of a case-by-case approach.

**Background**

9. The Commission's rules prohibit a commercial television licensee from having a cognizable interest in television stations that have an aggregate national audience reach above 39%, or up to a maximum of 78% using the UHF discount, which attributes to a UHF television station only 50% of the television households in the station's Nielsen Designated Market Area (DMA). As an original matter, the Communications Act of 1934 (Communications Act) itself does not set any limit on broadcast ownership; rather, the Commission created the cap in 1941 as a rule under the statute's public interest standard. Since it was promulgated originally, the limit on national television ownership has become less restrictive as television licensees have required greater flexibility to respond to the marketplace changes confronting the broadcast industry. During the earliest days of television, the Commission's first, and most restrictive, ownership limits prohibited an entity from owning, operating, or controlling more than three television stations nationwide. The Commission stated that it would be inconsistent with the public interest, convenience, and necessity to allow a greater concentration of television ownership. Three years later, it relaxed the limit to five television stations. In 1954, under its rulemaking authority, the Commission concluded that the limit should be raised further to seven television stations, provided that at least two of the seven stations were UHF stations. In finding that the increase was warranted in order to promote the development of the UHF band, the Commission explained that its diversification policy was not the only relevant consideration in setting television ownership limits.

10. In 1984, again utilizing its rulemaking authority, the Commission reexamined its television and radio ownership limits in light of the increase in the number of broadcast stations and the expanding reach of cable service. Citing, among other things, the tremendous increase in the number of media outlets, the Commission concluded that the ownership limits could be repealed without harming either viewpoint diversity or competition. The Commission stated that new evidence showed that, in fact, group ownership can boost viewpoint diversity. Nonetheless, to avoid a disruptive restructuring of the broadcast industry that an immediate repeal might cause, the Commission adopted a transitional approach that included raising the television ownership limit from seven stations to twelve stations, which was intended to sunset after six years.

11. In 1985, on reconsideration of its decision to raise the limit to twelve stations, the Commission affirmed its earlier conclusion that eliminating the seven station limit would not have contravened the Commission's viewpoint diversity and competition goals. Nevertheless, the Commission decided that an even more cautious approach was needed to minimize the potentially disruptive effects of permitting additional concentration. First, the Commission retained the 12 station numerical limit to guard against a rapid restructuring of small markets

that might ensue from eliminating the numerical limit. Additionally, it layered onto the rule an audience reach limit of 25% of the nation's television households to prevent a group owner from substantially increasing its audience base by focusing its expansion efforts on the most populous markets. However, to reflect the fact that, in the analog television broadcasting era, UHF signals reached a smaller audience in comparison with VHF signals, the Commission adopted a 50% UHF discount, whereby UHF stations are attributed with only half of the television households in their DMAs for purposes of determining compliance with the national audience reach cap. Consistent with its decision to proceed more cautiously, the Commission eliminated the sunset provision.

12. In the 1996 Act, Congress directed the Commission to amend its rules to increase the national audience reach cap from 25% to 35% and to eliminate restrictions on the number of television stations an entity may own nationwide. The Commission revised its rules accordingly, and, in doing so, it retained the 50% UHF discount, which the 1996 Act had not addressed. Pursuant to Congress's directive in the 1996 Act to review the media ownership rules biennially, the Commission examined the national cap in 1998, and considered revising it, notwithstanding Congress's instruction to the Commission in the 1996 Act to set the cap at a specific level in the Commission's rules. Upon completion of its review, the Commission opted for a wait-and-see approach and retained the 35% limit.

13. The D.C. Circuit remanded that decision in 2002, finding that the Commission had failed to demonstrate that retaining the 35% cap advanced localism, diversity, or competition. Perhaps even more significant, the court also rejected the argument that the 1996 Act required the Commission to draw the line at 35%. The court reasoned instead that Congress's instruction to the Commission to set the cap at 35% in its rules did not require deference because ''the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change.'' Upon rehearing, the court again rejected the Commission's argument that the agency should defer to Congress, explaining that if Congress wished to take away the Commission's power to alter the cap, ''it need only have enshrined the 35% cap in the statute itself.''

14. In its *2002 Biennial Review Order,* the Commission again reviewed the national television multiple ownership rule and found that, while a national ownership cap was no longer needed to protect diversity or competition, a cap remained necessary to promote localism given the nature of station ownership in the television industry. The Commission observed that, by limiting the national audience reach that a broadcast network could achieve through the ownership of local television stations, the national cap limits how many stations the network itself can own and operate for the purpose of distributing its programming. By contrast, in those markets not covered by a network-owned station, the network's programming is aired by local television stations that are affiliated with the network but that are owned and operated by another entity. The owner of the network and the owner of a station affiliated with the network periodically negotiate the terms and conditions of their affiliation agreement, including the affiliate's rights and responsibilities regarding the airing of the network's programming. In the *2002 Biennial Review Order,* the Commission reasoned that, by preserving a balance of negotiating power between networks and its affiliates, a national cap enables affiliates to maintain their bargaining power to select programming responsive to the interests of their local communities. The Commission decided, however, to raise the cap from 35% to 45% to promote free, over-the-air programming by allowing networks to achieve greater economies of scale by purchasing more stations in order to compete more effectively with cable and satellite operators, while at the same time ensuring that a network could not reach a larger national audience than its affiliates could reach collectively.

15. Following the adoption of the *2002 Biennial Review Order,* and while an appeal of that Commission decision was pending, Congress in 2004 partially rolled back the Commission's cap increase by including a provision in the CAA directing the Commission to modify its rules to set the national cap at 39% of national television households. The CAA also amended section 202(h) of the 1996 Act to require the Commission to review its media ownership rules quadrennially rather than biennially. In doing so, however, Congress excluded consideration of ''any rules relating to the 39 percent national audience reach limitation'' from the quadrennial review requirement. Prior to the enactment of the CAA, several parties had appealed the Commission's *2002 Biennial Review Order* to the Third Circuit. In June 2004, the Third Circuit found that the challenges to the Commission's actions with respect to the national audience reach cap and the UHF discount were moot as a result of the CAA provisions. The court further stated that Congress's decision to remove ''any rules relating to the 39 percent national audience reach limitation'' from mandatory periodic review under section 202(h) would include removing the UHF discount from that review, given that any change made with respect to the discount would effectively change the national cap. Moreover, the court clarified that, although the UHF discount would be insulated from the specific 202(h) review process going forward, the court did not intend its decision to ''foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of Section 202(h)'' and that the Commission remained free to ''decide, in the first instance, the scope of its authority to modify or eliminate the UHF discount outside the context of 202(h).''

16. In August 2016, as part of a proceeding unaffiliated with the Commission's quadrennial review under section 202(h), the Commission eliminated the UHF discount, finding that UHF stations were no longer technically inferior to VHF stations following the digital television transition and that the competitive disparity between UHF and VHF stations had disappeared. In doing so, the Commission concluded that it had the authority to revise not only the UHF discount but also the national cap. The Commission characterized the CAA as simply directing the Commission to revise its rules while eliminating the requirement for periodic review. The Commission found that no statute barred ''the Commission from revisiting the cap or the UHF discount contained therein in a rulemaking proceeding so long as such a review is conducted separately from a quadrennial review of the broadcast ownership rules pursuant to Section 202(h) of the 1996 Act.'' Moreover, the Commission concluded that it retained authority under the Communications Act, and had an affirmative obligation over time, to revisit and, where appropriate, revise or eliminate its rules, which could include ''any aspect of the national audience reach cap.'' Eliminating the UHF discount effectively tightened the national cap by reducing the maximum allowable audience reach of an owner of UHF stations from 78% to 39%. After networks owning and/or affiliated with UHF stations asked the Commission to

reconsider its decision, the Commission decided in April 2017 to reinstate the UHF discount. The Commission concluded that because the discount is used to determine licensees' compliance with the national cap, the two are inextricably linked and the discount cannot be eliminated without also considering whether the cap remains in the public interest. The Commission's reinstatement of the discount was challenged in the D.C. Circuit, but the court found that the petitioners lacked standing and dismissed the lawsuit in an unpublished decision in 2018. There have been no further modifications to the rule, and so both the 39% national audience reach cap and the 50% UHF discount remain in effect.

17. In reinstating the UHF discount, the Commission committed to undertake a comprehensive rulemaking proceeding to determine whether to modify or eliminate the national ownership limit, including the UHF discount. Accordingly, the Commission adopted a Notice of Proposed Rulemaking (*NPRM*) in 2017 to initiate that proceeding to seek comment on whether the Commission is authorized to make changes to the cap and/or the UHF discount. The *NPRM* also asked whether the current 39% cap should be modified or eliminated and, if a cap is retained, how to calculate compliance, including whether to modify or eliminate the UHF discount. Among other things, the *NPRM* also sought comment on whether the cap continues to promote localism given the current media marketplace and on whether it has other potential benefits, or costs, that the Commission should consider. Specifically, the *NPRM* asked whether changes in the marketplace have affected the network/affiliate relationship in ways that warrant revision of the Commission's previous assumptions underlying the rule's justifications. In response, a number of parties, including broadcasters, MVPDs, and public interest organizations, filed comments on March 19, 2018, and reply comments on April 18, 2018. Multiple ex parte filings addressing the rule have been submitted in the years since then.

18. Although the public has had ample opportunity to comment on the issues raised in the *NPRM,* the Media Bureau issued a Public Notice (*Refresh Public Notice*) on June 18, 2025, that invited interested parties to refresh the record given the passage of time since the *NPRM's* adoption. The *Refresh Public Notice* sought comment on: (1) materials filed since the comment period for the *NPRM* ended in April 2018; (2) pertinent new or additional information regarding the television and video programming marketplace; (3) relevant trends within the television and video programming industry or in related markets, including whether and how the national cap has affected broadcast television's market position in relation to other video distributors, such as online video providers; and (4) other legal or economic developments that the Commission should consider. Comments were due on August 4, 2025, and reply comments were due on August 22, 2025.

19. In comments responsive to the *Refresh Public Notice,* broadcasters urge the Commission to eliminate the national television multiple ownership rule in its entirety, which they view as an obsolete and artificial constraint on their ability to compete in a vastly changed media marketplace. Supporters of the rule, including public interest organizations and MVPDs, assert that the Commission lacks statutory authority to modify or eliminate the rule. They also argue that, among other things, the rule is necessary to promote localism and to prevent higher retransmission consent fees that would lead to higher MVPD subscription prices.

**Discussion**

20. We find that a bright line, *ex ante* limitation, as opposed to a transaction-specific review, is not necessary in today's media marketplace. A rigid cap is no longer needed to serve the "public interest, convenience, and necessity," which is the review standard used in our evaluation of individual applications and licenses, because, as discussed below, the Commission can review proposed transactions on a case-by-case basis to assess whether approval would promote the Commission's media ownership goals of diversity, competition, and localism. As mentioned above, the Commission determined in 2003 that a national cap was not necessary to promote either diversity or competition, and we find that there is even more support today for those conclusions given the availability and accessibility of a myriad of sources of video programming, including cable networks, online services, and social media platforms. The reason for the Commission's continued imposition of a limit in 2003 was to promote localism by maintaining the balance of power between the networks and their affiliates. At that time, limiting the percentage of households that networks could reach through their owned and operated stations ensured networks' reliance on affiliated television stations for the distribution of network programming. However, now networks can reach viewers by placing their programming on streaming platforms. After reviewing the extensive record in this proceeding, we find that a bright line rule is no longer necessary to serve the public interest because we can review cases on an individual basis.

