**No. 26-3871**

**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA,
*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION, and
UNITED STATES OF AMERICA,
*Respondents*.

On Petition for Review of
an Order of the Federal Communications Commission,
MB Docket No. 17-318

# MOTION FOR STAY PENDING REVIEW


JONATHAN A. FRIEDMAN
MICHAEL D. HURWITZ
SAMUEL H. ECKLAND
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006

PAUL D. CLEMENT
JAMES Y. XI
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Petitioner*


November 13, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Broadband Communications Association of Pennsylvania certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES........................................................................... iii

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................... 3

A. Statutory Background.................................................................... 3

B. Regulatory Background.................................................................. 6

C. The October 1 Order....................................................................... 9

ARGUMENT ................................................................................................ 12

I. BCAP Easily Clears This Court's Likelihood-Of-Success Threshold. ................................................................................. 12

A. FCC Lacks Authority to Eliminate the 39% Cap. ............................. 12

B. FCC's Contrary Conclusion Fails. .................................................. 17

II. The Remaining Factors Support A Stay.......................................................... 22

CONCLUSION ............................................................................................ 24

CERTIFICATES OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX

Reply Comments of Broadband Communications Association of Pennsylvania et al., MB Docket No. 17-318 (Aug. 22, 2025)............App.1

Petition for Stay & Injunction Pending Judicial Review, MB Docket No. 17-318 (Oct. 2, 2026) ..............................................App.39

Declaration of Joe Lorah, Blue Ridge Communications (Nov. 12, 2026) ..........................................................................App.60

# TABLE OF AUTHORITIES

## Cases

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) ........................................................18

*BCAP v. FCC*,
2026 WL 2055661 (D.C. Cir. 2026) ....................................................23

*Burton v. Schamp*,
25 F.4th 198 (3d Cir. 2022)................................................................15

*CBD v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019)...............................................................17

*Entergy Corp. v. Riverkeeper*,
556 U.S. 208 (2009)............................................................................20

*Epic Sys. v. Lewis*,
584 U.S. 497 (2018)........................................................................ 16, 17

*Fox v. FCC*,
280 F.3d 10 (D.C. Cir. 2002) ......................................................... 5, 13, 18

*FTC v. Dean Foods*,
384 U.S. 597 (1966)............................................................................22

*Gulf Fishermens Ass'n v. NMFS*,
968 F.3d 454 (5th Cir. 2020)...............................................................18

*In re Revel AC*,
802 F.3d 558 (3d Cir. 2015) ................................................................12

*Loper Bright v. Raimondo*,
603 U.S. 369 (2024)..................................................................... 2, 12, 18

*Malloy v. Eichler*,
860 F.2d 1179 (3d Cir. 1988) ..............................................................18

*MCI v. AT&T*,
512 U.S. 218 (1994)............................................................................20

*Melrose v. Pittsburgh*,
613 F.3d 380 (3d Cir. 2010) ........................................................................15

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................24

*Noel v. Boeing Co.*,
622 F.3d 266 (3d. Cir. 2010) ........................................................................13

*Prometheus v. FCC*,
2003 WL 22052896 (3d Cir. 2003)...................................................... 1, 2, 12, 22

*Prometheus v. FCC*,
373 F.3d 372 (3d Cir. 2004) .................................................................. 3, 4, 6, 16

*RadLAX Gateway Hotel v. Amalgamated Bank*,
566 U.S. 639 (2012)..................................................................................19

*Riccio v. Sentry Credit*,
954 F.3d 582 (3d Cir. 2020) ........................................................................21

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006)....................................................................................15

*Sekhar v. United States*,
570 U.S. 729 (2013)..................................................................................15

*Simmons v. Himmelreich*,
578 U.S. 621 (2016)..................................................................................12

*Stone v. INS*,
514 U.S. 386 (1995)..................................................................................16

*Trump v. Slaughter*,
146 S.Ct. 2283 (2026)..................................................................................2

*U.S. v. Craft*,
535 U.S. 274 (2002)..................................................................................21

*U.S. v. Loney*,
219 F.3d 281 (3d Cir. 2000) ........................................................................13

*UARG v. EPA*,
573 U.S. 302 (2014) .......... 2, 13

*Vanguard Interstate Tours, Inc. v. ICC*,
735 F.2d 591 (D.C. Cir. 1984) .......... 16

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 14

**Statutes**

31 FCC.Rcd. 10213 (2016) .......... 6, 14

42 U.S.C. §11023(f) .......... 16

47 U.S.C. §154(*i*) .......... 10, 18

47 U.S.C. §303(r) .......... 10, 18

47 U.S.C. §312(g) .......... 16

Pub.L.104-104, §202, 110 Stat. 110-12 .......... 4, 17, 20

Pub.L.108-199, §629, 118 Stat. 99-100 .......... *passim*

**Regulations**

47 C.F.R. 73.3555 .......... 14

50 Fed.Reg. 4666 (1985) .......... 4

68 Fed.Reg. 46,286 (2003) .......... 5

72 Fed.Reg. 16,283 (2007) .......... 6

78 Fed.Reg. 68,384 (2013) .......... 7

81 Fed.Reg. 73,035 (2016) .......... 7

82 Fed.Reg. 21,124 (2017) .......... 7

83 Fed.Reg. 3661 (2018) .......... 3, 7

90 Fed.Reg. 30,032 (2025) .......... 7

**Other Authorities**

2 FCC.Rcd. 10785 .......... 5

50 Cong. Rec. S141 (2004) .......... 17

149 Cong. Rec. H12838 (2003) .......... 17

150 Cong. Rec. S148 (2004) .......... 17

@BrendanCarrFCC, X (Feb. 7, 2026), https://perma.cc/9RXP-ZJU6 .......... 9

Tom DeLay, *I Helped Create the FCC's Ownership Cap. Here's How We Did It.*, DailyWire (2026), https://perma.cc/F2SW-J84Z .......... 5, 8

Kannon Shanmugam & William Marks, *FCC Lacks Statutory Authority to Revise the Telecommunication Act's 39% National Ownership Cap* (2025), https://perma.cc/7YX8-TZ6E .......... 8

Letter from Brian Fitzpatrick (2025), https://perma.cc/SD3P-UL94 .......... 7

*Nexstar Again Tops Station Groups as Consolidation Prospects Grow*, TVNewsCheck (2025), https://perma.cc/3R5F-RUH8 .......... 23

Brief for Michael O'Rielly as Amicus Curiae, *BCAP v. FCC*, No. 26-1062 (D.C. Cir. 2026) .......... 8

Press Release (2023), https://perma.cc/9JQC-WR9B .......... 8

@realDonaldTrump, Truth Social (Nov. 23, 2025), https://perma.cc/2UMF-QY6H .......... 9

@realDonaldTrump, Truth Social (Feb. 7, 2026), https://perma.cc/63H6-8XUG .......... 9

## INTRODUCTION

The order under review upends a decades-old cap on the cumulative national reach of an entity owning multiple television broadcast stations. Multiple FCCs across multiple administrations considered this issue settled: In 2004, Congress directed FCC to "modify" its rule allowing entities to amass 45% national audience reach and re-set "the national audience reach limitation for television stations to 39%." Countless regulated entities considered the issue settled too (with the investment-backed reliance interests to prove it), not least because that 2004 law included multiple provisions cross-referencing the "39 percent national audience reach limitation" and referring to it as a statutory limitation. But today's FCC claims that Congress' 2004 command was merely a starting suggestion. And because today's FCC prefers a regime *without* ex-ante limits on station-owner size, the order purports to eliminate the 39% cap entirely and let FCC assess concerns about station-owner size on a case-by-case basis when one entity applies to transfer licenses to another.

In prior cases reviewing FCC orders "significantly alter[ing] the agency's ownership rules," this Court has stayed the order to "maintain the status quo" "pending thorough and efficient judicial review." *Prometheus v. FCC*, 2003 WL 22052896, *1 (3d Cir. 2003). Even if "difficult to predict the likelihood of success on the merits," the resulting "industry consolidation" cannot be easily unwound

"should the new ownership rules be declared invalid." *Id.* That constitutes obvious "irreparable harm" for those opposing consolidation, in contrast to obviously "[in]substantial harm" to FCC from abiding longstanding rules slightly longer. *Id.*

Here, that logic applies *a fortiori*, because the likelihood of success is *not* hard to predict. Even under *Chevron*, it was blackletter law that "an agency may not rewrite" "precise numerical thresholds" set by Congress "to suit" the agency's "own sense of how the statute should operate." *UARG v. EPA*, 573 U.S. 302, 326, 328 (2014). Now that the Supreme Court has overruled *Chevron*, *see Loper Bright v. Raimondo*, 603 U.S. 369 (2024), and confirmed that FCC's job is "execut[ing]" Congress' policy choices rather than wielding "quasi-legislative" power of its own, *Trump v. Slaughter*, 146 S.Ct. 2283, 2301 (2026), that goes double.

Dismissing repeated statutory references to a "39[%] national audience reach limitation" as having "no independent significance" is an administrative-law nonstarter. PFR.Ex.A.54. It is one thing when Congress specifies a numerical threshold but expressly delegates continued agency discretion to change it, as Congress has done elsewhere, including with other broadcast-ownership rules. But when Congress repeats a precise numerical threshold five times, *without* discretion-conferring language, *and* does so to rein in agency discretion Congress deemed unwise, there is little doubt that Congress intends the cap to stick—*especially* when Congress surrounds the cap with provisions and cross-references underscoring the

cap's statutory provenance and constraining FCC's authority to modify or forbear applying the "limitation" going forward.

But unless this Court preserves the status quo, FCC has made clear that it stands ready to bless mergers allowing—as it did in the recent Nexstar–TEGNA merger—80+% national audience reach. That possibility is already distorting the marketplace and inviting cap-busting merger talks and applications. Once those mergers happen, they will remake the media landscape in ways impossible to unwind, permanently increasing costs for Petitioner's members and consumers alike. And as litigation challenging the Nexstar–TEGNA merger underscores, FCC can and will frustrate efforts to obtain judicial review of individual mergers until after the deals close. That makes a stay even more imperative here.

## BACKGROUND

### A. Statutory Background

Congress has repeatedly exercised its Article I authority to control station owners' market power, guided by its policy judgment "that diversification of mass media ownership serves the public interest." *Prometheus v. FCC*, 373 F.3d 372, 383 (3d Cir. 2004). In "the earliest days of broadcast television," Congress took a hands-off approach, leaving FCC to promulgate a rule "limiting the number of stations that could be commonly owned, operated, or controlled to three." 83 Fed.Reg. 3661, 3661-62 (2018). Over decades, FCC gradually increased that number and, under

pressure from Congress, separately capped an owner's national reach at 25%. 50 Fed.Reg. 4666, 4672 (1985). FCC "also determined that [ultra-high-frequency] television stations should not be deemed to have the same audience reach as [very-high-frequency] stations, due to 'the inherent physical limitations of [the UHF] medium.'" *Prometheus*, 373 F.3d at 383-84. It "therefore applied a 50% 'discount'" such that "UHF stations count only half of their audiences in determining compliance with the" national-audience-reach limitation. *Id.*

That hands-off approach began to change with the 1996 Telecommunications Act, when Congress directed FCC to "modify" its approach by eliminating the restriction on the number of stations and "increasing the national audience reach limitation for television stations to 35 percent":

> (c) TELEVISION OWNERSHIP LIMITATIONS.—
> (1) NATIONAL OWNERSHIP LIMITATIONS.—The Commission shall modify its rules for multiple ownership set forth in section 73.3555 of its regulations (47 C.F.R. 73.3555)—
> (A) by eliminating the restrictions on the number of television stations that a person or entity may directly or indirectly own, operate, or control, or have a cognizable interest in, nationwide; and
> (B) by increasing the national audience reach limitation for television stations to 35 percent.

Pub.L.104-104, §202(c), 110 Stat. 111. For several years thereafter, Congress invited FCC input into the national-audience-reach limitation: §202(h) of the 1996 Act required FCC to "biennially" review certain rules and "repeal or modify any"—including the 35% cap—"determine[d] to be no longer in the public interest." 110 Stat. 111-12; *Fox v. FCC*, 280 F.3d 1027, 1043 (under 1996 Act, FCC had "duty to

examine critically the new 35% [threshold] and to retain it only if it continued to be necessary”), *modified on reh’g*, 293 F.3d 537 (D.C. Cir. 2002). But that changed in 2003, when FCC hiked the cap to 45% in its biennial review. 68 Fed.Reg. 46,286, 46,339 (2003). FCC’s decision drew a swift and bipartisan rebuke in the 2004 Consolidated Appropriations Act, which reset the cap to 39% and codified a slew of provisions expressly referring to the new “39 percent national audience reach limitation”:

> SEC. 629. The Telecommunications Act of 1996 is amended as follows—
>
> (1) in section 202(c)(1)(B) by striking “35 percent” and inserting “39 percent”;
>
> (2) in section 202(c) by adding the following new paragraphs at the end:
>
> “(3) DIVESTITURE.—A person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation. This divestiture requirement shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth.
>
> “(4) FORBEARANCE.—Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B);”; and
>
> (3) in section 202(h) by striking “biennially” and inserting “quadrennially” and by adding the following new flush sentence at the end:
>
> “This subsection does not apply to any rules relating to the 39 percent national audience reach limitation in subsection (c)(1)(B).”.

Pub.L.108-199, §629, 118 Stat. 99-100; Tom DeLay, *I Helped Create the FCC’s Ownership Cap. Here’s How We Did It.*, DailyWire (2026), https://perma.cc/F2SW-J84Z; 32 FCC.Rcd. 10785, 10806-07 (detailing “significant controversy” over FCC’s move to 45%).

Congress specifically instructed that FCC's biennial-review requirement "does not apply to any rules relating to the 39 percent national audience reach limitation" going forward. 118 Stat. 99-100. Congress doubled-down on the need for a hard, permanent cap by specifying that an "entity that exceeds the 39 percent national audience reach limitation for television stations" "through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance." *Id.* And Congress went even further by making clear that FCC's forbearance authority allowing it to waive some statutory rules "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations." *Id.*; 31 FCC.Rcd. 10213, 10222 (2016) (no-forbearance provision "most reasonably interpreted as a congressional directive that [FCC] not decline to enforce against any person or entity the stricter national cap that Congress required [FCC] to adopt").

**B. Regulatory Background**

Several years after the 2004 Act, FCC called implementing the 39% cap a "nondiscretionary ministerial action" "mandated by" Congress. 72 Fed.Reg. 16,283, 16,284 (2007). This Court agreed, deeming "Congress's specification of a precise 39% cap" "a statutory directive." *Prometheus*, 373 F.3d at 396. But a decade later, while revisiting the UHF discount, FCC "tentatively" suggested it might retain

"authority to modify the national television ownership rule" through its general rulemaking powers, 78 Fed.Reg. 68,384, 68,386 (2013), and definitively concluded that it had authority to eliminate the UHF discount, which was always a creature of regulation pre-dating both the 1996 and 2004 Acts, 81 Fed.Reg. 73,035, 73,036 (2016). Although FCC ultimately let the UHF discount live to fight another day, 82 Fed.Reg. 21,124 (2017), FCC announced a new rulemaking in 2017 about the 39% cap generally, soliciting "comment on its authority to modify or eliminate the national cap" itself, 83 Fed.Reg. at 3662.

That rulemaking remained pending for the rest of the first Trump Administration and throughout the Biden Administration. A few months into the current Administration, Chairman Carr expressed interest in reinvigorating the proceeding, prompting FCC to "open a new comment window" in July 2025. 90 Fed.Reg. 30,032, 30,033 (2025).

Among the commentors was Broadband Communications Association of Pennsylvania (BCAP), a trade association representing cable operators that carry TV stations as part of their channel lineups. BCAP was one of many commentors, inside and outside the rulemaking, to explain that FCC lacks statutory authority to change the 39% cap. App.10-22; *e.g.*, Letter from Brian Fitzpatrick (2025), https://perma.cc/SD3P-UL94; Kannon Shanmugam & William Marks, *FCC Lacks Statutory Authority to Revise the Telecommunication Act's 39% National Ownership*

*Cap* (2025), https://perma.cc/7YX8-TZ6E; O'Rielly.Amicus.Br.4.&.21, *BCAP v. FCC*, No. 26-1062 (D.C. Cir. 2026) (former FCC Commissioner has "doubts about whether" "39% cap is a good idea," but "no doubt that [2004 Act] was intended to establish the 39% cap as mandatory and binding on the FCC"); DeLay, *supra* ("My end of the deal was that the cap would be raised to 39%, and in return, [Senator] Stevens received certainty that the FCC wouldn't and couldn't raise it higher.").

BCAP also explained that allowing TV station owners to amass greater national reach would raise monthly cable bills for consumers. App.6-10.&.23-37. Take Nexstar, the nation's largest television-station owner, which owns (among many others) WTAJ-TV in the Johnstown/Altoona market. WTAJ is a CBS affiliate; when Altoona-area cable subscribers want to watch the CBS Evening News or the Steelers, they turn on WTAJ. But cable operators and other multichannel video programming distributors (MVPD) must in turn pay Nexstar so-called "retransmission consent fees" to deliver that CBS content to their subscribers. Because those fees are negotiated by station owners and MVPDs on a national basis, the more stations (and national reach) Nexstar acquires, the greater its leverage to exact higher fees, on pain of blackouts severing an MVPD's entire subscription base from all Nexstar stations. *E.g.*, Press Release (2023), https://perma.cc/9JQC-WR9B (because of failed negotiations with DirectTV, "millions of Americans" temporarily lost access to Nexstar programming); App.28-30.&.60-63.

The revitalized rulemaking also attracted President Trump's attention. In November 2025, he noted that:

> If this would also allow the Radical Left Networks to 'enlarge,' I would not be happy. ABC & NBC, in particular, are a disaster—A VIRTUAL ARM OF THE DEMOCRAT PARTY. … NO EXPANSION OF THE FAKE NEWS NETWORKS. If anything, make them SMALLER!

@realDonaldTrump, Truth Social, https://perma.cc/2UMF-QY6H. A few months later in February 2026, when Nexstar sought to merge with TEGNA (one of its largest competitors), he weighed in again, this time supporting those companies amassing more than 39% reach:

> We need more competition against THE ENEMY, the Fake News National TV Networks. Letting Good Deals get done like Nexstar–Tegna will help knock out the Fake News because there will be more competition, and at a higher and more sophisticated level. … GET THAT DEAL DONE!

@realDonaldTrump, Truth Social, https://perma.cc/63H6-8XUG. Chairman Carr agreed:

> President Trump is exactly right. The national networks like Comcast & Disney have amassed too much power. For years, they've been pushing this Hollywood & New York programming all over the country with no real checks. Let's get it done and bring real competition to them.

@BrendanCarrFCC, X, https://perma.cc/9RXP-ZJU6.

### C. The October 1 Order

Nine years after it began, FCC's national-cap rulemaking culminated in the October 1 order under review—an order following the President's and Chairman's

marching orders to a T by announcing a standard affording the agency unbridled discretion. Instead of replacing the 39% cap with some other generally applicable rule, it "eliminate[s] the national television multiple ownership rule in favor of a case-by-case approach" "giv[ing] [FCC] the flexibility to approve deals that" "promote [FCC]'s media ownership goals" while "deny[ing]" other deals. PFR.Ex.A.3. According to the order, this change accords with Congress' 2004 directive to "modify" its broadcast-ownership rules to implement a 39% national-audience-reach limitation, because "[t]he use of the term 'modify' indicates that Congress was prescribing a" "starting point" "from which [FCC] periodically would reexamine the prescribed figures" "under its preexisting authority"—i.e., 47 U.S.C. §§154(*i*) and 303(r), which generally allow FCC to "make such rules and regulations … as may be necessary in execution of its functions." PFR.Ex.A.45-47; *accord* PFR.Ex.A.54 (contending the word "modify" supplies "the definitive indication that the 39% cap is a rule over which [FCC] has responsibility and not a statutory term").

In a separate statement, Chairman Carr explained his view that the D.C. Circuit's 2002 conclusion about Congress and FCC sharing responsibility for the national cap remains valid even though Congress rewrote the relationship in 2004. PFR.Ex.A.65. For her part, Commissioner Trusty "recognize[d] that reasonable minds can differ about" FCC's authority over the 39% cap, but decided "[o]n

balance" to cast the decisive vote with the hope of "enabl[ing] legal clarity on this issue through court review." PFR.Ex.A.76-77.

Commissioner Gomez dissented, describing it as "fundamental[]" that FCC "does not have the authority to raise or waive the 39 percent national audience reach limitation." PFR.Ex.A.68; PFR.Ex.A.71 (noting "bipartisan, durable, and deeply informed consensus"). Because "[n]o amount of policy preference can substitute for statutory authority," and because the 2004 law took "deliberate, explicit, and binding" "steps" to eliminate FCC's control over the cap, she refused to "support an action that so plainly exceeds the Commission's authority." PFR.Ex.A.67-71; *cf.* PFR.Ex.A.67 (further expressing policy concerns about the "real-world consequences for the public we serve"). She also deemed FCC's new case-by-case approach as "the very essence of arbitrary and capricious." PFR.Ex.A.74 ("This is indefensible.").

FCC published the order on its website on October 1. PFR.Ex.A. On October 2, BCAP asked for a stay pending review, and requested a ruling "by the date on which the Order is published in the Federal Register." App.58. FCC published the order in the Federal Register on November 12 without ruling on BCAP's stay motion. PFR.Ex.B. BCAP filed its petition for review and this motion the next day.

