No. 26-3871

**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

BROADBAND COMMUNICATIONS ASSOCIATION OF PENNSYLVANIA,
*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION, *et al.*,
*Respondents*,

and

NATIONAL ASSOCIATION OF BROADCASTERS *and* NEXSTAR MEDIA INC.,
*Proposed Intervenors-Respondents*.

On Petition for Review of an Order of the Federal Communications Commission, MB Docket No. 17-318

# NATIONAL ASSOCIATION OF BROADCASTERS AND NEXSTAR MEDIA INC.'S OPPOSITION TO PETITIONER'S MOTION FOR STAY


Thomas M. Johnson, Jr.
Kathleen A. Kirby
Eve Klindera Reed
Boyd Garriott
Joel S. Nolette
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
ereed@wiley.law

*Counsel for Proposed Intervenor-Respondent Nexstar Media Inc.*

Noel J. Francisco
Brinton Lucas
Bijan M. Aboutorabi
Avery R. Phillips
Bethany C. Lee
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3686
njfrancisco@jonesday.com

*Counsel for Proposed Intervenor-Respondent National Association of Broadcasters*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1
BACKGROUND .......... 3
ARGUMENT .......... 9
I. BCAP has not shown actual and imminent irreparable harm .......... 10
II. BCAP has not shown a likelihood of success on the merits. .......... 14
A. The 2004 Act did not repeal the FCC's longstanding authority over the national cap .......... 14
B. BCAP's inferences from the 2004 Act do not establish a repeal .......... 16
III. BCAP has no case on the remaining equities. .......... 22
CONCLUSION .......... 23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aristy-Rosa v. Att'y Gen.*,
188 F.4th 240 (3d Cir. 2026) ........ 3, 8, 12

*BCAP v. FCC*,
2026 WL 2055661 (D.C. Cir. July 9, 2026) ........ 11

*BCAP v. FCC*,
No. 26-1062 (D.C. Cir. Apr. 28, 2026) ........ 11

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ........ 14, 16, 17

*FCC v. Nat'l Citizens Comm. for Broad.*,
436 U.S. 775 (1978) ........ 3

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........ 3, 4, 20

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 12

*Fox Television Stations v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002) (*Fox I*) ........ 5, 6, 16

*Fox Television Stations v. FCC*,
293 F.3d 537 (D.C. Cir. 2002) (*Fox II*) ........ 5, 6, 19

*In re Nexstar-TEGNA Merger Litig.*,
2026 WL 1049295 (E.D. Cal. Apr. 17, 2026) ........ 11

*In re Revel AC, Inc.*,
802 F.3d 558 (3d Cir. 2015) ........ 8, 9, 12, 13

*Johnson & Johnson v. Samsung Bioepis Co.*,
173 F.4th 454 (3d Cir. 2026) .......... 9, 10

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .......... 15

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020) .......... 14

*Minard Run Oil Co. v. U.S. Forest Serv.*,
670 F.3d 236 (3d Cir. 2011) .......... 22

*Mullin v. Doe*,
609 U.S. 324 (2026) .......... 12

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .......... 14

*NBC v. United States*,
319 U.S. 190 (1943) .......... 2

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 12, 21

*Prometheus Radio Project v. FCC*,
2003 WL 22052896 (3d Cir. Sept. 3, 2003) .......... 12, 13

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) .......... 14, 17, 18

*Trump v. California*,
609 U.S. 1032 (2026) .......... 12

*TVA v. Hill*,
437 U.S. 153 (1978) .......... 14

**STATUTES**

47 U.S.C. § 154 .......... 3

47 U.S.C. § 160 .......... 19

47 U.S.C. § 303 .......... 2, 3, 16, 19

47 U.S.C. § 309 .......... 3

47 U.S.C. § 310 .......... 8

Communications Act of 1934 .......... 3, 8, 13, 19

Consolidated Appropriations Act of 2004, Pub. L. No. 108-199,
118 Stat. 3 .......... *passim*

Pub. L. No. 104-104, 110 Stat. 56 .......... 4

Radio Broadcasting Preservation Act of 2000,
Pub. L. No. 106-553, 114 Stat. 2762 .......... 16

Telecommunications Act of 1996,
Pub. L. No. 104-104, 110 Stat. 56 .......... 4, 6, 15, 20

