**No. 26-3871**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

BROADBAND COMMUNICATIONS ASSOCIATION
OF PENNSYLVANIA,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petition for Review of an Order of
the Federal Communications Commission

---

**FEDERAL COMMUNICATIONS COMMISSION'S OPPOSITION TO MOTION FOR STAY PENDING REVIEW**

---

## INTRODUCTION

The Broadband Communications Association of Pennsylvania (BCAP) seeks a stay, pending judicial review, of the Federal Communications Commission's order repealing the national television ownership rule, which limited a single entity to ownership of commercial broadcast television stations that reach no more than 39% of the national audience. *Amend. of Section 73.3555(e) of the Commission's Rules*, Report and Order, 2026 WL 2983230 ¶¶ (2026) (*Order*) (Attach. A hereto).

A stay pending appeal is an "extraordinary remedy," *Aristy-Rosa v. Att'y Gen. of United States*, 188 F.4th 240, 245 (3d Cir. 2026), to which BCAP is not entitled. BCAP's claimed harm is remote and speculative, and it is not irreparable. By itself, the *Order* approves no new transactions; under the Communications Act of 1934, as amended, a party seeking to acquire a broadcast television station must still obtain Commission approval for each license transfer. 47 U.S.C. § 310(d). Any interested party may file a petition to deny FCC approval of any proposed television station acquisition, and file for review (if aggrieved) with the U.S. Court of Appeals for the District of Columbia Circuit, which is vested with exclusive jurisdiction over such appeals. *Id.* § 402(b)(6). BCAP will thus have ample opportunity to challenge any specific transaction that threatens the broadcast industry consolidation it professes to fear. And if BCAP prevails on the merits of its challenge to the *Order*, adequate corrective relief will be available.

BCAP also has not shown that it is likely to succeed on the merits. BCAP argues that Congress divested the FCC of the authority to change the rule by directing the agency, in 2004, to modify its rules to change its national television audience reach limit from 35% to 39%. But that congressional direction did not enshrine the 39% limit in statutory law; Congress instead instructed the agency to change its rules. The FCC, like other federal agencies, has a continuing obligation to reexamine its rules to ensure that they continue to serve the public interest. Here,

the FCC found that, in a media landscape that has been vastly transformed in the past two decades, the national television ownership cap no longer served its intended goals.

BCAP's motion for a stay pending review should be denied.

## BACKGROUND

### A. The History of the FCC's Broadcast Ownership Rules

"The Federal Communications Commission possesses broad statutory authority to regulate broadcast media 'as public convenience, interest, or necessity requires.'" *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021) (quoting 47 U.S.C. § 303). Exercising this authority, the agency historically has limited the number of media outlets that a single entity may own. *See, e.g.*, *United States v. Storer Broad. Co.*, 351 U.S. 192, 202-05 (1956) (limiting how many broadcast stations one entity could own nationwide). The FCC has reviewed its rules over time to ensure that they still serve the public interest, revising them as necessary in response to changing circumstances.

The Commission established the national television ownership rule in the early 1940s, when the rule limited the number of stations that an entity could own, to promote its goals of competition and viewpoint diversity. *Fox Tel. St. v. FCC*, 280 F.3d 1027, 1034 (*Fox I*), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (*Fox II*). In 1985, the FCC modified the rule to add a prohibition on common

ownership of stations "that in the aggregate reached more than 25% of the national television audience." 280 F.3d at 1034 (citing *Amendment of Multiple Ownership Rules*, 100 FCC 2d 74, ¶¶ 36-40 (1984)).

In the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 111-12 (1996) (1996 Act), Congress instructed the FCC to "modify its rules ... by increasing the national audience reach limitation for television stations to 35 percent." *Id.* § 202(c)(1)(B). In addition, Congress directed the agency to review its ownership rules every two years to "determine whether any of such rules are necessary in the public interest" and "repeal or modify any regulation it determines to be no longer in the public interest." *Id.* § 202(h).

During the 2002 periodic review, the Commission concluded that a national television ownership cap was no longer necessary to promote competition and viewpoint diversity in light of changes in the media marketplace since 1985, but that the rule served the FCC's goal of promoting localism by "preventing a network from achieving a greater national audience reach than its affiliates have collectively," thereby "keeping in check the network's power over its affiliates."