21. The rule's repeal will not lead to automatic approval of transactions currently barred under the national cap because the Commission will review any proposed transaction that the national cap would have barred. In addition, it will have no effect on the public interest obligations of broadcast licensees. Instead, removal of the cap will serve the public interest because it will allow the Commission to analyze all proposed transactions on the basis of their individual merits, taking into account all pertinent factors, instead of automatically excluding transactions that do not satisfy a singular metric that may or may not be relevant to the circumstances of a particular case. National audience reach is not necessarily a meaningful measure of a station group's relative negotiating leverage, market power, financial strength, or public interest record. Thus, a blunt tool like the national cap may be precluding station acquisitions that would be in the public interest, without providing the Commission the opportunity, outside of a waiver process, to take into consideration factors favoring approval of a transaction. Conversely, station acquisitions that would result in a national audience reach below the cap are not given automatic approval on that basis. Rather, the Commission is required to review such transactions to ensure that they serve the public interest, as it always has.

22. In light of changing market conditions, it is no longer valid to presume that virtually any transaction that breaches the cap would disserve the public interest. Removing the cap will allow the Commission to consider additional proposed transactions instead of those currently brought by applicants because they happen to comply with an outdated cap. Eliminating the cap also will be a more efficient and sensible approach than retaining the cap and granting waivers for transactions that serve the public interest, like the recent merger between Nexstar Media Inc. (Nexstar) and TEGNA Inc. (TEGNA). For the reasons discussed below, we conclude that a blanket rule that automatically prohibits television mergers exceeding an inflexible numerical bar absent a waiver no longer makes sense in today's complex media marketplace, given the

numerous forces affecting the broadcast industry.

23. Therefore, we repeal the national television multiple ownership rule. Given that the UHF discount already allows television licensees to reach a potential 78% of the nation's households, we believe that repeal will provide needed relief to station owners without constituting a radical departure from the current ceiling. As discussed below, to the extent that market forces do not ameliorate or constrain any resulting public interest harms that some commenters in this proceeding predict, such as an imbalance in the network/affiliate relationship, a decrease in local programming, an increase in retransmission consent fees, or a loss of journalists and other communications workers, the Commission can consider addressing those concerns directly in more targeted ways, including as part of the Commission's transaction review process, rather than relying on an outdated rule that is no longer serving, and may be undermining, its intended purpose.

24. Furthermore, we conclude that the Commission has the statutory authority to modify or eliminate the national television multiple ownership rule. The best reading of the CAA is that Congress did not prohibit the Commission from reviewing or further modifying the rule. Under this authority, we now review the rule and conclude that it should be replaced with a case-by-case review.

*A. The National Television Multiple Ownership Rule Is Not Necessary*

1. The Rule Is Not Necessary To Promote Viewpoint Diversity or Competition

25. For more than 40 years, the Commission's position has been that a national ownership limit on television licensees is not necessary to promote competition or viewpoint diversity, most notably because the national scale of a broadcaster has no impact on the number of viewpoints or the concentration of competitors in the local television markets it serves. In 1984, the Commission reached that conclusion after observing the ''explosive growth and change'' that had led to an abundance of outlets in the mass media market, including the fact that the number of television stations had increased to 1,169; the number of radio stations had reached almost 9,500; cable passed 64% of the nation's television households; satellite service was expected to launch soon; and over 8.3 million video cassette recorders were in American homes. Moreover, the Commission concluded that national broadcast ownership limits are not pertinent to preserving viewpoint diversity and competition because the relevant market to consider for promoting those goals is local. The Commission reasoned that the viewpoint diversity to which an individual is exposed is not affected by whether those viewpoints also are disseminated in other local broadcast markets. The Commission also determined that ''the fact that local competitors may share common ownership with stations in other markets is unimportant in terms of competitive harm.'' In addition, the Commission concluded that ''[g]roup owners may be able to devote more resources to newsgathering and other activities which improve the quality of programming presented.'' Nevertheless, the Commission retained a modified national cap on a transitional basis to minimize potential disruptive effects to the broadcast industry. A year later, the Commission affirmed its position that repeal of the rule would not contravene its policy goals of promoting diversity and preventing undue concentration.

26. In 2003, the Commission again found that the national cap was not necessary to promote its diversity and competition goals. It affirmed its 1984 conclusion that the market for viewpoint diversity is local, not national, and that, regardless, ''the proliferation of media outlets nationwide'' rendered the cap unnecessary even if the national market were the relevant area to consider. The Commission added that the cap also was not necessary to promote program diversity, which it concluded that the marketplace can and should address. The Commission expanded its competition analysis from its 1984 review of the national television advertising market to include a review of the national program acquisition market. An in-depth analysis of both these markets confirmed the Commission's earlier conclusion that a national cap is not necessary to promote competition. The Commission's description of the U.S. media marketplace at the time was based on data showing that in 2000 there were more than 12,615 radio stations; 1,616 television stations; 68.5 million cable subscribers; approximately 14.8 million direct broadcast satellite systems (DBS) subscribers; and 281 nationally-distributed non-broadcast networks. Approximately 42.5 million U.S. households subscribed to an internet access provider, and the internet offered roughly 30 million websites. Thus, the total number of voices and competitors in the country had increased substantially since the Commission's 1984 observation that the media marketplace had undergone explosive growth.

27. We find no reason to depart from the Commission's earlier conclusions that a national cap is not needed to promote diversity or competition. Indeed, those findings are even more incontrovertible today, and we disagree with the commenters that claim otherwise. First, we affirm our previous view that it is the local market that is relevant for assessing those policy goals with respect to broadcast television. The national cap is not a constraint on local ownership because it is not focused on audience reach in any given local market but rather is concerned with how many stations a broadcaster owns on the national level. Therefore, eliminating the national cap will not permit any more or less consolidation within a local market and so will not affect the number of voices in that local market or the number of local stations competing in that local market. Allowing a station owner to purchase an existing station in another local market that it does not already serve will not harm viewpoint diversity because one viewpoint in the market will be exchanged for another, and the overall number of viewpoints in that market will not be reduced. Similarly, concentration within a local market will not be affected by the substitution of a station owner that is new to the local market for a station owner that had been serving the market, and in some instances, the new owner may inject new ideas or more vigorous competition into the market. In addition, while a broadcaster's acquisition of a second station in a local market could reduce the number of independent voices or independent competitors, repeal of the national cap has no bearing on the likelihood of such an outcome because, for purposes of the rule, a broadcaster's audience reach in that local market is the same regardless of the number of stations it owns in the market given that the television households in that market are counted only once and are not multiplied by the number of the broadcaster's stations in that market.

28. Second, the proliferation in recent years of video programming providers available on the internet and through streaming services only reinforces the Commission's 1984 and 2003 diversity and competition findings. We agree with some commenters that ''[i]f a national TV rule was not necessary to preserve viewpoint diversity or competition before the expansion of

cable TV channels; the launch of satellite TV and radio; the development and exponential growth of the [I]nternet, myriad online content providers, and social media . . . , then that rule is not necessary now.'' As compared with 1984 and 2003, recent data show that there are 15,686 radio stations; 1,777 television stations; 35.3 million cable subscribers; 13.7 million DBS subscribers; 5.1 million telephone company video subscribers; at least 193 nationally-distributed non-broadcast networks; and roughly 2.3 million U.S. podcast shows. Approximately 121 million U.S. households subscribe to an internet access provider, and the internet offers approximately 200 million active websites, with 252,000 new websites created daily. Although traditional MVPD subscribership has been in decline since 2012, when it reached 101.6 million subscribers, 83% of U.S. adults now access video programming through streaming services. Subscribership is robust for online video distributors (OVDs), which distribute video programming to consumers over the internet and include services such as Netflix, Amazon Prime Video, Disney+, and Paramount+, among many others. One report finds that 1,189 free, ad-supported streaming television (FAST) channels are available over the internet. As the Media Bureau observed in the *Nexstar-TEGNA Order,* ''today, broadcasters are competing in a much larger, broader, and competitive environment'' with digital advertisers and various technology platforms, including streaming services and podcasters. A national cap on broadcasters to protect viewpoint diversity and competition makes no sense in a media marketplace with so many ways for video content to reach consumers today. Indeed, allowing broadcasters to achieve greater scale in such a media environment is unlikely to have an adverse impact on viewpoint diversity or competition.

29. In any event, any relevant concerns about viewpoint diversity or competition can be raised and, if appropriate, adjudicated by the Commission in the context of its review of any broadcast transaction.

2. The Rule Is Not Necessary To Promote Localism

30. Notwithstanding its conclusion that a national cap is not necessary to promote its diversity and competition goals, the Commission decided to retain a cap in 2003 to promote its localism goal. We now find that the *ex ante* 39% cap is no longer necessary to serve this one remaining purpose. Rather, concerns regarding localism can be addressed by the Commission in the context of specific transactions.

31. As the Commission has explained before, to maximize their national audience, the Big Four networks (*i.e.,* ABC, CBS, FOX, and NBC) traditionally have acquired their own local broadcast stations (typically in the largest television markets) and entered into affiliation agreements with station owners throughout the rest of the country. Through this affiliation model, the Big Four networks benefit by obtaining wide-scale delivery of their programming, and affiliates benefit by obtaining access to network programming. By contrast, many local affiliates historically have aired local programming, including local news, in time slots not occupied by national network programming. Television viewers benefit from localism to the extent that their affiliated stations have the latitude and resources to produce and air local programming, as well as the incentive and ability to preempt national network programming in favor of local news or other programming that is potentially of greater value or importance to their local audiences and better serves local needs and interests. This network/affiliate model has long sought to balance two competing interests: that of broadcast networks, which are economically motivated to ensure that their programming appeals to a nationwide audience and is carried broadly by affiliates; and that of local affiliates, which are economically motivated to attract viewers and advertising dollars by tailoring their programming to the tastes of their local audiences and by inducing networks to air programming that is responsive to their communities' needs and interests.

32. The central factor in the Commission's 2003 decision to retain the national cap was its consideration of the ability of affiliated television stations to promote localism by: (1) influencing through collective negotiation the programming that networks provide and (2) preempting network programming in favor of programming that appeals more to the needs and interests of their local communities. The Commission acknowledged that it had not taken this factor into account in its determination in 1984 that the rule should sunset after a transition period. It noted that in 1984, the Commission had looked, however, at whether group station owners provided less or lower quality local news and public affairs programming than single station owners and had found no evidence that such was the case. In fact, the Commission found the opposite to be true. Similarly, the Commission concluded in 2003 that the national cap is not necessary to promote a higher quality or quantity of local news programming.

33. Nevertheless, after analyzing preemption rates, the Commission in 2003 found that affiliated stations act on their economic incentive to serve their local audiences by preempting network programming at greater rates than network-owned stations do, which is not surprising given networks' interest in the widest distribution of their programming in order to maximize their advertising and syndication revenues. The Commission pointed to data showing that affiliated stations preempted an average of 9.5 hours of prime time programming in 2001, as compared to an average of 6.8 hours preempted that year by network-owned stations. The Commission listed numerous specific examples of affiliates protecting local viewing interests by raising concerns with networks about certain programs and/or by preempting those programs. The Commission concluded that affiliates' ability to affect program selection is a benefit to viewers and that eliminating the cap would shift the balance of power toward the networks in a way that would disserve the Commission's localism policy. The Commission noted its finding in the *1998 Biennial Review Order* that ''affiliates 'play a valuable counterbalancing role' to network programming decisions by exercising their independent programming discretion regarding what programs best serve the needs and interests of their local communities.'' The Commission concluded that preventing a network from achieving a greater national audience reach than its affiliates have collectively serves the Commission's localism goal by keeping in check the network's power over its affiliates.