## ARGUMENT

Resolving stay motions requires asking whether "the applicant make[s] a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) and (b) will suffer irreparable harm absent a stay." *In re Revel AC*, 802 F.3d 558, 571 (3d Cir. 2015). If so, the Court "weigh[s] the likely harm to the movant (absent a stay)" "against the likely irreparable harm to the stay opponent(s) if the stay is granted," and "take[s] into account where the public interest lies." *Id.* at 569. Each factor supports a stay here.[1]

### I. BCAP Easily Clears This Court's Likelihood-Of-Success Threshold.

#### A. FCC Lacks Authority to Eliminate the 39% Cap.

When Congress crafted a 39% cap, it "sa[id] what it mean[t] and mean[t] what it sa[id]," *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016)—and it certainly did not reserve a far-reaching and constitutionally-suspect power for FCC to "tilt" the media landscape "in a preferred direction," whether to target THE ENEMY or to "achieve" some other "concept of speech nirvana." *Moody v. NetChoice*, 603 U.S. 707, 741-42 (2024) ("[F]ew" "dangers to free expression" "greater than allowing the government" "to advance its own vision of ideological balance.").

---

[1] Before granting the *Prometheus* stay, this Court heard "[e]xtensive oral argument." 2003 WL 22052896, *1. Counsel stands ready to present argument at the Court's request.

Start with the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate"—a principle applying with especial force when it comes to "precise numerical thresholds." *UARG*, 573 U.S. at 326, 328. "When" an agency "replace[s] those numbers with others of its own choosing"—or in this case, a different policy choice altogether—"it [goes] well beyond the 'bounds of its statutory authority.'" *Id.* at 326. Here, the 2004 Act said "39 percent" *five* different times, "enshrin[ing]" that limit "in the statute itself," *Fox*, 293 F.3d at 540—a marked departure from the approach Congress took in the 1996 Act which, as the D.C. Circuit had pointed out, tasked FCC with periodically reexamining "the new 35%" limit and retaining it only if it "continued to be necessary," *Fox*, 280 F.3d at 1043. The 2004 Act intentionally breaks from that prior approach. *See Noel v. Boeing Co.*, 622 F.3d 266, 274 (3d. Cir. 2010) ("well understood" that "Congress is aware of a judicial interpretation of statutory language").

The 2004 Act's five separate references to a "39 percent national audience reach limitation" underscore that the 2004 Congress intended FCC to permanently implement a 39% cap, use of the verb "modify" or not. *See U.S. v. Loney*, 219 F.3d 281, 285 (3d Cir. 2000) ("[W]e should not interpret one word in a statute in a way that renders other parts of the statute functionless."). Indeed, the statutory text itself references the 39% cap as statutory, not regulatory: Congress did not say "A person

or entity that exceeds the 39 percent national audience reach limitation *in 47 C.F.R. 73.3555* shall have not more than 2 years to divest"; it specified that someone exceeding "the 39 percent national audience reach limitation *in paragraph (1)(B)" of "section 202(c)" of "[t]he Telecommunications Act of 1996*" "shall have not more than 2 years" to divest. 118 Stat. 99-100 (emphasis added). What is more, it would be nonsensical for Congress to have specified that entities "exceed[ing] the *39 percent* national audience reach limitation" "shall have not more than 2 years" "to come into compliance with *such* limitation," *id.* (emphasis added), if FCC could pick a different number the next day/month/year after enactment. And it would be even more nonsensical if FCC could eliminate altogether Congress' basic policy choice to have a cap and replace it with pure agency discretion. That is no "unwarranted" "extrapolation," PFR.Ex.A.54; it is basic statutory interpretation. *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022).

FCC's new pure-discretion regime separately runs aground on the no-forbearance provision which—besides being another provision attributing the 39% limitation to "paragraph (1)(B)" of "section 202(c)" of "[t]he Telecommunications Act of 1996," 118 Stat. 99-100—"is most reasonably interpreted as a congressional directive that [FCC] not decline to enforce" the "national cap" "against any person or entity," 31 FCC.Rcd. at 10222. FCC's current view—that "nothing in" the no-forbearance provision "suggest[s] it pertains to [FCC]'s ability to modify or repeal a

rule," PFR.Ex.A.53—blinks reality. *Accord* PFR.Ex.A.68-70 (Commissioner Gomez citing no-forbearance provision as proof Congress viewed 39% threshold as permanent, statutory requirement). Last but far from least, allowing FCC to replace a neutral cap with unalloyed discretion heightens the risk of viewpoint-influenced (and outright retaliatory) licensing decisions by this and every future FCC. That is not only anathema to the First Amendment, *see Melrose v. Pittsburgh*, 613 F.3d 380, 392-93 (3d Cir. 2010); it underscores why Congress codified a non-forebearable viewpoint- and content-neutral fixed cap, *see Burton v. Schamp*, 25 F.4th 198, 212 (3d Cir. 2022).

History confirms Congress' intent for a permanent 39% cap. Concluding that FCC retains residual authority to alter or eliminate the 39% cap "would render" Congress' rejection of FCC's attempt to raise the national cap ten points to 45% "a largely meaningless exercise," *Rumsfeld v. FAIR*, 547 U.S. 47, 57-58 (2006): As FCC gamely admits, it would mean that the day after President Bush signed the 2004 Act reversing FCC's decision to raise the cap to 45%, FCC "could have" "changed the cap back immediately afterwards from what Congress had just set." PFR.Ex.A.52. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). And it becomes more absurd once one remembers the 2004 Act affirmatively *insulated* the 39% cap from FCC's periodic review. It is axiomatic that Congress intends any "amendment to have real and substantial effect." *Stone v.*

*INS*, 514 U.S. 386, 397 (1995). "Read against the backdrop of a prior practice of broad delegation"—and alongside the statute's repeated 39% references, divestiture mandate, and no-forbearance provision—carving the 39% cap out of the periodic-review mandate "must be understood as Congress altering the prior scheme of delegated authority." *Vanguard Interstate Tours, Inc. v. ICC,* 735 F.2d 591, 596 (D.C. Cir. 1984).

Other canons underscore that implementing §202(c)(1)(B)'s 39% cap is "a statutory directive." *Prometheus*, 373 F.3d at 396. When Congress legislates precise numerical limits but wants agencies to have authority over those limits going forward, "it knows exactly how to [say] so"—as it has done both inside and outside Title 47. *Epic Sys. v. Lewis*, 584 U.S. 497, 514 (2018). Take 47 U.S.C. §312(g), which automatically terminates a broadcast license after 12 months of silence, "except" if FCC concludes that "extend[ing] or reinstat[ing] such" license "promote[s] equity and fairness." Or take 42 U.S.C. §11023(f), which subjects certain facilities to mandatory reporting upon using over 10,000 pounds of toxic chemicals annually. Congress expressly allows EPA to "establish a threshold amount … different from the amount established by" statute, so long as it ensures "reporting on a substantial majority of total releases of the chemical at all facilities subject to [the reporting] requirements." *Id.* "[T]hat we have nothing like that

[proviso] here is further evidence" Congress did not intend FCC to modify the 39% cap going forward. *Epic*, 584 U.S. at 514.[2]

**B. FCC's Contrary Conclusion Fails.**

1. FCC cannot dispute that the 2004 Act repeatedly references a "39 percent national audience reach limitation." Nor can it dispute that, "[w]hen Congress enacts legislation that directs an agency to issue a particular rule, 'Congress has amended the law.'" *CBD v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019). Instead, FCC dismisses those repeated references as lacking "independent significance," because the 1996 Act directed FCC to "modify its rules" "by increasing the national audience reach limitation" "to 35 percent," 110 Stat. 111, and the 2004 Act's only change to that provision was "striking '35 percent' and inserting '39 percent,'" 118 Stat. 99. Perhaps FCC would have a point if that were *all* the 2004 Act did—and if, *contra* fact, the 2004 Act did not reject FCC's 45% cap and retained FCC's role in periodically reviewing the 39% cap, with mandatory-divestiture and no-forbearance provisions nodding towards some unspecified "~~39%~~ national audience reach

---

[2] For what it is worth, legislative history also supports reading the 2004 Act to set "a permanent cap at 39 percent." 150 Cong. Rec. S148 (2004) (Sen. Feinstein); 150 Cong. Rec. S141 (2004) (Sen. Leahy) ("[T]he White House successfully lobbied for last-minute increase of a permanent cap at 39%."). Even opponents of the 2004 Act conceded that plain import of the statutory text. 149 Cong. Rec. H12838 (2003) (Rep. Tauzin) ("[T]his bill will forbid the FCC from raising or lowering the 39 percent limit ... Eliminating the FCC's discretion over the national-audience-reach limit in this manner is unwise.").

limitation" (rather than the specific 39% "limitation" included in "paragraph (1)(B)" of "section 202(c)" of "[t]he Telecommunications Act of 1996"). And FCC would have an even better point if Congress had expressly "confer[red]" continued "discretionary authority" on FCC (which, as noted, it knows how to do). *Loper*, 603 U.S. at 404.

But the 2004 Act did the opposite. It included no discretionary language; it took the 39% cap out of periodic review; it included mandatory-divestiture and no-forbearance provisions that specifically reference a statutory (not regulatory) "39 percent national audience reach limitation." The only reason to do those things was to "enshrine[]" a 39% "cap in the statute"—the exact recipe the D.C. Circuit articulated for Congress to reassert control. *Fox*, 293 F.3d at 540.

FCC cannot hope to unwind Congress' specific judgments with general authority to make "necessary" regulations "not inconsistent with law." PFR.Ex.A.45-52 (citing 47 U.S.C. §§154(*i*), 303(r)). That general authority never "extend[s] to promulgating regulations or interpretations inconsistent with the statutes." *Malloy v. Eichler*, 860 F.2d 1179, 1182 (3d Cir. 1988); *accord Gulf Fishermens Ass'n v. NMFS*, 968 F.3d 454, 465 (5th Cir. 2020); *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018) ("[A]genc[ies] may not circumvent specific statutory limits" "by relying on separate, general rulemaking authority."). And "particularly" when "Congress has enacted a comprehensive scheme"

"target[ing] specific problems with specific solutions" about divestiture and forbearance, "the specific governs the general" with especial force. *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

If FCC is right, then taking the 39% cap out of the periodic-review process *increased* FCC authority over the cap by giving FCC authority to modify the cap outside of that temporally-restricted process. That is the *ne plus ultra* of seeing delegation everywhere an agency looks—and the *ne plus ultra* of losing the plot, as neither law nor logic suggests that, after enacting a law specifically rejecting FCC's 45% limit, ownership limits would be a thing that Congress wanted eliminated at a moment's notice. What Congress actually did is give "persons or entities that exceed the 39 percent national audience reach limitation" through acquisitions "not more than 2 years" to undertake "divestiture[s]" "to come into compliance with *such* limitation," while simultaneously making clear that if an entity refused, FCC "shall *not*" have the option of forbearance. 118 Stat. 99-100 (emphases added). Nor can FCC even extend that two-year deadline, as Congress allows in other contexts. *Cf. supra* p.16.

FCC cannot steamroll repeated statutory references to a "39 percent national audience reach limitation"; the *Statutes at Large* is not the same as the *Code of Federal Regulations*. And once "Congress has directly spoken to an issue," using the CFR to "contradict[] what Congress has said" is as *ultra vires* as it gets. *Entergy*

*Corp. v. Riverkeeper*, 556 U.S. 208, 218 n.4 (2009). FCC may believe that a discretion-enhancing, case-by-case approach is "a better regime," *MCI v. AT&T*, 512 U.S. 218, 234 (1994). But as Justice Scalia made clear the last time FCC claimed the word "modify" allowed it to work fundamental change without going back to Congress, FCC is not able to "introduc[e]" "a whole new regime of regulation" different from "the one that Congress established." *Id.*

2. FCC contends that "[e]liminat[ing] an outdated and overly restrictive bright line limit[] in favor of a more flexible approach[] is consistent with the approach" "taken with respect to other ownership restrictions," including "removal of restrictions on the nationwide ownership of broadcast radio stations and the cross-ownership of cable systems and broadcast television stations." PFR.Ex.A.24. But properly understood, the comparison supports BCAP: The 1996 Act expressly directed FCC to "eliminat[e]" those ownership provisions. Pub.L.104-104, §202(a), (*i*), 110 Stat. 110-112. Concluding that Congress countenanced FCC eliminating the national-audience-reach limitation codified in §202(c)(1)(B) without using the language Congress employed to that effect in §202(a) and §202(*i*) flouts the principle that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely." *Riccio v. Sentry Credit*, 954 F.3d 582, 587-88 (3d

Cir. 2020) (en banc). Policy arguments about changed conditions cannot supply FCC with authority Congress withheld.

3. FCC references two "other instances" in the 1996 Act "where Congress provided the specific figures [FCC] was to use in modifying its rules" but FCC "retained authority to modify or eliminate the rule in question." PFR.Ex.A.46 (citing §§202(b), (h)). That comparison overlooks that Congress did not repeat those specific figures multiple times in the way the 2004 Act repeatedly referenced a "39 percent national audience reach limitation," including in mandatory-divestiture and no-forbearance provisions underscoring the cap's statutory nature. 118 Stat. 99-100. Moreover, the comparison overlooks that Congress intentionally subjected those specific figures to FCC's continuing periodic review while intentionally *excluding* the 39% cap from that review. Congress' collaborative approach to those figures throws into stark relief its opposite approach to the 39% cap.

4. Last and least, FCC claims that "the same Congress that enacted the [2004 Act] considered alternative bills that would have enacted a fixed statutory cap" but "declined to enact those proposals." PFR.Ex.A.48. "[F]ailed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation,'" not least "because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *U.S. v. Craft*, 535 U.S. 274, 287 (2002); *supra* n.2.

## II. The Remaining Factors Support A Stay.

There is no disputing that consolidation harms BCAP's members and raises prices for consumers. App.24-32.&.61-62. Nor is there any disputing that, once "businesses have been merged or purchased and closed out it is commonly impossible to turn back." *FTC v. Dean Foods*, 384 U.S. 597, 604, 606 (1966). If station owners consummate cap-busting mergers during the pendency of these proceedings, there should be no serious dispute about irreparable harm to BCAP and its members. The difficulties of unwinding "industry consolidation" "should the new ownership rules be declared invalid" justified a stay in *Prometheus*, 2003 WL 22052896, *1. So too here.

Consolidation is not just possible, but probable. Chairman Carr and President Trump (who, post-*Slaughter*, exercises unquestioned control over FCC) have not-so-subtly supported certain consolidation—support already causing market distortion by sending a green light for certain companies to bandy about otherwise impossible deals with immediate real-world effect on valuations. App.63 (Sinclair Earnings Call: "[W]e'll be able to transact under this new rule shortly after the vote happens as soon as it gets into the federal registry."); App.63 (Gray Media Earnings Call: "[W]hat [FCC] has done is superb. And so yes, we are open for business.").[3]

---

[3] Sinclair and Gray are the second- and third-largest station owners by revenue. *See Nexstar Again Tops Station Groups as Consolidation Prospects Grow*, TVNewsCheck (2025), https://perma.cc/3R5F-RUH8 (noting "likely deregulation

If/when FCC approves those transaction(s), the harm will be truly irreparable, because no one will be able to obtain meaningful judicial review of the approval(s). The recent Nexstar–TEGNA merger proves the point. In March 2026, FCC's Media Bureau approved that merger and countenanced an entity with *80%* national reach, brazenly violating the 39% cap. BCAP promptly filed an application for review with the full FCC (a prerequisite for judicial review of Bureau orders). When FCC failed to resolve the application promptly, BCAP asked the D.C. Circuit to vacate—or at least stay—the merger approval. But notwithstanding the national-cap violation, and notwithstanding the Bureau order's immediate effect and the merging parties' rush to close, the D.C. Circuit held that it lacked jurisdiction to intervene unless and until FCC resolved BCAP's application for review, which FCC has refused to do even to today, eight months (and counting) after the transaction closed. *BCAP v. FCC*, 2026 WL 2055661 (D.C. Cir. 2026). In short, FCC believes it can avoid judicial review of mergers indefinitely by directing Bureau staff to approve mergers and then refusing to rule on applications for review, and the only court with jurisdiction over FCC merger orders has held that it is powerless to say otherwise.

---

and an M&A flurry to follow": "With looser ownership limits … the station trading market should get busy once again with the big publicly traded, non-network groups leading another wave of consolidation.").

The only way to prevent FCC from using this order to transform broadcast ownership during the pendency of judicial review is for this Court to grant a stay forthwith. And the harms to FCC and the public are negligible, as a stay merely requires FCC to abide for a few more months a 39% cap that went decades without question to facilitate an orderly judicial determination. *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (equities and public interest "merge" against the federal government).

## CONCLUSION

The Court should stay the order.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
JAMES Y. XI
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

JONATHAN A. FRIEDMAN
MICHAEL D. HURWITZ
SAMUEL H. ECKLAND
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006

*Counsel for Petitioner*

November 13, 2026

## CERTIFICATES OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,199 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

This motion complies with Third Circuit Rule 31.1 because the text of the electronic brief will be identical to the text of any paper copies submitted to the Court, and because, prior to being electronically submitted, a virus detection program (SentinelOne version 21.7.7.40005) was run on the file and no virus was detected.

Consistent with Third Circuit Rule 46.1(e), I certify that I am a member of the bar of this Court.

November 13, 2026

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I electronically filed this petition with the Clerk of the Court for the United States Court of Appeals for the Third Circuit on November 13, 2026 using the CM/ECF system. I will also serve an as-filed, date-stamped copy by email to LitigationNotice@fcc.gov.

s/Paul D. Clement
Paul D. Clement

# Appendix

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule | ) | MB Docket No. 17-318 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

# REPLY COMMENTS OF BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA, BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON, COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION, FLORIDA INTERNET AND TELEVISION ASSOCIATION, INDIANA CABLE & BROADBAND ASSOCIATION, LOUISIANA INTERNET & TELEVISION – THE BROADBAND ASSOCIATION, MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION, MINNESOTA CABLE COMMUNICATIONS ASSOCIATION, NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION, AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA

Todd Eachus
President
BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

Jeff Weist
Executive Director
COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION
225 East 16th St., Ste. 1050
Denver, CO 80206

Charles Dudley
General Counsel
FLORIDA INTERNET AND TELEVISION ASSOCIATION
108 S. Monroe St.
Tallahassee, FL 32301

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Lauren Chauvin
Executive Director
LOUISIANA INTERNET & TELEVISION – THE BROADBAND ASSOCIATION
763 North St.
Baton Rouge, LA 70802

Nathan Kark
Executive Director
MICHIGAN CABLE
TELECOMMUNICATIONS ASSOCIATION
412 W. Ionia St.
Lansing, MI 48933

Melissa Wolf
Executive Director
MINNESOTA CABLE COMMUNICATIONS
ASSOCIATION
525 Park St., Ste. 310
St. Paul, MN 55103

Tim Wilkerson
President
NEW ENGLAND CONNECTIVITY AND
TELECOMMUNICATIONS ASSOCIATION
53 State St., Ste. 525
Boston, MA 02109

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF
VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

August 22, 2025

# Table of Contents

I. INTRODUCTION AND SUMMARY ........................................................................ 3

II. THE COMMISSION DOES NOT HAVE THE AUTHORITY TO CHANGE THE NATIONAL CAP ........................................................................ 7

A. The Historical Background to the National Cap Provides a Critical Backdrop to the Question of the Commission's Authority. ........................................................................ 8

B. Further Changes to the National Cap in the 2004 CAA Underscore Congress's Intent to Bar the Commission from Adjusting the Cap Going Forward. ........................................ 10

C. Claims That the Commission Can Still Adjust the Cap Using Its General Authority Do Not Withstand Scrutiny........................................................................ 14

III. RELAXING OR ELIMINATING THE NATIONAL TELEVISION OWNERSHIP RULE WOULD RESULT IN SUBSTANTIAL PUBLIC INTEREST HARMS WITHOUT COUNTERVAILING BENEFITS ........................................................................ 20

A. Further Broadcast Industry Consolidation Would Impose Substantial Costs on MVPDs and Their Customers. ........................................................................ 21

B. Broadcaster Claims That Relaxing or Eliminating the National Cap Is Essential to Their Survival Are Without Merit. ........................................................................ 29

C. Relaxing or Eliminating the Cap Would Have a Destabilizing Effect on the Entire Broadcast Ecosystem. ........................................................................ 31

IV. CONCLUSION........................................................................ 34

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule | ) | MB Docket No. 17-318 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**REPLY COMMENTS OF**
**BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA, BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON, COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION, FLORIDA INTERNET AND TELEVISION ASSOCIATION, INDIANA CABLE & BROADBAND ASSOCIATION, LOUISIANA INTERNET & TELEVISION – THE BROADBAND ASSOCIATION, MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION, MINNESOTA CABLE COMMUNICATIONS ASSOCIATION, NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION, AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA**

The Broadband Communications Association of Pennsylvania ("BCAP"),[1] Broadband Communications Association of Washington ("BCAW"),[2] Colorado Cable Telecommunications Association ("CCTA"),[3] Florida Internet and Television Association ("FIT"),[4] Indiana Cable &

[1] BCAP is an association of Pennsylvania cable and broadband operators, equipment suppliers, programmers, and other allied companies. BCAP advocates, communicates, and educates about industry positions to public policy makers, opinion leaders, and the general public in order to enhance member companies' operations, competitiveness, and profitability.