**REGULATIONS**

47 C.F.R. 73.3555 .......... 15

47 C.F.R. § 73.3555 (1996) .......... 5, 6

47 C.F.R. § 76.65 .......... 11

61 Fed. Reg. 10691 (1996) .......... 5

72 Fed. Reg. 16283 (2007) .......... 20

91 Fed. Reg. 72799 (2026) .......... 8

### OTHER AUTHORITIES

11 FCC Rcd. 12374 (1996) .......... 21

15 FCC Rcd. 11058 (2000) .......... 5

28 FCC Rcd. 14324 (2013) .......... 7

29 FCC Rcd. 3351 (2014) .......... 11

31 FCC Rcd. 10213 (2016) .......... 7

32 FCC Rcd. 3390 (2017) .......... 7

32 FCC Rcd. 10785 (2017) .......... 7

*In the Matter of Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Dkt. No. 17-318 (2026) (Order) .......... *passim*

# INTRODUCTION

The Federal Communications Commission (FCC) recently issued an order that will do nothing more than repeal a self-imposed, artificial limit on broadcast-television-station owners' national-audience reach. *In the Matter of Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule*, MB Dkt. No. 17-318 (2026) (Order). Specifically, when this Order takes effect next year, it will remove an outdated restriction on transactions that would result in a broadcaster reaching over 39 percent of U.S. television households, thereby allowing the FCC to make "individualized, case-by-case assessment[s]" as to whether proposed transactions are in the public interest. *Id.* ¶ 6.

Remarkably, petitioner BCAP portrays this modest step as a profound threat to the separation of powers and the freedom of speech alike. But the only one engaged in overreach here is BCAP itself, which asks this Court to stay an action of a coequal branch of government on the flimsiest of grounds. Indeed, BCAP does not even try to show that the Order will cause its members any *immediate* irreparable injury, choosing instead to rest on prognostications of downstream market harm "[i]f/when" the FCC approves still-unknown transactions. Mot. 23.

BCAP likewise falls far short of proving that it is likely to succeed on the merits. While it accuses the FCC of engaging in an unprecedented seizure of "'quasi-legislative' power" (Mot. 2), BCAP eventually admits that the Commission had enjoyed the authority to "'repeal or modify'" its ownership rules for decades. Mot. 4. Instead, BCAP's real argument is that Congress supposedly stripped the FCC of its broad power in this area in a 2004 appropriations rider. But far from clearly curtailing Congress's prior delegation of authority, this legislation expressly preserved the FCC's power—recognized by the Supreme Court since the FDR Administration—to "modify" its own "rules." 47 U.S.C. § 303 note; *see NBC v. United States*, 319 U.S. 190, 225 (1943).

That leaves BCAP to try to downplay the harms from its proposed stay as "insubstantial" because the repealed ownership limit is "decades-old." Mot. 1-2 (cleaned up). But that is precisely the problem. The communications industry has changed dramatically since the days when consumers had access to just a handful of broadcast television stations. Today, consumers enjoy news and entertainment through literally thousands of content creators, ranging from online streaming services, to cable television, to social media. Yet the FCC's dated ownership cap saddles broadcasters—and broadcasters alone—with a limit on their reach. Prolonging that restriction indefinitely will only

further deprive broadcasters of opportunities to grow and compete in this radically different—and radically larger—market for news and entertainment.

In short, BCAP has not met any of the stay factors, much less all of them. Lest the "'extraordinary remedy'" of a stay "'become ordinary,'" its motion must be denied. *Aristy-Rosa v. Att'y Gen.*, 188 F.4th 240, 245 (3d Cir. 2026).

## BACKGROUND

**1.** The Communications Act of 1934 gives the FCC "broad authority to regulate broadcast media in the public interest." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 416 (2021). Under this statute, the FCC must "determine ... whether the public interest, convenience, and necessity will be served" by granting applications for station licenses. 47 U.S.C. § 309(a); *see id.* §§ 307, 310(d). The statute also empowers the FCC to issue "rules and regulations" to "carry out" that Act's provisions, 47 U.S.C. § 303(r), or that may be "necessary in the execution" of the Commission's functions, *id.* § 154(i). It is "well established that this general rule-making authority supplies a statutory basis for the Commission to issue regulations codifying its view of the public-interest licensing standard." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 793 (1978) (upholding challenged broadcast ownership rule).

"Exercising that authority," the FCC over time has adopted, modified, and repealed various "ownership rules" restricting the "radio stations, television stations, and newspapers that a single entity may own." *Prometheus*, 592 U.S. at 418. Among other things, those shifting rules have addressed local and nationwide broadcast station and network ownership.