*Order* ¶ 33; *id.* ¶¶ 31-33; *2002 Biennial Regulatory Review*, 18 FCC Rcd 13620, 13814-45 ¶¶ 500-84 (2003)).[1]

The FCC also decided to raise the national audience reach cap from 35% to 45%. *Id.* at 13842 -44 ¶¶ 578–83. In response, Congress in 2004 amended section 202(c)(1)(B) of the 1996 Act "by striking '35 percent' and inserting '39 percent.'" Consolidated Appropriations Act, Pub. L. No. 108-199, § 629(1), 118 Stat. 3, 99 (2004) (CAA). The result of that amendment was to revise section 202(c)(1)(B) to direct the agency to "modify its rules," this time "by increasing the national audience reach limitation for television stations to 39 percent." *Id.* At the same time, Congress removed the national television ownership rule from the agency's obligation to periodically review its media ownership rules (which Congress changed from a biennial to a quadrennial obligation). *Id.* § 629(3).

[1] "[T]o maximize their national audience, the Big Four networks (i.e., ABC, CBS, FOX, and NBC) traditionally have acquired their own local broadcast stations (typically in the largest television markets) and entered into affiliation agreements with station owners throughout the rest of the country." *Order* ¶ 31. The FCC retained the cap in the 2002 periodic review in an effort to balance the interests of the networks in airing programs that appeal to a nationwide audience with the interests of local affiliates in airing programs responsive to their local communities' needs and interests. *Id.* ¶¶ 31-33.

### B. The Agency Proceeding to Revisit the National Television Ownership Rule

In 2017, the FCC issued a notice of proposed rulemaking to revisit the national television ownership rule "in light of increased video programming options for consumers, technological developments, and other factors." *Amend. of Section 73.3555(e) of the Commission's Rules*, Notice of Proposed Rulemaking, 32 FCC Rcd 10785 ¶ 1 (2017). Eight years later, it invited interested parties to refresh the record in that proceeding. *Media Bureau Seeks to Refresh the Record*, Public Notice, 40 FCC Rcd 4159 (2025).

On October 1, 2026, the FCC released the *Order* under review. In the *Order*, the agency reaffirmed its prior conclusions that the national television ownership rule is not necessary to promote competition or viewpoint diversity, finding "even more support today for those conclusions given the availability and accessibility of a myriad of sources of video programming, including cable networks, online services, and social media platforms." *Order* ¶ 20; *id.* ¶¶ 25-29.

In addition, the Commission concluded that the rule is no longer necessary to serve its goal of broadcast localism. *Id.* ¶¶ 30-42. The FCC first explained that the "networks do not depend on affiliates for programming distribution to the same extent as they did in the past," as now "networks can reach viewers directly by placing their programming on their associated streaming platforms." *Id.* ¶ 34. "Thus, there is less incentive for networks to acquire local stations as a means of

controlling the distribution of their programming." *Id.* Conversely, "the national cap constrains a station group's ability to purchase more affiliated stations as a way to maintain its leverage vis-à-vis networks' increasing bargaining power." *Id.* ¶ 41. As a result, "rather than preserving a balance of power" between networks and local affiliates, the Commission found that the rule "may be exacerbating an imbalance of power." *Id*. *See id.* ¶¶ 37-40.

Finding for these reasons that the national television ownership rule no longer served the public interest, the FCC repealed it. *Id.* ¶ 42. In doing so, the agency emphasized that it remained subject to the "obligation to weigh the potential benefits and harms specific to a proposed transaction," *id*. ¶ 43; *see* 47 U.S.C. § 310(d), and that under the "case-by-case approach," "some transactions receive approval, while others do not." *Order* ¶ 46 .

The *Order*, which is scheduled to go into effect on January 11, 2027, was published in the Federal Register on November 12, 2026. 91 Fed. Reg. 72799. *See Order* ¶ 107. The next day, BCAP, an association including Pennsylvania cable and broadband operators, Mot. App. 4 n.1, petitioned for review in this Court and moved for a stay pending review.