34. However, in today's media marketplace, the Commission determines that restricting the national audience reach of station owners through an *ex ante* 39% cap is no longer the best way for the agency to maintain the balance of power between networks and their affiliated stations. Rather, the Commission can examine the dynamics between networks and affiliates in the context of specific transactions. In making this change, we note that networks do not depend on affiliates for programming distribution to the same extent as they did in the past. As described in the *Nexstar-TEGNA Order,* ''[w]e have entered a new streaming age.'' Now networks can reach viewers directly by placing their programming on their associated streaming platforms, such as Peacock, Disney+, Paramount+,

and FOX One. The streaming services owned by the parent companies of the Big Four networks reach tens of millions of viewers. Thus, there is less incentive for networks to acquire local stations as a means of controlling the distribution of their programming such that an *ex ante* 39% cap is no longer the best approach.

35. Notably, the national cap currently affords the networks plenty of headroom to acquire more local television stations, and yet all four of the major networks remain well below the 39% limit. With the UHF discount, the Big Four network owners currently reach through their owned stations the following percentages of the national television audience: ABC owns stations reaching 20.7% of the national audience; CBS owns stations reaching 21.8% of the national audience; FOX owns stations reaching 24.2% of the national audience; and NBC owns stations reaching 19.4% of the national audience. Moreover, all Big Four networks are owned by large conglomerates engaged in multiple enterprises and therefore derive substantial revenue from other lines of business besides their network-owned stations. Indeed, the total number of stations owned by the Big Four networks has decreased since the *2002 Biennial Review Order.* For these reasons, we are not concerned that repealing the cap will lead to a higher concentration of network station ownership and further erode the network/affiliate balance of power. Regardless, the networks comprise only a small subset of potential station buyers, and any such concerns about their ownership concentration, where identified as the product of a specific transaction, can be considered as part of the Commission's transaction review process. Given that the networks' power over their affiliates has become less contingent upon station ownership, the bright line 39% national cap is not the best way for the agency to limit networks' negotiating leverage with affiliated stations. Further indication that the 39% national cap is not serving its purpose is the fact that the affiliates no longer seek a two-tiered cap as they did in 2018, when they proposed that network-owned stations be subject to a 39% cap with no UHF discount but that the rule be relaxed for non-network-owned stations. It is telling that the affiliates in their 2025 comments do not object to the rule being repealed for network-owned stations despite their claim of increasing network power.

36. This is not to say that there are no relevant differences between affiliates owning more television stations compared to networks owning more television stations. The Commission continues to have concerns regarding the balance of power between these two types of station owners. But any differences between affiliate or network television station ownership can be taken into account in the context of a specific transaction.

37. Not only is the national cap no longer necessary to maintain the balance of power in the network/affiliate relationship, but neither has it been effective in doing so. The market capitalizations of the Big Four networks are multiples of those of station groups owning affiliated stations. The affiliates point out that the networks, despite previously paying their affiliates for distributing their programming, now demand reverse compensation fees from the stations in exchange for their affiliation. These fees, which typically are tied to the retransmission consent payments stations receive from MVPDs, now total approximately one-half of the retransmission consent fee revenues that a local station receives on average. And by some accounts, certain networks are now charging fixed reverse compensation fees that are in excess of the station's retransmission consent revenues. In addition, the affiliates contend that networks control not only the negotiations with online video providers for the right to stream a station's local signal but also that they demand a share of the negotiated licensing revenues of the station's online streaming rights.

38. The affiliates further claim that networks exert their negotiating power by imposing unreasonable terms and conditions in affiliation agreements, such as limitations on preemption rights. The ability to preempt network programming remains an important means through which local stations can reflect the tastes and needs of the communities they serve. When the Commission last reviewed the national cap as part of the *2002 Biennial Review Order,* affiliates, at that time, described how increased network leverage had led, over time, to networks' rising resistance to affiliate preemptions and to affiliates' declining use of preemptions. In the current proceeding, affiliates maintain that preemption allowances ''in network affiliation agreements, where they exist, remain increasingly crabbed and financial penalties for unauthorized preemptions high, and loss of affiliation remains the ultimate penalty.'' As evidence, they submit numerous examples of preemption provisions that the CBS, FOX, and NBC networks have imposed in their affiliation agreements. Nonetheless, they state that ''[e]ven in the face of these restrictions and possibly severe penalties, affiliates do still preempt network programming'' given that ''[a]ffiliates have a countervailing and independent duty, as broadcast licensees, to serve the public interest,'' which they claim to fulfill ''by making independent programming decisions to serve their individual local communities—by producing their own local news, sports, weather, and public affairs programming and by making ultimate decisions about which programs, including network programs, best serve their local audiences.'' They describe various occasions when affiliated stations have preempted network programming, including to provide local coverage of the shooting at Marjory Stoneman Douglas High School, Hurricane Irma, tornado warnings, local parades, local telethons, and sporting events of local interest. They posit that affiliated stations would preempt network programming more often ''if the network grip were not so tight.''

39. The national cap has not prevented this growing imbalance in the network/affiliate relationship, and eliminating the cap will not worsen it given not only networks' decreasing incentive to acquire local television stations as a means of controlling the distribution of their programming, but importantly and more fundamentally the Commission's determination here that any such issues can be addressed and mitigated as appropriate in the context of any particular transaction.

40. Furthermore, if warranted, network power over affiliates likely could be curbed more effectively through more direct mechanisms than a blanket rule like the national cap. For example, § 73.658 of the Commission's rules affords affiliates various protections in their negotiations with networks, including with respect to program preemption, territorial exclusivity, and station rates for the sale of broadcast time. Among its options, the Commission could enforce these existing rules more rigorously, consider adopting new rules that might be warranted, or ensure that affiliate concerns are addressed when reviewing proposed station acquisitions. Indeed, a closer look at the network/affiliate relationship is already underway at the Commission in order to gather information regarding what, if any, more targeted measures should be taken to ensure affiliated stations have the leverage they need to meet their public interest obligations.

41. The networks' ability to migrate their programming to streaming platforms not only has lessened their

incentive to purchase their own local television stations, but it also has weakened affiliates' bargaining power by reducing networks' reliance on affiliated stations for programming distribution. Despite this shift, affiliated stations remain an important distribution channel for network programming, and station groups therefore could boost their bargaining strength by increasing their ownership of affiliated stations. The more stations affiliated with a particular network that a station group owns, the more leverage it has with that network in negotiations regarding reverse compensation fees, preemption rights, access to network programming, and so forth. Additional leverage would help preserve affiliated stations' ability to influence network programming through collective negotiation and to preempt network programming in favor of programming that better serves the local community—the bases for which the Commission retained the national cap in 2003. As one station group owner explains, ''[f]or broadcast affiliate owners to have a stronger hand in negotiations with their networks, those affiliate owners need to be able to achieve greater scale, putting them on more even footing with their networks, which now have their own non-broadcast national distribution channels.'' By limiting national audience reach, the national cap constrains a station group's ability to purchase more affiliated stations as a way to maintain its leverage vis-à-vis networks' increasing bargaining power. According to that group owner, ''[w]ithout the ability to obtain greater scale, owners of local network affiliates remain at a massive disadvantage in negotiating with networks, threatening the ability of local broadcasters to survive and deliver essential local news and other locally-focused programming.'' Thus, we find that the national cap has become an ineffectual tool for promoting localism because, rather than preserving a balance of power, it may be exacerbating an imbalance of power. For these reasons, we find that it is no longer the case that eliminating the cap would ''shift the balance of power with respect to programming decisions toward the national broadcast networks in a way that would disserve our localism policy.'' In fact, allowing station groups to achieve greater scale may promote our localism goal depending on the facts of any particular case.

42. For the reasons discussed above, we conclude that the national television multiple ownership rule is no longer serving its intended purpose to promote localism; nor is it necessary to promote the Commission's other media policy goals of viewpoint diversity and competition. On this basis, we therefore find that the rule is not serving the public interest, convenience, or necessity, and we repeal § 73.3555(e) of the Commission's rules.

*B. Case-by-Case Review Is a Better Way To Promote the Commission's Goals*

43. As discussed above, the Commission must review all applications for television license transfers and assignments to evaluate whether approval would serve the public interest. Elimination of the rule does not eliminate the Commission's obligation to weigh the potential benefits and harms specific to a proposed transaction. Rather, it ensures that proposed transactions that otherwise would have been presumed not to be in the public interest under the national cap are reviewed on their individual merits. On the one hand, opponents of the national cap argue that, as a general matter, further consolidation will produce public interest benefits, namely furtherance of the Commission's localism goal and advancement of innovative technologies, such as ATSC 3.0. On the other hand, proponents of the national cap warn that further consolidation will result in public interest harms, such as a decrease in localism, an increase in retransmission consent fees, and a loss of journalists and other communications workers. We respond to commenters' arguments below. We note, however, that to the extent that commenters forecast harms as a result of the rule's repeal, those harms would occur, if at all, as a result of specific transactions. This action to repeal the rule will neither create harms nor affect our ability to assess and address any particular concerns about the potential effect of a proposed transaction.

44. Moreover, our decision to eliminate an outdated and overly restrictive bright line limit, in favor of a more flexible approach, is consistent with the approach the Commission has taken with respect to other ownership restrictions, including in other spectrum bands and services. It is undisputed, and abundantly evident in the record of this proceeding, that the communications industry (broadcast television included) has undergone seismic changes over the course of several decades. Seeing this transformation on the horizon, Congress, in the 1996 Telecommunications Act, set out to ''promote competition and reduce regulation.'' Consistent with those objectives, and in recognition of dramatic changes in the marketplace, the Commission's rules have evolved over time such that many *ex ante* restrictions have given way to case-by-case review. For instance, the 1996 Telecommunications Act led to the removal of restrictions on the nationwide ownership of broadcast radio stations and the cross-ownership of cable systems and broadcast television stations. Similarly, the Commission no longer restricts MVPD ownership via horizontal or vertical restrictions. More recently, the Commission also eliminated restrictions on the cross-ownership of newspapers and broadcast stations as well as cross-ownership of radio and television stations.

45. In addition to its actions with respect to media ownership limits, the direction the Commission has taken over the past twenty plus years in the mobile wireless sector also proves instructive. In that context, the Commission once maintained spectrum aggregation limits that strictly limited the total megahertz of spectrum across certain spectrum bands that a licensee could hold in a geographic area. In 2001, the Commission decided to eliminate this so-called spectrum cap, with the final sunset of the cap occurring in 2003. The Commission found, at the time, that with the evolution of competition in the market, the rule was no longer necessary in the public interest to serve its intended purpose and it was, therefore, ''no longer appropriate to impose overbroad, *a priori* limits on spectrum aggregation that may prevent transactions that are in the public interest.'' In the absence of a rigid spectrum cap, the Commission, for more than two decades, has employed a case-by-case approach, guided by the use of a ''spectrum screen'' that has evolved over time, through both transaction and rulemaking decisions, to keep pace with developments in the wireless industry.