[2] The Broadband Communications Association of Washington (BCAW) is a 501(c)(6) organization under the Internal Revenue Code. BCAW's membership consists of franchised cable companies that are major providers of cable, voice, and internet services to subscribers throughout Washington State. BCAW is governed by a Board of Directors comprised of member company leaders.

[3] The Colorado Cable Telecommunications Association is the state trade association representing Colorado's cable broadband, video, and voice providers, passing nearly two million households in the state.

[4] Florida Internet & Television Association is a Florida not-for-profit corporation, representing the interests of internet and cable providers. Our members include Comcast, Cox, Breezeline, and Mediacom.

Broadband Association ("ICBA"),[5] Louisiana Internet & Television – The Broadband Association ("LIT"),[6] Michigan Cable Telecommunications Association ("MCTA"),[7] Minnesota Cable Communications Association ("MCCA"),[8] New England Connectivity and Telecommunications Association ("NECTA"),[9] and VCTA – Broadband Association of Virginia ("VCTA")[10] (collectively, the "State Cable Associations") submit these reply comments in response to the Media Bureau's June 18, 2025 Public Notice seeking to refresh the record of the

---

[5] Founded in 1985 as the Indiana Cable Telecommunications Association (ICTA), the Indiana Cable and Broadband Association (ICBA) represents an industry building the world's most powerful technology platform. We believe that connectivity has the power to transform the state of Indiana. We unite leaders in broadband infrastructure, technology, and entertainment to connect Hoosiers to the world—transforming how we live, learn, work, and play. We believe in creating progress through stronger connections and are proud to play a key role as the industry continues to develop.

[6] Louisiana Internet & Television – The Broadband Association (LIT) was organized in 1968 as the Louisiana Cable Television Association (LCTA) to provide leadership, direction, and a focal point for ideas of common interest among the cable and telecommunications industry. Over the years, the association evolved to reflect the expanding role of broadband and technology in our members' work, becoming LIT.

We represent innovators and creators. Our industry is building the most powerful broadband platform and creating exciting TV programming that entertains, informs, and inspires consumers every day. Through our representation in the state legislature, executive branch, and regulatory bodies in Louisiana, we are supporting the industry's vision for a technology and entertainment future that will advance innovation, inspire creativity, unleash connectivity, and exceed consumer expectations for a wide range of high-quality services.

[7] Established in 1981, the Michigan Cable Telecommunications Association ("MCTA") is a Michigan non-profit corporation which has represented the cable television and communications industry in Michigan on issues affecting the cable industry for over four decades. MCTA's members are cable providers who offer video, voice, and broadband internet services to Michigan residents and businesses through high-speed fiber and cable connections in all eighty-three (83) of Michigan's counties.

[8] Minnesota Cable proudly represents cable providers serving communities in all corners of the state—from Sjoberg's in Thief River Falls and Midco in Isanti, to Mediacom in Waseca and Comcast in Madelia. Collectively, our members deliver robust and reliable broadband service to over 1.5 million residents, bridging urban, suburban, and rural communities and we've done so for decades. We are committed to ensuring that every Minnesotan—regardless of zip code—has access to reliable, future-proof, high-speed broadband.

[9] The New England Connectivity and Telecommunications Association (NECTA) is a nonprofit industry trade association representing cable broadband providers, television and content creators, and innovative companies in Connecticut, Massachusetts, New Hampshire, Rhode Island, and Vermont. Throughout New England, NECTA members provide state-of-the-art Internet, video, voice, and wireless offerings as well as cutting-edge products, services, and emerging technologies.

[10] Founded in 1966, the VCTA – Broadband Association of Virginia ("VCTA") is an association representing providers of fiber optic cable services across the Commonwealth of Virginia. VCTA members provide high-speed internet connections to over 2.6 million Virginia homes, more than 1500 schools and libraries, as well as businesses of all sizes, educational institutions, hospitals, data centers, nonprofit organizations and many of Virginia's government and military facilities. VCTA members are committed to expanding broadband access for unserved populations in urban, suburban and rural areas throughout the Commonwealth of Virginia.

above captioned proceeding.[11] For the reasons set forth herein, the State Cable Associations respectfully urge the Commission to affirm the current statutory 39 percent national audience reach limit ("National Cap" or "Cap") and reject proposals to relax or eliminate it. The Commission lacks the authority to adjust the Cap, and doing so would impose substantial public interest harms without countervailing benefits.

## I. INTRODUCTION AND SUMMARY

The fundamental jurisdictional question in this proceeding is whether the Commission has authority to modify or eliminate the National Cap. Basic principles of administrative law make clear the answer is no. The Consolidated Appropriations Act of 2004 ("2004 CAA") expressly sets the National Cap at 39 percent, and Congress further underscored that (already clear) intent by excluding the National Cap from the Quadrennial Review process, which Congress established as the Commission's only mechanism for considering changes to broadcast ownership rules. Even in a *Chevron* world, that would be the end of the story as Congress set a precise numerical limit in statute. But *Loper Bright* has since eliminated any remaining doubt: The best reading of the 2004 CAA's text, even putting aside the statutory and regulatory history that fully supports this reading, is that Congress laid down a statutory directive impervious to agency second-guessing.

A broad cross-section of commenters from across the ideological spectrum agree. Newsmax explains that, "in 2004 Congress unequivocally set the national audience reach limit at 39 percent and removed any authority for the Commission to adjust it. The clear, specific,

---

[11] *Media Bureau Seeks to Refresh the Record in the National Television Multiple Ownership Rule Proceeding*, Public Notice, DA 25-530 (rel. June 18, 2025); *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd. 10785 (2017) ("*NPRM*").

unequivocal, and repeated actions by Congress establishing today's 39 percent limit reveals Congress' intent to maintain the cap and prevent the FCC from weakening it."[12] Likewise, the Center for Regulatory Freedom (a project of the CPAC Foundation) states that the proposed rule fails "to address this express statutory limitation on the Commission's authority. Instead, it proceeds as if the Commission retains full discretion to modify the cap through its normal rulemaking process, which contradicts the plain language and intent of the 2004 Act."[13] Free Press underscores that, in the wake of the enactment of the 39 percent Cap, both consumer groups and broadcasters themselves "repeatedly agreed" that "Congress had definitively set the Cap," but that now proponents of lifting the Cap "must contort themselves to make this legal argument."[14] And the The NewsGuild-CWA et al. aver that "[r]eading the statute to require only a temporary change would lead to absurd results, granting the Commission undue authority to rewrite [the] statute and rendering the statute meaningless."[15]

The Commission does not retain some residual well of authority—in Section 303(r) or elsewhere—allowing it to do at a moment's notice what Congress said it could not do periodically. To quote *Loper Bright*, far from "empower[ing] an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable,'"[16] the 2004 CAA effectively did the opposite, taking away power that Congress had previously granted to

[12] Comments of Newsmax, MB Docket No. 17-318, at 6 (filed July 23, 2025) ("Newsmax Comments"). Unless otherwise noted, all citations to comments included herein are to comments filed in MB Docket No. 17-318 on August 4, 2025.

[13] Comments of the CPAC Foundation Center for Regulatory Freedom at 4 ("CPAC Comments").

[14] Comments of Free Press at 14-15 ("Free Press Comments").

[15] Comments of The NewsGuild-CWA et al. at 3.

[16] *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 395 (2024).

modify the National Cap and repeatedly referring to "the 39 percent national audience reach limitation" in the statutory text.[17]

Even assuming *arguendo* that the Commission did retain such residual authority, it would not be in the public interest for the Commission to exercise that authority to raise or eliminate the Cap given the substantial public interest harms that would flow from such a change. As NCTA, the American Television Alliance ("ATVA"), and other multichannel video programming distributors ("MVPDs") explain, large station groups routinely leverage their nationwide footprints to threaten station blackouts and force MVPDs to accede to skyrocketing retransmission consent fees and higher prices for consumers for what is supposed to be free over-the-air television.[18] Relaxing or eliminating the National Cap will compound the problem. The ink was barely dry on the Notice relaunching this proceeding when Nexstar, the largest station group in the country, announced its intention to acquire Tegna, the fourth-largest station group.[19] The combined company would have 265 stations in 132 markets and reach 80 percent of TV households.[20] Such a super-sized Nexstar could only be possible if the Commission relaxes or

---

[17] Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 ("2004 CAA").

[18] *See* Comments of NCTA—The Internet & Television Association at 3-4 ("NCTA Comments"); Comments of The American Television Alliance at 2-9 ("ATVA Comments"); Comments of Cincinnati Bell Extended Territories LLC (d/b/a altafiber) at 8-9 ("altafiber Comments"); Comments of NTCA—The Rural Broadband Association at 1-2 ("NTCA Comments").

[19] *See* Press Release, Nexstar Media Group, Inc., *Nexstar Media Group, Inc. Enters into Definitive Agreement To Acquire TEGNA Inc. for $6.2 Billion in Accretive Transaction* (Aug. 19, 2025), https://www.nexstar.tv/nexstar-media-group-inc-enters-into-definitive-agreement-to-acquire-tegna-inc-for-6-2-billion-in-accretive-transaction/ ("Nexstar/Tegna Press Release"). As Nexstar CEO Perry Sook explained, "it's been, suffice to say, several months" since Nexstar began planning the transaction with Tegna. Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).

[20] *See id.* Sinclair, the third-largest station group in the country, reportedly is also interested in acquiring Tegna—a combination that likewise would result in an massive station group. *See* Lauren Thomas, *TV-Station Owner Sinclair Proposes Merger With Tegna*, The Wall Street Journal (Aug. 19, 2025), https://www.wsj.com/business/deals/tv-station-owner-sinclair-proposes-merger-with-tegna-4bd3bb86?gaa_at=eafs&gaa_n=ASWzDAjJCU9ZjH0tLKdr1hJgg_qi122aIGUT2PCZqZ_6FrBbLcIpx4A5QwMJ&gaa_ts=68a66794&gaa_sig=RYyumIxoZz0KYMw0T2uj8yMr94HYLr9LR6thznQrvzu0QSi5s2Z5O_JbEFoSfT0SKEe3c9UxM0b_CgaG1Gkg_w%3D%3D.

eliminates the Cap. And the claimed benefit of the merger? Nexstar says it will result in "contractual revenue synergies"—Wall Street speak for further hikes in retrans fees for MVPDs and their customers.[21]

Station groups claim that such consolidation is necessary for the survival of the broadcast industry. However, such claims are belied by station groups' record revenues. And, ironically, rather than putting broadcasters in a stronger competitive position relative to Big Tech, relaxing or eliminating the Cap will undermine the video ecosystem. Higher retrans costs will mean higher costs for MVPD customers. This, in turn, will lead to more cord-cutting, smaller audience share for broadcast channels, and lower advertising and retransmission consent revenues for broadcasters. NTCA has further noted that spiraling retransmission consent fees have already compelled some smaller MVPDs to discontinue video service, and that further hikes would accelerate the trend.[22] When NTCA members were polled about reasons for discontinuing or considering discontinuing video service, "64.2% identify the difficulty of negotiating retransmission consent agreements with consolidated broadcast groups as a significant factor."[23] As these effects play out, they will further accelerate the downward spiral of the broadcast and pay-TV ecosystems. ATVA aptly concludes that: "Unless this cycle—described by [industry analyst] Craig Moffett as a series of 'doom loops'—is broken, broadcaster viewership will continue to suffer. Modifying or eliminating the [Cap] will only make the problem worse."[24]

---

[21] *Id.*; *see also* altafiber Comments at 9 (explaining that, when such acquisitions occur, "the cable operator (and ultimately its customers) would need to pay any higher rate under the acquiring licensee's retransmission consent agreement—without any change of content and possibly even less original local content").

[22] *See* NTCA Comments at 2-3.

[23] *Id.* at 3.

[24] ATVA Comments at 13-14.

In short, despite claims by certain commenters, eliminating or increasing the Cap is *not* necessary to protect small struggling broadcasters and sustain local news. Rather, an increase or elimination of the Cap would do the exact opposite. Such a change would provide a windfall to behemoth broadcast ownership groups seeking even greater consolidation, and empower these station groups to get bigger and seek larger retransmission consent fees while scaling back local news production. The end result will be to hasten the demise of broadcasting to the advantage of Big Tech content distribution and the disadvantage of consumers. Nothing could be further from the public interest.

## II. THE COMMISSION DOES NOT HAVE THE AUTHORITY TO CHANGE THE NATIONAL CAP

The threshold legal issue in this proceeding is whether the Commission has authority to modify or eliminate "the 39 percent national audience reach limitation for television stations" codified in Section 629 of the 2004 CAA.[25] As basic principles of administrative law indicate—and as numerous commenters from across the political and ideological spectrum explain—the answer is no.[26] Even in a *Chevron* world, that would be the end of the story, as "[i]t is hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds."[27] But *Loper Bright* has since eliminated any remaining doubt: The best reading of the 2004 CAA's text, as

---

[25] 2004 CAA § 629.

[26] *See* ATVA Comments at 14-22; Comments of Asian Americans Advancing Justice (AAJC) at 1; CPAC Comments at 3-5; Free Press Comments at 14-19; Comments of The Free State Foundation at 7-8; Comments of National Association of Broadcast Employees and Technicians – Communications Workers of America (NABET-CWA) at 3, 14-15; Comments of The National Hispanic Media Coalition (NHMC) at 1; NCTA Comments at 1-3; Newsmax Comments at 6, 25-29.

[27] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014).

confirmed by the statutory and regulatory history, is that Congress laid down "a statutory directive" impervious to agency second-guessing.[28]

### A. The Historical Background to the National Cap Provides a Critical Backdrop to the Question of the Commission's Authority.

Beginning in the 1940s, the Commission sought to carry out Congress's directive to promote localism, diversity, and competition in broadcasting by restricting the number of stations that any one person may own nationwide.[29] By the 1980s, the question of whether to also limit any one station group owner's national audience reach became a central focus for both Congress and the Commission. In 1985, amidst dueling proposals by the Senate and House to limit one owner's national audience reach at 22.5 percent and 25 percent, respectively, the Commission exercised its general rulemaking and licensing authority to set the Cap at 25 percent.[30] The Commission explained that a 25 percent Cap was "a reasonable" and "administra[ble]" "limit" that would "temper" the growth of the largest station group owners while giving smaller group owners "a greater opportunity to expand."[31]

Although the Commission's 1985 action prompted Congress to temporarily stay its hand, Congress re-asserted its control in remarkably specific terms in the Telecommunications Act of 1996 ("1996 Act"). In particular, Section 202(c)(1) of the 1996 Act opted to eliminate the Commission's numerical restrictions on the number of stations any one person may own nationally, instead prioritizing the national audience reach limit as a key mechanism to promote

---

[28] *Prometheus Radio Proj. v. FCC*, 373 F.3d 372, 396 (3d Cir. 2004).

[29] *See NPRM* ¶ 2.

[30] *See Amendment of Section 73.3555 of the Commission's Rules Relating to the Multiple Ownership of AM, FM, and Television Broadcast Stations*, Memorandum Opinion and Order, 100 FCC 2d 74 ¶¶ 39-40, 63, n.45 (1985) ("*1985 Order*") ("Authority for the actions taken herein is contained in Sections 4(i) and (j), 301, 303, 308, 309 and 405 of the Communications Act of 1934, as amended").

[31] *See id.* ¶ 40.

localism, diversity, and competition.[32] To that end, Congress mandated that the Commission increase the National Cap from 25 to 35 percent of U.S. television households.[33]

While setting a specific limit in the 1996 Act, Congress also established for the first time a regularized process for the Commission to consider further adjustments to the National Cap and other broadcast ownership rules in subsequent Commission proceedings. It displaced the Commission's general rulemaking authority—which the Commission had used before the 1996 Act to set and revise the National Cap—in favor of requiring the Commission to undertake a "Biennial Review" of the broadcast ownership rules to "determine whether any of such rules are necessary in the public interest as a result of competition" and "repeal or modify any regulation it determines to be no longer in the public interest."[34] It is easy to see why: Replacing a roving regulatory remit with a formalized review process provided more predictability for broadcasters and other industry stakeholders as to how the Commission would address the ownership rules going forward. Underscoring its intent for the Biennial Review process to serve as the *sole* regulatory vehicle for changing the ownership rules going-forward, Congress directed the FCC to "conclude [separate, then-existing broadcast deregulatory proceedings] in a timely manner."[35]

In the inaugural 1998 Biennial Review Order, the Commission rebuffed calls to adjust the 35 percent National Cap set by Congress just two years prior, noting "that it was *required* to

---

[32] *See* Telecommunications Act of 1996, Pub. L. No. 104-04, § 202(c)(1)(a), 110 Stat. 56, 111 ("1996 Act").

[33] *See id.* § 202(c)(1)(b).

[34] *Id.* § 202(h); *see Bridging the Digital Divide for Low-Income Consumers; Lifeline and Link Up Reform and Modernization; Telecommunications Carriers Eligible for Universal Service Support*, Fifth Report and Order, Memorandum Opinion and Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 34 FCC Rcd. 10886, ¶ 50 (2019) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) for the proposition that "the specific governs the general"); *see also Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) ("[t]his Court has understood the present canon ('the specific governs the general') as a warning against applying a general provision when doing so would undermine limitations created by a more specific provision").

[35] S. Rep. No. 104-230, at 164 (1996) (Conf. Rep.) ("1996 Act Conference Report").

defer to the decision of the Congress to set the initial ownership cap in the 1996 Act at 35%."[36] However, in the subsequent 2002 Biennial Review, the Commission elected to revise the Cap upwards by nearly a third to 45 percent while rejecting NAB's proposal to do away with Congress's handiwork entirely by eliminating the National Cap altogether.[37] As explained below, Congress found that percent to be too high and lowered the limit by statute, a result that the current proposal to eliminate the Cap would unilaterally undermine.

### B. Further Changes to the National Cap in the 2004 CAA Underscore Congress's Intent to Bar the Commission from Adjusting the Cap Going Forward.

The Commission's decision to raise the Cap from 35 to 45 percent prompted Congress to make a full course correction. In the 2004 CAA, Congress directed the Commission to undo its action and "modify" the National Cap back down to 39 percent.[38] And to make its intent to set a hard cap crystal clear, Congress clarified that "[t]h[e] subsection" prescribing periodic reviews (which it also switched from biennial to quadrennial) "does not apply to any rules relating to the 39 percent national audience reach limitation."[39] In other words, Congress narrowed the scope of the now-Quadrennial Review process to strip the Commission of discretion to consider further changes to the 39 percent cap—in stark contrast to other broadcast ownership rules still subject to that process and thus still eligible for change or elimination.[40]

---

[36] *See 1998 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Order, 15 FCC Rcd. 19949 ¶¶ 25-30 (2000) ("*1998 Biennial Review Order*") (emphasis added); *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1042-43 (D.C. Cir. 2002).

[37] *See 2002 Biennial Review Order – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Biennial Review Order, 18 FCC Rcd. 13620 ¶¶ 578-80 (2003).

[38] 47 U.S.C. § 303 note (as amended).

[39] 2004 CAA § 629(3).

[40] *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 420, n.1 (2021) ("The FCC has one additional [broadcast] ownership rule, the National Television Ownership Rule, which is not subject to review under Section 202(h)."); *cf.*

The 2004 CAA also amended the 1996 Act to prevent the Commission from using its Section 10 forbearance authority to waive application of "the 39 percent national audience reach limitation."[41] In so doing, Congress underscored that 39 percent means 39 percent, and that the Commission should not even try to find ways to tinker with the lines Congress drew. *Neither the specific reference to "the 39 percent national audience reach limitation" nor the general carveout from the Commission's forbearance authority would make sense if the Commission retained the ability to alter the 39 percent threshold some other way*.[42]

What is more, in addition to specifically referring to "the 39 percent national audience reach limitation" in the context of the Commission's periodic-review obligations and in the context of its forbearance authority, Congress also codified a two-year divestment period during which "[a] person or entity that exceeds the 39 percent national audience reach limitation for television stations . . . through grant, transfer, or assignment of an additional license for a commercial television broadcast station" can "come into compliance with such limitation" even as it exempted from the Cap "persons or entities that exceed the 39 percent national audience

*Zimmer Radio of Mid-Missouri, Inc. v. FCC*, No. 24-1380, 2025 WL 2056854, at *4, n.5 (8th Cir. July 23, 2025) ("The only three rules that remain subject to Section 202(h) review are the Local Television Ownership Rule, the Local Radio Ownership Rule, and the Dual Network Rule."); *see also id.* at *2 (distinguishing the Local Television Ownership Rule's local station ownership limit from other ownership rules at issue, explaining "[t]hose numbers, *which were set by Congress as part of the 1996 Act, have remained unchanged since*.") (emphasis added).

[41] *See* 2004 CAA § 629(2) (amending "section 202(c) by adding the following new paragraph[] at the end:

> (4) FORBEARANCE.—Section 10 of the Communications Act of 1934 (47 U.S.C. 160) shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B)").