The FCC first adopted a nationwide cap on the ownership of television stations in 1941. Order ¶ 9. Until the 1980s, the cap governed only the number of stations owned, which the FCC slowly increased over time. *Id.* ¶¶ 9-10. In 1985, however, the FCC added a new restriction—a 25% "audience reach limit"—measuring not the number of stations owned but the percentage of households served. *Id.* ¶ 11. In calculating this limit, the new rule discounted by 50% the audience reach for stations using ultra-high-frequency (UHF) channels, whose weaker signals then did not reach as many people. *Id.* At the time, the FCC acknowledged that national television limits were not necessary to further competition or diversity goals. *Id.*

**2.** A decade later, Congress passed the Telecommunications Act of 1996 (1996 Act), which directed the FCC to "modify its rules for multiple ownership" by "eliminating" the numerical television station cap and "increasing the national audience reach limitation … to 35 percent." Pub. L. No. 104-104,

§ 202(c)(1)(A)-(B), 110 Stat. 56, 111. The FCC accordingly modified its National Television Multiple Ownership Rule (or national cap) to forbid any entity from owning "television stations which have an aggregate national audience reach exceeding thirty-five (35) percent." 47 C.F.R. § 73.3555(e)(1) (1996); *see* 61 Fed. Reg. 10691, 10691-92 (1996).

This reform was just one piece of a much larger deregulatory effort. The 1996 Act also directed the FCC to, among other things, eliminate the national limit on radio station ownership and relax the local radio, radio-television cross-ownership, and dual-network rules. 1996 Act § 202(a)-(e). In addition, the 1996 Act created a new periodic-review procedure, requiring the FCC to "review" its "ownership rules biennially" to determine if they still served the public interest "as the result of competition." *Id.* § 202(h).

In its first such review, the FCC considered revising the 35% national cap set two years prior, but ultimately left it in place to "observe[] and assess[]" the effects of the new limit before "mak[ing] any alteration." 15 FCC Rcd. 11058, 11072 (2000). The D.C. Circuit vacated that decision as arbitrary, holding that the FCC had not shown that the 35% limit was "necessary in the public interest." *Fox Television Stations v. FCC*, 280 F.3d 1027, 1043 (D.C. Cir. 2002) (*Fox I*), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (*Fox II*).

In doing so, the D.C. Circuit rejected the argument that the FCC "was required to defer to the decision of the Congress to set the initial ownership cap in the 1996 Act at 35%." *Id.* As the court explained, the 1996 Act had not "enshrined the 35% cap in the statute itself." *Fox II*, 293 F.3d at 540. Rather, Congress had "determined only the starting point from which the Commission was to assess the need for further change." *Fox I*, 280 F.3d at 1043. In short, the FCC kept its longstanding authority over its own ownership rules—including its authority to *change* the 35% cap—despite the 1996 Act.

**3.** In its 2002 biennial review, the FCC raised the national audience reach limit from 35% to 45%. Order ¶ 14. While a challenge to that increase was pending, Congress passed a rider to the Consolidated Appropriations Act of 2004 (2004 Act) that did two key things: *First*, it amended the 1996 Act by changing "35 percent" to "39 percent," leaving the statute to direct the FCC to "modify its rules" by adopting a "39 percent" cap on national audience reach. 2004 Act, Pub. L. No. 108-199, § 629(1), 118 Stat. 3, 99. *Second*, the rider excluded "rules relating to the 39 percent national audience limitation" from the 1996 Act's periodic-review mandate (and made the reviews quadrennial instead of biennial). *Id.* § 629(3), 118 Stat. at 100. The FCC was therefore no longer *required* to revisit the national cap on a periodic basis.

Consistent with the directive to "modify its rules," the FCC modified its national cap regulation to forbid any entity from owning "television stations which have an aggregate national audience reach exceeding thirty-nine (39) percent." 47 C.F.R. § 73.3555(e)(1). Despite significant "changes in the media marketplace" since then, that rule has remained in place ever since. Order ¶ 5. Cable and satellite television operators and video-streaming platforms, such as BCAP's members, are not subject to any such limits. *See id.* ¶ 48.

**4.** In 2013, the FCC proposed eliminating the discount for calculating the reach of UHF stations, tentatively concluding that the 2004 Act had not divested it of "authority to modify the national television ownership rule, including the authority to revise or eliminate the UHF discount." 28 FCC Rcd. 14324, 14329-30 (2013). Three years later, the FCC, with bipartisan support, definitively embraced that view, concluding that "no statute"—the 2004 Act included—"bars the Commission from revisiting the cap or the UHF discount contained therein in a rulemaking proceeding so long as such a review is conducted separately from a quadrennial review." 31 FCC Rcd. 10213, 10222 (2016); *see id.* at 10247. The FCC therefore decided to repeal the UHF discount. *Id.* at 10213.