**ARGUMENT**

In order to obtain a stay pending review, BCAP must (1) make a "strong showing that [it is] likely to succeed on the merits" and demonstrate (2)

"irreparable injury" and that (3) the balance of "harm[s]" and "the public interest" favor relief. *Nken v. Holder*, 556 U.S. 418, 433-35 (2009). Even then, a stay "is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 427. BCAP falls far short of meeting these stringent requirements.

## I. BCAP HAS NOT SHOWN IRREPARABLE INJURY.

"To establish irreparable harm, a stay movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) (quotations omitted). BCAP's claimed injury is remote and speculative, and is not irreparable. BCAP argues that the repeal of the national television ownership cap will lead to broadcast industry consolidation that will enable broadcasters to extract higher fees from BCAP's cable company members to carry broadcast programming. Mot. 22 (citing Mot. App. 24-32 & 61-62). But by itself, the *Order* does not approve any transaction involving a broadcast television station license. The Commission will continue to engage in case-by-case review of proposed transactions, and interested parties have the statutory entitlement to file petitions to deny, with a right to appeal any decision with which they disagree.

**A.** BCAP's claimed harm is not imminent. A proposed transaction creates a separate proceeding before the Commission that provides interested parties with an opportunity to raise any objections they might have. The *Order* will not go into

effect until January 11, 2027. *Order* ¶ 107. Thereafter, any specific proposed transaction is subject to the Commission's case-by-case review, and interested parties may petition to deny any transaction. See 47 U.S.C. § 309(d). Any contested proceeding requires the Commission to make a transaction-specific public interest finding that is responsive to the petitioner's arguments. Transactions that are opposed can take several months to resolve. "And larger transactions or transactions implicating significant geographic overlap will undergo review by federal and potentially state antitrust authorities as well." NAB Admin. Stay Opp., MB Docket No. 17-318, 6 (Oct. 9, 2026) (https://www.fcc.gov/ecfs/document/26110080382/1). *See, e.g.*, *In re Nexstar-Tegna Merger Litig.*, No. 26-cv-976, 2026 WL 1049295, at *28-31 (E.D. Cal. Apr. 17, 2026) (issuing a preliminary injunction against acquisition of one broadcast group by another), *appeal docketed*, No. 26-2490 (9th Cir. Apr. 22, 2026). Parties will thus have ample future opportunities to challenge transactions before the Commission. Any alleged harms are not imminent.

Further, the full range of ordinary remedies would be available if the FCC approves a transaction, including taking an appeal and seeking a stay of that decision. *See* 47 U.S.C. § 402(b)(6). *See, e.g.*, *ADX Commc'ns of Pensacola v. FCC*, 794 F.3d 74 (D.C. Cir. 2015) (reviewing FCC order approving broadcaster's

acquisition of additional radio stations).[2] And "[e]ven if a transaction were to close, many of the [potential retransmission consent-related] rate changes would not occur until the next contract negotiation, which could be years away." NAB Admin. Stay Opp. 7. The lack of any need for immediate relief forecloses a stay pending review here.

**B.** BCAP's claimed harm also is speculative. The Commission found "conflicting evidence in the record regarding whether, and the extent to which, permitting some level of greater audience reach would affect retransmission consent fees in all, or even most, cases." *Order* ¶ 73. In any event, as discussed above, the FCC must review any proposed transaction to ensure that it serves the public interest. *Id.* ¶ 21 (citing 47 U.S.C. § 310(d)). *See id.* ¶¶ 76-79 (providing guidance as to how the agency will analyze allegations of retransmission consent-related harms in the context of specific transactions). Various outcomes from this case-by-case review are possible: transactions may be approved, approved with conditions, or not approved. *See id.* ¶ 46. If a transaction is approved, whether the new station owner tries to increase a BCAP member's fees, and whether the

---

[2] BCAP predicts that the Commission will seek to evade judicial review "by directing Bureau staff to approve mergers and then refusing to rule on applications for review." Mot. 23. In that event, aggrieved parties could seek relief for any unreasonable delay in the D.C. Circuit by way of mandamus under the All Writs Act. *See Telecomms. Research and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984).