46. In keeping with that approach, the end of a strict cap on national broadcast television ownership by no means represents the end of Commission oversight regarding the transfer of ownership of broadcast television stations. Rather, the overall shift away from rigid limits, and toward a more nuanced approach (which our current action also reflects) has proven nimble and provided the Commission with much needed flexibility in a rapidly changing environment, allowing it to consider, and reach determinations regarding, which transactions would, or would not, serve the public interest. Under this case-by-case approach, and

consistent with the Commission's statutory public interest review, it has long been true—and it will remain so—that some transactions receive approval, while others do not. Ultimately, approval of any given transaction will continue to depend on the Commission's analysis of the transaction's potential benefits and harms and the likelihood that any potential harms can be mitigated by the imposition of merger conditions. In the discussion below, we address arguments that a case-by-case approach allows for more subjective decision-making than bright line rules do. We provide some initial guidance regarding the kind of information that would inform our review of any non-local effects of a television merger, particularly with respect to allegations of potential harm from such effects. We anticipate that such transactions processed under a case-by-case approach will help to refine and further develop these guideposts and criteria.

1. Potential Transaction-Specific Benefits

a. Increase in Local Programming

47. As suggested above, instead of promoting localism, the national cap may be undermining it by preventing the Commission from approving specific transactions that promote localism (*e.g.,* transactions that would improve the ability of local television stations to access additional capital and advertising revenue needed to invest in local programming). Repealing the rule will provide the Commission the opportunity to analyze whether a particular transaction would result in increased investment in local news coverage and other programming of local interest.

48. There is considerable debate in the record over whether the national cap prevents station groups from competing effectively with national and global technology and media conglomerates, which some commenters refer to as Big Tech and Big Media, for the revenues that local broadcasters need to serve their communities. The broadcast industry argues that station groups need economies of scale in order to compete for viewers and advertisers with Big Tech and Big Media, which enjoy unrestricted reach. Several commenters cast the threat to the broadcast industry as existential. They argue that "[t]he remedy is unshackling local broadcasters by eliminating the national ownership cap, which will allow broadcasters to achieve greater scale and synergies and challenge Big Tech and Big Media gatekeepers."

49. Proponents of retaining the national cap are not persuaded. They assert that station groups are not as vulnerable as they claim, as evidenced by their statements to investors touting their company's profit performance and favorable business outlook. For example, they quote Nexstar's Chief Executive Officer stating that "[Nexstar's] record-breaking top line financial performance . . . [and] record-breaking distribution revenue further validates the power and sustainability of [its] highly profitable business model." They provide financial data purporting to show that Nexstar, Sinclair, Scripps, Gray, and TEGNA generally experienced healthy growth from 2016 to 2024 in terms of operating revenue, advertising revenue, and political advertising revenue.

50. Proponents of retaining the national cap further argue that comparing local broadcast licensees, which have unique public interest obligations and regulatory protections, to Big Tech and Big Media is an apples to oranges comparison because Big Tech and Big Media do not provide local news and other locally produced content. One commenter, for example, contends that "[w]hile there have indeed been market and technological changes, broadcasters misrepresent the reality of how these changes have affected broadcasting's profitability and local broadcasting's continued unique role relative to streaming services and Big Tech." These commenters argue that, even if they were direct competitors, eliminating the national cap would not let station groups achieve equal footing with massive conglomerates such as Google, Apple, Amazon, Netflix, DIRECTV, Verizon, Comcast, Disney, Paramount, and Fox.

51. It is not necessary for us to resolve this debate in order to recognize that the broadcast industry as a whole has been experiencing declines in both viewership and advertising revenue for decades. A recent Nielsen study reported that viewership of streaming services has surpassed that of broadcast and cable combined. Other data show that "the ratings of the top-rated scripted program on broadcast TV has fallen 72.1 percent since 2004 . . . ; by 78.3 percent since passage of the 1996 Telecommunications Act; and by 86.4 percent since the mid-1980s." BIA data show that total advertising revenue (over-the-air plus digital) for television stations fell 42.9% from 2000 to 2024 on an inflation-adjusted basis. In addition, local broadcasters now control only 28.7% of the local advertising-supported viewing market, while 42.4% of that market goes to streaming services. As the Media Bureau noted in the *Nexstar-TEGNA Order,* both streaming services and cable providers offer "targeted and DMA-wide advertising options" that are "real and competitive substitutes in any market for local spot advertising."

52. Station groups argue that expansion through the elimination of the national cap will improve their ability to provide programming that promotes the Commission's localism goal. Broadcasters describe the high cost of gathering and producing local news content. They also decry the rising expense of securing distribution rights to live sports programming of interest to their local communities given increasing migration of live sports programming to non-broadcast channels and streaming platforms. They claim that allowing station groups to reach more viewers will enable them to attract additional advertising and investment capital needed to improve local service. Broadcasters argue that the national cap creates "a vicious circle" by restricting broadcasters' audiences and advertising revenues, which hinders their ability to produce and/or acquire quality programming and to obtain investment capital, which in turn further impairs their ability to attract viewers and advertising dollars, and thus their ability to invest in local journalism.

53. We share station groups' concern that, with the increase in network bargaining power over their affiliates that has resulted from the rise of online video distribution and other secular changes in the media landscape, the returns on local programming investments by affiliates have been reduced due to the networks now capturing a larger share of the profits from those investments. With the rising leverage of the networks over their affiliates, the returns on local programming investments, and therefore the total dollars invested in local programming, would be reduced primarily for three reasons. First, as networks extract an increasing share of the retransmission consent fees that MVPDs pay to carry the local network affiliate, the returns on local programming investments decline because the affiliate retains a lower share of the returns on such investments. Second, networks negotiating the online distribution rights and retaining a share of these revenues similarly would directly reduce the return on local programming investments. Third, network-imposed limitations on preemption directly limit the amount of local programming that an affiliate can produce and air. Furthermore, the imbalance of power

between networks and affiliates that now exists is exacerbated by our artificial cap on station ownership because it does not allow station owners to sufficiently consolidate and restore their bargaining position vis-à-vis the networks.

54. We believe that eliminating the national cap will serve to allow affiliates to restore their leverage in negotiations with networks, which will promote the public interest by providing affiliates with the ability to use their greater returns to invest in local programming. To the extent that the national cap is preventing station groups from increasing investment in local news and other content of local interest, we agree with broadcasters that the cap is not only unnecessary to promote our localism goal but that, in fact, it likely is undermining it. That possibility, although not a basis for our decision to repeal the rule, lends support to our conclusion that the rule is no longer serving the public interest. We will evaluate proposed transactions on a case-by-case basis to determine, among other things, whether approval would result in a higher quality and quantity of local programming on the applicants' television stations.

55. Several broadcasters claim that expanding their audience reach across other local markets already has enabled them to produce a higher quality and quantity of local content. One commenter provides data showing that during a period of consolidation between November 2011 and November 2023 when the number of different television station groups fell from 140 to 62, the number of local news telecasts increased by 41.7% and the hours of local news increased by 49.7%. According to one station group owner, when it acquired the licenses in 2021 of television stations KUPX in the Salt Lake City market and KMCC in the Las Vegas market, neither station aired any local news. It states that, under its ownership, KUPX now airs 25 hours per week of local news and KMCC now airs 21.5 hours per week of local news. Among other examples it provides, it touts its addition of 15.5 hours per week of local news to KCDO's schedule after it purchased the station in 2020 and combined it with station KMGH in the Denver, Colorado market. Further, it credits its ability to leverage the resources obtained through its increased scale for its addition of hundreds of hours of local sports to various stations it owns and for the acquisition of its broadcast rights to a number of women's sporting events and games.

56. Likewise, another group owner claims that "[its] own experience demonstrates that the efficiencies and resources available to larger station groups lead to expanded news and other local coverage." It states that between its 2019 acquisition of Tribune Media Company (Tribune) and 2024, its stations increased their total local news coverage by more than 28,000 hours and won hundreds of journalism awards annually. It further states that, during that period, its stations added a total of more than 9,000 hours of local lifestyle programming and almost 800 hours of local political programming. It contends that its reach and the resources made possible by scale enabled it to host 74 political debates or forums leading up to the 2024 election. In addition, it describes how resource sharing among its stations allows it to provide continuing weather and safety information to communities affected by hurricanes and other natural disasters.

57. These examples demonstrate that allowing station groups to grow and expand their audience reach can promote the Commission's localism goal. This point is particularly salient in the case of a station that is without the resources to produce local news or is likely to go dark without some form of relief. As some broadcasters argue, "[t]o the extent individual stations are financially struggling, repealing the national cap would allow station groups with healthier balance sheets to expand into new markets, acquire those stations, and provide those communities with more robust locally-oriented programming."

58. In reviewing proposed transactions, we will consider all arguments supporting or opposing a finding that approval of the transaction would promote localism. Thus, rather than presume that any deal that exceeds the cap would not be in the public interest, by repealing the rule, we will consider and potentially approve specific transactions based on their individual merit.

b. Increase in Innovation

59. Another potential benefit of allowing broadcasters to achieve greater scale via transactions approved through the Commission's case-by-case approach could be their improved ability to invest in innovative technologies and services, such as ATSC 3.0, to the benefit of consumers. That is, the rule's repeal will mean that the Commission will evaluate each proposed transaction on its individual merit, including whether grant would enable the merged entity to devote additional resources to the deployment of ATSC 3.0, among other innovations, without first needing to show that special circumstances warrant a waiver. In the *2002 Biennial Review Order,* the Commission posited that the national cap encouraged innovation in the television industry because different station groups were likely to develop different types of services and offerings, which the Commission concluded would be particularly beneficial in facilitating the impending transition to digital television. With the rollout of ATSC 3.0, the television industry is again on the cusp of a technological transition. However, given the changes to the media marketplace in the more than 20 years since the Commission's conclusion that the national cap would promote innovation in the transition to digital television, we now find that the national cap may be hindering, rather than promoting, investment in innovative developments by limiting broadcasters' ability to expand their operations and achieve economies of scale in the deployment of new technologies. With respect to innovation, once again, a principal advantage of removing an *ex ante* barrier in the national cap is that the Commission will consider transactions on their individual merit, rather than presume that deals in excess of the bright line limit would not be in the public interest even if they otherwise would promote innovation.

2. Potential Transaction-Specific Harms

a. Decrease in Local Programming

60. Numerous commenters contest the argument that further consolidation among station groups will promote localism. They argue that consolidation leads to a homogenization of news content, fewer resources devoted to local journalism, cuts to local newsroom staffs, and corporate takeover of editorial decision-making. They assert that empirical research shows that "the larger broadcast conglomerates *do not* invest freed resources into local content and coverage." They posit that economies of scale and scope are not achieved unless local news and local programming are replaced with centrally-produced programming. Similarly, they point to a study finding a prevalence of duplicated news content when stations are under common ownership or control, which the study's authors call "a direct and unambiguous form of the achievement of economies of scale." Several commenters criticize Sinclair's use of "must-run" news segments, where local news anchors across Sinclair's stations are required to read from the same script or to air a news story that was produced at Sinclair's national headquarters. One commenter predicts that "[i]nstead of

competing for the approval of viewers by investing in news and other local programming, broadcasting conglomerates would likely take any relaxation of the national ownership cap as encouragement to compete for scale alone—pursuing mergers that swallow up the last semblance of diverse voices in the broadcasting marketplace, and pocketing the savings for shareholders rather than spending them on viewers.''