[42] As a matter of statutory construction, the Supreme Court has long instructed that "statutes should be read to avoid superfluity." *Marx v. General Revenue Corp.*, 568 U.S. 371, 392 (2013) (Sotomayor, J., dissenting); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal quotations omitted). Hence, even if the forbearance language has no practical effect in the broadcast context, it must nonetheless be read to provide some insight into Congress's statutory purpose. Here, and consistent with Congress's decision to remove the National Cap from the Quadrennial Review process, the provision plainly signals Congress's intent that the Commission would have no role in setting the Cap going forward.

reach limitation through population growth."[43] Broadcasters' contention that the Commission may use its authority under Sections 303(r) or 154(i) to relax or eliminate the Cap necessarily implies that the Commission could have re-raised the Cap to 45 percent (or some other figure) immediately after President Bush signed the 2004 CAA into law—rendering meaningless the two-year window for station groups exceeding the newly-enacted 39-percent limit to come into compliance.[44] Likewise, if, as broadcasters contend, the Cap were merely rules-based and subject to change, then presumably the Commission would have had the ability to use its waiver authority to allow station groups to stay above the Cap, making the need for a two-year grace period pointless. The only logical explanation for Congress's inclusion of the two-year divestiture provision is that Congress intended the 39 percent Cap to be permanent.[45] Last but not least, if Congress intended the new Cap to be subject to Commission revision, it would not have expressly and repeatedly referred to "the 39 percent national audience reach limitation" at four different times throughout the statutory text.

The legislative history accompanying the 2004 CAA further confirms that Congress intended its 39 percent Cap to stick. In floor debates in both the Senate and the House, multiple members of Congress referred to the 39 percent Cap as "permanent."[46] Then-Chairman of the

[43] *See* 2004 CAA § 629(2).

[44] *See* Comments of the National Association of Broadcasters at 26-27 ("NAB Comments") (citing Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President Legal and Regulatory Affairs, NAB, and Jerianne Timmerman, Senior Vice President and Senior Deputy General Counsel Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 45-46 (filed Apr. 2, 2025), https://www.fcc.gov/ecfs/document/1040226279346/1 ("NAB Apr. 2, 2025 Letter")).

[45] *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute 'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995); *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959))); *see also id.* ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.").

[46] *See* 149 Cong. Rec. S16087-88 (2003) (statement of Sen. Robert Byrd) ("The 1-year limitation on the FCC media ownership rule was turned into a *permanent cap at 39 percent*.") (emphasis added); 150 Cong. Rec. S141 (2004)

House Energy and Commerce Committee and original co-sponsor of the 1996 Act, Rep. Billy Tauzin (R-LA) was even clearer on this point, stating that "*this bill will forbid the FCC from raising or lowering the 39 percent limit*."[47]

Former FCC Commissioner Michael O'Rielly, who was directly involved in negotiating the National Cap provisions in the 2004 CAA as a Congressional staffer, has underscored this conclusion. In a statement accompanying the Commission's 2017 NPRM teeing up the instant proceeding on whether the Commission can or should change the Cap, Commissioner O'Rielly said: "The language in the law cannot be clearer: it statutorily sets the national ownership limit and correspondingly removes it from the quadrennial review under section 202(h) of the Telecommunications Act."[48] Likewise, in a dissent to the Commission's 2016 order eliminating the UHF discount, Commissioner O'Rielly stated: "The result [of negotiations] was a national ownership cap that remains one of the few media ownership rules specifically set by statute and the only one exempted from the Quadrennial Review process governing the other ownership rules, in order to protect a tenuous compromise from the whims of the Commission."[49]

---

(statement of Senator Patrick Leahy) ("[T]he White House successfully lobbied for last-minute increase of a *permanent cap at 39 percent*.") (emphasis added).

[47] 149 Cong. Rec. H12766 (2003) (Statement of Rep. Billy Tauzin) (emphasis added).

[48] *NPRM* (Statement of Commissioner Michael O'Rielly).

[49] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule,* Report and Order, 31 FCC Rcd. 10213 (2016) ("*2016 UHF Discount Order*") (Dissenting Statement of Commissioner Michael O'Rielly) ("The pertinent language ultimately included in the 2004 Consolidated Appropriations Act . . . was heavily negotiated and painstakingly crafted in order to settle a recurring and particularly contentious media ownership issue. I know since I was there at the time and helped reach the agreement. . . . Since enactment, many parties have advocated changes in different elements of this compromise for a wide variety of reasons, including those cited here. But the only acceptable venue for these arguments is Congress.").

### C. Claims That the Commission Can Still Adjust the Cap Using Its General Authority Do Not Withstand Scrutiny.

NAB contends that, even if the Commission no longer has the authority to adjust the Cap in the Quadrennial Review process, it still has the authority to make changes pursuant to its general powers under Sections 303(r) and 154(i).[50] The gist of the argument is that Congress merely directed in the 2004 CAA that the Commission "modify" its National Cap rule to 39 percent, rather than actually setting the Cap at a permanent level, while at the same time placing no restrictions on the Commission's ability to make further changes to the Cap in the future using its general authority under Sections 303(r) or 154(i).[51] NAB further claims that in removing the National Cap from the Quadrennial Review process, Congress was simply relieving the Commission of its *mandatory* duty to review the Cap every four years; it did nothing to prevent the Commission from addressing the Cap outside that process.[52]

These arguments lack merit. Congress passed—and the President signed—a law expressly referring to "the 39 percent national audience reach limitation" not once, but four separate times. That the law instantiates that 39 percent Cap by directing the Commission to "modify" its rules merely reflects the provenance of the National Cap, which as noted, began as (and technically remains) a regulation, albeit one that Congress took control of in the 1996 Act. And there is no basis for claiming Congress somehow intended the Commission to further tinker with its handiwork once the Cap was set at 39 percent.[53] The 2004 CAA overrode the Commission's prior effort to impose a different numerical threshold, repeatedly enshrined "the

[50] *See* NAB Comments at 26-27 (citing NAB Apr. 2, 2025 Letter at 45-46).

[51] *See* NAB Comments at 25-26.

[52] *See id.* at 27-28.

[53] *Cf. Fox Television Stations*, 280 F.3d at 1043 (holding that, because review of the then-35-percent Cap was part of the Biennial Review process following the 1996 Act, the Commission had authority to adjust the Cap).

39 percent national audience reach limitation" in the statutory text, and took the additional step of insulating the National Cap from the exclusive mechanism enabling the Commission to revise broadcast-ownership rules.[54]

No principle of law or logic suggests that the Commission retains some residual well of authority allowing it to do at a moment's notice what Congress said it could not do periodically. Far from "empower[ing] an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable,'"[55] the 2004 CAA effectively did the

---

[54] In the nearly three decades since the 1996 Act and more than two decades since the 2004 CAA, the only substantive revisions to the Commission's structural television and radio broadcast ownership rules in 47 C.F.R. § 73.3555 were adopted either in the context of a Biennial or Quadrennial Review proceeding, or stemmed from one of the proceedings that preexisted the 1996 Act that Congress instructed the FCC to "timely" conclude. *See* 1996 Act Conference Report at 164. Any other modifications to Section 73.3555 have been ministerial in nature. *See, e.g.*, *Amendment of Part 73 of the Commission's Rules to Update Television and Class A Television Broadcast Station Rule and Rule Applicable to All Broadcast Stations*, Report and Order, 38 FCC Rcd. 8706 (2023) (updating, among other code provisions, the service contour requirements in the local television ownership rule to revise provisions "for full power and Class A television stations that no longer have any practical effect given the transition from analog to digital-only operations"); *Streamlined Reauthorization Procedures for Assigned or Transferred Television Satellite Stations*, Report and Order, 34 FCC Rcd. 1539 (2019) (updating reauthorization rules for satellite television stations, including Note 5 of Section 73.3555, which since 1985 has exempted satellite stations from the structural ownership rules). The Commission also considers changes to its attribution standards to be separate from its structural broadcast ownership rules. *See 1998 Biennial Review Order* ¶ 10 ("Nor do we seek comment on our attribution standards. Our attribution rules define what the Commission will consider a cognizable interest for purposes of its ownership rules. They do not of themselves establish limits on ownership or restrict cross-ownership combinations. Accordingly, we do not consider them to be broadcast ownership rules subject to biennial review."). The Commission has similarly considered, outside of the Quadrennial Review process, changes to the UHF discount, which relates to how UHF stations are counted for purposes of the Cap (i.e., at 50 percent of VHF stations), but not the level of the overall Cap itself. Several commenters have urged the Commission to dispense with the discount entirely given technological and marketplace changes. *See* CPAC Foundation Comments at 7-9; Free Press Comments at 19-21; NABET-CWA Comments at 16-17; Newsmax Comments at 29-33. The Commission established the UHF discount in 1985 to account for the "inherent physical limitations" of the UHF television band, as compared to the VHF band, in an analog environment. *2016 UHF Discount Order* ¶ 5. The transition to digital service flipped the script, as the UHF band had more favorable characteristics in that environment than the VHF band. *See id.* ¶¶ 4-15 (recounting history of discount). As a result, "some station owners have therefore opted to migrate their signals from VHF to UHF," and get the added benefit of the UHF discount in the process. *Id.* ¶ 14. Nexstar, for example, has used such station migrations in combination with aggressive station acquisitions to increase its national audience reach to 70 percent. *See* Nexstar Media Group, Investor Presentation – June 2025 at 3 (Jun. 11, 2025) ("Nexstar June 2025 Investor Presentation"), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf.

[55] *Loper Bright*, 603 U.S. at 395.

opposite, taking away power that Congress had previously granted to modify the National Cap and repeatedly referring to "the 39 percent national audience reach limitation" in the statutory text. Understanding that enactment to have no effect on the Commission's statutory authority "would effectively create one of the biggest backdoors in the history of legislating."[56]

What is more, even under the *Chevron* regime when "statutory ambiguities" constituted "implicit delegations to agencies,"[57] there was widespread acknowledgement that "[i]t is hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds."[58] Especially now that Congress must expressly "delegate[] discretionary authority to an agency,"[59] any attempt by the Commission "to substitute a dramatically higher number"—or no number at all—for a "particular number used by the statute" should be dead in the water.[60] Even accepting that "the power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration," the best reading of the statutory text, structure, and history is that 39 percent means 39 percent, not that

---

[56] *NPRM* (Statement of Commissioner Michael O'Rielly); *see* Comments of Sinclair Broadcasting Group, MB Docket No. 13-236, at 6 (filed Dec. 16, 2013) ("It simply makes no sense for Congress to go to such great lengths to set a specific 39 percent limit, forbid the FCC to make any changes to any rules relating to that limit and remove the FCC's authority to review that rule as part of its periodic ownership review, but allow the FCC to change the 39% Cap and related rules in any other proceeding the FCC initiates. Such a strained interpretation of the CAA, which creates a gaping loophole in the CAA, is not a rational interpretation of the statute."); *see also Rumsfeld v. FAIR*, 547 U.S. 47, 57-58 (2006) ("We refuse to interpret" a statute "in a way that negates its recent revision, and indeed would render it a largely meaningless exercise."); *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218 (2024) (explaining that a reviewing court should "afford a statute the scope a reasonable reader would attribute to it," while declining to interpret a statute in such a way as "to endow [a delegated authority] with [a] radically different power.") (internal quotations omitted).

[57] *Loper Bright*, 603 U.S. at 399 (discussing *Chevron, U.S.A. Inc., v. NRDC*, 467 U.S. 837 (1984)).

[58] *Util. Air Regul. Grp.*, 573 U.S. at 326.

[59] *Loper Bright*, 603 U.S. at 395, n.6.

[60] *Util. Air Regul. Grp.*, 573 U.S. at 328, n.8.

the Commission has *carte blanche* "to revise clear statutory terms that turn out not to work in practice."[61]

The Commission's general authority to promulgate "necessary" broadcast-licensing rules "not inconsistent with law" does not change this result.[62] For one, substituting a dramatically higher number—or eliminating the Cap entirely—*would be* "inconsistent" with the 2004 CAA. For another, "the grant of authority to promulgate 'necessary' regulations cannot expand the scope of the provisions the agency is tasked with 'carry[ing] out.'"[63] Indeed, given the "economic and political significance" of national broadcast ownership limits, the Commission must identify not just "a merely plausible textual basis," but rather "clear congressional authorization" before it can hope to modify the 39 percent Cap.[64] A provision that says nothing at all about broadcast ownership issues falls well shy of the mark. It was one thing for the Commission to rely on Section 303 and other general grants of authority when it first adopted the National Cap; it is quite another to rely on them after Congress asserted its power over the National Cap, enshrined "the 39 percent national audience reach limitation" in the statutory text, and affirmatively insulated its preferred numerical threshold from FCC review.[65] NAB's

---

[61] *Id.* at 327.

[62] *See* 47 U.S.C. § 303(r) (empowering the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions, *not inconsistent with law*, as may be necessary to carry out the provisions of this chapter, or any international radio or wire communications treaty or convention, or regulations annexed thereto, including any treaty or convention insofar as it relates to the use of radio, to which the United States is or may hereafter become a party.) (emphasis added); *see also id.* § 154(i) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, *not inconsistent with this chapter*, as may be necessary in the execution of its functions.") (emphasis added).

[63] *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) (alteration original).

[64] *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022).

[65] *See generally* 2004 CAA § 629.

expansive reading of the Commission's authority would flout that express statutory text and render the entire Cap-related provisions of the 2004 CAA a nullity.[66]

The statute's use of the word "modify" does not change anything either. Even accepting that the word could have a deregulatory valence in the context of Section 202(h),[67] it plainly does not bear that meaning in Section 202(c)(1), where Congress most recently directed the Commission to "modify" the National Cap from 45 percent to 39 percent (i.e., to *tighten* the regulatory burden), thereby expressly rejecting a higher number as is currently being proposed. And in all events, NAB's emphasis on "modify" is especially misplaced considering that Congress used similar phrasing elsewhere in its updates to the broadcast ownership rules in the 1996 Act. Specifically, Congress directed the Commission to "revise" its radio ownership rules in 47 C.F.R. § 73.3555 to include specific numerical limits for in-market radio station ownership.[68] As with the National Cap at the time, those limits were subject to adjustment under the Biennial Review process. However, when Congress amended the National Cap in the 2004 CAA, it kept the radio ownership rules under the new Quadrennial Review process, while, as noted, exempting the National Cap from that process. Clearly, Congress intended the two rules

---

[66] The manner in which the Commission codified the new 39 percent Cap underscores that the Commission itself viewed the new limit as a clear directive from Congress and not something the Commission had the discretion to adjust in the future. In a standalone 2006 order (rather than as part of the just-launched 2006 Quadrennial Review), the Commission stated that "the rule changes adopted in this Order do not involve discretionary action on the part of the Commission" but rather "simply implement provisions of the Appropriations Act, as it amends the Telecommunications Act, which directs the Commission to revise its rules according to specific terms set forth in those laws." *Implementation of Section 629 of the Consolidated Appropriations Act, 2004 (National Broadcast Television Ownership)*, Order, 22 FCC Rcd. 4245 ¶ 2 (2006). Likewise, in making this change, the Commission dispensed with notice-and-comment under the "good cause" exception of the Administrative Procedure Act citing to court precedent affirming use of the "good cause" exception in situations involving "nondiscretionary ministerial actions issued in conformity with statute." *Id.* ¶ 2 n.5 (citations omitted).

[67] *See Zimmer Radio*, 2025 WL 2056854, at *17-18; *but see Prometheus Radio Project*, 373 F.3d at 394-95 (finding that the "repeal or modify" language in the statute does not "operate only as a one-way ratchet").

[68] *See* 1996 Act § 202(b)(1).

to be treated differently going forward. Yet, NAB insists that, essentially, nothing changed.[69] Worse yet, NAB maintains that by directing the Commission to "modify" the National Cap, Congress *sub silentio* countenanced the Commission eliminating the Cap altogether—an argument that flies in the face of recent Supreme Court precedent holding that "statutory permission to 'modify' does *not* authorize 'basic and fundamental changes in the scheme' designed by Congress."[70] Indeed, in interpreting the word "modify" in the Communications Act, the Court explained that "[t]he word 'modify' . . . has a connotation of increment or limitation."[71]

* * *

In sum, Congress established a hard 39 percent Cap in the 2004 CAA, and "no principle of administrative law . . . would allow" the Commission "to rewrite such a clear statutory term" simply "to suit its own sense of how the statute should operate."[72] That is especially true because, as discussed in the next section, even assuming *arguendo* that the Commission *did* have such authority under Section 303(r), it would not be in the public interest for the Commission to exercise that authority to raise or eliminate the Cap given the substantial public interest harms that would flow from such a change.

---

[69] *See* NAB Apr. 2, 2025 Letter at 45 ("To be clear, Section 629(1) [of the 2004 CAA] directed the Commission, again, to merely *modify its rules* for multiple ownership by increasing the national audience reach limitation for television stations, this time to 39 percent, as Congress left untouched the original language of Section 202(c)(1)(b) [of the 1996 Act] that had only directed the Commission to amend its regulation." (emphasis in original)); *see also* NAB Comments at 25-26.

[70] *Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (emphasis added).

[71] *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 225 (1994).

[72] *Util. Air Regul. Grp.*, 573 U.S. at 328, n.8.

## III. RELAXING OR ELIMINATING THE NATIONAL TELEVISION OWNERSHIP RULE WOULD RESULT IN SUBSTANTIAL PUBLIC INTEREST HARMS WITHOUT COUNTERVAILING BENEFITS

The public interest harms from relaxing or eliminating the Cap are clear cut and non-speculative. Over the past two decades, broadcast station group consolidation has led to a handful of owners with massive TV station holdings. These large station groups routinely leverage their nationwide footprints to threaten station blackouts and force MVPDs to accede to skyrocketing retransmission consent fees and higher prices for consumers. Relaxing or eliminating the National Cap would compound the problem. As noted, Nexstar's recently announced merger with Tegna, if approved, would result in an industry behemoth with a national audience reach of 80 percent; factoring in the UHF discount, Nexstar estimates its national audience reach would still be approximately 60 percent—more than 1.5 times the allowable reach under existing rules.[73] Nexstar has been candid with investors that its vastly increased size will result in "contractual revenue synergies"—Wall Street speak for further hikes in retransmission consent fees.

Station groups claim that such consolidation is necessary for the survival of the broadcast industry. However, such claims are belied by station groups' record revenues.[74] And, ironically, rather than putting broadcasters in a stronger competitive position relative to Big Tech, relaxing or eliminating the Cap would actually undermine the video ecosystem and accelerate the demise of broadcasting. Higher retransmission consent fees would mean higher costs for MVPD customers. This, in turn, would lead to more cord-cutting, smaller audience share for broadcast channels, and lower overall advertising and retransmission consent revenues for broadcasters,

---

[73] *See* Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025).

[74] *See infra* § III.B.

harming local broadcast news and the other public interest benefits that the NPRM claims it is endeavoring to fortify and sustain.

### A. Further Broadcast Industry Consolidation Would Impose Substantial Costs on MVPDs and Their Customers.

Numerous commenters in the record have highlighted how retransmission consent fees paid to TV broadcast stations have grown exponentially over the past two decades. For example, NCTA observed that "[r]etransmission consent revenue increased by 31% from 2019 to 2023 ($11.5 billion to $15.1 billion) and more than *135%* when compared to 2015 levels ($6.4 billion)—despite MVPDs' decline in subscribership."[75] Likewise, DISH stated that "the average total retransmission fee per subscriber, per month (across all station owners) rose from $0.19 in 2006 to $6.79 in 2016."[76] According to S&P Global Market Intelligence, retrans fees are projected to rise to $23.21 per subscriber per month in 2025, and to grow to $30.25 by 2030.[77] This is a staggering increase for MVPDs and their customers: On a per-subscriber per-month basis, retransmission consent fees have increased 12,116 percent since 2006 and

---

[75] *See, e.g.*, NCTA Comments at 4 (citing *2024 Communications Marketplace Report*, Report, 39 FCC Rcd. 14116 ¶ 263 (2024); *2020 Communications Marketplace Report*, Report, 36 FCC Rcd. 2945 ¶ 216 fig. II.D.17 (2020)).

[76] Comments of DISH Network L.L.C., MB Docket No. 17-318, at 4 (filed Mar. 19, 2018) ("2018 DISH Comments").

[77] S&P Global Market Intelligence, *TV Station Retrans and Virtual Multichannel Sub Carriage Fee Projections, 2006-2030* (2025); *see also* NTCA Comments at 2 ("In their most recent retransmission consent negotiations, rural MVPDs faced average fee increases of $104,020 in 2024, a 33% increase over 2023 levels. These MVPDs also reported that retransmission consent fees now represent an average of 37% of total operating expenditures in 2024, compared to 27.9% in 2023.") (internal citations omitted).

242 percent since 2016.[78] Any way you cut it—broadcasters have enjoyed windfall retransmission consent revenues.[79]

Industry consolidation has been a key driver of these rising retrans costs. Broadcast station groups negotiate retransmission consent on a nationwide basis, across their station footprints.[80] These are not mom-and-pop enterprises that need greater leverage in their negotiations with MVPDs; they are sophisticated actors with multibillion dollar balance sheets—some of which are backed by the world's largest private equity firms.[81]

[78] These astronomical increases dwarf expected price increases under normal-course inflation. For comparison, according to the U.S. Bureau of Labor Statistics' Consumer Price Index Inflation calculator, $0.19 in June 2006 has the same buying power as $0.30 in June 2025; $6.79 in June 2016 has the same buying power as $9.09 in June 2025. *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator* (last visited August 22, 2025), https://www.bls.gov/data/inflation_calculator.htm.

[79] Nexstar followed up last year's boom with "record first quarter distribution revenue" in the first quarter of 2025. Transcript of Nexstar Media Group, Inc. Q1 2025 Earnings Call (May 8, 2025). Likewise, Sinclair has boasted that "distribution revenues were up 5% year-over-year driven by renewal rate step-ups and new carriage agreements." Transcript of Sinclair, Inc. Q3 2024 Earnings Call (Nov. 6, 2024).