In 2017, however, the FCC reinstated the UHF discount, concluding it was "inextricably linked" with the national cap and therefore could not be eliminated without reassessing the necessity of the cap. 32 FCC Rcd. 3390, 3390 (2017). The FCC accordingly launched a "comprehensive review" of the national cap itself. 32 FCC Rcd. 10785, 10796 (2017).

**5.** On October 1, 2026, the FCC issued the Order here. The Order determined that the national cap "no longer serves the public interest" because it is unnecessary to advance the objectives of viewpoint diversity, competition, or localism, and may in fact be preventing transactions that would improve access to the capital and revenue needed to invest in local programming. Order ¶¶ 6, 25-47. The FCC therefore decided to repeal the national cap and to continue reviewing each proposed television license transaction to ensure it serves the public interest, as long required by the Communications Act. *Id.* ¶¶ 20-23, 43; *see* 47 U.S.C. § 310(d). The FCC also reaffirmed its longstanding bipartisan view that it has authority to eliminate the cap. Order ¶¶ 84-101.

On November 12, 2026, the Order was published in the Federal Register, setting the repeal to take effect on January 11, 2027. 91 Fed. Reg. 72799. BCAP petitioned for review and moved for a stay the following day. Dkts. 1, 3.

## ARGUMENT

A judicial stay of executive-branch action is an "'extraordinary remedy'" requiring the movant to meet "the burden of proving four factors." *Aristy-Rosa*, 188 F.4th at 245. Specifically, the movant must make a "strong showing" that (1) it "is likely to succeed on the merits"; (2) it "will be irreparably injured absent a stay"; (3) the stay will not "substantially injure the other parties interested in the proceeding"; and (4) the stay is in "the public interest." *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015). The "first two factors are the most critical," and "if the movant does not make the requisite showings on either of these first two factors," "the stay should be denied without further analysis." *Id.* at 570-71 (cleaned up).

BCAP comes nowhere close to carrying its burden on any of the four factors. It cannot show a likelihood of success on the merits because nothing in the 2004 Act deprived the FCC of its long-held authority to modify or repeal the national cap. But this Court need not even reach that issue because BCAP has not demonstrated that the Order will cause it or any of its members any immediate irreparable harm. Either way, BCAP's motion must be denied.

## I. BCAP has not shown actual and imminent irreparable harm.

To start, this Court should deny a stay because BCAP has not shown an irreparable injury that is "'actual and imminent,'" as opposed to "'remote'" and "'speculative.'" *Johnson & Johnson v. Samsung Bioepis Co.*, 173 F.4th 454, 464 (3d Cir. 2026). That alone is fatal to its motion. *See Revel*, 802 F.3d at 571.

**A.** While BCAP treats the irreparable harm to its members from the Order as "obvious," it takes a lot of steps to connect the dots. Mot. 4. Specifically, BCAP claims the Order (1) will spur a "'wave of consolidation,'" (2) "no one will be able to" stop those transactions "[i]f/when FCC approves" them, (3) larger "TV station owners" will then have more "leverage" in "negotiations" over "'retransmission consent fees'" with BCAP's members, (4) those members (who face no scale limits of their own) will capitulate to their demands, and (5) BCAP's members will therefore pay higher fees. Mot. 8, 22 n.3, 23.

That daisy chain of contingencies cannot possibly establish the "'imminent'" harm required for a stay. *Johnson & Johnson*, 173 F.4th at 464. To the contrary, this Court recently held that an "assertion of irreparable harm from a loss of negotiating leverage" in a shifting market, possibly leading to unwelcome "concessions," cannot serve as "the requisite 'clear showing of immediate irreparable injury.'" *Id.* at 464-65.

That holding squarely controls here. *Every* step of BCAP's prediction is speculative, and *none* is imminent. To start, BCAP cannot even identify a specific transaction that the Order will trigger, noting only that two companies have begun "to bandy about" the *possibility* of deals on "earnings call[s]." Mot. 22 (capitalization omitted). And even if a specific deal were on the table, it would have to be reviewed by the FCC, which may approve, condition, or reject it regardless of whether the cap is in place, through a process in which BCAP and its members may fully participate. Order ¶¶ 46, 58. And even then, FCC approval is just one factor among many in whether any proposed deal immediately goes forward. Antitrust review, for instance, comes to mind.