member agrees, depends on a host of variables, *see id.* ¶¶ 72-75, including the specific rules governing the retransmission consent process. *See id.* ¶ 68. Given all these contingencies, BCAP's claimed harm amounts to speculation that cannot support a stay pending appeal. *Aristy-Rosa*, 188 F.4th at 247 ("A 'possibility' of irreparable harm will not cut it.").[3]

**C.** Lastly, a stay pending review is unwarranted because the harm BCAP alleges is not beyond remediation in the normal course. If BCAP prevails on the merits of its challenge, the Court could order the Commission not only to reinstate the national cap rule, but also to re-examine any transactions that may have been approved during this litigation to ensure that they remain in compliance with the reinstated rule.[4] "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs

---

[3] By the same token, BCAP has not met its burden of making "a clear showing that [it is] likely to establish each element of standing" under the Constitution. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotations omitted). *See Doe v. Pine Richland Sch. Dist.*, No. 24-3348, 2026 WL 1103489, at *2 (3d Cir. Apr. 23, 2026) ("[T]he Supreme Court has cautioned that a plaintiff cannot rely on a 'speculative chain of possibilities' to establish Article III standing.") (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013)).

[4] The agency has the authority to require divestiture to ensure compliance with its media ownership restrictions. *See Fox I*, 280 F.3d at 1053. It has exercised that authority in the past. *See, e.g.*, *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978) (*NCCB*).

heavily against a claim of irreparable harm." *Revel AC*, 802 F.3d at 571 (quotations omitted).

## II. BCAP IS NOT LIKELY TO PREVAIL ON THE MERITS.

BCAP also has failed to make the required "strong showing" of likelihood of success on the merits. *Revel AC*, 802 F.3d at 568.[5]

**A.** Section 202(c) of the 1996 Act, as amended by the 2004 Consolidated Appropriations Act, directed the FCC to "modify its rules ... by increasing the national audience reach limitation for television stations to 39 percent." 1996 Act § 202(c)(1)(B). Just as when Congress directed the FCC in 1996 to increase the national television ownership cap from 25% to 35%, it did not transform the cap into statutory law, but instead left the cap in the agency's rules. Therefore, the cap remained subject to the agency's continuing duty to ensure that its rules, over time, remain consonant with the public interest. *See Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) ("changes in factual and legal circumstances may impose upon

[5] The Third Circuit's grant of a stay in *Prometheus Radio Project v. FCC*, 2003 WL 22052896, *1 (Sept. 3, 2003) (per curiam), does not support a stay here. *See* Mot. 1-2, 22. The *Prometheus* Court granted a stay without making a finding of likelihood of success on the merits, but the Supreme Court has since made clear that a stay movant must demonstrate *both* a likelihood of success on the merits *and* irreparable harm. *See Nken*, 556 U.S. at 433-36. BCAP has made neither of these required showings.

the [FCC] an obligation to reconsider a settled policy or explain its failure to do so").

It is particularly odd to think that Congress would have encased the national cap in statutory concrete given the "fluid and dynamic" nature of the broadcast industry, whose "dominant characteristic [is] the rapid pace of its unfolding." *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943). In any event, as the D.C. Circuit observed after Congress directed the FCC to revise the national cap to 35%, had Congress wished to divest the agency of its general power to adjust its rules to changed circumstances, "it need only have enshrined the ... cap in the statute itself." *Fox II*, 293 F.3d at 540.[6] Or, as in the Radio Broadcasting Preservation Act of 2000, Congress could have stated that the FCC "may not ... eliminate or reduce" the rule modifications Congress had prescribed except "as expressly authorized by [a subsequently enacted] an Act of Congress." *See* Pub. L. No. 106-553, § 632(a)(2). *See also* 47 U.S.C. § 334 (prohibiting the FCC from revising its equal employment opportunity rules). Nor did Congress specify that the FCC should "maintain the national cap at 39% indefinitely or for any period of time." *Order*

---

[6] Indeed, "Congress considered and rejected language that would have codified the National Cap into statutory law." *Order* ¶ 88 n.304 & accompanying text. *See, e.g.*, S. 1046, 108th Cong., 1st Sess., § 3(a) (2003) (forbidding the FCC from allowing the grant, transfer, or assignment of any license that would result in the control of television stations having an "aggregate national audience reach exceeding 35 percent").