61. In addition, commenters submitted a 2018 study by Gregory J. Martin and Josh McCrain, political scientists then with Emory University, that compared stations acquired by Sinclair from Bonten Media Group Holdings to other stations operating in the same markets. The study found that Sinclair's station acquisitions led to ''substantial increases in coverage of national politics at the expense of local politics.'' However, another study in 2024 by these same authors and Nicola Mastrorocco and Arianna Ornaghi widened the analysis of local news coverage to include stations acquired by Nexstar and Gray, as well as Sinclair. Consistent with their earlier research, they found that news coverage of local events and local politics dropped by about 10% on the Sinclair stations. However, their data showed an increase in local news coverage by about that same amount on the stations acquired by Nexstar. The data showed no real change on the stations acquired by Gray. Therefore, the study shows that the effect of consolidation on local news coverage varies by merger, with some mergers leading to decreases in local coverage, some leading to increases, and others having no effect. Furthermore, viewers in local markets have an interest in national and regional political issues, and many of the larger broadcast groups are able to invest in such reporting that otherwise would be unavailable in the market or provided solely by national news networks.

62. We acknowledge that there are arguments on both sides of the question regarding the effects of consolidation on investment in locally oriented programming. However, given that repealing the rule could help restore the balance of bargaining power in the network/affiliate relationship, which ultimately should have a salutary effect on station revenues, we believe that the better course is to remove the national cap and replace it with a case-by-case approach. We reiterate that removal of the cap will not itself lead to any direct or inevitable harm given the Commission's obligation to review all proposed transactions. Moreover, review of applications for transfers and assignments, license renewal applications, and complaints filed against a station offer the Commission a more targeted means of ensuring that local stations are meeting their public interest obligations, based on the record in a particular proceeding, rather than a rigid bar proscribing certain transactions that may be in the public interest.

63. We believe that, regardless, the need for Commission action likely will be mitigated by market forces. Numerous commenters maintain that television local news remains one of the most relied upon and trusted sources of news among consumers. They further argue that local news, live sports, weather and traffic reports, and emergency information are the types of offerings that differentiate local broadcasters from other video programming providers. As expressed by one commenter, ''relaxation of the National Cap will not change the enduring incentive of broadcasters to produce quality local content, because quality local service is simply sound business.'' Another commenter adds that ''[l]ocal programming and local community service are key to allowing television broadcasters to differentiate themselves in the sea of voices that have invaded the contemporary video programming marketplace.'' We therefore reject the suggestion that retention of the national cap is justified given TEGNA's plan to expand its local news operations despite being subject to the cap. If anything, the claim regarding TEGNA supports the argument that removing the cap will not reduce broadcasters' incentive to invest in local news coverage, such as by expanding news staffs, adding news anchors, and devoting more time to local news stories. To the extent that stations are incentivized to invest in local programming as a means of differentiation, the market will serve as a check against station owners reducing investment in local journalism and other local content. Nevertheless, in reviewing a proposed transaction, we will take into consideration any and all concerns that market forces would be insufficient to negate the transaction's potential harms.

64. In light of our new approach replacing the national cap with case-by-case review, we provide initial guidance on our anticipated approach to case-by-case review of the potential transaction-specific harms premised on national reach identified in this Order should they be alleged in a particular transaction in the future. In doing so, we do not seek to comprehensively identify every consideration that could be relevant in the future, but we simply highlight certain implications particularly relevant in light of our analysis in this Order.

65. With respect to concerns about decreases in local programming, and local news in particular, alleged to result from the post-transaction national reach of a broadcast group, a threshold consideration will be the transaction-specific nature of any alleged harms. The record reveals the financial challenges posed by producing high-quality local news and the fact that not all local television stations broadcast local news. Thus, we will expect oppositions to a transaction based on local news concerns to draw any comparisons to the likely marketplace *status quo* and likely trajectory absent the transaction, rather than some hypothetical ideal marketplace not grounded in practical realities.

66. As to the merits of any alleged transaction-specific concern about local news, given the record evidence that local programming, including local news, is a competitive advantage for local broadcasters, we will expect oppositions to a transaction based on local news concerns to explain why that incentive is unlikely to exist or why the broadcaster is unlikely to act on that incentive in a given transaction. In conducting such an analysis, historical experience involving the parties at issue is likely to be relevant. This includes the practical experience of viewers in communities where the potential acquiror expanded into new markets in the past. Such history is not in itself dispositive insofar as that history is distinguishable or where such issues are mooted by commitments by the merging parties. But giving due consideration to the practical experience of viewers is a critical way to ensuring our case-by-case approach truly best protects the public interest in the markets at issue, consistent with our expectations.

b. Increase in Retransmission Consent Fees

67. Any concerns regarding the effect a particular transaction may have on retransmission consent negotiations can be addressed within the context of the Commission's review of that transaction. Therefore, we disagree with those commenters that argue that the Commission should retain a national ownership cap to preserve a balance of power between broadcasters and MVPDs, including small MVPDs, in retransmission consent negotiations. We note, at the outset, that the national cap—a structural ownership rule that applies nationwide—historically has not been intended as a vehicle for addressing concerns about leverage in retransmission consent negotiations.

Instead, retransmission consent negotiations are governed by a specific set of behavioral rules, including a good faith negotiation standard that applies to both broadcasters and MVPDs.

68. Moreover, the Commission previously has found that, in general, the public is well served when marketplace mechanisms can be left to govern such negotiations as much as possible. Over the years, Congress and the Commission have reviewed, and in some cases modified (or declined to modify), the retransmission consent rules as warranted in light of evolving marketplace behavior (*e.g.,* prohibiting joint negotiations for two stations in a given geographic market where the two stations are not commonly owned). We note that, in addition to advocacy in this proceeding, parties are free to seek further clarification or modification of the Commission's retransmission consent rules, including the good faith standard, to address areas where they have specific concerns. Given that the Commission has separate rules that directly govern the retransmission consent process—something the national cap has never been intended to do—general issues related to retransmission consent are best addressed in a rulemaking proceeding focused on those rules.

69. It should also be noted that the Commission has not previously identified or defined a non-local (*e.g.,* national or regional) market for retransmission consent. Instead, the Commission has focused on the individual local markets in which the licensing of broadcast television stations occurs. Indeed, if the national cap is removed, the Commission must still review all applications for the transfer of control and assignment of licenses and authorizations to ensure that the public interest would be served by approving the applications. We recognize that retransmission consent issues associated with national consolidation may continue to come up in the context of the Commission's individualized broadcast television transaction review. Commenters in those transaction proceedings will continue to be able to raise transaction-specific issues in the context of a specific combination of broadcast assets and a defined set of facts. Given the state of the video marketplace today, we believe that approach is far more suitable than clinging to a bright line limit that no longer serves its intended purpose and was never intended to address retransmission consent issues.

70. Despite these rules and safeguards currently in place, some commenters argue that the national cap should remain because there is a correlation between station group size and increased retransmission consent fees and that allowing station groups to grow in size would harm MVPD subscribers who will be forced to pay higher bills due to higher programming costs. They contend that increasing or abolishing the 39% national cap would increase the bargaining leverage for a station group by allowing it to threaten blacking out programming across a greater percentage of an MVPD's footprint, thereby enabling the station group to extract a higher retransmission consent fee from the MVPD. These commenters argue that retransmission fees paid by MVPDs have grown exponentially in recent years and that broadcasters will use this increased bargaining leverage to continue raising retransmission consent fees, resulting in more contentious negotiations that will, in turn, lead to more programming blackouts and higher prices for MVPD subscribers. One commenter points out that "[r]etransmission consent revenue increased by 31% from 2019 to 2023 ($11.5 billion to $15.1 billion) and more than *135%* when compared to 2015 levels ($6.4 billion)—despite MVPDs' decline in subscribership." By contrast, broadcast commenters claim the fees are set by the market, they are appropriately priced for the programming's value, they are more affordable than cable programming, and they are slowing in growth. Moreover, the record shows that increases in retransmission consent fees charged by network-affiliated local stations to MVPDs have coincided with increasing reverse compensation fees charged by the networks to their affiliates based on network bargaining power. As commenters note, these payments to national networks are resources that do not go toward additional local news coverage or other local programming. Outside of retransmission consent fees themselves, some commenters also warn against the influence a large station group may have in retransmission consent negotiations, which they claim may enable such groups to induce MVPDs to carry additional programming or to dictate an MVPD's carriage terms in a way that disfavors a competing independent programmer.

71. With regard to concerns about station group leverage in retransmission consent negotiations, two studies introduced into the record reach conflicting conclusions regarding the relationship between station group size and increased retransmission consent fees. DIRECTV introduced a statistical study performed by Dr. Allan Shampine. The study examines the relationship between station group size and retransmission consent fees and concludes that larger station group owners charge higher retransmission consent fees to DIRECTV than smaller station group owners. The study purports to replicate a 2017 study by DISH that was introduced in the docket of the Sinclair-Tribune proceeding (MB Docket No. 17–179). The 2017 study was submitted by DISH in that docket to support allegations that the specific, proposed combination of Sinclair and Tribune would lead to higher retransmission consent fees for the combined company's stations. In his study, Dr. Shampine reviewed DIRECTV's confidential monthly retransmission consent data from January 2023 to December 2024 and found that retransmission consent fees for stations affiliated with the Big Four broadcast networks were higher for affiliates owned by larger groups with the impact of size on fees being "very economically significant."

72. In response, NAB submitted its own analysis from Dr. Jay Ezrielev that refutes DIRECTV's submission and contends that the analysis does not demonstrate a causal relationship between station group size and retransmission consent fees. Dr. Ezrielev argues that Dr. Shampine's analysis does not take into account key variables, such as DMA size and the greater per-household costs of serving small versus large markets. Dr. Ezrielev also asserts that Dr. Shampine's analysis is overly skewed toward small station groups with which DIRECTV can negotiate a below market rate for retransmission consent and does not properly take into account DIRECTV's natural loss of market power when negotiating with a larger station group. NAB further contends that even if DIRECTV pays more to larger broadcast groups than to smaller groups for retransmission consent, that fact does not establish that the rates are anticompetitive or overpriced.

73. Given the conflicting evidence in the record regarding whether, and the extent to which, permitting some level of greater audience reach would affect retransmission consent fees in all, or even most, cases, we do not believe the record justifies retaining a bright line prohibition on all acquisitions that would exceed 39%. To start, even if there may be some evidence that purports to show a correlation between station group size and retransmission consent fees, we do not believe it is reasonable to conclude that larger group owner reach automatically results in retransmission consent fee increases

across all broadcasters, such that a 39% cap remains necessary to limit broadcaster leverage. For instance, not all broadcasters obtain, or even seek, retransmission consent compensation in exchange for carriage. In lieu of retransmission consent compensation, broadcast stations are permitted to choose mandatory carriage of their signal (also known as ''must carry''). As a result, when viewed through the lens of retransmission consent, the rule is likely overbroad because it restricts the growth of all station groups regardless of whether, or the extent to which, they actually seek or intend to seek retransmission consent fees for their stations. With respect to price increases that MVPDs allege would be passed through to consumers, or other direct harms (*e.g.,* increased signal blackouts) that MVPDs allege would follow from broadcasters increasing their audience reach, we note that, ultimately, it is MVPDs that set the prices for their subscribers and that the video marketplace today offers consumers various alternatives beyond a traditional MVPD subscription to access broadcast programming.