[80] *See* 2018 DISH Comments at 8-9 ("[B]roadcast groups negotiate for retransmission consent fees across their entire footprint, demanding the same rate for a Top-4 station across all the broadcasters' markets, large and small, urban and rural.").

[81] For example, as of July 31, 2025, Nexstar, which also owns The CW Network, NewsNation, Antenna TV, Rewind TV, and has interests in Cooking Channel and Food Network, among other media interests, has a market capitalization of $5.64 billion; Tegna, which also owns True Crime Network and Quest, of $2.68 billion; and Sinclair, which also owns the Tennis Channel, Comet, Charge!, Roar, The Nest, and interests in Marquee Sports Network, of $1.01 billion. *See* Nexstar Media Group, Inc. (NXST), Stock Analysis, https://stockanalysis.com/stocks/nxst/market-cap/; TEGNA Inc. (TGNA), Stock Analysis, https://stockanalysis.com/stocks/tgna/market-cap/; Sinclair, Inc. (SBGI), Stock Analysis, https://stockanalysis.com/stocks/sbgi/market-cap/. Meanwhile, some of the world's biggest private equity funds own and control or have invested substantial stakes in other broadcast station groups, including Cox Media Group (owned and controlled by Apollo Global Management), Univision (ownership group includes Searchlight Capital and Softbank), and Paramount Global (RedBird Capital Partners). *See Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC to Terrier Media Buyer, Inc., et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 10554 (MB 2019); *Univision Holdings II, Inc. Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934*, as Amended, Declaratory Ruling, 37 FCC Rcd. 449 (MB 2022); *Applications for Consent to the Transfer of Control of Paramount Global*, Memorandum Opinion and Order, FCC 25-43 (rel. July 24, 2025).

**Fig. I. Major Broadcast Station Group Consolidation Metrics**




Source: Company Annual Filings[82]

[82] Nexstar Broadcasting Group, Inc., Annual Report (Form 10-K) (Mar. 15, 2012), https://www.sec.gov/Archives/edgar/data/1142417/000114241712000010/nxst201110k.htm; Sinclair Broadcast Group, Inc., Annual Report (Form 10-K) (Mar. 2, 2012), https://www.sec.gov/Archives/edgar/data/912752/000110465912015324/a11-31176_110k.htm; Gannett Co., Inc., Annual Report (Form 10-K) (Feb. 22, 2012), https://www.sec.gov/Archives/edgar/data/39899/000119312512072714/d258830d10k.htm; Nexstar Media Group, Inc., Annual Report (Form 10-K) (Feb. 27, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001142417/000095017025028949/nxst-20241231.htm; Sinclair Inc., and Sinclair Broadcast Group, LLC, Annual Report (Form 10-K) (Feb. 26, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001971213/000197121325000012/sbgi-20241231.htm; TEGNA INC., Annual Report (Form 10-K) (Feb. 27, 2025),

As station groups consolidate, greater numbers of stations are subject to single negotiations, increasing the risk of widescale blackouts to consumers. In turn, this increases the leverage station groups have to extract supra-competitive retransmission consent fees. *As the Department of Justice has repeatedly explained, the ability "to black out more . . . stations simultaneously . . . lead[s] to increased retransmission consent fees" for in-footprint MVPDs and their "subscribers in the form of higher subscription fees."*[83]

The record in this and other broadcast ownership-related dockets reinforces this conclusion.[84] As the economic analysis included in DISH's 2018 comments found: "[o]ther things being equal, the larger the broadcast station group, the higher the retransmission fee paid by the MVPD."[85] Likewise, an economic analysis that NCTA submitted in the Sinclair/Tribune merger proceeding found that "broadcaster size is positively correlated with broadcaster bargaining power" and "a threatened blackout across a substantially larger portion of an MVPD's footprint has the prospect to impose disproportionately higher costs on the MVPD in

---

https://www.sec.gov/ix?doc=/Archives/edgar/data/0000039899/000095017025029076/tgna-20241231.htm. Notes: Station counts include sidecar stations, as applicable. *See infra* note 91. 2011 revenue for Gannett Co., Inc. (the predecessor of Tegna) is limited to its broadcasting segment (i.e., excludes since spun-off publishing segments). Gannett Co., Inc. did not report on UHF-discounted national audience reach in 2011.

[83] Competitive Impact Statement at 8, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020) (emphasis added), https://www.justice.gov/atr/case-document/file/1192116/dl?inline; *see also* Competitive Impact Statement at 7, *United States v. Gray Television, Inc. and Quincy Media*, Inc., No. 1:21-cv-02041 (D.D.C. July 28, 2021), https://www.justice.gov/opa/press-release/file/1418011/download (finding consumer harms via increased retransmission consent fees where a broadcaster would have greater ability to black out more stations simultaneously); Competitive Impact Statement at 8-9, *United States v. Nexstar Broad. Grp., Inc.*, No. 1:16-cv-01772-JDB (D.D.C. Nov. 16, 2016), https://www.justice.gov/atr/case-document/file/910661/dl?inline (same).

[84] *See* ATVA Comments at 4-9 (recapping retransmission consent-related harms established on the record to date).

[85] 2018 DISH Comments at 7; *see also* Reply Comments of Public Knowledge, et al., MB Docket No. 17-318, at 10-11 (filed Apr. 18, 2018) ("When broadcasters are able to demand higher retransmission fees from pay-TV providers, those providers must necessarily pass those costs on to consumers. When pay-TV providers refuse to be held hostage by broadcasters' 'take it or leave it' retransmission offers, it has resulted in 'blackouts' in local broadcast programming. Either way, the public loses—pay-TV subscribers will either see an increase in their monthly dues or go without local news and content.") (citations omitted).

dealing with the repercussions of the blackout."[86] Even the Eighth Circuit recently acknowledged that "the exponential increase in retransmission consent fees could provide broadcasters with excessive market leverage."[87]

The link between broadcast industry consolidation and higher retrans fees is not merely theoretical.[88] Nexstar provides an instructive case study. Nexstar describes itself as "the largest local television broadcast group" with 201 full-power stations reaching "~70% of the U.S." and with a "local footprint ~75%+ larger than the other major broadcast network owners."[89] Nexstar amassed these holdings through aggressive consolidation and liberal use of the UHF discount[90] and "sidecar" arrangements.[91] Over the past decade and a half, Nexstar has made more than two dozen acquisitions of broadcast stations and station groups, including the acquisition of Media General's 67 stations in 2017, and Tribune's 41 stations in 2019.[92] CEO Perry Sook attributed

---

[86] Comments of NCTA – The Internet & Television Association, MB Docket No. 17-179, Att. A (Economic Analysis of Bryan Keating and Jon Orszag) ¶ 35 (filed June 20, 2018) ("Such costs may take the form of disproportionately higher customer service costs or disproportionately higher costs to the brand as a result of adverse publicity from the blackout. Such costs place the MVPD in a weaker bargaining position (effectively, they create a concave surplus function) and create an incentive to agree to higher retransmission consent fees in order to avoid incurring those costs."); *see also* NCTA Comments at 3-4 (same).

[87] *Zimmer Radio*, 2025 WL 2056854, at *10 (citing an NCTA *ex parte* filing noting that retransmission consent revenue is up 1,084 percent since 2010 and 85 percent over the last six years).

[88] ATVA Comments at 7 ("Indeed, broadcasters often state outright that consolidation will lead to higher retransmission consent prices.").

[89] Nexstar June 2025 Investor Presentation at 5, 7; *see also supra* Fig. I.

[90] *See supra* n.54.

[91] Broadcast stations that take on outsourced management and operational functions for, and have other financial arrangements with, other stations are known as "sidecars." *See, e.g.*, Letter from Tom Wheeler, Chairman, FCC, to Hon. John D. Rockefeller IV et al., at 3 (Mar. 27, 2014), https://docs.fcc.gov/public/attachments/DOC-326470A1.pdf (noting that, aside from service agreements, sidecars also involve financial linkages between stations, and that "[t]aken in their totality, these sharing and financial arrangements can serve to transfer effective, if not complete, control of one supposedly 'independently-owned' station to [another] party"); *see also infra* at 28-29 (discussing the National Cap- and retransmission consent-related consequences of Nexstar's use of Mission Broadcasting as a sidecar).

[92] *See Consent to Transfer Control of License Subsidiaries of Media General Inc., from Shareholders of Media General, Inc. to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183 (MB/WTB 2017); *Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee), et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 8436 (2019) ("*Nexstar/Tribune Order*").

Nexstar's ability to "continue to grow distribution revenue" as "a testament to our position as the largest owner of local broadcast television."[93] Likewise, Nexstar Executive Vice President and Chief Financial Officer Lee Ann Gliha recently explained, "because of our scale . . . when we have these negotiations that enables us to do some things that maybe some of the smaller companies in our sector can't do."[94] As a result, quarter-after-quarter Nexstar imposes the highest average retransmission consent rates in the country on MVPDs and their customers.[95]

Nexstar's proposed acquisition with Tegna would super-size the company. Nexstar would grow from 201 to 265 full-power stations; expand its footprint from 116 to 132 Designated Market Areas ("DMAs"), including stations in nine of the top-10 DMAs and 41 of the top-50 DMAs; and grow its national audience reach from 70 percent to 80 percent when excluding the UHF discount.[96]

Nexstar has made plain that it will take a similar approach to raising retrans rates further if the Commission allows additional industry consolidation and Nexstar's proposed merger with

[93] Transcript of Nexstar Media Group, Inc. Q4 2024 Earnings Call (Feb. 27, 2025).

[94] Transcript of Nexstar Media Group, Inc. Presentation at Morgan Stanley Technology, Media & Telecom Conference (Mar. 5, 2025).

[95] *See* S&P Global Market Intelligence, *Average Monthly Retrans Per Sub Fees Q1 2024 & Q1 2025* (July 2025) (showing that Nexstar has the highest monthly retrans per sub fees on both a station/network basis—$5.62/per subscriber in Q1 2024, rising to $6.31/subscriber Q1 2025—and an owner/market basis (i.e., accounting for multiple stations owned within a market)—$8.59 in Q1 2024 rising to $9.17 in Q1 2025); *see also* Nexstar June 2025 Investor Presentation at 12 (depicting 36 percent growth in retrans revenue from 2020—the first full year following the Tribune acquisition—to 2024, including a compound annual growth rate of 8 percent over that period).

[96] *See* Nexstar/Tegna Press Release. The Commission has already concluded that, when properly attributing Nexstar with New York's WPIX, the group's current UHF-discounted audience reach exceeds the 39 percent cap. *See Mission Broadcasting, Inc., Licensee of Station WPIX, New York, NY*, Notice of Apparent Liability for Forfeiture, 39 FCC Rcd. 3676 ⁋ 54 (2024) ("*WPIX NAL*") ("Prior to acquiring an attributable interest in WPIX, Nielsen reported that Nexstar had an aggregate national audience reach of approximately 39.0%. . . . With WPIX added, then, Nexstar's national reach apparently exceeded 45%, well in excess of the 39% limit set by the National Ownership Cap."). Per Nexstar, the group's UHF-discounted reach would balloon even further to approximately 60 percent with the Tegna acquisition. *See* Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025). The proposed merger would also involve station overlaps in 35 of Tegna's 51 DMAs, further enhancing Nexstar's incentive and ability to simultaneously black out multiple in-market stations if MVPDs do not accede to Nexstar's "playbook." *See* Nexstar/Tegna Press Release; *infra* at 26-27.

Tegna to go forward. Nexstar achieves these increases through so-called "after-acquired station" clauses in its existing contracts with MVPDs. Under these contractual terms, if Nexstar were to acquire a new station under a relaxed or eliminated National Cap, MVPDs would likely have to pay the higher Nexstar rate on the newly-acquired station, rather than any pre-existing rate that the MVPD paid the prior station owner.[97] Nexstar has described such "retrans synergies" as "number one" in its "playbook": "[W]e have the ability to step up any targets' retrans if its lower to our level. And that's a very nice synergy to have. It's easy to achieve."[98] Likewise, when describing the potential for the elimination of broadcast ownership regulations, Nexstar's Gliha said "if those things went away, I do think there's going to be significant opportunity for additional consolidation. . . . In the past we've been able to accomplish a lot of value . . . through application of our retransmission agreements[] onto the new assets."[99] As for the recently announced Tegna transaction, Gliha confirmed that the "the synergy playbook here is very similar to the playbook that you've seen us execute in the past," including "contractual retrans synergies"—foremost among "$300 million of synergies we expect" in the transaction's first year.[100]

---

[97] altafiber Comments at 8 ("If allowed to amass even more stations, larger broadcast station group owners will be able to charge supra-competitive retransmission consent fees immediately upon acquisition of a station pursuant to typically non-negotiable retransmission consent provisions that have the effect of terminating the acquired station's existing retransmission consent agreement (and its typically lower negotiated rates).").

[98] Transcript of Nexstar Media Group, Inc. Presentation at 53rd Annual JPMorgan Global Technology, Media and Communications Conference 7 (May 14, 2025); *see also* Nexstar June 2025 Investor Presentation at 22 ("The Nexstar Consolidation Playbook: 1. Retransmission Revenue Synergies: Acquired stations move to Nexstar's retransmission consent agreements.").

[99] Transcript of Nexstar Media Group, Inc. Presentation at UBS Global Media & Communications Conference (Dec. 9, 2024); *see also* Transcript of Nexstar Media Group, Inc. Q2 2025 Earnings Call (Aug. 7, 2025) ("I would say that as far as acquisition opportunity, growing our national footprint probably has more strategic importance to the company than simply doubling up in markets where we have a single station, which is we are already kind of doubled up in about half of our markets.").

[100] Transcript of Nexstar Media Group, Inc. M&A Call (Aug. 19, 2025) (emphasis added). Gliha went on to advise the audience to "go back and sort of take a look at what we disclosed on the Tribune side and . . . use that sort of as your guidepost in terms of allocation" of synergies among those at the retrans-, corporate-, and station-levels. *Id.*

The Commission has previously concluded that these types of price hikes—resulting from the exercise of market power rather than a properly functioning retransmission consent marketplace—harm consumers and the public interest.[101] For example, the Commission found that Nexstar apparently violated the Commission's rules, including the National Cap, when Nexstar asserted retransmission consent authority over WPIX, a station it had divested to come into compliance with the National Cap as part of the Tribune transaction.[102] As NECTA members in the New York market know well, Nexstar did so to achieve windfall profits from applying its own retransmission consent rate to WPIX, rather than the much lower rate that would have applied to the actual station owner, Nexstar's smaller sidecar entity, Mission Broadcasting.[103] Likewise, Mission abandoned its planned acquisition of WADL in the Detroit market after the Commission's approval of the transaction was conditioned on Nexstar *not*

---

There, Nexstar estimated $75 million of the $160 million total estimated synergies (i.e., 46.875 percent) to come from "net retransmission revenue" (described as "applying Nexstar rates to Tribune subscriber counts"). Nexstar Media Group, Inc., *Acquisition of Tribune Media Company* at 10 (Dec. 3, 2018), https://www.nexstar.tv/wp-content/uploads/2018/12/Nexstar-Tribune-Investor-Presentation-FINAL-12-3-18.pdf. Applying that same "allocation" to the $300 million in expected Tegna transaction synergies yields a *$140 million year-one windfall* in net retransmission consent revenues—all on the backs of MVPDs and their customers.

[101] Specifically, the Commission has made clear that "a public interest harm" exists "where an increase [in retransmission consent fees] is not the product of 'competitive marketplace considerations.'" *Nexstar/Tribune Order* ¶ 29 (2019); *see also Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, Hearing Designation Order, DA 23-149, ¶ 24 (MB Feb. 24, 2023) ("[T]he caselaw makes clear that increases in retransmission consent rates can constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace."). When analyzing this issue, the Commission has distinguished between rates that "rise over time pursuant to a functioning retransmission consent marketplace," on the one hand, and those that rise "as a product of market power," on the other. *Nexstar/Tribune Order* ¶ 29.

[102] *See generally WPIX NAL*.

[103] *See id.*; *see also* Petition for Declaratory Ruling of Comcast Cable Communications, LLC that Nexstar Media Group, Inc.'s Relationship with WPIX-TV Violates 47 C.F.R. § 73.3555(e) and the *Nexstar/Tribune Order*, at 19-20 (filed July 1, 2021), https://www.fcc.gov/ecfs/document/10702278919219/1; Informal Complaint of Spectrum Management Holding Company, LLC Against Nexstar Media Group Inc. for Violation of the Commission's Media Ownership Rules and Nexstar/Tribune Order (filed Apr. 12, 2022); Verified Complaint of Comcast Cable Communications, LLC Against Nexstar Media Group, Inc. and Mission Broadcasting, Inc. for Failure to Negotiate Retransmission Consent in Good Faith, MB Docket No. 22-443, File No. CSR-9005-C, ¶ 13 n.19 (Dec. 12, 2022), https://www.fcc.gov/ecfs/document/1212102136916/1.

imposing its non-market rates on the station.[104] If the Commission were to relax or eliminate the National Cap, Nexstar and its fellow station owners would face no similar constraints on raising rates for new stations they acquire either directly or through one of their sidecar entities.[105]

### B. Broadcaster Claims That Relaxing or Eliminating the National Cap Is Essential to Their Survival Are Without Merit.

Since this proceeding began nearly eight years ago, broadcasters have argued that their survival vis-à-vis unregulated Big Tech competitors depends on relief from the National Cap. NAB has described broadcasters as under "duress,"[106] has claimed "[t]he broadcast industry can no longer bear the burdens of asymmetric regulation,"[107] and concluded "TV station groups can

---

[104] *See Consent to Assign the License of WADL(TV), Mount Clemens, Michigan, from Adell Broadcasting Corporation to Mission Broadcasting, Inc.*, Memorandum Opinion and Order, 39 FCC Rcd. 4014 ¶¶ 45-51 (MB 2024) ("In the *WPIX NAL*, the Commission noted that 'Mission's unwritten delegation to Nexstar of the power to serve as the exclusive decisionmaker with regard to retransmission consent authority . . . as indicative of the usurpation by Nexstar of the financial and business affairs of WPIX.' To avoid similar usurpation here, we also impose conditions as set forth below, barring Mission from delegating or outsourcing authority to Nexstar to conduct retransmission consent negotiations for WADL or to otherwise control the Station's retransmission rights or revenue.").

[105] *See* Reply Comments of DISH Network L.L.C., MB Docket No. 17-318, at 4 (filed Apr. 18, 2018) ("The 39 percent cap already ensures that broadcasters can enjoy extraordinary bargaining advantages and is a necessary ceiling to ensure that these entities don't gain even greater leverage, and the ability to demand even steeper price increases.").

[106] Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 32 (filed May 13, 2022), https://www.fcc.gov/ecfs/document/10513816821480/1.

[107] Letter from Jerianne Timmerman, Senior Vice President and Deputy General Counsel Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 1 (filed Oct. 23, 2023), https://www.fcc.gov/ecfs/document/102389841161/1.

no longer effectively compete."[108] Broadcasters sounded an even louder alarm in their latest comments in this docket.[109]

In fact, the very broadcasters that alleged seven years ago that "maintenance of antiquated restrictions on local television broadcasters . . . would have the counterproductive effect of impeding innovation and growth in the industry" are the same ones boasting to shareholders today of record financial success.[110] Take Nexstar, for example. At quarterly earnings just days after the November 2024 presidential election, Nexstar CEO Perry Sook explained the broadcast conglomerate "achieved the highest third quarter total net revenue in the company's history comprised of all-time high third quarter distribution and advertising revenue, including record political advertising revenue."[111] Sook went on to explain: "*Our record-breaking top line financial performance in the current environment including record-breaking distribution revenue further validates the power and sustainability of our highly profitable business model*."[112]

Nor is Nexstar alone. Sinclair President and CEO Chris Ripley explained his broadcast station group's "equity outperformed all of our publicly traded broadcast peers in 2024, both on a

---

[108] NAB Apr. 2, 2025 Letter at 4.

[109] *See generally* NAB Comments (declaring "the need for TV broadcasters to gain scale" as "*an emergency*" no less than nine times, including a "*true emergency*" three times) (emphasis added); *see also* Comments of Nexstar Media Inc. at 1-2 (describing broadcasting as "at a *dangerous juncture*," being "under *increasing siege*," and in an "*existential crisis*" before declaring "[w]ithout *immediate regulatory relief*, local broadcasting companies will *cease to exist*") (emphasis added); Joint Comments of the Four Affiliates Associations at i (describing "broadcasters that are struggling to compete with the unregulated giants of the Internet age" and "facing *existential squeezes* on all sides") (emphasis added); Comments of the E.W. Scripps Company at 1 ("Scripps' ability to continue to deliver this high quality local programming to its viewers is *under threat* from many directions, including from increasing competition from largely unregulated video entertainment providers") (emphasis added).

[110] Letter from Elizabeth Ryder, Executive Vice President & General Counsel, Nexstar Broadcasting, Inc., to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318, at 2 (filed June 18, 2018), https://www.fcc.gov/ecfs/document/1061822539613/1.

[111] Transcript of Nexstar Media Group, Inc. Q3 2024 Earnings Call (Nov. 7, 2024).

[112] *Id.* (emphasis added).