BCAP nonetheless protests that "[i]f/when" the FCC blesses that transaction, courts will be "powerless" to review it. Mot. 23. Nonsense. Indeed, BCAP's reliance on the "Nexstar-TEGNA merger" (*id.*) proves the opposite, as a district court preliminarily enjoined that deal in an antitrust suit. *In re Nexstar-TEGNA Merger Litig.*, 2026 WL 1049295 (E.D. Cal. Apr. 17, 2026). For that reason, among others, the D.C. Circuit twice rejected BCAP's theory of injury. *See BCAP v. FCC*, 2026 WL 2055661, at *1 (D.C. Cir. July 9, 2026) (harms "not certain" given "preliminary injunction"); *BCAP v. FCC*, No. 26-1062 (D.C. Cir. Apr. 28, 2026) (similar). The third time should not be the charm.

In any event, even if a future specific transaction closes, there is no guarantee it would affect retransmission fees at all, let alone immediately. *See* Order ¶¶ 71-73 (discussing "conflicting" record evidence on "the relationship between station group size and increased retransmission consent fees"). To the contrary, retransmission fees are fixed in separate contracts between cable or satellite providers and broadcasters and usually run for "three-year or even longer intervals." 29 FCC Rcd. 3351, 3364 (2014); *see* 47 C.F.R. § 76.65. And consumer rates are dictated wholly by those providers themselves. To treat this convoluted chain as presenting an "imminent" harm would empty that word of all meaning. After all, "stacking hypothetical on hypothetical to speculate that harm will eventually materialize" cannot establish even standing, much less irreparable harm. *Trump v. California*, 609 U.S. 1032, 1036 (2026).[1]

[1] While this Court can deny BCAP's motion based on the lack of irreparable harm alone, BCAP has also failed to show that it likely has standing to seek a stay, even though movants "must address" this Court's "jurisdiction to consider" stay requests. *Aristy-Rosa*, 188 F.4th at 246; *see Mullin v. Doe*, 609 U.S. 324, 345-46 (2026) (plurality). Because BCAP and its members are unregulated parties seeking the FCC's regulation of "*someone else*," their standing is "'substantially more difficult to establish.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Yet BCAP's only asserted injury—higher retransmission fees—rests on the same speculative "chain of events" discussed above, including independent choices by broadcasters, the FCC, and antitrust regulators in future transaction reviews. *Id.* at 385. No link in that chain is "predictable," and even if it were, such a "distant … ripple effect[]" cannot support "Article III standing." *Id.* at 383.

**B.** Faced with this reality, BCAP invokes the stay in *Prometheus Radio Project v. FCC*, 2003 WL 22052896 (3d Cir. Sept. 3, 2003), suggesting that "'new ownership rules'" should *always* be stayed on request. Mot. 22; *see* Mot. 1. But that brief, non-precedential order cannot be reconciled with subsequent binding precedent. It is now settled that "simply showing some possibility of irreparable injury" cannot justify a stay, as a "'possibility' standard is too lenient." *Nken v. Holder*, 556 U.S. 418, 434-35 (2009) (cleaned up). Instead, a movant "must demonstrate that irreparable injury is *likely*." *Revel*, 802 F.3d at 569. Yet the *Prometheus* panel thought it sufficient that the movants had "*alleged* harms from industry consolidation" and "*contend[ed]* they would be widespread and irreversible." 2003 WL 22052896, at *1 (emphases added). That is no longer good enough.

The cases, moreover, are not comparable. The FCC action in *Prometheus* swept far beyond the single issue of the national cap, promising to "significantly alter" the FCC's "ownership rules for multiple media properties, including national television networks, local broadcast affiliates, radio stations, and newspapers." *Id.* The FCC action here, in contrast, changes only a single rule—the national cap for television stations—and even then preserves the case-by-case review the Commission has always conducted.

There was also "little indication" that a stay in *Prometheus* would cause "substantial harm" to "interested parties"—something that cannot be said about BCAP's request. *Id.*; *see infra* Pt. III. This Court's non-precedential 2003 order therefore does not control the outcome here.