¶ 88. Instead of doing any of those things, Congress instructed the FCC to modify its rules. That left the national cap in the agency's rules, and "necessarily preserve[d] Commission discretion to adjust its rules as warranted by the public interest." *Id.* ¶ 98.

**B.1.** BCAP nonetheless argues (Mot. 13-14, 17-20, 21) that Congress "enshrined the [] cap in the statute itself," *Fox II*, 293 F.3d at 540, by mentioning the "39 percent" cap five separate times in the CAA. But each of those mentions refers to section 202(c)(1)(B) of the 1996 Act, as amended, which directs the FCC to set the cap by "modifying its rules," 1996 Act § 202(c)(1)(B), and thereby leaves it with the Commission to reexamine the cap as circumstances warrant. *Order* ¶ 98. *See* CAA §§ 629(1) (amending the 1996 Act "in section 202(c)(1)(B) by striking '35 percent' and inserting '39 percent'"), (2) (amending the 1996 Act by adding divestiture and forbearance provisions referencing "the 39 percent national audience reach limitation for television stations in paragraph (1)(B)" of section 202(c)), (3) (amending the 1996 Act by excluding "the 39 percent national audience reach limitation in subsection (c)(1)(B)" from section 202(h)).

BCAP also contends that because references to the cap "in paragraph (1)(B)" and "in subsection (c)(1)(B)" are to provisions of section 202 of the 1996 Act, the cap must be "statutory, not regulatory." Mot. 13-14. But "paragraph (1)(B)" of the statute, as amended, directs the FCC to "modify its rules" by increasing the cap to

39%—a regulatory action. The phrases "in paragraph (1)(B)" and "in subsection (c)(1)(B)" simply identify the cap the statute is referring to—"the 39 percent national audience reach limitation for television stations," CAA § 629(2), (3)—which Congress left in the Commission's rules.

**2**. BCAP also contends (Mot. 14-15, 19) that the divestiture and forbearance provisions the CAA added to section 202(c) of the 1996 Act support its claim that Congress intended the 39% cap to be "permanent[]." Mot. 13. *See* CAA § 629(2). But as the FCC explained, neither does so.

The divestiture provision provides an entity that exceeds "the 39 percent national audience reach limitation for television stations in paragraph (1)(B)" with "not more than two years ... to come into compliance with such limitation." 1996 Act, § 202(c)(3). As the Commission explained, this provision "simply sets a specific time period for coming into compliance with the rule as it exists," *Order* ¶ 97; it says nothing about the agency's ability to reexamine the regulatory limit as circumstances warrant.

The forbearance provision is even further afield. It provides that "[s]ection 10 of the Communications Act of 1934 (47 U.S.C. § 160) shall not apply to any person or entity that exceeds the 39 percent" limitation. 1996 Act, § 202(c)(4). At the outset, section 10 applies to "telecommunications carriers," not broadcasters. 47 U.S.C. § 160(a)(1). *See Order* ¶ 96 . In any event, forbearance is a power to

refuse to apply an existing rule or statutory provision; it is separate and "distinct" from the agency's power to "alter or eliminate" its rules. *Id.* Withdrawing the power of forbearing from a rule that is otherwise in force does not withdraw the power to reexamine the rule as a whole.

BCAP also contends that because 39 percent is a "precise numerical limit[]," it must be presumed to be a "statutory directive." Mot. 16. BCAP misses the point, which is that Congress placed that limit, however precise, in the Commission's rules, and thereby subjected the cap to the agency's power of reexamination in light of changing circumstances and the public interest.

Congress's decision in 2004 to take the "cap out of periodic review," Mot. 18, *see* CAA § 629(3), likewise did not divest the Commission of its power to reexamine the rule outside of that review process—as this Court has previously recognized. *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 397 (3d Cir. 2004) (Congress's removal of the national cap rule from periodic review did not "foreclose the Commission's consideration of its regulation ... in a rulemaking outside [that] context"); *Order* ¶ 94.