74. Moreover, if size equates to influence on pricing, the maxim may hold true on the MVPD side of the negotiation as well, where MVPDs are not bound by bright line limits on their geographic reach. That is, larger MVPDs, many of which have broad geographic reach, may have the ability to drive down prices for retransmission consent. Indeed, gaining scale in order to reduce the amount spent on video programming was a key aspect of several mergers involving MVPDs. Additionally, while smaller MVPDs, in general, may likely pay more for programming than larger MVPDs, they are also permitted by law to designate a qualified MVPD buying group to negotiate on their behalf in retransmission consent negotiations with large station groups to help level the playing field.

75. Furthermore, the Commission, consistent with the direction of Congress, has not found it to be a failure of good faith bargaining where a broadcaster, regardless of its size, enters into different terms and conditions, including different price terms, with MVPDs so long as the different terms and conditions are based on competitive marketplace conditions. The Commission also has not found that increasing a station's national reach leads to a public interest harm in retransmission consent negotiations. Similarly, the Commission has held that an increase in compensation, by itself, is not necessarily a public interest harm, and rather, the Commission found that such harm exists where an increase is not the product of ''competitive marketplace considerations.'' In addition, to the extent greater audience reach permits some stations to increase their retransmission consent fees, additional revenue could serve to strengthen the viability of the station and contribute greater resources to the mission of serving its local community. For the foregoing reasons, we find that concerns about retransmission consent negotiations raised in the record of this proceeding are insufficient to justify retaining a broad structural limit on station ownership that no longer serves its intended purpose. Finally, as noted previously, all station acquisitions will be subject to the Commission's transaction review process, where the Commission will have the opportunity to evaluate any alleged transaction-specific harms and to make a determination as to whether the proposed transaction serves the public interest.

76. Consistent with the analysis above, we provide certain guidance about our anticipated approach to allegations of retransmission consent-related harms premised on an increase in broadcaster negotiating leverage due to increased national reach. A threshold consideration will be the transaction-specific nature of any alleged harms, particularly because the Commission historically has not identified a non-local market for retransmission consent. Oppositions to a transaction premised on cost increases in future retransmission negotiations arising from increased national reach could seek to justify a non-local market definition or would need to support another theory why the increased national reach at issue in a given transaction would cause the alleged harms.

77. Further, the Communications Act circumscribes the Commission's authority with respect to retransmission consent. As a result, we will expect allegations of transaction-specific retransmission consent harms to explain why the alleged concerns should be cognizable in the Commission's review.

78. In the case of alleged harms in future retransmission consent negotiations premised on expanded national reach, we further will expect oppositions to identify why the relative negotiating leverage of the broadcast group would be contrary to the public interest. As discussed above, many MVPDs are themselves large, and small MVPDs have the statutory right to designate a qualified buying group to negotiate on their behalf when dealing with large station groups. For example, evidence or arguments alleging concerns about future retransmission consent negotiations should address whether a broadcast group's increased national reach leads to a material net change in the stakes for the two sides and, if so, whether the change unfairly advantages the broadcasters in negotiations or simply enables the broadcast group to begin to approach comparable negotiating leverage to the MVPD. We recognize that this could turn on a number of specific factors or considerations and we do not seek to catalog them all here.

79. Finally, the ultimate question in our public interest review remains the overall effect on the viewing public. We recognize that this commonly has been the intended focus of retransmission consent-related arguments raised in transactions in the past, but we take this opportunity to confirm our approach in that regard.

c. Loss of Journalists and Other Communications Workers

80. Some commenters argue that eliminating the national cap will harm workers in the broadcast industry. They contend that removing the national cap would allow for greater consolidation in the broadcast industry and that consolidation historically has caused harm to journalists and newsroom staffs when newly consolidated stations centralize their operations in an attempt to increase scale and revenue. They argue that the harms caused by consolidation include lowered employee wages and reduced benefits, a decrease in the total number of jobs, and weakened job security. In addition, they contend that further consolidation will follow this trend and lead to less journalism being produced, which in turn would undermine and harm the Commission's public interest goal of localism. For the reasons below, we find that these labor-related concerns do not justify preserving a bright line limit on station ownership.

81. While commenters raise a valid concern that industry consolidation could result in employment reductions, we also recognize that questions about the viability of broadcast stations include risks to the long-term employment of its workers. As a result, we find that allowing broadcasters to increase their scale could improve long-term employment prospects for workers, particularly in instances where a financially stronger company acquires a station. In addition, we note that the synergies to be gained by transactions currently subject to the national cap are different from the synergies that would be gained from combining ownership of

stations within a local market. As we have noted, removing the national cap does nothing to permit greater consolidation within a local market and therefore does not carry the same risk of elimination of overlapping or redundant operations that would result from the acquisition of an additional station in the market. Rather, repealing the national cap could allow a station group to expand its reach to a new market where it is currently not present, and the acquired station, under new ownership, would continue to compete with the other stations in the market for audience share, advertising revenue, and broadcast employees.

82. Regardless, elimination of the national cap rule would not foreclose the Commission's consideration of such issues in a case-by-case public interest review of individual acquisitions. Therefore, although labor issues historically have been handled and enforced by federal agencies other than the Commission, commenters still will be able to raise transaction-specific labor issues that may be involved in a particular matter.

83. When seeking to raise such concerns, we will expect oppositions to be premised on a proper baseline to ensure the alleged employment-related harms are transaction-specific. In particular, financial challenges in the broadcast television industry make it important to compare alleged post-merger harms against the pre-transaction *status quo* and trajectory that actually was likely absent the transaction. We also will expect oppositions to explain why the alleged transaction-specific labor issues are cognizable by the Commission under its public interest authority under the Communications Act. Finally, we once again will be focused on the ultimate effects on viewers through the broadcasters' continued ability to operate consistent with their public interest duties under the Communications Act and Commission rules.

*C. The Commission Has Authority To Repeal the Rule*

84. Congress has authorized the Commission to adopt, modify, or eliminate broadcast ownership rules, including the national cap, under sections 154(i) and 303(r) of the Communications Act. 47 U.S.C. 154(i). The Commission promulgated and modified broadcast ownership limits pursuant to this authority throughout the decades following the Act's passage in 1934. The Commission adopted a national cap after determining such a rule was necessary to serve the public interest. As with any Commission rule, the agency has the authority and obligation to reexamine the national cap rule in response to changing circumstances and to modify or repeal it if it no longer serves the public interest. Indeed, the Commission has modified its limits on the number of television stations an entity can own several times, raising the limit each time to account for developments in the television industry.

85. Although Congress also has reset the level of the national cap as the video marketplace evolved, Congress has uniformly done so by directing the Commission to modify its rules rather than by enacting a fixed cap into law. In the 1996 Act, Congress instructed the Commission to set its previously modified national cap at a specific numerical percentage. See 1996 Act section 202(c)(1)(b). Specifically, section 202(c)(1)(b) of the 1996 Act directed the Commission to ''*modify its rules* . . . by increasing the national audience reach limitation for television stations to 35 percent.'' Section 202 similarly instructed the Commission to ''modify'' or ''revise'' other media ownership rules and directed the Commission to ''review its rules adopted pursuant to this section and all of its ownership rules'' on a periodic basis. See 1996 Act section 202(b)(1), (c)(2), (e), (h). The use of the term ''modify'' indicates that Congress was prescribing a point to which the Commission would set the national cap, using the Commission's preexisting authority to modify the national cap, and from which the Commission periodically would reexamine the prescribed figures, again under its preexisting authority.

86. Section 202(h) of the 1996 Act could not have been the sole statutory authority granted to the Commission for reviewing the media ownership rules because the Commission, having modified the national cap on multiple occasions prior to 1996, plainly had authority to promulgate or review its media ownership rules prior to adoption of the 1996 Act. An argument that the 1996 Act takes away the Commission's plenary authority over television ownership ignores the fact that Congress chose to have the Commission revise its rules rather than enact statutory provisions and that the 1996 Act directs the Commission to conduct a rulemaking proceeding on local television ownership limits. 1996 Act § 202(c). Therefore, the 1996 Act cannot be read credibly as having rescinded the Commission's rulemaking authority over television ownership.

87. Notably, there are other instances where Congress provided the specific figures the Commission was to use in modifying its rules but similarly declined to enact those limits in statute. For instance, § 202(b) of the 1996 Act specified the precise market size tiers and numerical limits that the Commission was to use in its revisions for the local radio ownership rule. Section 202(e) of the 1996 Act also specified the numerical limits and definition for networks that the Commission was to use in its revisions for the dual network rule. In each of those cases, even though Congress provided the specific language and figures to be used in the rule revisions, the Commission retained authority to modify or eliminate the rule in question, and at Congress's direction, has periodically reviewed those rules ever since. Furthermore, as described above, the Commission promulgated and revised the national television ownership limits many times before the adoption of the 1996 Act, exercising its authority under sections 154(i) and 303(r) of the Communications Act to promulgate and review its media ownership rules. The 1996 Act did not change that. It simply directed the Commission to make revisions under the Commission's preexisting rulemaking authority and review them periodically.

88. In this regard, we find particularly significant the D.C. Circuit's rulings in the *Fox* litigation, which remanded the Commission's 1998 decision to defer any revision of the national cap when the agency examined it two years after the 1996 Act's instruction to increase the cap from 25% to 35%. 1996 Act § 202(c)(1). In doing so, the court rejected the Commission's argument that by setting the line at 35%, Congress had thereby removed the Commission's power to revisit that line should the public interest require. *Fox I,* 280 F.3d at 1042–43. The court explained that the Commission's decision to leave Congress's initial number untouched was improper: ''the choice of 35% rather than any other number determined only the starting point from which the Commission was to assess the need for further change.'' On rehearing, the court again rejected the Commission's argument that Congress set an unchangeable limit, explaining that had Congress wished to take away the Commission's ability to alter the cap, ''it need only have enshrined the 35% cap in the statute itself,'' which it had not done. *Fox II,* 293 F.3d 540.

89. Eight years after the 1996 Act and two years after the *Fox* rulings, Congress again set the national cap at a specific numerical percentage in the CAA. Critically, Congress chose to use the

same language as in the 1996 Act. The CAA amends section 202(c)(1)(B) to instruct the Commission to ''modify its rules . . . by increasing the national audience reach limitation for television stations to 39 percent.'' CAA section 629(1), 118 Stat. at 99 (amending 1996 Act section 202(c)(1)(B) ''by striking '35 percent' and inserting '39 percent' ''). In accordance with that instruction, the Commission amended its rules to revise the national cap to 39%—the level at which it stands today. Echoing the 1996 Act, Congress included no language in the CAA taking away the Commission's rulemaking authority with regard to the cap, even though Congress, as made clear by the D.C. Circuit, easily could have ''enshrined'' the 39% level ''in the statute itself.'' Nonetheless, there is no language in the CAA requiring the Commission to maintain the national cap at 39% indefinitely or for any period of time. That omission is especially significant because Congress was acting against the backdrop of the ruling in *Fox I* and in direct response to the Commission's attempt to increase the national cap in the *2002 Biennial Review Order,* both of which read the language used in the 1996 Act—which Congress incorporated into the CAA—to preserve the Commission's authority to further revise or eliminate the national cap in the future. By using the same formulation as the 1996 Act, Congress did not suggest that it was eliminating the agency's authority to amend its national cap rule. Some commenters suggest that Congress need not retract rulemaking authority from agencies in express statutory language. Even if that were so, the circumstances here (namely of the Commission having so recently concluded it retains authority in the wake of Congress legislating on the matter and the court decision affirming the Commission's conclusion) make it very unlikely that Congress would refrain from making some express statement. As the Supreme Court has explained, ''Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.'' *Lamar, Archer & Cofrin, LLP* v. *Appling,* 584 U.S. 709, 721–22 (2018) (quoting *Lorillard* v. *Pons,* 434 U.S. 575, 580 (1978)); *accord, e.g., Hall* v. *United States,* 566 U.S. 506, 516 (2012). Notably, as pointed out in the *Nexstar-TEGNA Order,* the same Congress that enacted the CAA considered alternative bills that would have enacted a fixed statutory cap as part of the Communications Act, displacing the rules created and maintained by the Commission, but it declined to enact those proposals.