1-year and 2-year basis" and further noted that such gains were "[d]riven by our strategic initiatives, our robust core advertising business, record-breaking political spend and a successful negotiation of significant retransmission deals with our distribution partners."[113] Ripley went on to conclude: "*In this face of ongoing industry trends towards digital media consumption, broadcast television remains an incredibly powerful platform*."[114]

In short, the station groups themselves acknowledge that they are doing just fine under the existing National Cap.[115]

### C. Relaxing or Eliminating the Cap Would Have a Destabilizing Effect on the Entire Broadcast Ecosystem.

Rather than saving broadcast station groups from financial ruin, relaxing or eliminating the National Cap would put the entire broadcast ecosystem at risk of expedited extinction. As noted, large station groups are already leveraging their size to extract supra-competitive retransmission consent fees from MVPDs. If the Commission removes all limits on broadcast ownership, the situation would worsen substantially—to the ultimate detriment of all stakeholders in the broadcast marketplace, including the station groups themselves, and to the benefit of their Big Tech competitors.[116]

---

[113] Transcript of Sinclair, Inc. 2025 Annual Meeting (June 5, 2025).

[114] *Id.* (emphasis added).

[115] *See generally* Free Press Comments at 52-58; altafiber Comments at 5-7. To the extent broadcast station groups are experiencing any financial issues, they are a function of the heavy debt loads the groups incurred to pay for station acquisitions in recent years—not the National Cap. *See* Newsmax Comments at 22-23 ("The largest broadcast television groups that used the relaxed UHF discount to go on station-buying binges saddled themselves with enormous debt loads. . . . It is important to note that without these debt loads, the broadcast licenses would provide enormous profits. For example, in 2024, Nexstar reported net income of $722 million, but interest payments on its debt were more than half that amount, $444 million. Similarly, Sinclair's net income in 2024 was $310 million, but its interest expense was almost that much at $304 million.").

[116] The Eighth Circuit's recent vacatur of the Commission's Top Four Prohibition will only exacerbate these harms as station groups use greater in-market consolidation to extract higher per-station rates, which they can then impose across their station footprints. *See generally Zimmer Radio*. To the extent the FCC further deregulates the *Local*

These harms would include immediate price increases to MVPDs and consumers, as discussed above. But the harms would not end there. MVPD subscribers have been "cutting the cord" for over a decade now,[117] and many smaller MVPDs have already exited the cable marketplace altogether when faced with higher programming costs and a smaller subscriber base to defray those costs.[118] Commenters in the docket emphasize that this trend would accelerate if large station groups can get larger and demand ever-higher retrans fees from their distributors.[119]

The irony is that these trends would ultimately hurt broadcasters themselves.[120] Retransmission consent and advertising revenues are tied to MVPD subscribership levels. As

---

Television Ownership Rule's remaining Duopoly Rule limitation, this will further spiral out of control costs to MVPDs and consumers.

[117] *2024 Communications Marketplace Report* ¶ 204 ("Traditional MVPD subscribership has been declining since 2012, when it reached 101.6 million subscribers. . . . [C]ollectively, the number of traditional MVPD subscribers fell from 61.9 million at the end of 2022 to 54.1 million at the end of 2023, which represents a loss of 7.8 million video subscribers. . . . Over the past decade, cable MVPDs lost about 17.3 million subscribers and DBS and telephone company MVPDs lost about 23.2 million subscribers. NCTA estimates that the percentage of households subscribing to a traditional MVPD has fallen from a peak of approximately 88% in 2009 to approximately 41% as of December 2023.") (citations omitted).

[118] *See, e.g.*, Luke Bouma, *5 Cable TV Companies Have Shut Down TV Service or Moved to Streaming TV in 2023 Including Spectrum*, Cord Cutters News (Oct. 21, 2023), https://cordcuttersnews.com/5-cable-tv-companies-have-shut-down-tv-service-or-moved-to-streaming-tv-in-2023-including-spectrum/ ("Mid-Rivers Communications . . . announced that they will be ending cable TV operations on December 31st, 2023. This comes as they say only 10% of their customers still pay for TV and that it is just not sustainable. . . . Wikes Communications and its RiverStreet Networks have also shut down their cable TV service in Virginia and North Carolina. Now, instead of offering their own TV service, they have partnered with DIRECTV to offer [satellite or streaming options]. . . . Sparklight Cable (also known as Cable One) will be shutting down its traditional cable TV service. Instead, customers will need to use the new Sparklight TV service, a streaming-only service that needs a device like an Apple TV or Fire Stick to work.); Luke Bouma, *One More Cable TV Company is Shutting Down Its TV Service & Replacing it With YouTube TV*, Cord Cutters News (May 15, 2023), https://cordcuttersnews.com/one-more-cable-tv-company-is-shutting-down-its-tv-service-replacing-it-with-youtube-tv/ ("Today the cable TV company WOW! announced a deal with YouTube TV to replace its cable TV service with YouTube TV. WOW! says it will start moving its remaining TV customers to YouTube TV this summer.").

[119] *See* NTCA Comments at 2 ("These retransmission consent fee increases have consequences for rural communities as rural MVPDs are driven from the market. Turning again to recent survey data, nearly one-quarter of respondents indicated that they are not very likely to continue offering MVPD service, and 7.9% report that they already have plans to exit this market altogether.").

[120] *See* ATVA Comments at 12-14 ("So far, broadcasters have responded to MVPD subscriber losses (and their corresponding retransmission consent and advertising losses) by charging MVPDs higher per-subscriber retransmission consent fees. But this provides, at best, short-term relief.") (internal citations omitted).

those levels drop with accelerated cord-cutting, so too would the revenues that flow to station groups and other broadcasters. This means less money to invest in high-quality video programming, such as popular sporting events and local news, therefore reducing the appeal of, and consumer interest in, broadcast channels, as well as the MVPDs that distribute them. And the beneficiaries of these trends will be Big Tech companies like Amazon, Apple, Alphabet (Google), and Netflix. These companies are already the largest distributors of video programming today,[121] and far outpace broadcasters and MVPDs when it comes to market capitalization and free cash flow.[122] If traditional video providers lack the resources to compete, then Big Tech will be standing by to win those marquee rights and migrate more sports and other popular content from free, over-the-air broadcasting to behind paywalls. Such developments would reduce consumer choices while adding to their costs—and thereby compounding the public interest harms detailed above.

---

[121] Amazon (130 million) and Netflix (89.6 million, including Canada) have more than double and AppleTV+ the same (45 million) number of subscribers as the entire traditional MVPD market *combined* (46.8 million). *See* Alex Werpin, *Prime Video Now Reaches 130 Million U.S. Ad-Supported Customers, Amazon Says*, The Hollywood Reporter (May 12, 2015), https://www.hollywoodreporter.com/business/digital/prime-video-reach-130-million-us-amazon-says-1236213847/; Netflix, 2024 Annual Report, Form 10-K, at 20 (Jan. 2, 2025) (reporting 89.625 million "paid memberships" in the U.S. and Canada); Todd Spangler, *Apple Is Losing Over $1 Billion Per Year On Streaming Service, Has 45 Million Apple TV+ Subscribers (Report)*, Variety (Mar. 20, 2025), https://variety.com/2025/digital/news/apple-tv-plus-streaming-losses-1-billion-per-year-1236344052/; Mau Rodriguez and John Fletcher, *Multichannel Video Market Share Q1 2025: Lowest First-Quarter Losses Since 2019*, S&P Global Market Intelligence (May 23, 2025), https://www.capitaliq.spglobal.com/apisv3/spg-webplatform-core/news/article?KeyProductLinkType=2&id=89133371.

[122] As of July 31, market caps for Amazon ($2.485 trillion), Apple ($3.1 trillion), Google ($2.377 trillion), and Netflix ($492.66 billion) tower above those of Comcast ($122.69 billion), Charter ($36.79 billion), Nexstar ($5.64 billion), and Tegna ($2.68 billion). Likewise, as of year-end 2024 the free cash flow for Amazon ($32.88 billion), Apple ($108.81 billion), Google ($72.764 billion) dwarf levels for Comcast ($15.38 billion), Charter ($3.16 billion), Nexstar ($1.1 billion), and Tegna ($632.53 million). *See* Stock Analysis, *Amazon.com, Inc. (AMZN) Stock Price and Overview*, https://stockanalysis.com/stocks/amzn/; Stock Analysis, *Apple Inc. (AAPL) Stock Price and Overview*, https://stockanalysis.com/stocks/aapl/; Stock Analysis, *Alphabet Inc. (GOOGL) Stock Price and Overview*, https://stockanalysis.com/stocks/googl/; Stock Analysis, *Netflix, Inc. (NFLX) Stock Price and Overview*, https://stockanalysis.com/stocks/nflx/; Stock Analysis, *Comcast Corporation (CMCSA) Stock Price and Overview*, https://stockanalysis.com/stocks/cmcsa/; Stock Analysis, *Charter Communications, Inc. (CHTR) Stock Price and Overview*, https://stockanalysis.com/stocks/chtr/; Stock Analysis, *Nexstar Media Group Inc. (NXST) Stock Price and Overview*, https://stockanalysis.com/stocks/nxst/; Stock Analysis, *TEGNA Inc. (TGNA) Stock Price and Overview*, https://stockanalysis.com/stocks/tgna/.

## IV. CONCLUSION

For the reasons set forth above, the State Cable Associations urge the Commission to reject proposals to relax or eliminate the National Cap. The Commission lacks authority to take this step given the plain language of 1996 Act, as amended, and Congress's clear intent to eliminate the Commission's prior role in setting the Cap. Moreover, relaxing or eliminating the Cap would impose substantial costs on the State Cable Associations' members and their customers. Large station groups already leverage their massive scale to demand ever-rising retransmission consent fees from our members. Raising or eliminating the Cap would only compound the problem, to the overall detriment of consumers and the broadcast ecosystem—and to the benefit of Big Tech competitors.

Respectfully submitted,

/s/________________

Todd Eachus
President
BROADBAND COMMUNICATIONS
ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS
ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

Jeff Weist
Executive Director
COLORADO CABLE
TELECOMMUNICATIONS ASSOCIATION
225 East 16th St., Ste. 1050
Denver, CO 80206

Charles Dudley
General Counsel
FLORIDA INTERNET AND TELEVISION
ASSOCIATION
108 S. Monroe St.
Tallahassee, FL 32301

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND
ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Lauren Chauvin
Executive Director
LOUISIANA INTERNET & TELEVISION –
THE BROADBAND ASSOCIATION
763 North St.
Baton Rouge, LA 70802

Nathan Kark
Executive Director
MICHIGAN CABLE
TELECOMMUNICATIONS ASSOCIATION
412 W. Ionia St.
Lansing, MI 48933

Melissa Wolf
Executive Director
MINNESOTA CABLE COMMUNICATIONS
ASSOCIATION
525 Park St., Ste. 310
St. Paul, MN 55103

Tim Wilkerson
President
NEW ENGLAND CONNECTIVITY AND
TELECOMMUNICATIONS ASSOCIATION
53 State St., Ste. 525
Boston, MA 02109

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF
VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

August 22, 2025

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| *Amendment of Section 73.555(e) of the Commission's Rules, National Television Multiple Ownership Rule* | ) | MB Docket No. 17-318 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

# PETITION FOR STAY AND INJUNCTION PENDING JUDICIAL REVIEW OF BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION; FLORIDA INTERNET AND TELEVISION ASSOCIATION; INDIANA CABLE AND BROADBAND ASSOCIATION; MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION; MINNESOTA CABLE COMMUNICATIONS ASSOCIATION; MISSISSIPPI INTERNET & TELEVISION; NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION; AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA

Todd Eachus
President
BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

Jeff Weist
Executive Director
COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION
225 East 16th St., Ste. 1050
Denver, CO 80206

Charles Dudley
General Counsel
FLORIDA INTERNET AND TELEVISION ASSOCIATION
108 S. Monroe St.
Tallahassee, FL 32301

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Nathan Kark
Executive Director
MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION
412 W. Ionia St.
Lansing, MI 48933

Melissa Wolf
Executive Director
MINNESOTA CABLE COMMUNICATIONS ASSOCIATION
525 Park St., Ste. 310
St. Paul, MN 55103

Lindsey Simmons
Executive Director
MISSISSIPPI INTERNET & TELEVISION
PO Box 55867
Jackson, MS 39296

Tim Wilkerson
President
NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION
53 State St., Ste. 525
Boston, MA 02109

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

October 2, 2026

## TABLE OF CONTENTS

INTRODUCTION ........ 1

BACKGROUND ........ 3

DISCUSSION ........ 6

I. PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS ........ 6

A. Eliminating the National Cap Violates the 2004 CAA ........ 6

B. The Order Is Arbitrary and Capricious ........ 11

II. THE REMAINING FACTORS DECISIVELY SUPPORT A STAY ........ 15

CONCLUSION ........ 17

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| *Amendment of Section 73.555(e) of the Commission's Rules, National Television Multiple Ownership Rule* | ) | MB Docket No. 17-318 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**PETITION FOR STAY AND INJUNCTION PENDING JUDICIAL REVIEW OF BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA; BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON; COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION; FLORIDA INTERNET AND TELEVISION ASSOCIATION; INDIANA CABLE AND BROADBAND ASSOCIATION; MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION; MINNESOTA CABLE COMMUNICATIONS ASSOCIATION; MISSISSIPPI INTERNET & TELEVISION; NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION; AND VCTA – BROADBAND ASSOCIATION OF VIRGINIA**

## INTRODUCTION

At its August 2026 Open Meeting, the Commission adopted an order ("Order")[1] based on a mistaken belief that it has authority to eliminate the statutory 39 percent national audience reach limit ("National Cap" or "Cap"). However, as the record makes clear, the Consolidated Appropriations Act of 2004 ("2004 CAA")[2] expressly and repeatedly set the National Cap at 39 percent and eliminated any mechanism by which the Commission could modify or waive—let alone eliminate—the Cap. Not only is the Order *ultra vires* in violation of the 2004 CAA, but it arbitrarily and capriciously ignores the harms that will surely follow from allowing broadcast

[1] *Amendment of Section 73.555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Report and Order, MB Docket No. 17-318, FCC 26-53 (rel. Oct. 1, 2026) ("Order"). Unless otherwise noted, all citations to comments, reply comments, or ex parte letters included herein are to those filed in MB Docket No. 17-318.

[2] Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 ("2004 CAA").

station groups to exceed the National Cap, in the form of increased retransmission consent fees for multichannel video programming distributors ("MVPDs") and higher monthly TV bills for consumers.

The Order is scheduled to take effect 60 days from Federal Register publication. Petitioners intend to file a petition for review of the Order in the Court of Appeals once the Order is published in the Federal Register. Petitioners respectfully request that, pursuant to its authority under Section 10(d) of the Administrative Procedure Act, the Commission stay the effectiveness of the Order pending judicial review.[3] **Petitioners further request that the Commission rule on this stay petition by the date on which the Order is published in the Federal Register**, to give Petitioners time to seek a stay in court, if necessary, and to give the court time to adjudicate the stay before the Order takes effect.[4]

Petitioners' challenge to the Order satisfies the Commission's criteria for a stay, which track the factors applied by federal courts.[5] First and foremost, Petitioners' challenge is likely to succeed on the merits. For the reasons set forth below, the Order violates Section 629 of the 2004 CAA, ignores Commission precedent acknowledging the mandatory nature of the Cap, and ignores substantial record evidence.

---

[3] *See* 5 U.S.C. § 705 ("When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."); *Targeting and Eliminating Unlawful Text Messages; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Advanced Methods to Target and Eliminate Unlawful Robocalls*, Order, 40 FCC Rcd. 1054 ¶ 1 (CGB 2025) (granting a petition for stay of the effective date of certain rules "find[ing] that justice requires postponement of the effective date pending judicial review of the adopted rule.").

[4] Even if the Order were to be published in the Federal Register within one week, a stay ruling in that time would be supported by precedent. For example, in both 2015 and 2024, the Commission ruled on comparable stay requests within seven days. *See Protecting and Promoting the Open Internet*, Order Denying Stay Petitions, GN Docket No. 14-28, DA 15-563 (May 8, 2015); *Safeguarding and Securing the Open Internet Restoring Internet Freedom*, Order Denying Stay Petition, 39 FCC Rcd. 5870 (June 7, 2024).

[5] *See, e.g.*, *Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadband Industries*, Order Denying Stay Request, 4 FCC Rcd. 6476 ¶ 6 (1989).

Despite the record clearly showing that retransmission consent fees and consumers' monthly TV bills will increase substantially as a result of increased broadcaster consolidation following the Order, the Commission dismissed these affordability concerns. Instead, the Commission determined that retransmission consent concerns are better handled in *transaction reviews*, inexplicably reversing course after months of Media Bureau-level orders indicating that such concerns were to be addressed in *industry-wide rulemakings*. While the Commission justified its decision to eliminate the Cap based on alleged benefits to network-affiliate relationships, it cited no evidence to support its claim that improving these relationships would mitigate the downstream harms to consumers. The Commission also failed to adequately address other substantial and material facts in the record, including the likelihood of public interest harms to localism and viewpoint diversity. As Commissioner Gomez summarized in her dissent: "I cannot support an action that so plainly exceeds the Commission's authority while simultaneously overlooking the real-world consequences for the public we serve."[6]

The remaining factors confirm the need for a stay. The broadcast consolidation unleashed by the Order will result in immediate irreparable harm in the form of higher retransmission consent fees, higher prices for MVPD customers, and increased risk of widespread blackouts of broadcast television stations on MVPD systems, to the detriment of consumers, MVPDs, and the public interest. Meanwhile, broadcasting groups would not be harmed by preserving the status quo consistent with Congress's clear directive.

## BACKGROUND

In 1985, the Commission exercised its general rulemaking and licensing authority to set the National Cap at 25 percent. Afterward, Congress in the Telecommunications Act of 1996

---

[6] Order (Dissenting Statement of Commissioner Anna Gomez).

(the "1996 Act") directed the Commission to increase the National Cap to 35 percent, while also enacting Section 202(h), requiring periodic regulatory review of all of the Commission's broadcast ownership rules.[7] In the years following the 1996 Act, Congress shared control with the Commission over the National Cap, directing the Commission to include the National Cap in its periodic review process.[8] However, in the 2004 CAA, Congress set the National Cap to 39 percent and codified a series of new provisions making express and repeated references to that "39 percent national audience reach limitation"[9] and thus making crystal clear that the Cap was a statutory limitation and no longer subject to Commission adjustments. Specifically, Congress:

- Directed the Commission to increase the national audience reach limitation for television stations to 39 percent;[10]

- Prescribed that "[a] person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B) through grant, transfer, or assignment of an additional license for a commercial television broadcast station shall have not more than 2 years after exceeding such limitation to come into compliance with such limitation";[11]

- Mandated that the divestiture requirement above "shall not apply to persons or entities that exceed the 39 percent national audience reach limitation through population growth";[12]

- Made clear that the Commission's forbearance authority in 47 U.S.C. § 160 "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation for television stations in paragraph (1)(B)";[13] and

---

[7] Telecommunications Act of 1996, Pub. L. No. 104-104, §§ 202(c), 202(h) 110 Stat. 56, 111 ("1996 Act").

[8] *See id.* § 202(g); *Fox Television Stations v. FCC*, 293 F.3d 537, 540 (D.C. Cir. 2002); S. Rep. No. 104-230 at 164 (1996) (underscoring the periodic-review process as the exclusive mechanism for revising ownership rules going forward).

[9] 2004 CAA § 629.

[10] 2004 CAA § 629(1); 1996 Act § 202(c)(1)(B).

[11] 2004 CAA § 629(2); 1996 Act § 202(c)(3).

[12] 2004 CAA § 629(2); 1996 Act § 202(c)(3).

[13] 2004 CAA § 629(2); 1996 Act § 202(c)(4).

- Excluded the "39 percent national audience reach limitation" from the quadrennial review of broadcast ownership rules.[14]

When the Commission codified the 39 percent Cap into its rules, it dispensed with notice-and-comment procedures because it viewed adoption of the 39 percent Cap and divestiture procedures as a "nondiscretionary ministerial action" "mandated by" the 2004 CAA.[15]

In the more than two decades since the 2004 CAA, the Commission never waived or modified the National Cap.[16] Rather, *in every case* where a proposed license transfer would result in a violation of the Cap, the FCC conditioned approval on mandatory divestitures to bring the new entity under the Cap, consistent with the requirements of the 2004 CAA.[17] In March of this year, the Media Bureau for the first time asserted that it could, on delegated authority, waive the National Cap and allow the Nexstar/TEGNA transaction to proceed, in violation of the Cap.[18] That Bureau-level order is still under consideration by the Commission, and the subsequent Nexstar/TEGNA transaction has been challenged extensively in the courts.[19] In fact, the U.S.

---

[14] 2004 CAA § 629(3); 1996 Act § 202(h).

[15] *Implementation of Section 629 of the Consolidated Appropriations Act, 2004 (National Broadcast Television Ownership)*, Order, 22 FCC Rcd. 4245 ¶ 2 n.7 (2007) (invoking "good cause" exception to implement the Cap in a direct final rulemaking).

[16] The Commission claimed in a 2016 order relating to the UHF discount that it had the authority to adjust the Cap, *see Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Report and Order, 31 FCC Rcd. 10213 ¶ 21 (2016), but that order was reversed on reconsideration, *see Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Order on Reconsideration, 32 FCC Rcd. 3390 ¶ 17 (2017), and the Commission reopened that question in the NPRM that gave rise to this Order. *See Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd. 10785 ¶ 7 (2017) ("We seek comment on the Commission's authority to modify or eliminate the national cap, including authority to modify or eliminate the UHF discount.").