## II. BCAP has not shown a likelihood of success on the merits.

### A. The 2004 Act did not repeal the FCC's longstanding authority over the national cap.

BCAP also has not come close to making a "strong showing" that it is likely to succeed in its argument that the FCC lacks the authority to eliminate the national cap. *Revel*, 802 F.3d at 568. For all its talk of the FCC mounting an unheralded power-grab, BCAP concedes that the Commission had authority under the Communications Act to "'repeal'" the national cap *before* the 2004 Act. Mot. 4; *see* Mot. 18; *supra* at 3-4. Instead, BCAP's sole argument is that in a 2004 appropriations rider, Congress "'amended the law'" by creating a "'permanent cap.'" Mot. 17 & n.2.[2]

[2] For that reason, BCAP's observation that Congress gave agencies "authority over" statutory "numerical limits" elsewhere is beside the point. Mot. 16. The same goes for its proclamation that the word "'modify'" does not "allow[]" the FCC "to work fundamental change." Mot. 20 (citing *MCI v. AT&T*, 512 U.S. 218, 234 (1994)). Because BCAP agrees the FCC had the power to repeal the national cap before 2004, these other authorities have no bearing on this case.

But under the "strong presumption" against "repeals by implication," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up), courts "will not infer a statutory repeal unless" the later act "expressly contradicts" the earlier one or "such a construction is absolutely necessary" to give "the later statute … any meaning," *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (cleaned up). And that rule "applies with even *greater* force" when, as here, "the claimed repeal rests solely on an Appropriations Act." *TVA v. Hill*, 437 U.S. 153, 190 (1978); *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020). Thus, as this Court explained in this very context, if Congress wants to "'curtail'" the FCC's "'broad rulemaking authority,'" it must "'do so in language expressly describing an exception'" to that authority. *Prometheus Radio Project v. FCC*, 373 F.3d 372, 395 n.18 (3d Cir. 2004).

BCAP comes nowhere near to satisfying this demanding test. Far from revoking the FCC's longstanding authority in this area, the 2004 Act told the Commission to continue exercising it. In 1996, Congress directed that "[t]he Commission shall modify its rules for multiple ownership set forth in section 73.3555 of its regulations (47 C.F.R. 73.3555) … by increasing the national audience reach limitation for television stations to 35 percent." 110 Stat. at 111. In 2002, the D.C. Circuit held that this provision did not "enshrine[] the 35%

cap in the statute itself" but rather told the FCC how to exercise its own rule-making power. *Fox II*, 293 F.3d at 540. And just two years after that, the 2004 Act amended the same provision "by striking '35 percent' and inserting '39 percent.'" 118 Stat. at 99. In using "the materially same language" as the 1996 Act, the 2004 Congress "presumptively was aware" of the recent "judicial interpretation of the phrase and intended for it to retain its established meaning." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018). The statutory history here is dispositive.

**B. BCAP's inferences from the 2004 Act do not establish a repeal.**

BCAP therefore admits that Congress's 2004 act of "striking '35 percent' and inserting '39 percent'" cannot carry its burden. Mot. 17. Instead, it claims four other features of the 2004 Act reveal Congress clawed back the FCC's "general authority" over the national cap. Mot. 18. Not one comes close to the "'clear and manifest'" indication necessary here. *Epic Sys.*, 584 U.S. at 510.

**1.** To start, BCAP emphasizes that the 2004 Act contains three cross-references to "the 39 percent national audience reach limitation for television stations in paragraph (1)(B)"—or "subsection (c)(1)(B)"—of the amended 1996 Act, 118 Stat. at 99-100, which it reads to impose a "statutory" cap, Mot. 13-14. But statutory cross-references to a *rule* do not transform it into a *statute*.

To the contrary, the references to paragraph (1)(B) only undercut BCAP's case. As amended in 2004, that paragraph now reads: "The Commission shall *modify its rules* for multiple ownership set forth in section 73.3555 of *its regulations* … by increasing the national audience reach limitation for television stations to 39 percent." 47 U.S.C. § 303 note (emphases added). That only confirms that the "39% cap" is a "regulatory" one. Mot. 13.

Indeed, "when Congress wants" to strip the FCC of its longstanding authority in an area, "it knows exactly how to do so." *Epic Sys.*, 584 U.S. at 514. For example, in the Radio Broadcasting Preservation Act of 2000, Congress directed the FCC to "modify the rules" related to FM radio stations, but it expressly stated that the FCC "may not ... eliminate or reduce" those prescribed rules. Radio Broadcasting Preservation Act § 632(a)(2), Pub. L. No. 106-553, 114 Stat. 2762. Yet four years later, Congress omitted any such language in the 2004 Act, which provides still "further evidence" that this legislation "does nothing to address the question" here. *Epic Sys.*, 584 U.S. at 514.