**3.** BCAP argues that "allowing FCC to replace a neutral cap with unalloyed discretion heightens the risk of viewpoint-influenced (and outright retaliatory) licensing decisions by this and every future FCC." Mot. 15. The FCC, however, does not have "unalloyed discretion" in its case-by-case review of broadcast

television transactions: its discretion is bounded by the agency's obligation to advance "the public interest, convenience, and necessity." 47 U.S.C. § 309(a); *Nat'l Broad. Co.*, 319 U.S. at 216. *See also infra* pg. 17. Here, the FCC explained that its shift from "rigid limits" to a "more nuanced approach" not only serves to "provide[] the Commission with much needed flexibility in a rapidly changing environment," *Order* ¶ 46, but is "consistent with the approach the Commission has taken with respect to other ownership restrictions." *Id.* ¶¶ 44-45. Moreover, in addressing arguments that a case-by-case approach would be unduly "subjective," the FCC took care to set forth "initial guidance regarding the kind of information that would inform [its] review of any non-local effects of a television merger," including "allegations of potential harm," as well as its expectation that over time case-by-case analysis "will help to refine and further develop these guideposts and criteria." *Id.* ¶ 46. *See id.* ¶¶ 47-83

Finally, BCAP contends (Mot. 14, 15, 19) that, under the agency's reading, the FCC could have modified or repealed the rule immediately after the CAA was enacted in 2004. But the Administrative Procedure Act requires the Commission's actions to be "reasonable and reasonably explained," *see Prometheus*, 592 U.S. at 423, and it is hard to imagine the FCC could, in the immediate aftermath of Congress's decision, have satisfied its burden of explaining the changed circumstances that might have justified such a step. *Order* ¶ 95. In any event, that

hypothetical is not remotely presented by this case. Over 20 years have elapsed since the FCC implemented the CAA's direction, and, as explained at length in the *Order*, *e.g.*, *id.* ¶¶ 28, 35, 41, 51, 52, dramatic changes have taken place in the media marketplace that have rendered the national cap an obstacle to the FCC's goal of fostering localism. BCAP's reading of the statute would freeze the cap in place despite the dynamic nature of the broadcast industry and in the face of the FCC's conclusion that the cap no longer serves its intended goals. *Id.* ¶ 42.

## III. THE REMAINING FACTORS WEIGH AGAINST A STAY.

The Court need not address the remaining factors, as BCAP has not made the requisite showings on either of the first two. *See S.S. Body Armor I.*, *Inc. v. Carter, Ledyard & Milburn*, 927 F.3d 763, 772 (3d Cir. 2019). In any event, the remaining factors weigh against a stay.

"The third and fourth factors are whether a stay would substantially injure other interested parties and the impact of a stay on the public interest." *Aristy-Rosa*, 188 F.4th at 246. "These two factors merge because the government is the opposing party." *Id.*

Here, grant of a stay would harm the interests of parties seeking to engage in transactions that the national television ownership rule would not permit. *See Order* ¶ 53; NAB Admin. Stay Opp. 20. A stay also would disserve the public interest. The FCC concluded that "a blanket rule that automatically prohibits

television mergers exceeding an inflexible numerical bar absent a waiver no longer makes sense in today's complex media marketplace," and that "removal of the cap will serve the public interest because it will allow the Commission to analyze all proposed transactions on the basis of their individual merits." *Order* ¶¶ 21-22. BCAP's contention (Mot. 24 ) that "the harms to [the] FCC and the public would be negligible" if a stay were granted ignores the FCC's comprehensive and considered findings that repeal of the national television ownership rule will benefit, not undermine, the public interest. *Order* ¶ 42.

## CONCLUSION

The motion for stay should be denied.

Respectfully submitted,

CHRISTOPHER S. SANTINI
ACTING GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

/s/ Jacob M. Lewis

WILLIAM J. SCHER
COUNSEL

FEDERAL COMMUNICATIONS
COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

November 23, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   ☒ this document contains 4,299 words, *or*

   ☐ this document uses a monospaced typeface and contains _ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word in Office 365 in 14-point Times New Roman, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using ____________________ with ______________.

*/s/ Jacob M. Lewis*

Jacob M. Lewis
Associate General Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740

**CERTIFICATE OF FILING AND SERVICE**

I, Jacob M. Lewis, hereby certify that on November 23, 2026, I filed the foregoing Opposition to Motion for Stay Pending Review with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Jacob M. Lewis*

Jacob M. Lewis
Associate General Counsel

Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740