90. The fact that express prohibitory language can be found elsewhere in the Communications Act further illustrates that Congress could have included such language in the CAA, but chose not to do so. The Radio Broadcasting Preservation Act of 2000, which also contains an express removal of the Commission's authority, similarly contrasts with the CAA and the 1996 Act. Along with directing the Commission to modify its low-power FM radio rules, Congress included language that the Commission ''may not . . . eliminate or reduce'' its prescribed rule modifications except ''as expressly authorized by an Act of Congress enacted after the date of the enactment of this Act.'' Radio Broadcasting Preservation Act of 2002 § 632(a)(2). Language rescinding the Commission's ability to modify or eliminate the national cap is not present anywhere in the CAA or the 1996 Act. As another example, Congress codified an existing Commission broadcast ownership rule via section 613 of the Cable Communications Policy Act of 1984. See Cable Communications Policy Act of 1984, Public Law 98–549, 98 Stat. 2779, section 613 (1984). By enshrining that rule into statutory law, Congress ensured that the Commission could not modify or eliminate it. Tellingly, Congress did no such thing with respect to the national cap.

91. For all these reasons, we believe that the Commission's interpretation of its statutory authority to modify or repeal the national audience reach cap is the best reading of the CAA and the 1996 Act. As the Supreme Court has held, ''a legislature says in a statute what it means and means in a statute what it says there.'' See *Conn. Nat'l Bank* v. *Germain,* 503 U.S. 249, 253–54 (1992). Statutory language then must be interpreted to ''mean[ ] what it says and no more.'' See *United States* v. *M.H. Pulaski Co.,* 243 U.S. 97, 107 (1917). Nor can a statute be interpreted beyond its text based ''on the view that . . . Congress 'must have intended' something broader'' than it enacted. *Michigan* v. *Bay Mills Indian Cmty.,* 572 U.S. 782, 794 (2014). In short, the plain text of the 1996 Act and the CAA shows that the Commission has authority to modify or eliminate the national cap.

92. Furthermore, the Supreme Court has indicated that agency interpretations ''issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning.'' *Loper Bright Enterprises* v. *Raimondo,* 603 U.S. 369, 394 (2024) (citing *U.S.* v. *American Trucking Ass'ns.,* 310 U.S. 534, 549 (1940)). Our interpretation here meets these conditions. First, the Commission's interpretation was issued contemporaneously with the relevant statutes. After the 1996 Act was enacted, the Commission considered changing the national audience reach cap under the interpretation that, in directing the Commission to set the national cap at a specific level, the 1996 Act did not curtail the Commission's authority to revise the cap further if deemed necessary in the public interest.

93. Second, the Commission has consistently maintained that it retains authority to repeal or revise both the national cap and the UHF discount since then. In 2013, the Commission, with bipartisan support, tentatively concluded that the CAA did not preclude it from revisiting the national cap or the UHF discount in a proceeding separate from the quadrennial review proceeding. In 2016, the Commission, again with bipartisan support, concluded that it had authority to revise the national cap, including the UHF discount, and characterized the CAA as simply directing the Commission to revise the cap while eliminating the need for periodic review.

94. After undertaking a comprehensive review of the relevant statutory and regulatory provisions, we find no reason to depart from the Commission's longstanding bipartisan position that the Commission retains authority to modify or eliminate the rule establishing the national cap upon a determination that the rule no longer serves the public interest, convenience, and necessity. To properly examine the issue, the *NPRM* in this proceeding sought further comment on whether the Commission has authority to modify or eliminate the national cap and the UHF discount used for measuring compliance with the cap. The *Refresh Public Notice* also sought comment on whether any legal developments have affected the Commission's past conclusions about its authority to implement changes to the national cap and the UHF discount. We conclude that the Commission continues to have the authority to modify or repeal the national cap based on the record of this proceeding and prior determinations.

95. Some commenters argue that the Commission lacks authority to modify the national audience reach because the CAA excluded the cap from the quadrennial review mandated by section 202(h) of the 1996 Act. We are unpersuaded. Section 202(h) requires the Commission to ''review . . . all of

its ownership rules quadrennially'' to ''determine whether any of such rules are necessary in the public interest as the result of competition,'' and to ''repeal or modify any regulation it determines to be no longer in the public interest.'' The CAA added language stating that the periodic review mandated by section 202(h) ''does not apply to any rules relating to'' the national audience reach cap. CAA section 629(3), 118 Stat. at 100. Consistent with the Commission's position, here the CAA expressly refers to any provisions relating to the national cap as ''rules.'' Section 629(3) of the CAA is also notable because, had Congress established the 39% cap as a statute, there would have been no need for a separate provision exempting the national cap from quadrennial review because the Commission would have no authority—under section 202(h) or otherwise—to review a cap enshrined in statute. The express exclusion of the national cap from the quadrennial review thus reinforces our conclusion that the 39% national cap is a rule and that the Commission retains authority to review it outside of the quadrennial cycle mandated by 202(h). As the Third Circuit recognized in *Prometheus I,* the language of section 629(3) of the CAA does not purport to forbid the Commission from accounting for changing market conditions by reexamining rules relating to the national cap *outside of* the quadrennial review process; it simply separates the Commission's decisions to review the national cap from the statutorily mandated review of other media ownership rules that are to occur every four years. *Prometheus I,* 373 F.3d at 397. Nor can the CAA be read to implement an implied repeal of the Commission's general authority to modify its rules, including the national cap rule, since no such intent is ''clear and manifest'' in the text and the law as written is not ''irreconcilable'' with that authority.

96. Furthermore, Congress's decision to remove the requirement that the national cap be subject to statutorily mandated periodic review can be read to serve other purposes that make more sense than implicitly removing the cap from Commission review altogether. Congress's elimination of a rigid review cycle for the national cap effectively gave the Commission additional flexibility and time to evaluate the national television market and determine whether modifying or repealing the cap would serve the public interest. Had Congress not removed the national cap from section 202(h)'s periodic review mandate, the Commission would have been tasked as part of the 2006 quadrennial review with revisiting that particular rule a mere two years after Congress had directed the Commission to change it to 39%. Congress's decision to remove the national cap—set at 39% in 2004—from further review in 2006 thus can be seen, at least in part, as informed by practical considerations that the fixed periodic timetable likely would not have given the Commission sufficient time to assess the marketplace and consider possible changes to the new rule.

97. Other commenters argue that the Commission's interpretation would lead to an absurd result if the Commission could have waived the cap or changed the cap back immediately afterwards from what Congress had just set. But under general administrative law principles, the Commission would have had to have shown that the public interest would have been served by such an immediate waiver or revision of the rule. Administrative procedure constraints would also have required the Commission to seek public comment on whether the existing cap continues to serve the public interest before revising it. As a practical matter, some period of time would have had to elapse to provide an opportunity for debate on the advisability of any possible rule change. In all events, whether the Commission could have justified a change to the national cap shortly after Congress prescribed the figure in 2004, over two decades have elapsed since then, and such concerns can hardly apply to the Commission's decision here to revisit the cap now.

98. The CAA's exclusion of the national cap from the Commission's forbearance authority under section 10 of the Communications Act does not preclude the Commission from altering the cap itself. See CAA section 629(2), 118 Stat. at 100. For one thing, as the Commission has noted, ''the meaning of this provision is unclear given that forbearance authority does not apply to the regulation of broadcasters under Title III of the Communications Act.'' Whatever the import of the provision, as the Media Bureau explained in the *Nexstar-TEGNA Order,* the Commission's ability to forbear from enforcement of its rules is distinct from its power to alter or eliminate those rules.

99. The CAA also provides that any person or entity that exceeds the 39% national cap through a transaction ''shall have not more than 2 years after exceeding such limitation to come into compliance.'' CAA § 629(2), 118 Stat. at 99. This provision simply sets a specific time period for coming into compliance with the rule as it exists. It is not reasonably read to restrict the Commission's discretion to alter the cap. Indeed, the Commission routinely provides grace periods for acquiring parties to come into compliance with existing ownership rules via divestiture when granting applications for assignments or transfers of television station licenses. The provision also states that ''[t]his divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.'' This clarifying language merely restates Commission policy adopted when the national cap based on audience reach was first adopted in 1985 and cannot be read as indicating that population growth was the only congressionally-approved method of avoiding divestiture after exceeding the national cap. We note that this sentence does not include the reference, ''in paragraph (1)(B),'' which some might claim suggests the number is to be unchangeable statutory language. However, given the other references in the CAA to section (c)(1)(B), the second sentence is best understood as also referring to that section (which only directs the Commission to use its rulemaking authority) rather than creating a freestanding statutory cap. Furthermore, as noted earlier, the CAA refers to provisions relating to the national cap as ''rules.'' CAA § 629(3), 118 Stat. at 100.

100. Finally, we see no independent significance to the CAA's various other references to ''the 39 percent national audience reach limitation for television stations in [section 202(c)](1)(B).'' CAA section 629(2), (3), 118 Stat. at 99–100 (amending 1996 Act section 202(c), (h), 110 Stat. at 111–12). This language simply reflects that, at the time Congress enacted the CAA, it had directed the Commission in section 202(c)(1)(B) to revise its rules to reset the national cap to that particular level. While they refer to the then-existing cap, they do not freeze the cap at a particular level indefinitely. The references to the 39% number are to its placement ''in paragraph (1)(B),'' which is the provision of the 1996 Act that directed the Commission to set the cap through its rulemaking authority, which necessarily preserves Commission discretion to adjust its rules as warranted by the public interest.

101. We acknowledge that there are some statements by Members of Congress while the CAA was under consideration, as well as other contemporaneous accounts expressing a

belief that the statute would preclude the Commission from making further changes to the national cap. But these statements are belied by the terms of the legislation that was adopted. As the Supreme Court has reiterated, ''[L]egislative history is not the law. It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute we do not inquire what the legislature meant; we ask only what the statute means.'' *Epic Systems Corp.* v. *Lewis,* 584 U.S. 497, 523 (2018). In similar circumstances, the D.C. Circuit in *Fox I* refused to find a statement ''by the ranking minority Member of the relevant subcommittee of the House'' that the 1996 Act's specification of a 35% cap ''should settle the issue for many years to come'' to dispose of the statute's meaning. *Fox I,* 280 F.3d at 1043.