[17] *See, e.g.*, *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183 ¶ 1 (MB 2017); *Tribune Media Company (Transferor) and Nexstar Media Group, Inc. (Transferee), et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 8436 ¶ 8 (2019) ("*Nexstar/Tribune Order*").

[18] *See generally Applications for Consent to the Transfer of Control of TEGNA Inc. to Nexstar Media Inc.*, Memorandum Opinion and Order, MB Docket No. 25-331, DA 26-267 (MB Mar. 19, 2026).

[19] *See* Emergency Application for Review of Broadband Communications Association of Pennsylvania et al., MB Docket No. 25-331 (Mar. 20, 2026) ("Nexstar/TEGNA AFR"); *In re Nexstar-TEGNA Merger Litigation*, No. 2:26-cv-00976-TLNCKD (E.D. Cal. 2026); *see also* Opposition of FCC to Emergency Petitions for Writ of Mandamus at

District Court for the Eastern District of California found that the Nexstar/TEGNA transaction would result in higher retransmission consent fees, causing harm to consumers, and issued a preliminary injunction that keeps the companies separate to this day.[20]

Despite this statutory backdrop and regulatory history, the Commission issued its Order, which, for the first time, finds that the Commission can eliminate the National Cap and ignores many of the harms raised in the record by a wide array of commenters. Following publication of the Order in the Federal Register, Petitioners intend to file a petition for review in the Court of Appeals. Petitioners now submit this petition for stay pending judicial review of the Order.

## DISCUSSION

Under Commission precedent, petitioners must show that (1) they are likely to prevail on the merits; (2) they will suffer irreparable harm if the stay is not granted; (3) other interested parties will not be substantially harmed if the stay is granted; and (4) the public interest favors granting a stay.[21] Petitioners readily satisfy all four criteria.

## I. PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS

### A. Eliminating the National Cap Violates the 2004 CAA

As Petitioners and many other parties repeatedly emphasized in this proceeding, the Commission has no authority to eliminate, modify, waive, or otherwise adjust the National Cap.[22] Congress established the National Cap at 39 percent in the 2004 CAA *in direct response*

---

12, *Broadband Commc'ns Ass'n of Pa. et al. v. FCC*, No. 26-1062 (D.C. Cir. May 11, 2026) ("We are authorized to represent that the application for review of the Media Bureau's Order is now under active consideration.").

[20] *See In re Nexstar-TEGNA Merger Litigation*, Order, No. 2:26-cv-00976-TLNCKD, at 29-31, 42-43 (E.D. Cal. April 17, 2026).

[21] *Amendment of Parts 73 and 76 of the Commission's Rules Relating to Program Exclusivity in the Cable and Broadcast Industries*, Order Denying Stay Request, 4 FCC Rcd. 6476 ¶ 6 (1989) (citing *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 842, 843-44 (D.C. Cir. 1977)).

[22] *See* State Cable Association 2025 Reply Comments at 7-19; Letter from Todd Eachus et al., to Marlene H. Dortch, Secretary, FCC (Jul. 29, 2026) ("State Cable Association July 2026 Letter"); *see also* ATVA 2025 Comments at 14-

*to the FCC's attempt to aggressively raise the Cap to 45 percent* and made repeated references to the 39 percent Cap in the statute. It is "hard to imagine a statutory term less ambiguous than . . . precise numerical thresholds."[23] As Petitioners explained, the CAA's removal of the Cap from the Commission's periodic review process and inclusion of a divestiture provision further signal Congress's intent to remove the Cap from Commission discretion.[24]

Indeed, the statutory text itself references the 39 percent Cap as statutory, not regulatory: For example, with respect to the divestiture provision, Congress did not say "A person or entity that exceeds the 39 percent national audience reach limitation *in 47 C.F.R. 73.3555* shall have not more than 2 years to divest"; it specified that someone exceeding "the 39 percent national audience reach limitation *in paragraph (1)(B)" of "section 202(c)" of "[t]he Telecommunications Act of 1996*" "shall have not more than 2 years to divest."[25]

Likewise, Congress singled out the Commission's only mechanism for setting aside statutory requirements—the Commission's forbearance authority under 47 U.S.C. § 160—and made clear that it "shall not apply to any person or entity that exceeds the 39 percent national audience reach limitation."[26] Here again, Congress underscored the statutory nature of the Cap, attributing the 39 percent limitation to paragraph (1)(B) of "section 202(c)" of "[t]he

---

22; ATVA 2025 Reply Comments at 2-3; CPAC – Center for Regulatory Freedom 2025 Comments at 2-5; Free Press 2025 Comments at 14-19; NABET-CWA 2025 Comments at 14-16; NABET-CWA 2025 Reply Comments at 10-12; NCTA 2025 Comments at 1-3; Newsmax 2025 Comments at 25-29; NTCA – The Rural Broadband Association 2025 Reply Comments at 4-6; Order (Dissenting Statement of Commissioner Anna Gomez) ("Most fundamentally, however, the Commission does not have the authority to raise or waive the 39 percent national audience reach limitation. . . . No amount of policy preference can substitute for statutory authority.").

[23] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014).

[24] State Cable Association 2025 Reply Comments at 10-12; *see also* Tom DeLay, *I Helped Create The FCC's Ownership Cap. Here's How We Did It*, DAILY WIRE (Aug. 3, 2026), https://www.dailywire.com/news/tom-delay-i-helped-create-the-fccs-ownership-cap-heres-how-we-did-it ("DeLay Op-Ed") (As then-House Majority Leader and architect of the 2004 CAA Tom DeLay explained: "My end of the deal was that the cap would be raised to 39%, and in return, [Sen.] Stevens received certainty that the FCC wouldn't and couldn't raise it higher.").

[25] 2004 CAA § 629(2) (emphasis added).

[26] *Id.*

Telecommunications Act of 1996."[27] The Commission's interpretation cannot withstand scrutiny when it "would render" Congress's rejection of the Commission's attempt to raise the Cap to 45 percent "a largely meaningless exercise."[28]

The statutory history of the 2004 CAA confirms the logic of this construction of the statute. Congress's decision to remove the National Cap from the periodic review process was a direct response to the D.C. Circuit's 2002 *Fox Television* decisions, which concluded that the Commission retained authority to modify the Cap because the Cap remained within the ambit of the Commission's Section 202(h) review process.[29] *The D.C. Circuit articulated that, to reassert control over the Cap, Congress could enact a hard cap, which is exactly what it did in the 2004 CAA.*[30] "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," and just as it presumably "adopt[s] that interpretation when it re-enacts a statute without change,"[31] it equally intends any "amendment to have real and substantial effect."[32] Contemporaneous legislative history confirms the same.[33]

---

[27] *Id.*

[28] *Rumsfeld v. Forum for Acad. and Inst. Rts.*, 547 U.S. 47, 57-58 (2006); *see also We Interrupt This Program: Media Ownership In the Digital Age: Hearing Before the S. Comm. on Com., Sci., & Transp.*, 119th Cong. (2026) (statement of Sen. Ted Cruz, Chairman) ("Yes or no, on the day after the enactment of this 2004 law, did the FCC have the statutory authority to adopt rules that set the national television audience cap to say, 42 percent or 50 percent, or was the FCC instead bound to follow the 39 percent cap fixed by statute?"). The Commission's efforts to address this hypothetical, *see* Order ¶ 95, do not withstand scrutiny.

[29] *See Fox Television Stations v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002); *opinion modified on reh'g* 293 F.3d 537 (D.C. Cir. 2002).

[30] *Fox Television Stations*, 293 F.3d at 540 ("Had the Congress wished to insulate the [National Cap] from review under § 202(h), it need only have enshrined the 35% cap in the statute itself.").

[31] *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 194 (D.C. Cir. 1993).

[32] *Stone v. INS*, 514 U.S. 386, 397 (1995).

[33] *See* State Cable Association 2025 Reply Comments at 12-13; State Cable Association July 2026 Letter at 4 n.15 (citing former Chairman Michael O'Rielly's amicus brief describing the "significant backlash" following the FCC's attempt to raise the Cap to 45 percent and Congress' actions in the 2004 CAA to settle once and for all in the statute this "recurring and particularly contentious media ownership issues."); *see also* DeLay Op-Ed ("Regulatory agencies cannot defy or modify laws enacted by Congress. If Chairman Carr wants to raise the statutory cap, he should ask Congress to pass a law giving him authority to do that. As former Republican FCC Chairman Mike O'Rielly put it, the 39% cap is 'a statute, not a suggestion.' As someone who helped create that statute, I agree."); 149 Cong. Rec.

Accordingly, until now, the Commission has never modified, nor sought to eliminate, the National Cap in the aftermath of the 2004 CAA. Rather, when presented with proposed transactions that would exceed the Cap, the Commission has *always* required divestitures. While the Media Bureau approved the Nexstar/TEGNA transaction and granted a waiver of the National Cap earlier this year, that Bureau-level order has no precedential effect and, as referenced above, is subject to a pending Application for Review.[34] At the very least, under the Major Questions Doctrine, the Commission would need to provide a very good explanation for "discover[ing]" "an unheralded power" to eliminate the Cap and allow national audience reaches beyond 39 percent.[35] As further discussed below, it has not come close to providing the requisite explanation for eliminating the Cap.

In sum, the Commission's general rulemaking authority cannot circumvent the text of the 2004 CAA.[36] Not only has Congress addressed the Commission's authority to eliminate or otherwise adjust the Cap directly, but Congress has also specified in the Administrative Procedure Act that the agency may not act contrary to or "in excess of statutory jurisdiction,

H12838 (2003) (statement of Rep. Billy Tauzin) ("[T]his bill will forbid the FCC from raising or lowering the 39 percent limit . . . Eliminating the FCC's discretion over the national audience-reach limit in this manner is unwise."); 150 Cong. Rec. S148 (2004) (statement of Sen. Dianne E. Feinstein quoting Sen. Robert Byrd) ("[T]he one-year limitation on the FCC media ownership rule was turned into a permanent cap at 39 percent."); 150 Cong. Rec. S141 (2004) (statement of Sen. Patrick J. Leahy) ("[T]he White House successfully lobbied for last-minute increase of a permanent cap at 39%.").

[34] *See supra* note 19.

[35] *Util. Air Regul. Grp.*, 573 U.S. at 324; *see also Biden v. Nebraska*, 600 U.S. 477, 519 (2023) (Barrett, J., concurring) ("A longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred."); *see also* Newsmax 2025 Comments ("The Supreme Court's Major Questions Doctrine explains that agencies lack authority to adopt 'basic and fundamental changes in [a] scheme' designed by Congress. There could be no greater 'basic and fundamental change' in a limit established by Congress than abolishing it altogether.") (citing *Biden*, 600 U.S. at 494).

[36] *See* State Cable Association 2025 Reply Comments at 14-19 (noting Supreme Court precedent holding that "statutory permission to 'modify' does *not* authorize 'basic and fundamental changes in the scheme' designed by Congress") (quoting *Biden*, 600 U.S. at 494); State Cable Association July 2026 Letter at 5; *see also* Petition to Deny of Broadband Communications Association of Pennsylvania et al., MB Docket No. 25-331, at 17-21 (Dec. 31, 2025); Nexstar/TEGNA AFR at 1-5.

authority, or limitations."[37] Indeed, *Loper Bright* requires the Commission to defer to Congress, not the other way around[38]—a requirement that applies with even more force now that the Supreme Court has dispelled the fiction that the FCC might serve some "quasi-legislative" function.[39] Even to the extent a court looks to the Commission's prior interpretations for guidance under *Skidmore v. Swift*,[40] as the Order suggests should be the case,[41] doing so would only underscore both the novelty of the Commission's approach and the strength of Petitioners' interpretation.[42]

In light of Congress's decision to impose a "39 percent national audience reach limitation" in statute, along with other provisions clearly signifying its intent to make this cap permanent, any Commission interpretation finding authority to eliminate, modify, waive, or otherwise adjust the Cap is simply incorrect.[43] The best interpretation of the statute is that

---

[37] 5 U.S.C. § 706(2)(C); *see also* Kannon Shanmugam & William Marks, *The FCC Lacks Statutory Authority to Revise the Telecommunications Act's 39% National Ownership Cap for Television* 11 n.17 (2025), available at https://americantelevisionalliance.org/wp-content/uploads/2025/12/NationalOwnershipCapWhitePaper_12-15-25.pdf (Given the directive in the Administrative Procedure Act that an agency may not act contrary to or in excess of statutory jurisdiction, authority, or limitations, the FCC is barred from using its waiver authority as "an end run to Congress's statutory commands in the 2004 amendments, including the prohibition on FCC forbearance from the 39% cap.").

[38] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).

[39] *Trump v. Slaughter*, 146 S. Ct. 2283, 2302 (2026) ("When an agency 'executes' a congressional mandate against private parties, it exercises executive power—no ifs, ands, or quasis about it.").

[40] 323 U.S. 134 (1944)

[41] *See* Order ¶ 92 ("[T]he Commission has consistently maintained that it retains authority to repeal or revise both the national cap and the UHF discount [since the 1996 Act]."). The Commission specifically cites its statements in the 2016 *UHF Discount Elimination Order* in support of repeal of the Cap. *See id.* ¶¶ 88, 96.

[42] *See Encino Motorcars v. Navarro*, 579 U.S. 211, 221-22 (2016).

[43] *See* Order (Dissenting Statement of Commissioner Anna Gomez) ("Simply put, the 39 percent national audience reach limitation was established by a statute and only Congress has the authority to raise or eliminate it. The Consolidated Appropriations Act of 2004 (2004 CAA) directed the Commission to set the national audience reach limitation at 39 percent, removed this limitation from the congressionally created review process, established an ongoing divesture requirement for any entity that exceeds the 39 percent limitation, and not only failed to provide the Commission with authority to modify, waive, or raise the limitation, it affirmatively stated that the Commission was prohibited from forbearing from enforcing the statutory provision. These steps were deliberate, explicit, and binding.").

Congress intended for the 39 percent Cap to remain in place unless and until it decides to change it in the future via legislation.

### B. The Order Is Arbitrary and Capricious

Administrative law makes clear that "an agency is under an obligation to follow, distinguish, or overrule its own precedent."[44] When an agency overrules its own precedent, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."[45] Furthermore, an agency order is arbitrary and capricious if it "offer[s] an explanation for its decision that runs counter to the evidence before the agency."[46] Here, the Order fails to properly engage with the substantial evidence submitted in the record, much less rebut it, and contradicts prior precedent, particularly on retransmission consent harms, and therefore is arbitrary and capricious.

There are myriad reasons why eliminating the Cap will exacerbate the harms that Petitioners and others have detailed in the record. First, removing the Cap will lead to higher retransmission consent-related costs for MVPDs and consumers. As thoroughly demonstrated on the record, large station groups routinely leverage their nationwide footprints to threaten station blackouts and force MVPDs to accede to skyrocketing retransmission consent fees and higher prices for consumers for what is supposed to be free over-the-air television.[47] The Commission's Order will super-charge that trend as large station groups expand into new markets without any constraint. The Nexstar-TEGNA merger, which would create a broadcast

---

[44] *Steger v. Dep't of Def.*, 717 F.2d 1402, 1406 (1983).

[45] *FCC v. Fox TV Stations*, 556 U.S. 502, 515-16 (2009).

[46] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[47] *See, e.g.*, State Cable Association 2025 Reply Comments at 5; NCTA 2025 Comments at 3-4; ATVA 2025 Comments at 2-9; Cincinnati Bell Extended Territories LLC (d/b/a altafiber) 2025 Comments at 8-9; NTCA – The Rural Broadband Association 2025 Comments at 1-2.

station group behemoth reaching 80 percent of U.S. television households, is merely a preview of the further massive broadcast industry consolidation and higher consumer prices that will follow if this Order is not stayed.[48]

Yet, the Order summarily dismisses retransmission consent concerns by arbitrarily stating they should be addressed elsewhere, including on a case-by-case basis in individual transactions.[49] As Petitioners have explained, this is cold comfort for consumers who will be subject to significant price increases as a result of the Order.[50] Moreover, the Commission's statements are squarely inconsistent with how it has handled retransmission consent-related issues in recent broadcast transaction approval orders. In those orders, the Commission (acting through its Media Bureau) dismissed transaction-specific retransmission consent-related affordability harms, finding that "issues of broad applicability, such as the effect of broadcast industry consolidation on the retransmission consent process, are best handled in a rulemaking of

---

[48] *See In re Nexstar-TEGNA Merger Litigation*, Order, No. 2:26-cv-00976-TLNCKD (E.D. Cal. April 17, 2026). In April, Scripps, too, sought a waiver to exceed the 39 percent Cap as part of its acquisition of 23 INYO stations. *See Media Bureau Establishes Pleading Cycle For Application For Consent To The Assignment Of Broadcast Television Licenses From Inyo Broadcast Licenses, LLC To Ion Television License, LLC, And Permit-But-Disclose Ex Parte Status For The Proceeding*, Public Notice, MB Docket No. 26-85, DA 26-376 (MB Apr. 16, 2026). In late June, Scripps filed an amendment to "remove[] and withdraw[]" six stations from its pending FCC applications to "bring[] the Transaction into compliance with the [Cap] by reducing the post-transaction national audience reach below 39 percent of television households nationwide" to 38.96 percent. Applications of ION Television License, LLC and INYO Broadcast Licenses, LLC, FCC File Nos. 0000290962, et seq., Amendment Explanation and Notice of Withdrawal of Option Exercise (filed June 25, 2026). Although Scripps' national audience reach would remain under the Cap for the time being, Scripps still retains the option to reacquire those six INYO stations in the future, leaving a question of not if but when it will resume consolidation beyond the 39 percent Cap. *See* Option Agreement by and between Scripps Media, Inc., Inyo Broadcast Holdings, LLC, and Inyo Broadcast Licenses LLC § 2 (Jan. 7, 2021) (establishing an option period effective through January 7, 2028); *Id.* §§ 4(b)(vii), 9, 10 (providing no set closing date but instead requiring closing no later than three days after the satisfaction of various conditions, including Commission consent).

[49] Order ¶¶ 67-68.

[50] *See* State Cable Association July 2026 Letter at 7.

industry-wide effect."[51] The Order arbitrarily and capriciously doubles down on this shell game at the expense of due process, consumer affordability, and the broader public interest.[52]

The Order similarly dismisses concerns that repealing the Cap will diminish broadcast competition by harming smaller, independent broadcasters and impeding larger broadcast groups from competing amongst each other.[53] Rather, the Commission takes broadcasters at their word that they need repeal of the National Cap to compete with "Big Tech," ignoring broadcasters' continued profitability.[54] Likewise, the Order dismisses extensive record evidence of the harms that repeal and the resulting industry consolidation will cause to localism via news duplication

---

[51] *See Applications to Assign Licenses to Gray Television Licensee, LLC*, Memorandum Opinion and Order, DA 26-427 ¶ 31 (MB Apr. 30, 2026) ("[I]ssues of broad applicability, such as the effect of broadcast industry consolidation on the retransmission consent process, are best handled in a rulemaking of industry-wide effect."); Letter from Chief, Video Division to Sinclair, Inc. et al., Letter Order, DA 26-108, at 9 (MB Feb. 3, 2026) (same); Letter from Chief, Video Division to Sinclair, Inc. et al., Letter Order, DA 26-177, at 6 (MB Feb. 20, 2026) (same); Letter from Chief, Video Division to Cox Television Jacksonville et al., Letter Order, DA 26-304, at 5 (MB Mar. 30, 2026) (same); Letter from Chief, Video Division to Gray Television Licensee, LLC et al., Letter Order, DA 26-417, at 5 (MB Apr. 28, 2026) (same); Letter from Chief, Video Division to Gray Television Licensee, LLC et al., Letter Order, DA 26-441, at 13 (MB May 6, 2026) (same); Letter from Chief, Video Division to Cadillac Telecasting Co. et al., Letter Order, DA 26-612, at 5-6 (MB June 18, 2026) (same); Letter from Chief, Video Division to WTVQ-TV LLC et al., Letter Order, DA 26-755, at 5-6 (MB July 20, 2026) (same).

[52] *See* Order ¶ 69 & n.237 (acknowledging but failing to reconcile the inconsistency between the recent Media Bureau orders and the Order regarding the proper forum to raise retransmission consent-related harms); Order (Dissenting Statement of Commissioner Anna Gomez) ("Clearly the Commission does not want to address the challenging questions retransmission consent raises, but ***passing the buck to another proceeding when the impact is significant, direct, and current can only go so far without becoming the very essence of arbitrary and capricious. The Commission has crossed that line here. This is indefensible.***") (emphasis added).

[53] *See, e.g.*, Hispanic Technology & Telecommunications Partnerships 2025 Reply Comments at 1; Multicultural Media, Telecom and Internet Council et al. 2025 Reply Comments at 3-5; NABET-CWA 2025 Reply Comments at 3-5; National Action Network 2025 Reply Comments at 2; Newsmax 2025 Reply Comments at 2-4; 2042 Media USA Nov. 2025 Comments at 1-2.