**2.** BCAP fares no better in pointing to (Mot. 15-18) Congress's decision to exempt "any rules relating to the 39 percent national audience reach limitation" from the periodic-review requirement. 118 Stat. at 100. The fact that the FCC is no longer *required* to revisit the national cap every four years

obviously does not *prohibit* it from addressing the question on its own timetable. Indeed, this Court said as much in *Prometheus*. There, it recognized that the same 2004 amendment removed the UHF discount from the periodic-review process but did not "foreclose the Commission's consideration of its regulation defining the UHF discount in a rulemaking outside the context of" such review. 373 F.3d at 396-97. BCAP never explains how the 2004 Act could permit the FCC to "modify … the UHF discount outside the context" of the periodic-review process, but not the national cap itself. *Id.* at 397. Nor could it, given that the two are effectively one and the same—the UHF discount expands the percentage of potential households broadcasters may reach, so modifying that discount would directly tighten or loosen the national cap. Order ¶ 23; *see Prometheus*, 373 F.3d at 396 (recognizing that altering "the discount for UHF station audiences would effectively" change "the audience reach limit" and thereby modify the "39% cap"); *supra* at 7.

If anything, Congress's exclusion of any "rules" relating to the "national" cap from the periodic-review process is yet further proof that the cap is a "rule[]" subject to FCC revision. 118 Stat. at 100. After all, such a carveout would have been unnecessary if Congress had enacted a "statutory" cap, which the FCC would have no authority to review in the first place. Mot. 13.

BCAP also errs in suggesting that the only conceivable reason to exclude the national cap from the mandatory periodic review was to reduce "FCC authority." Mot. 19. In taking that step, Congress was addressing a different problem altogether. The rigid periodic-review mandate had produced back-to-back litigation over the national cap in multiple cycles, and it would otherwise have required the FCC to reexamine the 2004 Congress's freshly chosen figure in just two years. *See supra* at 5-6; *see also Prometheus*, 373 F.3d at 396 (holding the 2004 Act mooted challenge to FCC's increase to 45%); *Fox I*, 280 F.3d at 1043 (holding that the FCC had "to examine critically the new 35%" cap—even though it had been mandated just two years prior—and retain it "only if it continued to be necessary"). Removing the national cap from this mandatory process solved that problem, freeing the FCC to review the cap as necessary, rather than every four years. But it had nothing to do with stripping the FCC of its power to review its own rules on its own schedule.

**3.** BCAP is no more persuasive in its invocation of the 2004 Act's "no-forbearance provision" (Mot. 14-15), which states that 47 U.S.C. § 160—a provision addressing the FCC's power to forbear from enforcing some of its rules—"shall not apply" to anyone who "exceeds the 39 percent" national cap. 118 Stat. at 100. This aspect of the 2004 Act is somewhat of an inkblot: The

FCC's forbearance authority does not apply to broadcasters in the first place, so it makes no sense to forbid the FCC from using its forbearance power in this context. 47 U.S.C. § 160. Accordingly, this provision cannot be read to prohibit the FCC from "reexamining and revising the national audience reach cap." 31 FCC Rcd. at 10222 n.77.

But even where it applies, the FCC's power to "forbear" from enforcing a "regulation" or statutory "provision" against a party, *id.* § 160(a), is entirely different from its power to "make" general "rules" to carry out the Communications Act, *id.* § 303(r). So even if this 2004 Act provision were an *enforcement* "'directive'" (Mot. 6, 14), that has nothing to do with the FCC's *rulemaking* authority. This cryptic provision thus does not come close to "clearly" repealing the FCC's settled power to amend its own rules.

**4.** Finally, BCAP seizes on (Mot. 13-14) the 2004 Act's divestiture provision, which directs that anyone who "exceeds the 39 percent national audience reach limitation" through "grant, transfer, or assignment of an additional license" will have no "more than 2 years after exceeding such limitation to come into compliance with such limitation." 118 Stat. at 99. But Congress's decision to provide a grace period to comply with the rule as it currently exists says nothing about the FCC's authority to change that rule going forward.