102. A few commenters assert that the Commission is prevented from repealing the national cap by the Major Questions Doctrine. But that doctrine applies to instances in which an agency claims ''extravagant statutory power over the national economy'' in the absence of clear authority from Congress. See *Utility Air Regulatory Group* v. *EPA,* 573 U.S. 302, 324 (2014). The Commission has held the power to modify or repeal broadcast ownership rules since the Communications Act was passed. It is not regulating outside its area of expertise or invoking expansive power from a narrow statute. And, as we have discussed, nothing in the CAA repeals the Commission's authority to review its rules, even where the ''starting point'' has been set by Congress. *Fox I,* 280 F.3d at 1043.

103. In sum, the best reading of the statute supports the Commission's longstanding position that the Commission retains authority to modify or eliminate the national television audience reach rule upon determining that the rule no longer serves the public interest, and for the reasons we have explained, we have determined that here. We therefore exercise our authority to modify our rules by repealing the national audience reach limitation for television stations in favor of a case-by-case analysis of specific transactions. This, in our judgment, far better serves the public interest in light of the significant changes to the position of television broadcasters in the modern media marketplace.

**Procedural Matters**

104. *Regulatory Flexibility Act.* The Regulatory Flexibility Act of 1980, as amended (RFA), requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that ''the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Public Law 104–121, 110 Stat. 847 (1996); 5 U.S.C. 605(b). Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule and policy changes contained in this Report and Order on small entities. The FRFA is set forth below.

105. *Paperwork Reduction Act.* This Report and Order does not contain proposed new or revised information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104–13 (44 U.S.C. 3501–3520). In addition, this Report and Order therefore does not contain any new or modified ''information burden for small business concerns with fewer than 25 employees'' pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, 44 U.S.C. 3506(c)(4).

106. *Congressional Review Act.* The Office of Information and Regulatory Affairs of the Office of Management and Budget has found that this rule is major under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of this Report & Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

**Final Regulatory Flexibility Act Analysis**

107. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), the Federal Communications Commission (Commission) incorporated an Initial Regulatory Flexibility Analysis (IRFA) in *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule,* Notice of Proposed Rulemaking (*NPRM*), released on December 18, 2017. The Media Bureau sought further written public comment in *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding,* Public Notice (*Refresh Public Notice*), including comment on the IFRA. The comments received are addressed below. This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA and it (or summaries thereof) will be published in the **Federal Register**.

*A. Need for, and Objectives of, the Rules*

108. In December 2017, the Commission adopted an *NPRM* to seek comment on whether to retain, modify, or eliminate its rule limiting entities from owning or controlling broadcast television stations that, in the aggregate, reach more than 39% of the television audience households in the United States. The *NPRM* also sought comment on a component of the rule, which provides a 50% discount to UHF stations for purposes of calculating compliance with the 39% audience reach cap, often referred to as the ''UHF discount.'' In June 2025, the Media Bureau issued the *Refresh Public Notice* seeking to refresh the record in this proceeding. In light of the request to refresh the record, the *Refresh Public Notice* invited comment on any potential effect of proposals on small entities and the IRFA. In the *Report & Order,* we repeal the national television multiple ownership rule, an important step towards modernizing our regulation of the media marketplace.

109. We find that the record demonstrates that eliminating the national television multiple ownership rule serves the public interest, as it is no longer necessary to promote competition, viewpoint diversity, and localism. The Commission has found since 2003 that the rule is not needed to promote competition and viewpoint diversity, which is only more true today in the modern, diverse media marketplace that includes the proliferation of online video streaming options for viewers. On localism, we agree that increased scale will open opportunities for broadcasters to attract additional capital and advertising revenue needed to produce local programming and to improve service to their local communities. We find that a case-by-case review of applications for the transfer and assignment of television licenses is a better way to ensure that the Commission's media ownership goals are being met. Accordingly, we eliminate the national television multiple ownership rule.

*B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA*

110. While no commenter directly responded to the IRFA in this proceeding, one commenter references the RFA process. That commenter contends that the Commission's regulatory flexibility analysis under the RFA is insufficient because, in seeking to refresh the record, the Commission ''fails to provide any meaningful analysis of how potential changes to the nationwide audience reach cap or UHF discount might affect small broadcast entities.'' The commenter further states that ''[t]o address this deficiency, the FCC should conduct a comprehensive

RFA analysis before proceeding with any modifications to the national audience reach cap or UHF discount.'' The arguments raised by the commenter fail to acknowledge that the 2017 *NPRM* in this proceeding included the requisite IRFA and that the *Refresh Public Notice* sought further comment on that IRFA. The Commission has reviewed the record in its entirety and has evaluated the impact of this final action on small broadcast entities, and now publishes this FRFA, consistent with the requirements of the RFA.

*C. Response to Comments by the Chief Counsel for the Small Business Administration Office of Advocacy*

111. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy, and also provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules in this proceeding. The SBA Office of Advocacy did file comments in another Commission proceeding (GN Docket No. 25–133) that discuss the national television multiple ownership rule, 47 CFR 73.3555(e).

*D. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply*

112. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the adopted rules. The RFA generally defines the term ''small entity'' as having the same meaning as the terms ''small business,'' ''small organization,'' and ''small governmental jurisdiction.'' In addition, the term ''small business'' has the same meaning as the term ''small business concern'' under the Small Business Act. A ''small business concern'' is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA. The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.

113. Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by our actions. In general, a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 34.75 million businesses. Next, ''small organizations'' are not-for-profit enterprises that are independently owned and operated and are not dominant in their field. While we do not have data regarding the number of non-profits that meet that criteria, over 99% of nonprofits have fewer than 500 employees. Finally, ''small governmental jurisdictions'' are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand. Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.

114. The rule changes adopted in the *Report and Order* will apply to small entities in the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS) codes and corresponding SBA size standard. Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the adopted rules will impact a substantial number of small entities. Where available, we also provide additional information regarding the number of potentially affected entities in the identified industries below.

TABLE 1—2022 U.S. CENSUS BUREAU DATA BY NAICS CODE

| Regulated industry (footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS code | SBA size standard (million) | Total firms | Total small firms | % Small firms |
|---|---|---|---|---|---|
| Television Broadcasting Stations | 516120 | $47 | 413 | 316 | 76.51 |

TABLE 2—BROADCAST ENTITY DATA

| Broadcast station owners (as of August 8, 2025) | SBA size standard ($47 million) | | |
|---|---|---|---|
| Affected entity | Number commercial licensed | Small firms | % Small entities |
| Television Stations | 171 | 142 | 83.04 |

*E. Description of Economic Impact and Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities*

115. The RFA directs agencies to describe the economic impact of adopted rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.

116. In this *Report and Order,* we repeal the national television multiple ownership rule. Accordingly, small and other entities that want to purchase or control broadcast television stations that, in the aggregate, reach more than 39% of the television audience households in the United States will no longer need to make a showing or otherwise calculate and demonstrate compliance with the rule. We find that there are no reporting, recordkeeping, or other compliance requirements for small entities. After reviewing the record in this proceeding, we received no concerns about these types of burdens on small entities. In addition, as the *Report and Order* explains, eliminating the national cap will not permit any more or less consolidation within a local market and so will not reduce the number of voices in the market or increase the concentration among

stations for small broadcasters in a given market.

*F. Discussion of Steps Taken To Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

117. The RFA requires an agency to provide, ''a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

118. The rule change, eliminating the national television multiple ownership rule, is deregulatory in nature and does not impose or increase regulatory burdens on small entities. In the *Report & Order,* the Commission finds that a case-by-case approach to applications for television license transfers and assignments is the best way to promote the Commission's media ownership goals of localism, competition and viewpoint diversity. Notably, in response to the latest request for comment in the *Refresh Public Notice,* broadcast commenters were unified in their advocacy for complete elimination of the rule. As the *Report & Order* explains, elimination of the rule would not result in a loss of viewpoint diversity or competition in the local markets in which broadcast stations operate. Further, the *Report & Order* finds that eliminating the national cap does not permit any more or less consolidation within a local market and therefore has no effect on the number of voices in the market. Similarly, the *Report & Order* finds that competition within a local market will not be harmed by the substitution of one station owner for another, and preservation of the rule is not needed to promote localism.

119. Some commenters believe an alternative approach of maintaining the national ownership cap will encourage competition and local programming. By contrast, the *Report & Order* makes clear that eliminating the rule will enable broadcasters to gain additional scale, which will allow broadcasters to generate additional revenues that can be used to provide broadcast service to the local community. Creating this flexibility for broadcasters is important, as the *Report & Order* details the loss of viewership and revenue that the industry has endured since the time when the Commission last reviewed the need for this rule. The *Report & Order* further finds that scale will give local broadcast affiliates additional leverage vis-à-vis the national networks with which they negotiate for affiliation, thereby improving the ability of broadcast affiliates to resist network demands with respect to compensation and programming decisions. We considered alternative arguments that eliminating the national ownership cap would give broadcasters leverage over multichannel video programming distributors (MVPDs) in retransmission consent negotiations; however, any retransmission consent concerns may be addressed in the context of a specific transaction or in a separate rulemaking proceeding. The *Report & Order* also explains that, for individual stations that are financially struggling, repealing the national cap would give those stations additional options by permitting station groups with healthier balance sheets to expand into new markets, acquire those stations, and provide communities with more robust locally-oriented programming.

*G. Report to Congress*

120. The Commission will send a copy of the *Report & Order,* including this Final Regulatory Flexibility Analysis, in a report to Congress pursuant to the Congressional Review Act. In addition, the Commission will send a copy of the *Report & Order,* including this Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the SBA and will publish a copy of the *Report & Order,* and this Final Regulatory Flexibility Analysis (or summaries thereof) in the **Federal Register**.

**Ordering Clauses**

121. Accordingly, *it is ordered* that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152(a), 154(i), 303(r), 307, 309, and 310, the Report and Order *is adopted* effective 60 days after the date of publication in the **Federal Register**.

122. *It is further ordered* that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 303(r), 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. 151, 152(a), 154(i), 303(r), 307, 309, and 310, Part 73 of the Commission's rules *is amended* as set forth below, effective 60 days after the date of publication in the **Federal Register**.

123. *It is further ordered* that the Commission's Office of the Secretary *shall send* a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy.

124. *It is further ordered* that the Office of the Managing Director, Performance Program Management, *shall send* a copy of this Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

125. *It is further ordered* that, should no petitions for reconsideration or petitions for judicial review be timely filed, MB Docket No. 17–318 *shall be terminated* and its docket *closed.*

**List of Subjects in 47 CFR Part 73**

Television.

Federal Communications Commission.

**Marlene Dortch,**

*Secretary, Office of the Secretary.*

**Final Rules**

For the reasons discussed in the preamble, the Federal Communications Commission amends 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

■ 1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

**§ 73.3555 [Amended]**

■ 2. Amend § 73.3555 by removing and reserving paragraph (e).

[FR Doc. 2026–23040 Filed 11–10–26; 8:45 am]

**BILLING CODE 6712–01–P**

---

## DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

## 50 CFR Part 679

**[Docket No. 260305–0066; RTID 0648–XG161]**

## Fisheries of the Exclusive Economic Zone Off Alaska; Reallocation of Pacific Cod in the Bering Sea and Aleutian Islands Management Area

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; reallocation.

**SUMMARY:** NMFS is reallocating the projected unused amounts of Pacific cod from catcher vessels using trawl gear to Amendment 80 (A80) trawl catcher/