[54] Order ¶¶ 47-51. *But see* State Cable Association 2025 Reply Comments at 20. The FCC notes that "[a] number of commenters assert that elimination of the national cap will harm competition and viewpoint diversity," but only directly addresses Newsmax, saying Newsmax has confused source diversity with viewpoint diversity. Order ¶ 27 n.89.

and cuts to local journalism.[55] Here again, the Commission accepts broadcasters' counterfactual arguments that repealing the Cap will somehow protect and promote local news.[56]

The Commission largely attempts to justify repeal on the alleged benefits to network-affiliate relationships (i.e., repeal will give large station groups added leverage in negotiations with networks over reverse retransmission consent payments).[57] However, the Commission fails to explain, let alone demonstrate, that such changed dynamics in network-affiliate relationships will in any way mitigate the harms presented in the record.[58] For example, the Order asserts that "additional leverage to negotiate reverse compensation fees could put downward pressure on the retransmission consent fees that MVPDs pay to owners of affiliated stations."[59] There is no evidence for this assertion in fact or economic theory.[60]

---

[55] *See, e.g.*, NABET-CWA 2025 Reply Comments at 4, 7-9; National Action Network 2025 Reply Comments at 2-4; United Church of Christ Media Justice Ministry et al. 2025 Reply Comments at 3-4.

[56] Order ¶¶ 55-57, 60-63. *Contra* DISH 2018 Comments at 11-12; Free Press 2018 Comments at 11-12; Herndon-Reston Indivisible 2018 Comments at 2-4; Newsmax 2018 Comments at 5-7; WGAW 2018 Comments at 7-10; Free Press 2018 Reply Comments at 10-11; DISH 2018 Reply Comments at 5; UCC et al. 2018 Reply Comments at 2-4; WGAW 2018 Reply Comments at 2-4; Free Press 2025 Reply Comments at 32-52; NewsGuild-CWA et al. 2025 Reply Comments at 1-3; Newsmax 2025 Reply Comments at 2-3, 9-13; ATVA 2025 Reply Comments at 19-23; HTTP 2025 Reply Comments at 2; UCC et al. 2025 Reply Comments at 3-4; National Action Network 2025 Reply Comments at 2, Appx; NABET-CWA 2025 Reply Comments at 7-10.

[57] Order ¶¶ 41 & n.155, 61.

[58] *See* State Cable Association July 2026 Letter at 7.

[59] Order n.152.

[60] The Commission now caveats that this theory is "not a basis for our action today," Order n.152, but its inclusion in the Order nonetheless flies in the face of market realities. In fact, numerous large affiliate station groups have boasted positive *net* retrans growth (i.e., more money coming in from MVPDs than money going out to the networks). *See* Transcript of Nexstar Media Group, Inc. Presentation at UBS Global Media and Communications Conference (Dec. 8, 2025) ("Historically, we've been able to . . . deliver positive growth in net retrans growth. And we think that, again, we'll see a continuation of that trend. . . . [W]e do expect that we will continue to show growth in both gross and net retrans in '26."); Janet Stilson, *Despite Uncertainty, Sinclair Sees Reasons To Be Optimistic Going Forward*, TVNEWSCHECK (May 7, 2025), https://tvnewscheck.com/business/article/despite-uncertainty-sinclair-sees-reasons-to-be-optimistic-going-forward/ (reporting Sinclair's "net retransmission revenue grew by mid-single-digits year over year in the quarter, and Sinclair expects a mid-single-digit compound annual growth rate for net retrans over a two-year period that ends with the close of this year"); Press Release, Gray Media, Gray Media Reports Fourth Quarter Results Exceeding Guidance, Feb. 26, 2026, https://graytv.gcs-web.com/static-files/e21486e5-7317-4873-aab5-2246b37f38cb (reporting a 3 percent year-over-year increase in net retransmission consent revenue). This comes all while the largest broadcasters like these are commanding higher fees from MVPDs. *See, e.g.*, State Cable Association 2025 Reply Comments at 21-29.

For all of these reasons, the Order is unsupported by and does not flow logically from the record evidence and is therefore arbitrary and capricious.

## II. THE REMAINING FACTORS DECISIVELY SUPPORT A STAY

The remaining factors likewise support a stay. Petitioners will face serious and irreparable injury if the Order is not stayed; and the balance of harms and the public interest favors a stay.

Petitioners' injuries from eliminating the Cap are clear cut, certain, and irreparable. As noted, eliminating the National Cap would compound the problem of spiraling retransmission consent-related costs.[61] Numerous commenters in the record have highlighted how retransmission consent fees paid to TV broadcast stations have grown exponentially over the past two decades—and especially in the wake of increasing broadcast consolidation—and would immediately grow further as station groups expand into new markets without constraint once the Cap is repealed.[62] The record in this and other broadcast ownership-related dockets reinforces this conclusion.[63]

The public interest also favors a stay. As numerous commenters explained, the Cap prevents the type of broadcast consolidation that leads to job cuts, a reduction in local news,

---

[61] *See* State Cable Association 2025 Reply Comments at 20.

[62] For example, NCTA observed that "[r]etransmission consent revenue increased by 31% from 2019 to 2023 ($11.5 billion to $15.1 billion) and more than *135%* when compared to 2015 levels ($6.4 billion)—despite MVPDs' decline in subscribership." *See, e.g.*, NCTA 2025 Comments at 4 (citing *2024 Communications Marketplace Report*, Report, 39 FCC Rcd. 14116 ¶ 263 (2024); *2020 Communications Marketplace Report*, Report, 36 FCC Rcd. 2945 ¶ 216 fig. II.D.17 (2020)). Likewise, DISH stated that "the average total retransmission fee per subscriber, per month (across all station owners) rose from $0.19 in 2006 to $6.79 in 2016." DISH 2018 Comments at 4.

[63] *See* ATVA 2025 Comments at 4-9 (recapping retransmission consent-related harms established on the record to date); Letter from Michael Nilsson, DIRECTV, to Marlene H. Dortch, Secretary, FCC, at Exh. A (filed Sept. 19, 2025) (submitting a report by economist Dr. Allan Shampine finding a positive relationship between retransmission consent fees and station group size).

reduced competition, and decreased viewpoint diversity.[64] Additionally, the Commission has previously concluded that price hikes—resulting from the exercise of market power rather than a properly functioning retransmission consent marketplace—harm the public interest.[65]

Conversely, broadcasters cannot plausibly claim such harms from a stay. A stay merely requires the Commission to abide for a few more months a rule that went 20 years without question,[66] and that the station groups themselves acknowledge has not been an impediment to their growth.[67] Moreover, there will be no harm when it comes to recent mergers that would exceed the Cap, as Nexstar and TEGNA must remain separate due to the preliminary injunction in the Eastern District of California, at least through July 6, 2027, when the merits trial begins.[68]

---

[64] *See, e.g.*, Hispanic Technology & Telecommunications Partnerships 2025 Reply Comments at 1; Multicultural Media, Telecom and Internet Council et al. 2025 Reply Comments at 3-5; NABET-CWA 2025 Reply Comments at 3-5, 7-9; National Action Network 2025 Reply Comments at 2-4; Newsmax 2025 Reply Comments at 2-4; United Church of Christ Media Justice Ministry et al. 2025 Reply Comments at 3-4.

[65] Specifically, the Commission has made clear that "a public interest harm" exists "where an increase [in retransmission consent fees] is not the product of 'competitive marketplace considerations.'" *Nexstar/Tribune Order* ¶ 29; *see also Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC*, Hearing Designation Order, DA 23-149, ¶ 24 (MB Feb. 24, 2023) ("[T]he caselaw makes clear that increases in retransmission consent rates can constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace."). When analyzing this issue, the Commission has distinguished between rates that "rise over time pursuant to a functioning retransmission consent marketplace," on the one hand, and those that rise "as a product of market power," on the other. *Nexstar/Tribune Order* ¶ 29.

[66] *See also Nken v. Holder*, 556 U.S. 418, 435 (2009) (equities and public interest "merge" against the federal government). And even if a stay were to delay a public-interest-advancing merger, there is no reason the merger could not happen with alacrity if the Court ultimately lifts the stay. *See FTC v. HJ Heinz*, 246 F.3d 708, 726-27 (D.C. Cir. 2001) ("If the merger makes economic sense now, the appellees have offered no reason why it would not do so later.").

[67] *See generally* State Cable Association 2025 Reply Comments at 29-31; Free Press 2025 Comments at 52-58; altafiber 2025 Comments at 5-7. To the extent broadcast station groups are experiencing any financial issues, they are a function of the heavy debt loads the groups incurred to pay for station acquisitions in recent years—not the National Cap. *See* Newsmax 2025 Comments at 22-23 ("The largest broadcast television groups that used the relaxed UHF discount to go on station-buying binges saddled themselves with enormous debt loads. . . . It is important to note that without these debt loads, the broadcast licenses would provide enormous profits. For example, in 2024, Nexstar reported net income of $722 million, but interest payments on its debt were more than half that amount, $444 million. Similarly, Sinclair's net income in 2024 was $310 million, but its interest expense was almost that much at $304 million.").

[68] *See In re Nexstar-TEGNA Merger Litigation*, Order Amending the Initial Pretrial Scheduling Order, Setting Trial, and Entering Stipulated Discovery Protocol, No. 2:26-cv-00976-TLNCKD (E.D. Cal. July 9, 2026) (setting a trial date of July 6, 2027).

There is thus little indication that harms will result from maintaining the status quo that has been in place for decades pending judicial review of the Commission's Order.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Commission stay the effectiveness of the Order pending judicial review. **If the Commission has not ruled on this stay petition by the date on which the Order is published in the Federal Register, Petitioners will conclude that the agency has "denied the motion or failed to afford the relief requested"[69] and seek a judicial stay.**[70]

Respectfully submitted,

/s/________________


Todd Eachus
President
BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA
127 State St.
Harrisburg, PA 17101

David Ducharme
Executive Director
BROADBAND COMMUNICATIONS ASSOCIATION OF WASHINGTON
4217 Williams Ave. N.
Renton, WA 98056

Jeff Weist
Executive Director
COLORADO CABLE TELECOMMUNICATIONS ASSOCIATION
225 East 16th St., Ste. 1050
Denver, CO 80206

Charles Dudley
General Counsel
FLORIDA INTERNET AND TELEVISION ASSOCIATION
108 S. Monroe St.
Tallahassee, FL 32301

Joseph Dant
Executive Director
INDIANA CABLE AND BROADBAND ASSOCIATION
150 W. Market St., Ste. 412
Indianapolis, IN 46204

Nathan Kark
Executive Director
MICHIGAN CABLE TELECOMMUNICATIONS ASSOCIATION
412 W. Ionia St.
Lansing, MI 48933


[69] Fed. R. App. P. 18(a).

[70] *Id.*

Melissa Wolf
Executive Director
MINNESOTA CABLE COMMUNICATIONS ASSOCIATION
525 Park St., Ste. 310
St. Paul, MN 55103

Lindsey Simmons
Executive Director
MISSISSIPPI INTERNET & TELEVISION
PO Box 55867
Jackson, MS 39296

Tim Wilkerson
President
NEW ENGLAND CONNECTIVITY AND TELECOMMUNICATIONS ASSOCIATION
53 State St., Ste. 525
Boston, MA 02109

Ray LaMura
President
VCTA – BROADBAND ASSOCIATION OF VIRGINIA
1111 East Main St., Ste. 802
Richmond, VA 23219

October 2, 2026

**DECLARATION OF JOE LORAH, BLUE RIDGE COMMUNICATIONS**

I, Joe Lorah, being over 18 years of age, swear and affirm as follows:

1. My name is Joe Lorah. I make this declaration using facts of which I have personal knowledge, or based on information provided to me, in connection with the FCC's National Cap Order ("Order"),[1] and the likely harmful effects of the Order on Blue Ridge Communications ("Blue Ridge").

2. I am currently Director of Government & Public Affairs at Blue Ridge. Blue Ridge has been connecting Pennsylvanians since 1950 and today provides cable, Internet, and phone services to the Poconos and other areas of central Pennsylvania. In my role, I develop and implement Blue Ridge's policy agenda and advocacy based on our operational strategy and serve as the primary point of contact between the company and state and local officials.

3. Blue Ridge is a multichannel video programming distributor ("MVPD") and member of the Broadband Communications Association of Pennsylvania. Today, Blue Ridge serves over 60,000 video customers in six designated market areas ("DMAs") [2] spanning Pennsylvania and New York.

4. Our video customers rely on Blue Ridge to carry a wide range of news, sports, and general entertainment programming on its cable systems. Among other channels, this includes the local broadcast affiliates of the "Big Four" national networks (i.e., ABC, CBS, FOX, and NBC), which feature must-have, marquee programming such as the NFL and college

---

[1] *Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Report and Order, MB Docket No. 17-318, FCC 26-53 (rel. Oct. 1, 2026).

[2] These markets are New York, NY; Philadelphia, PA; Harrisburg-Lancaster-Lebanon-York, PA; Buffalo, NY; Wilkes Barre-Scranton-Hazleton, PA; and Elmira, NY.

football or awards shows like the Oscars, in addition to essential local news and emergency programming. In order to carry these broadcast stations on our channel lineups, MVPDs like Blue Ridge must negotiate "retransmission consent" agreements with the owners of those broadcast stations and pay applicable fees (generally, on a per-station, per-subscriber monthly basis). If Blue Ridge and a broadcaster do not come to terms in a retransmission consent negotiation, that group will deny Blue Ridge's customers access to that content through a programming blackout.

5. Broadcast station groups negotiate retransmission consent on a nationwide basis, across their station footprints.[3] Thus, if Blue Ridge cannot agree to the retransmission consent fee imposed by a broadcast station group, that station group will simultaneously blackout its stations across all DMAs in which Blue Ridge operates.

6. Broadcast station group consolidation over the past decade has caused retransmission consent fees imposed on MVPDs like Blue Ridge to increase at a staggering pace.[4] As station groups consolidate, greater numbers of stations are subject to a single negotiation, increasing the risk of widescale blackouts to consumers. In turn, this increases the

---

[3] *See, e.g., In re Nexstar-TEGNA Merger Litigation*, Order, No. 2:26-cv-00976-TLNCKD at 12-13, (E.D. Cal. April 17, 2026) ("Nexstar-TEGNA Preliminary Injunction") (recognizing that harms from the Nexstar-TEGNA merger are far reaching because the "Transaction materially increases Nexstar's national footprint and bargaining leverage in negotiations that are commonly conducted on a station-group, multi-market basis"); Competitive Impact Statement at 4, *United States v. Nexstar Media Grp., Inc.*, No. 1-19-cv-02295-DLF (D.D.C. Feb. 10, 2020), https://www.justice.gov/atr/case-document/file/1192116/dl?inline ("Nexstar Competitive Impact Statement") ("A retransmission agreement is negotiated directly between a broadcast station group . . . and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or 'footprint.'").

[4] *See* Reply Comments of Broadband Communications Association of Pennsylvania, et al., MB Docket No. 17-318 at 21-22 (filed Aug. 22, 2025) ("State Cable Association Reply Comments") ("On a per-subscriber-per-month basis, retransmission consent fees have increased 12,116 percent since 2006 and 242 percent since 2016.").

leverage station groups have to extract supra-competitive fees from MVPDs like Blue Ridge, which results in higher prices for our company and our customers.[5]

7. The Order's elimination of the 39 percent national audience reach limit ("National Cap") will supercharge this problem. The FCC's broadcast ownership rules have traditionally stood as a bulwark against anticompetitive levels of concentration—particularly the National Cap, which Congress set at 39 percent of U.S. television households.[6] Without this structural limit, station groups can continue to grow without constraint and exert ever-escalating leverage to extract ever-higher retransmission consent fees from MVPDs like Blue Ridge.

8. Nexstar, the largest station group owner by both reach and revenue, provides an illustrative example. Nexstar has attributed its ability to "grow distribution revenue" (i.e., revenue from retransmission consent fees) to its "position as the largest owner of local broadcast television."[7] Nexstar also generally commands the highest retransmission consent fees in the industry.[8] When describing the elimination of broadcast ownership regulations such as the National Cap, Nexstar executives have touted to investors that "there's going to be significant opportunity for additional consolidation . . . . In the past we've been able to accomplish a lot of

[5] *See, e.g.*, Nexstar Competitive Impact Statement at 8 (explaining that the ability "to black out more . . . stations simultaneously . . . lead[s] to increased retransmission consent fees" for in-footprint MVPDs and their "subscribers in the form of higher subscription fees."); State Cable Association Reply Comments at 24-25 (citing economic analysis finding that broadcaster size is positively correlated with broadcaster bargaining power); Nexstar-TEGNA Preliminary Injunction at 11, 29-30, 41 (recognizing that broadcast consolidation gives broadcast station groups leverage to extract higher fees in retransmission negotiations and that MVPDs pass those fees on to subscribers); Letter from Michael Nilsson, DIRECTV, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 17-318 at Exh. A (filed Sept. 19, 2025) (submitting a report by economist Dr. Allan Shampine finding a positive relationship between retransmission consent fees and station group size).

[6] *See* State Cable Association Reply Comments at 11-19.

[7] Transcript of Nexstar Media Group, Inc. Q4 2024 Earnings Call (Feb. 27, 2025).

[8] *See* State Cable Association Reply Comments at 26 (citing S&P Global Market Intelligence, Average Monthly Retrans Per Sub Fees Q1 2024 & Q1 2025 (July 2025) and Nexstar Media Group, Investor Presentation – June 2025 at 12 (Jun. 11, 2025), https://www.nexstar.tv/wp-content/uploads/2025/06/Nexstar-Investor-Deck-2025-6.10.25.pdf ("Nexstar June 2025 Investor Presentation")).

value . . . through application of our retransmission agreements[] onto the new assets."[9] In other words, Nexstar's size allows it to have the highest rates in the country, apply those higher rates on any stations it acquires, and obtain even greater leverage moving forward when negotiating with MVPDs.[10]

9. In the aftermath of the FCC eliminating the National Cap, executives from Sinclair, Inc. and Gray Media, Inc.—the second- and third-largest station-owner conglomerates by revenue—have boasted to investors of plans to further consolidate in the new environment absent any regulatory guardrails.[11] That foreshadowed consolidation, which is already having a real-world effect on valuation, portends further increases in retransmission consent fees and higher risks of widescale blackouts.

10. Beyond the increases to retransmission consent fees and risks of widescale blackouts, the Order will harm Blue Ridge's customers. MVPD subscribers have been "cutting the cord" for over a decade now, and many smaller MVPDs have already exited the cable marketplace altogether when faced with higher programming costs and a smaller subscriber base

[9] Transcript of Nexstar Media Group, Inc. Presentation at UBS Global Media & Communications Conference (Dec. 9, 2024); *see also* Transcript of Nexstar Media Group, Inc. Q2 2025 Earnings Call (Aug. 7, 2025) ("I would say that as far as acquisition opportunity, growing our national footprint probably has more strategic importance to the company than simply doubling up in markets where we had a single station, which is – we're already kind of doubled up in about half of our markets.").

[10] *See* Nexstar-TEGNA Preliminary Injunction at 5 ("Nexstar has a 'Consolidation Playbook' that describes acquisitions as a way to gain 'scale' and 'leverage,' with the ultimate aim of raising prices.") (citing Nexstar June 2025 Investor Presentation).

[11] *See, e.g.*, Sinclair, Inc. Q2 2026 Earnings Call (Aug. 5, 2026), https://perma.cc/395N-SEDV ("[W]e'll be able to transact under this new rule shortly after the vote happens as soon as it gets into the federal registry [sic]."); Gray Media, Inc. Q2 2026 Earnings Call (Aug. 7, 2026), https://perma.cc/YU2V-K63Y ("I think what the FCC has done is superb. And so yes, we are open for business.").

to defray those costs.[12] This Order will only accelerate this trend due to increased monthly consumer TV prices caused by higher retransmission consent fees.

11. In sum, the Order paves the way for super-charged broadcast station group consolidation, which, in turn, will result in higher retransmission consent fees for our company, higher prices for our customers, and a greater risk of broadcast station blackouts in the markets Blue Ridge serves.

12. By staying this Order, the Court can prevent these significant harms to Blue Ridge and our customers while the merits of the underlying challenge are adjudicated.

---

[12] *See, e.g.,* Luke Bouma, *5 Cable TV Companies Have Shut Down TV Service or Moved to Streaming TV in 2023 Including Spectrum, Cord Cutters News (Oct. 21, 2023),* https://cordcuttersnews.com/5-cable-tv-companies-have-shut-down-tv-service-or-moved-to-streaming-tv-in-2023-including-spectrum/ ("Mid-Rivers Communications . . . announced that they will be ending cable TV operations on December 31st, 2023. This comes as they say only 10% of their customers still pay for TV and that it is just not sustainable. . . . Wikes Communications and its RiverStreet Networks have also shut down their cable TV service in Virginia and North Carolina. Now, instead of offering their own TV service, they have partnered with DIRECTV to offer [satellite or streaming options]. . . . Sparklight Cable (also known as Cable One) will be shutting down its traditional cable TV service. Instead, customers will need to use the new Sparklight TV service, a streaming-only service that needs a device like an Apple TV or Fire Stick to work.); Luke Bouma, *One More Cable TV Company is Shutting Down Its TV Service & Replacing it With YouTube TV, Cord Cutters News (May 15, 2023),* https://cordcuttersnews.com/one-more-cable-tv-company-is-shutting-down-its-tv-service-replacing-it-with-youtube-tv/ ("Today the cable TV company WOW! announced a deal with YouTube TV to replace its cable TV service with YouTube TV. WOW! says it will start moving its remaining TV customers to YouTube TV this summer.").

* * * *

The foregoing declaration has been prepared using facts of which I have personal knowledge or based upon information provided to me. I declare under penalty of perjury that the foregoing is true and correct to the best of my current information, knowledge, and belief.

Joe Lorah
Director of Government & Public Affairs

Dated:
613 3rd Street
Palmerton, PA 18071
November 12, 2026