BCAP nevertheless protests that it would be "nonsensical," "absurd," and "'meaningless'" for the 2004 Congress to have created a two-year compliance window "if FCC could pick a different number the next day." Mot. 14-15. But in directing the FCC to "modify its rules" in 2004, Congress merely required the Commission to set the cap at the level it had specified for that point in time, based on then-current market conditions, and then give regulated parties two years to comply. 110 Stat. at 111; 118 Stat. at 99. Any subsequent modification under the FCC's broad regulatory and licensing powers would require a rulemaking—including a notice of proposed rulemaking, a comment period, agency deliberation, and a final rule that, to be valid, would need to be both "reasonable and reasonably explained." *Prometheus*, 592 U.S. at 423. There was no prospect of that happening "at a moment's notice"—much less "'the day after'" the 2004 Act took effect, when the FCC had not even yet *implemented* the 39% cap. Mot. 15, 19. The 2004 Act therefore had a "'real and substantial effect,'" just not the one BCAP wants. Mot. 15.[3]

---

[3] All this explains why the FCC described its 2007 amendment raising the cap to 39% as a "nondiscretionary ministerial action" "mandated by" Congress. 72 Fed. Reg. 16283, 16284 (2007); *see* Mot. 6. This amendment was nondiscretionary only as an initial matter, and the FCC fulfilled its statutory obligation by implementing the 39% cap once. Indeed, the FCC said the same thing when it carried out the 1996 Act's directive, which all agree did not deprive the Commission of its authority to repeal the cap. *See* 11 FCC Rcd. 12374, 12377 (1996).

## III. BCAP has no case on the remaining equities.

BCAP likewise fails to show that the balance of harms and public interest favor a stay. At most, it claims the cost of a stay to the FCC and public—whose interests are "merge[d]" here, *Nken*, 556 U.S. at 435—is "negligible" because broadcasters have labored under a 39% cap for "decades." Mot. 24. But that timeline is exactly why a stay of the Order is so harmful. Broadcasters have had to live with a 39% cap for decades, despite "seismic changes" to the entire "communications industry" during that time. Order ¶ 44. Throughout those long years, the national cap has hindered their "ability to expand their operations and achieve economies of scale in the deployment of new technologies," all while they sustain "declines in both viewership and advertising revenue." *Id.* ¶¶ 51, 59. That costs the public too, as the result is inevitably less "investment" in "local programming." *Id.* ¶ 54.

Granting an indefinite stay would only prolong the harms from this "outdated and overly restrictive" rule. *Id.* ¶ 44. Staying the Order would forestall broadcasters' entrance into transactions that would benefit both them and the public, with no guarantee of those deals being reassembled if and when the Order is ultimately upheld. *See* Order ¶¶ 57, 59 (cataloguing benefits of repeal); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011) ("loss

of unique" business "opportunities" is an "irreparable injury"). While those harms to broadcasters and consumers may benefit BCAP's members who compete against broadcast stations for viewers and advertisers, they cannot remotely be described as "insubstantial." Mot. 2 (cleaned up).

## CONCLUSION

This Court should deny BCAP's stay motion.

Dated: November 23, 2026

Respectfully submitted,

*/s/ Eve Klindera Reed*
Thomas M. Johnson, Jr.
Kathleen A. Kirby
Eve Klindera Reed
Boyd Garriott
Joel S. Nolette
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000
ereed@wiley.law

*Counsel for Proposed Intervenor-Respondent Nexstar Media Inc.*

*/s/ Noel J. Francisco*
Noel J. Francisco
Brinton Lucas
Bijan M. Aboutorabi
Avery R. Phillips
Bethany C. Lee
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
njfrancisco@jonesday.com

*Counsel for Proposed Intervenor-Respondent National Association of Broadcasters*

## CERTIFICATES OF COMPLIANCE

I certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5129 words, excluding the parts exempted under Federal Rules of Appellate Procedure 27(d)(2)(B) and 32(f).

I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Expanded BT font.

I certify that this motion complies with Third Circuit Rule 31.1 because the text of the electronic motion will be identical to the text of any paper copies submitted to the Court and because, prior to the motion's submission, a virus detection program (Microsoft Safety Scanner) was run on the file and no virus was detected.

I certify that, consistent with Third Circuit Rule 46.1(e), I am a member of the bar of this Court.

Dated: November 23, 2026

/s/ *Noel J. Francisco*
Noel J. Francisco
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
njfrancisco@jonesday.com

*Counsel for Proposed Intervenor-Respondent National Association of Broadcasters*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

Dated: November 23, 2026

*/s/ Noel J. Francisco*

Noel J. Francisco
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
njfrancisco@jonesday.com

*Counsel for Proposed Intervenor-Respondent National Association of Broadcasters*